| STATE OF NORTH CAROLINA | File No. 06-CVS- |
|---|---|
| MECKLENBURG County | In The General Court of Justice<br>☐ District  ☒ Superior Court Division |

| Name of Plaintiff | |
|---|---|
| Blue Cross and Blue Shield of North Carolina | **CIVIL SUMMONS** |
| Address | |
| City, State, Zip | ☐ Alias and Pluries Summons |
| **VERSUS** | G.S. 1A-1, Rules 3, 4 |
| Name of Defendant(s)<br>Jemsek Clinic, P.A. and<br>Joseph G. Jemsek, M.D., an individual | Date Original Summons Issued |
| | Date(s) Subsequent Summon(es) Issued |

**To Each of The Defendant(s) Named Below:**

| Name And Address of Defendant 1 | Name And Address of Defendant 2 |
|---|---|
| Jemsek Clinic, P.A.<br>Joseph G. Jemsek, M.D., Registered Agent<br>16630 North Cross Drive<br>Suite 102<br>Huntersville, NC 28078 | Joseph G. Jemsek, M.D.<br>16630 North Cross Drive<br>Suite 102<br>Huntersville, NC 28078 |

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address of Plaintiff's Attorney (If None, Address of Plaintiff) | Date Issued | Time | ☐ AM ☐ PM |
|---|---|---|---|
| L.D. Simmons, Stephen D. Allred, Mark W. Kinghorn<br>Helms Mulliss & Wicker, PLLC<br>PO Box 31247<br>Charlotte, NC 28231 | Signature | | |
| | ☐ Deputy CSC | ☐ Assistant CSC | ☐ Clerk of Superior Court |

| ☐ ENDORSEMENT | Date of Endorsement | Time | ☐ AM ☐ PM |
|---|---|---|---|
| This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | Signature | | |
| | ☐ Deputy CSC | ☐ Assistant CSC | ☐ Clerk of Superior Court |

**NOTE TO PARTIES:** Many Counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.

AOC-CV-100, Rev. 10/01
© 2001 Administrative Office of the Courts                    (Over)

STATE OF NORTH CAROLINA      IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
COUNTY OF MECKLENBURG    2006 SEP 13 PM 4: 17   06-CVS- 18432

MECKLENBURG COUNTY, C.S.C.

BLUE CROSS AND BLUE SHIELD OF
NORTH CAROLINA

    Plaintiff,

v.                                                   **COMPLAINT**
(Jury Trial Demanded)

JEMSEK CLINIC, P.A., and JOSEPH G.
JEMSEK, M.D, an individual,

    Defendants.

Plaintiff Blue Cross and Blue Shield of North Carolina complains against Defendants Jemsek Clinic, P.A. and Joseph G. Jemsek, M.D. as follows:

## NATURE OF THE ACTION

1. This is an action by Blue Cross and Blue Shield of North Carolina ("Blue Cross") against Jemsek Clinic, P.A. (the "Jemsek Clinic") and Joseph G. Jemsek, M.D. ("Dr. Jemsek") (collectively "Jemsek" or the "Defendants") to recover damages arising from the Defendants' breach of contract, fraud, unfair trade practices and other wrongful acts identified herein.

2. Blue Cross and the Jemsek Clinic entered into contracts with respect to medical services Dr. Jemsek and the Jemsek Clinic would perform, from time to time, for patients of his practice who were members of individual or group healthcare plans issued by Blue Cross, or who were members under group plans for which Blue Cross provided certain administrative services (all such members are hereafter referred to as "Blue Cross Members" or "Members").

3. The contracts between Blue Cross and the Jemsek Clinic pursuant to which Jemsek provided medical care to Blue Cross Members and submitted claims for direct payment

for Blue Cross Members include: (1) a Master Agreement between Blue Cross and the Jemsek Clinic with an Effective Date of June 8, 2000 (the "Master Agreement"), a copy of which is attached to this Complaint as Exhibit A; (2) a Costwise Participating Provider Payment Plan between Blue Cross and the Jemsek Clinic with an Effective Date of May 26, 2000 (the "Costwise Agreement"), a copy of which is attached to this Complaint as Exhibit B; and a Preferred Care Select Professional Provider Agreement between Blue Cross and the Jemsek Clinic with an Effective Date of June 9, 2000 (the "Preferred Care Select Agreement"), a copy of which is attached to this Complaint as Exhibit C (together, the "Provider Agreements"). The Provider Agreements are incorporated into this Complaint by reference.

4. At all times relevant to this Complaint, Jemsek has provided medical services to Blue Cross Members and submitted claims for reimbursement to Blue Cross for services provided, and Blue Cross has paid Jemsek for those services. Blue Cross reasonably relied on the accuracy of the claims submitted by Jemsek in determining whether to pay Jemsek for the services provided to Blue Cross Members.

5. Jemsek was obligated under the terms of the Provider Agreements to submit claims for reimbursement only for services that were "medically necessary," and Blue Cross was obligated to pay only for services that were "medically necessary" as that term is defined in the Provider Agreements, the agreements between Blue Cross and its Members (the "Member Agreements"), Blue Cross's relevant medical policies and North Carolina law.

6. Blue Cross has determined that Jemsek regularly submitted claims for reimbursement to Blue Cross for medical services provided to Blue Cross Members purportedly for treatment of Lyme disease that were not "medically necessary" as that term is defined in the Provider Agreements, the Member Agreements, Blue Cross's relevant medical policies and

North Carolina law. Specifically, Jemsek billed for the following: (1) patient treatments for Lyme disease where the medical records did not support a diagnosis of Lyme disease; (2) long-term intravenous antibiotic treatment to Members for Lyme disease that was not within the standard of care; and (3) long-term intravenous antibiotic treatment for Lyme disease that was experimental and investigational in nature.

7. Over the course of several years, Jemsek submitted and Blue Cross paid in excess of $10,000 in claims for medical services represented by Jemsek to be related to Lyme disease that were not properly payable under the terms of the Provider Agreements or the Member Agreements. Under the terms of the Provider Agreements, Jemsek is therefore obligated to repay Blue Cross the amounts Jemsek has received from Blue Cross that were not payable by Blue Cross according to the Member Agreements.

8. In addition, as shown below, Jemsek has breached the Provider Agreements and engaged in fraud, unfair and deceptive trade practices and other wrongful acts with respect to his submission of claims to Blue Cross for medical services provided to Blue Cross Members. Blue Cross has suffered substantial damages as a result of Jemsek's breach of contract, fraud, unfair trade practices and other wrongful acts alleged herein.

## THE PARTIES

9. Plaintiff Blue Cross is a non-profit hospital and medical service corporation organized and existing under North Carolina law with its principal place of business in Orange County, North Carolina.

10. Dr. Jemsek is a resident of Mecklenburg County, North Carolina, and is licensed to practice medicine in the State of North Carolina, although the North Carolina Medical Board

3

suspended his license on August 21, 2006, subject to certain terms and conditions which are discussed below.

11. Defendant Jemsek Clinic is a North Carolina professional corporation with its principal place of business in Mecklenburg County, North Carolina.

12. Dr. Jemsek is the founder and sole director of the Jemsek Clinic.

13. Upon information and belief, at all times relevant to this Complaint, Dr. Jemsek owned, operated and was an officer of the Jemsek Clinic.

14. At all times relevant to this Complaint, Dr. Jemsek was an employee and agent of the Jemsek Clinic, and his actions, as alleged herein, were within the express or implied authority of the Jemsek Clinic.

15. Upon information and belief, at all times relevant to this Complaint, Dr. Jemsek acted for and on behalf of the Jemsek Clinic as its owner, sole director and/or an officer and at all relevant times he acted within the scope of his authority and capacity as such.

16. Upon information and belief, Dr. Jemsek is liable for the tortious acts by the Jemsek Clinic alleged herein as an owner, sole director and and/or officer of the Jemsek Clinic who participated in, directed and benefited from those wrongful acts.

17. Dr. Jemsek and the Jemsek Clinic are jointly and severally liable for all claims for relief and damages set forth in this Complaint.

18. Upon information and belief, all tortious and wrongful conduct alleged against Defendants and all breaches of contractual obligations alleged against Defendants in this Complaint occurred during the course of the Jemsek Clinic's business and/or during the course of and within the scope of Dr. Jemsek's capacity as the owner, sole director and/or an officer of the Jemsek Clinic.

19. Upon information and belief, at all times relevant to this Complaint,

    (a) the Jemsek Clinic was operated as a mere instrumentality or alter ego for Dr. Jemsek;

    (b) Dr. Jemsek had complete control and domination over the Jemsek Clinic, and he directed and/or participated personally in all of the wrongful conduct alleged in this Complaint so that the Jemsek Clinic as a corporate entity had no separate mind, will or existence of its own with respect to all wrongful acts, omissions, concealments, fraud and breaches of contract alleged in this Complaint;

    (c) Dr. Jemsek used such control and domination to commit the wrongful acts alleged herein, including fraud, and to violate the terms of Jemsek's contracts with Blue Cross in contravention of Blue Cross's legal rights; and

    (d) the control and domination by Dr. Jemsek proximately caused Blue Cross's damages with respect to all claims for relief set forth in this Complaint.

## JURISDICTION AND VENUE

20. This Court has jurisdiction over the Defendants pursuant to N.C. GEN. STAT. § 1-75.4.

21. Venue is proper in this Court pursuant to N.C. GEN. STAT. §§ 1-79 & 1-82.

## FACTUAL BACKGROUND

**A.**    **Jemsek's Contracts with Blue Cross**

22. Dr. Jemsek has been practicing medicine in Mecklenburg County, North Carolina since 1979. In 2000, Jemsek opened the Jemsek Clinic in Huntersville, North Carolina.

23. The Jemsek Clinic specializes in general infectious disease diagnosis and treatment, with a primary focus on two key areas: HIV/AIDS and Lyme disease.

24. In 2000, after establishing the Jemsek Clinic in Huntersville, North Carolina, Jemsek entered into the Provider Agreements with Blue Cross.

25. Under the Provider Agreements, Blue Cross is obligated to pay Jemsek only for those "Medically Necessary Covered Services" that Jemsek provides to Blue Cross Members.

26. "Medically Necessary" is defined by the Master Agreement as follows:

> *"Medically Necessary" or "Medical Necessity" means those Covered Services or supplies that are:*
>
> - *Provided for the diagnosis, treatment, cure, or relief of a health condition, illness, injury, or disease; and not for experimental, investigational, or cosmetic purposes;*
> - *Necessary for and appropriate to the diagnosis, treatment, cure, or relief of a health condition, illness, injury, disease, or its symptoms;*
> - *Within generally accepted standards of medical care in the community;*
> - *Not solely for the convenience of the insured, the insured's family, or the Practitioner.*

27. "Covered Services" is defined by the Master Agreement as follows:

> *Covered Services means the benefits and services, goods, equipment and supplies specified in the Benefit Plan to which Members are entitled in accordance with the terms and conditions thereof. We may compare the cost-effectiveness of alternative services or supplies when determining which of the services or supplies will be Covered Services.*

28. The Provider Agreements establish that Blue Cross has no obligation to make payment to Jemsek for any submitted claims relating to medical services or supplies that are not covered by the agreements that Blue Cross has with its Members, and/or that are not medically necessary.

**B.   Blue Cross's Contracts with its Members.**

29. Blue Cross provides healthcare coverage to its members under several different Member Agreements. Under each of the Member Agreements, Blue Cross agrees to provide

healthcare coverage for "covered services" that are "medically necessary," as defined by the contracts.

30.     The Member Agreements expressly state that Blue Cross will not provide coverage for medical services or supplies that are (1) not medically necessary, and/or (2) investigational or experimental in nature.

31.     The term "medically necessary" is defined in a similar way by each of the Member Agreements. A typical definition of "medically necessary," which is used by several of the Member Agreements, is as follows:

> *MEDICALLY NECESSARY (or MEDICAL NECESSITY) – those covered services or supplies that are:*
>
> *a)     Provided for the diagnosis, treatment, cure, or relief of a health condition, illness, injury, or disease; and not for experimental, investigational, or cosmetic purposes, except as specifically covered by your health benefit plan;*
>
> *b)     Necessary for and appropriate to the diagnosis, treatment, cure, or relief of a health condition, illness, injury, disease, or its symptoms;*
>
> *c)     Within generally accepted standards of medical care in the community;*
>
> *d)     Not solely for the convenience of the insured, the insured's family, or the provider.*
>
> *For medically necessary services, BCBSNC may compare the cost-effectiveness of alternative services, settings or supplies when determining which of the services or supplies will be covered and in what setting medically necessary services are eligible for coverage.*

32.     The definitions of "medically necessary" in the Member Agreements and in the Provider Agreements are consistent with one another and comport with the statutory requirements of N.C. GEN. STAT. § 58-3-200.

7

33.     "Investigational" and "experimental" are also defined terms in each of the Member Agreements. A typical definition of these terms in some of the Member Agreements is:

> *INVESTIGATIONAL (EXPERIMENTAL) – the use of a service or supply including, but not limited to, treatment, procedure, facility, equipment, drug or device that BCBSNC does not recognize as standard medical care of the condition, disease, illness, or injury being treated. The following criteria are the basis for BCBSNC's determination that a service or supply is investigational:*
>
> *a)      Services or supplies requiring federal or other governmental body approval, such as drugs or devices that do not have unrestricted market approval from the Food and Drug Administration (FDA) or final approval from any other governmental regulatory body for use in treatment of a specified condition. Any approval that is granted as an interim step in the regulatory process is not a substitute for final or unrestricted market approval.*
>
> *b)      There is insufficient or inconclusive scientific evidence in peer-reviewed medical literature to permit BCBSNC's evaluation of the therapeutic value of the service or supply.*
>
> *c)      There is inconclusive evidence that the service or supply has a beneficial effect on health outcomes.*
>
> *d)      The service or supply under consideration is not as beneficial as any established alternatives.*
>
> *e)      There is insufficient information or inconclusive scientific evidence that, when utilized in a non-investigational setting, the service or supply has a beneficial effect on health outcomes and is as beneficial as any established alternatives.*
>
> *If a service or supply meets one or more of the criteria, it is deemed investigational, except as specifically covered by your health benefit plan. Determinations are made solely by BCBSNC after independent review of scientific data. Opinions of experts in a particular field and/or opinions and assessments of nationally recognized review organizations may also be considered by BCBSNC but are not determinative or conclusive.*

34.     The definitions of "investigational" and "experimental" in the Member Agreements and in the Provider Agreements are consistent with one another.

35. The Provider Agreements provide that in the event Blue Cross erroneously makes payment to Jemsek for a claim that is not covered by a Member Agreement, Jemsek is required to return such payments to Blue Cross, or Blue Cross is authorized to recover such amounts by offset against current or future amounts payable to Jemsek. The relevant provision in the Master Agreement provides as follows:

> *Excess Payments.* *You agree that in the event of any overpayment, duplicate payment, or other payment of an amount in excess of any benefits payable according to the Member's Benefit Plan, you will promptly remit such amounts to us, or in addition to our other remedies, we may recover such amounts by offset against current or future amounts payable to you.*

The other Provider Agreements contain similar repayment provisions.

### C. Jemsek's Diagnosis and Treatment of Lyme Disease

36. Dr. Jemsek holds himself out to the general public as an expert in infectious diseases, with a specific expertise in the treatment of Lyme disease.

37. Lyme disease is a bacterial infection transmitted to humans by tick bites. While Lyme disease is the most common tick-transmitted disease in the United States, most diagnosed incidents occur in the Northeast. Lyme disease is relatively uncommon in North Carolina; according to the Center for Disease Control (the "CDC"), only 156 cases of Lyme disease were reported in North Carolina in 2003, and only 122 cases of Lyme disease were reported in North Carolina in 2004.

38. The standard method for diagnosing and treating Lyme disease generally accepted by the medical community has been determined by the CDC, the National Institutes of Health (the "NIH") and the Infectious Diseases Society of America (the "IDSA"). The CDC and the IDSA have published guidelines setting forth the accepted standard for the diagnosis and

treatment of Lyme disease in the medical community, and studies conducted by the NIH are consistent with those guidelines.

39.    During the time period relevant to this Complaint, Jemsek has diagnosed and treated hundreds of Blue Cross Members purportedly for Lyme disease.

40.    During that same time period, Jemsek has submitted hundreds of claims to Blue Cross related to his treatment of Blue Cross Members that Jemsek had diagnosed with Lyme disease.

41.    Jemsek's method of diagnosing and treating Lyme disease does not comply with the standard of care ordinarily employed and generally accepted by the medical community and does not follow the guidelines published by the CDC and the IDSA.

42.    Dr. Jemsek often diagnoses Lyme disease in his patients even where the generally accepted diagnostic tests demonstrate that the patients do not carry the antibodies that are generally found in persons carrying Lyme bacteria.

43.    Dr. Jemsek treats many patients diagnosed with Lyme disease with an extended course of intravenous antibiotics that lasts much longer than the treatments generally accepted by the medical community and set forth in the guidelines published by the CDC and the IDSA.

44.    At all relevant times to this Complaint, Dr. Jemsek has at all relevant times owed professional and fiduciary obligations to his patients, including patients of the Jemsek Clinic, many of whom are Blue Cross Members. Dr. Jemsek's obligations to his patients, including Blue Cross Members, include compliance with the ethical obligations of the medical profession, including compliance with acceptable and prevailing medical practice. The Jemsek Clinic likewise was obligated, at all relevant times, to comply with the ethical obligations of the medical profession and with acceptable and prevailing medical practice.

45. In December 2005, the North Carolina Medical Board (the "Medical Board") launched an investigation of Dr. Jemsek after receiving information that Dr. Jemsek was diagnosing and treating patients for Lyme disease in a manner that did not comport with generally accepted medical practices. After the Medical Board conducted a two-day hearing concerning Dr. Jemsek's treatment of several patients for Lyme disease, the Medical Board suspended Dr. Jemsek's medical license for one year, but stayed the suspension as long as he agreed to comply with certain stipulations.

46. On August 21, 2006, the Medical Board issued an order concerning Dr. Jemsek, in which it found and ruled, among other things, that Dr. Jemsek's diagnosis and treatment methods regarding Lyme disease constituted "unprofessional conduct, including, but not limited to, departure from, or the failure to conform to, the standards of acceptable and prevailing medical practice, or the ethics of the medical profession, irrespective of whether a patient is injured thereby." The Medical Board's order also found that by not properly explaining his methods of diagnosing and treating Lyme disease, Dr. Jemsek "breached his patients' informed consent, and therefore engaged in unprofessional conduct, including, but not limited to, departure from, or the failure to conform to, the standards of acceptable and prevailing medical practice, or the ethics of the medical profession, irrespective of whether a patient is injured thereby."

47. The Medical Board's order suspends Dr. Jemsek's medical license for twelve months from August 21, 2006, but stays the suspension subject to the following terms and conditions:

(a) Dr. Jemsek must have informed consent from his patients approved by the President of the North Carolina Medical Board;

  (b) if a patient's diagnosis is not supported by current CDC criteria, then the patient must have a consultation or second opinion by a North Carolina licensed infectious disease physician approved by the President of the North Carolina Medical Board before treatment;

  (c) any treatment, oral or intravenous, for greater than two months total time must be included in a formal research protocol with Institutional Review Board supervision approved by the President of the North Carolina Medical Board; and

  (d) any complications of treatment must be addressed immediately.

D.  **Jemsek's Improper and Fraudulent Claims Related to Services Provided to Blue Cross Members for Lyme Disease**

48. At various times, Jemsek submitted to Blue Cross claims for reimbursement for medical services provided to Blue Cross Members, including services purportedly provided for the treatment of Lyme disease. In submitting these claims for reimbursement, Jemsek was required to comply with the terms of the Provider Agreements. Jemsek likewise was obligated, at all relevant times, to comply with the ethical obligations of the medical profession and with acceptable and prevailing medical practice.

49. For example, Jemsek was obligated to submit claims for reimbursement *only* for services covered by the Member Agreements, for services that were medically necessary, for services that were not experimental or investigational in nature, and for services that were within the accepted medical standards in the community. And Jemsek was obligated to submit claims for reimbursement that accurately reflected the services that were actually performed, on the date of service listed on the claim, for the applicable Blue Cross Member. Jemsek was also obligated not to submit claims for reimbursement to Blue Cross where the claims reflected charges for

12

services that had not been performed for the Blue Cross Member identified on the claim for reimbursement.

50.     After he opened the Jemsek Clinic, Dr. Jemsek began providing certain treatments and services purportedly for Lyme disease to his patients, including Blue Cross Members, and he began submitting claims to Blue Cross for reimbursement for services and supplies related to treatments for Lyme disease.

51.     Jemsek submitted claims to Blue Cross for services related to the diagnosis and treatment of Lyme disease that were not medically necessary as defined by the Member Agreements, the Provider Agreements, Blue Cross's relevant medical policies, standards of acceptable and prevailing medical practice and North Carolina law.

52.     Specifically, Jemsek has submitted claims to Blue Cross for payment when (1) the patients' medical records did not support a diagnosis of Lyme disease; (2) the long-term intravenous antibiotic treatment provided by Jemsek was not within the standard of care; (3) the amounts of antibiotics prescribed by Jemsek were excessive; and (4) the long-term intravenous antibiotic treatment for Lyme disease was experimental or investigational.

53.     Since the time that Dr. Jemsek began treating patients for Lyme disease at the Jemsek Clinic, Jemsek has submitted hundreds of claims to Blue Cross seeking and obtaining payment for medical services and supplies that were not medically necessary, inconsistent with generally accepted medical practices, and/or experimental or investigational.

54.     The claims that Jemsek submitted to Blue Cross for reimbursement under the terms of the Provider Agreements identified, among other things, the Blue Cross Member's name, the diagnoses, the date(s) of the service provided by Jemsek, and the procedures, services or supplies furnished to the patient for which Jemsek was seeking reimbursement.

55. Each time Jemsek submitted a claim for reimbursement to Blue Cross, Jemsek represented to Blue Cross that the procedures, services or supplies provided to the Blue Cross Member were medically necessary.

56. For example, the "Provider Certification" on Form CMS-1500, on which Jemsek submitted claims for reimbursement, states as follows: "I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction."

57. Jemsek's submission of claims for reimbursement by Blue Cross for services that were not medically necessary was done knowingly and in violation of Jemsek's obligations under the Provider Agreements and the professional and ethical obligations to Jemsek's patients. Jemsek's conduct as described herein violated Jemsek's professional and ethical obligations, breached the terms of the Provider Agreements, and was unfair, deceptive and unethical.

58. Jemsek has knowingly charged and collected payments from Blue Cross to which Jemsek was not entitled, and Jemsek has failed to return any payments to Blue Cross.

59. Each of the Provider Agreements imposed a duty of good faith and fair dealing on Jemsek. The wrongful acts by Jemsek described above amount to a breach of Jemsek's duty of good faith and fair dealing to Blue Cross.

60. In processing and paying claims submitted by Jemsek to Blue Cross, Blue Cross reasonably relied on the claims submitted by Jemsek as representing services, supplies or procedures that were medically necessary and that were reimbursable under the terms of the Provider Agreements. Blue Cross reasonably relied on the claims submitted by Jemsek as being for services that were generally accepted by the medical community and that were not experimental or investigational.

61. Blue Cross reasonably relied on the claims submitted by Jemsek as including a valid diagnosis and fairly and accurately representing the services actually performed by Jemsek for Blue Cross Members.

62. Blue Cross reasonably relied on representations by Jemsek, including the certification statements, that the procedures, services and supplies provided by Jemsek to Blue Cross Members were medically necessary as that term is defined by the Member Agreements, the Provider Agreements, Blue Cross's relevant medical policies and North Carolina law.

63. Jemsek's fraudulent conduct constitutes an unfair or deceptive practice, in or affecting commerce, which proximately caused actual damage to Blue Cross.

E. **Additional Improper and Fraudulent Billing Practices by Jemsek**

64. In addition to billing for services that were not medically necessary, Jemsek engaged in other improper and fraudulent billing practices.

65. Specifically, Jemsek engaged in a type of billing fraud known as "upcoding." Upcoding is a practice by which a provider fraudulently inflates bills submitted for payment by using billing codes for services that are more sophisticated, time-consuming or expensive than those actually performed.

66. Jemsek's method of upcoding usually involved the submission of claims for high-level office visits where the corresponding medical records demonstrate that a high-level office visit was not performed.

67. On multiple occasions, Jemsek submitted claims to Blue Cross seeking and receiving payment for office visits, including high-level office visits, where the medical records contain no evidence that the patient was treated or seen by a physician or nurse practitioner. The submission of such claims is an example of fraudulent upcoding.