68. Jemsek also upcoded claims by submitting claims and receiving payment for high-level office visits where the accompanying medical records provided no support for elevating the office visits to the level reflected in the claim. The submission of such claims is an example of fraudulent upcoding.

69. In reliance on the claims fraudulently submitted by Jemsek for reimbursement, Blue Cross made a substantial number of payments to Jemsek for services that were not performed or that were not covered under the Member Agreements and that were not payable under the Provider Agreements.

70. Jemsek's fraudulent scheme to upcode claims submitted to Blue Cross was a false representation of a material fact, reasonably calculated to deceive Blue Cross and made with the intent to deceive Blue Cross, that did in fact deceive Blue Cross and resulted in damage to Blue Cross.

71. Blue Cross also discovered that Jemsek engaged in additional fraudulent and misleading billing practices, and that on numerous occasions, the documentation provided by Jemsek to Blue Cross does not support the claims submitted for reimbursement.

72. Jemsek's submission of upcoded claims for reimbursement by Blue Cross was done knowingly and in violation of Jemsek's obligations under Jemsek's agreements with Blue Cross. Jemsek's improper billing practices, including submitting upcoded claims, violated Jemsek's professional ethical obligations, breached the terms of the Provider Agreements, and was unfair, deceptive and unethical.

73. Jemsek has knowingly charged and collected payments from Blue Cross as a result of Jemsek's improper billing practices, and Jemsek has not returned any such payments to Blue Cross.

74. In processing and paying claims submitted by Jemsek to Blue Cross, Blue Cross reasonably relied on the claims submitted by Jemsek as accurate and true. Blue Cross reasonably relied on the charges being submitted by Jemsek as fairly and accurately representing the services actually performed by Jemsek for Blue Cross Members.

75. Jemsek's fraudulent conduct, including but not limited to the upcoding of claims submitted to Blue Cross, constitutes an unfair or deceptive practice, in or affecting commerce, which proximately caused actual damage to Blue Cross.

### F. Blue Cross is Entitled to Recover Payments Made to Jemsek

76. Blue Cross paid Jemsek for hundreds of claims relating to Jemsek's treatment of Blue Cross Members purportedly for Lyme disease, which treatment was not medically necessary.

77. Blue Cross has determined that it paid significant sums of money to Jemsek in excess of the benefits payable according to the Provider Agreements and Member Agreements. Under the terms of the Provider Agreements, Jemsek is contractually obligated to return these amounts to Blue Cross.

78. More specifically, Jemsek is obligated to reimburse Blue Cross for payments that Jemsek received from Blue Cross for services that were not medically necessary, and any other overpayments, erroneous payments or payments in excess of any benefits payable under the Provider Agreements and Member Agreements that Blue Cross made to Jemsek.

79. Blue Cross has made demand on Jemsek to reimburse Blue Cross for the claims submitted by Jemsek and paid by Blue Cross for services that were not medically necessary.

80. Defendants know that they have received payments from Blue Cross to which they are not entitled.

81. Despite Blue Cross's demand, Jemsek has failed to make any payment to Blue Cross for any of the payments received by Jemsek from Blue Cross to which Jemsek was not entitled. Blue Cross is entitled to recover the payments that have been made to Jemsek by Blue Cross to which Jemsek was not entitled, including all payments for services that were not medically necessary and any other overpayments, erroneous payments or payments in excess of benefits payable under the Member Agreements.

82. All conditions precedent to Blue Cross's claims against Jemsek, as alleged herein, have occurred or been satisfied.

## FIRST CLAIM FOR RELIEF
(Breach of Contract)

83. Blue Cross realleges and incorporates the preceding allegations in the Complaint.

84. Defendant Jemsek Clinic entered into various Provider Agreements with Blue Cross, including the June 8, 2000 Master Agreement, the May 26, 2000 CostWise Agreement and the June 9, 2001 Preferred Care Select Agreement.

85. The Provider Agreements are attached to this Complaint as Exhibits A, B and C and are enforceable agreements with respect to the time periods referenced in this Complaint. The Provider Agreements are incorporated into this Complaint by reference.

86. For the reasons stated above, Defendant Jemsek Clinic has breached the Provider Agreements with Blue Cross, including the Master Agreement, the CostWise Agreement and the Preferred Care Select Agreement.

87. At the time that Blue Cross processed claims for reimbursement from Jemsek and made corresponding payments to Jemsek, Blue Cross reasonably believed that the claims were submitted in accordance with Jemsek's contractual, legal and ethical obligations under the

Provider Agreements and applicable law, when in fact the claims were not submitted in accordance with Jemsek's contractual, legal and ethical obligations.

88.  As a direct and proximate result of Jemsek's breaches of the Provider Agreements, Blue Cross has incurred damages, including but not limited to financial loss, in an amount in excess of $10,000.

89.  Blue Cross is entitled to recover compensatory damages from Defendants jointly and severally, together with interest.

90.  Defendant Dr. Jemsek participated in all of the breaches of the Provider Agreements, directed the course of conduct constituting the breaches, and, on information and belief, has controlled the monies received by Defendants from Blue Cross in breach of the Provider Agreements.

91.  Upon information and belief, Dr. Jemsek operated the Jemsek Clinic as an instrumentality or alter ego for himself, and Dr. Jemsek so dominated the Jemsek Clinic that as a corporate entity, the Jemsek Clinic had no mind or existence of its own. Dr. Jemsek's control of the Jemsek Clinic was used to commit fraud against Blue Cross and breach Jemsek's contractual obligations to Blue Cross, and his control and domination of the Jemsek Clinic proximately caused Blue Cross's damages.

### SECOND CLAIM FOR RELIEF
(Fraudulent Misrepresentation)

92.  Blue Cross realleges and incorporates the preceding allegations in the Complaint.

93.  Defendants made various misrepresentations of material facts and failed to disclose material facts to Blue Cross concerning claims Jemsek submitted for payment by Blue Cross and the services that Jemsek provided to Blue Cross Members for which Jemsek sought payment under the Provider Agreements.

94. The misrepresentations of material fact made by Defendants to Blue Cross include but are not limited to the following:

 a. Defendants submitted claims to Blue Cross for payment for procedures, services and supplies that were not medically necessary, as defined by the Provider Agreements, the Member Agreements, Blue Cross's relevant medical policies and North Carolina law.

 b. Defendants represented and certified to Blue Cross that claims submitted to Blue Cross for payment were for procedures, services or supplies that were medically necessary, when the procedures, services and supplies provided by Jemsek to Blue Cross Members were not medically necessary, as defined by the Provider Agreements, the Member Agreements, Blue Cross's relevant medical policies and North Carolina law.

 c. Defendants submitted claims to Blue Cross for payment that had been improperly upcoded.

 d. Defendants falsely represented and certified to Blue Cross that claims submitted to Blue Cross for payment accurately reflected services furnished to Blue Cross Members, when in fact many claims were upcoded to reflect a higher level office visit than was actually furnished to Blue Cross Members.

 e. Defendants submitted claims to Blue Cross for payment that were not supported by the records maintained by Jemsek regarding the treatment provided to the patient.

 f. Defendants submitted these claims knowing that they were not properly submitted under the rules and regulations contained in the Provider Agreements and the materials incorporated therein and knowing that the claims falsely represented that the services provided were medically necessary.

95. Defendants engaged in the above-alleged misrepresentations willfully and with the intent to defraud Blue Cross, or with willful and reckless disregard of Blue Cross's rights and interests.

96. Blue Cross reasonably relied upon Defendants' fraudulent misrepresentations.

97. Defendants' fraudulent misrepresentations did, in fact, deceive Blue Cross.

98. As a direct and proximate result of Defendants' fraudulent misrepresentations, Blue Cross sustained damages in excess of $10,000.

99. Defendants' fraudulent misrepresentations were outrageous or aggravated such that punitive damages are appropriate.

100. Blue Cross is entitled to recover compensatory and punitive damages from Defendants jointly and severally, in excess of $10,000, for their fraudulent misrepresentations.

### THIRD CLAIM FOR RELIEF
(Negligent Misrepresentation)

101. Blue Cross realleges and incorporates the preceding allegations in the Complaint.

102. Defendants made various misrepresentations of material facts and failed to disclose material facts to Blue Cross, as alleged above.

103. In making such misrepresentations, Defendants failed to exercise reasonable care and competence in obtaining and communicating the information to Blue Cross.

104. Defendants made their negligent misrepresentations in willful and wanton disregard of Blue Cross's rights and interests.

105. Blue Cross reasonably relied upon such negligent misrepresentations.

106. As a direct and proximate result of Defendants' negligent misrepresentations, Blue Cross sustained damages in excess of $10,000.

attachment 2    Page 7 of 15

107. Defendants' negligent misrepresentations were outrageous or aggravated such that punitive damages are appropriate.

108. Blue Cross is entitled to recover compensatory and punitive damages from Defendants jointly and severally, in excess of $10,000, for their negligent misrepresentations.

### FOURTH CLAIM FOR RELIEF
(Unfair or Deceptive Trade Practices, N.C. GEN. STAT. § 75-1.1, *et seq.*)

109. Blue Cross realleges and incorporates the preceding allegations in this Complaint.

110. Defendants' actions and conduct, as alleged above, constitute unfair or deceptive acts, practices and methods of competition, in or affecting commerce, in violation of N.C. GEN. STAT. § 75-1.1. The conduct of Defendants was unfair, deceptive, unethical and in violation of ethical standards of dealings between persons engaged in business and the public policy of the State of North Carolina.

111. Defendants fraudulently sought payment from Blue Cross for hundreds of claims for services that were not medically necessary, that had been improperly upcoded, and that were not supported by the medical records that correspond with the claims.

112. Blue Cross made substantial payments to Defendants for the claims that were fraudulently submitted by Defendants.

113. Defendants' fraudulent and unlawful actions were "in or affecting commerce" within the meaning of N.C. GEN. STAT. § 75-1.1.

114. As a direct and proximate result of Defendants' unfair and deceptive trade practices, Blue Cross suffered actual damages in an amount in excess of $10,000, plus interest thereon. Blue Cross is entitled to have and recover of the Defendants such actual damages, trebled pursuant to N.C. GEN. STAT. § 75-16, and attorneys' fees and costs pursuant to N.C. GEN. STAT. § 75-16.1.

## FIFTH CLAIM FOR RELIEF
(Breach of Contract Accompanied by a Fraudulent Act)

115. Blue Cross realleges and incorporates the preceding allegations in the Complaint.

116. As described above, Jemsek breached the Provider Agreements by submitting claims that were not submitted in accordance with Jemsek's contractual, legal and ethical obligations.

117. This breach of contract was aggravated by Jemsek's fraudulent conduct as described above.

118. Blue Cross suffered damages as a result of Jemsek's fraudulent conduct.

119. Jemsek's fraudulent conduct was outrageous and/or aggravated such that punitive damages are appropriate.

120. As a direct and proximate result of Jemsek's breach of contract and fraudulent acts, Blue Cross has suffered actual damages in excess of $10,000, plus interest, and is further entitled to punitive damages.

## SIXTH CLAIM FOR RELIEF
(Breach of the Duty of Good Faith and Fair Dealing)

121. Blue Cross realleges and incorporates the preceding allegations in the Complaint.

122. Each of the Provider Agreements between Blue Cross and Jemsek contained an implied covenant of good faith and fair dealing.

123. Jemsek's wrongful conduct, as alleged herein, constitutes a breach of the implied covenant of good faith and fair dealing.

124. Jemsek's conduct in breaching the covenant of good faith and fair dealing was outrageous and aggravated.

125. Jemsek's breach of the covenant of good faith and fair dealing was outrageous and aggravated such that punitive damages are appropriate.

126. As a direct and proximate result of Jemsek's breach of the implied covenant of good faith and fair dealing, Blue Cross has suffered actual damages in excess of $10,000, plus interest, and is further entitled to punitive damages.

### SEVENTH CLAIM FOR RELIEF
(Claim for Refund of Payment Made on Mistake of Fact)

127. Blue Cross realleges and incorporates the preceding allegations in the Complaint.

128. As described above, Jemsek submitted claims for reimbursement from Blue Cross with respect to services provided to Blue Cross Members.

129. Blue Cross has processed numerous claims for reimbursement from Jemsek and has made payments to Jemsek.

130. At the time that Blue Cross processed those claims and made those payments to Jemsek, Blue Cross reasonably believed that the claims were submitted in accordance with Jemsek's representations concerning the claims and Jemsek's contractual, legal and ethical obligations, as described above.

131. With respect to many of the payments that have been made to Jemsek by Blue Cross, Blue Cross now believes that the amounts paid were not in fact properly payable to Jemsek and that Blue Cross paid them based on its erroneous belief induced by a mistake of fact that the charges were properly payable at the time paid.

132. Defendants have received payments to which they were not entitled. Defendants have refused to refund amounts which they improperly received.

133. Defendants should be required to refund to Blue Cross amounts which Defendants received but to which they were not entitled.

## EIGHTH CLAIM FOR RELIEF
(Constructive Trust and Equitable Liens)

134.   Blue Cross realleges and incorporates the preceding allegations in the Complaint.

135.   After Jemsek's actions as alleged herein, Jemsek received ill-gotten profits, gains and amounts from Blue Cross. On information and belief, some of these amounts have been used to purchase various assets and real property of Jemsek and to establish and fund various accounts of Jemsek.

136.   Blue Cross is entitled to trace the proceeds of the scheme and this conduct of Jemsek, as alleged above, through whatever real and personal property and accounts the proceeds may have flowed, and Blue Cross is further entitled to a constructive trust or an equitable lien on that secret profit in whatever form it may now exist, including Jemsek's real and personal property and accounts.

137.   Jemsek should be required to disgorge all ill-gotten profits, payment or gains received by either of them in connection with any of the fraudulent misconduct and transactions alleged above and any of the mistaken payments made by Blue Cross in reliance on Jemsek's representations and good faith.

138.   The Court should impose an equitable lien or constructive trust for the benefit of Blue Cross upon any real or personal property or goods held by any of the Defendants that derived entirely or in part from any of the ill-gotten profits or proceeds of the Defendants' misconduct.

## NINTH CLAIM FOR RELIEF
(Punitive Damages)

139.   Blue Cross realleges and incorporates the preceding allegations in the Complaint.

140. Defendants' conduct, as alleged herein, makes punitive damages appropriate because such damages will punish Defendants for their egregious wrongful acts and deter Defendants and others from committing similar wrongful acts.

141. Defendants' actions were fraudulent, willful and wanton and in intentional disregard for, or indifference to, the rights of others, including Blue Cross and the Blue Cross Members. The damages that Blue Cross has suffered are related to this fraudulent, willful and wanton conduct of Defendants.

142. Defendants should therefore be found liable, jointly and severally, for punitive damages, in an amount to be determined at trial.

## JURY DEMAND

Blue Cross demands that a jury determine all issues of fact.

**WHEREFORE**, Blue Cross respectfully requests:

1. That the Court enter judgment for Blue Cross on its claims against Defendants;

2. That Blue Cross have and recover from Defendants, jointly and severally, compensatory damages in an amount in excess of $10,000, plus pre- and post-judgment interest at the legal rate;

3. That Blue Cross have and recover punitive damages from Defendants as appropriate;

4. That any damages recoverable by Blue Cross from Defendants for violations of N.C. GEN. STAT. § 75-1.1 be trebled in accordance with N.C. GEN. STAT. § 75-16;

5. That the Court award Blue Cross its costs and its reasonable attorneys' fees in connection with this action;

### MASTER AGREEMENT

THIS MASTER AGREEMENT (the "Master Agreement") is between Blue Cross and Blue Shield of North Carolina, an independent licensee of the Blue Cross and Blue Shield Association, (herein referred to as "we" "us" and "our"), and The Jemsek Clinic (herein referred to as "you" and "your").

RECITALS: The parties to this Agreement seek to facilitate the efficient and cost-effective delivery of quality health care services to Members. Both parties desire to enter into this Master Agreement to generally govern their relationship, and to incorporate attached Addenda to govern their relationship with respect to particular Benefit Plans (herein the "Addenda" or individually "Addendum"). Therefore, in consideration of the mutual covenants and agreements set forth herein, the parties agree as follows:

1. **GENERAL DEFINITIONS.**

The following are general definitions of technical insurance, managed care, or other terms, which apply to this Agreement, and will be construed consistent with definitions included in the applicable evidence of coverage. Terms not specifically defined in this Agreement will be defined as set forth in our policies, procedures, Benefit Plan materials, or other written materials, if applicable.

1.1. "Application" means the standardized credentialing Application form developed by the North Carolina Association of Health Plans, as may be changed from time to time by us or the North Carolina Association of Health Plans to incorporate NCQA or other accreditation or regulatory requirements, or other acceptable form as approved by us.

1.2. "Benefit Plan" means the evidence of coverage issued to a group or individual by us or other Blue Cross and/or Blue Shield plans, that describes the scope of Covered Services and establishes the level of benefits payable, on an insured or administered basis, for such services rendered to Members.

1.3. "Coinsurance" means the percentage, as indicated in the Benefit Plan, of the amount otherwise due to you under this Agreement, which is due and payable by the Member, if any.

1.4. "Copayment" means the dollar amount indicated in the Benefit Plan due and payable by the Member, if any.

1.5. "Covered Services" means the benefits and services, goods, equipment and supplies specified in the Benefit Plan to which Members are entitled in accordance with the terms and conditions thereof. We may compare the cost-effectiveness of alternative services or supplies when determining which of the services or supplies will be Covered Services.

1.6. "Deductible" means the amount indicated in the Benefit Plan payable by the Member for Covered Services that must be incurred by the Member before benefit payments begin for all or part of the remaining Covered Services.

1.7. "Emergency" or "Emergency Medical Condition" means a medical condition manifesting itself by acute symptoms of sufficient severity, including, but not limited to, severe pain, or by acute symptoms developing from a chronic medical condition that would lead a prudent layperson, possessing an average knowledge of health and medicine, to reasonably expect the absence of immediate medical attention to result in any of the following:

- Placing the health of an individual, or with respect to a pregnant woman, the health of the woman or her unborn child, in serious jeopardy;
- Serious impairment to bodily functions;
- Serious dysfunction of any bodily organ or part.

1.8. "Emergency Services" means health care items and services furnished or required to screen for or treat an Emergency Medical Condition until the condition is stabilized, including prehospital care and ancillary services routinely available to the emergency department.

1.9. "Grievance" means a written complaint submitted by a Member about any of the following:

- Our decisions, policies, or actions related to availability, delivery, or quality of health care services;
- Claims payment or handling, or reimbursement for services;
- The contractual relationship between us and a Member; or
- The outcome of an appeal of a noncertification under North Carolina General Statutes 58-50-61, or successor thereto.

1.10. "Grievance and Appeals Process" means the formal process described in the physician manual for the submission of Grievances or requesting review of denials of coverage or utilization review decisions. This process provides for expedited review in cases where the Member's health would be detrimentally affected by a delay of care pending the standard review process.

1.11. "Medically Necessary" or "Medical Necessity" means those Covered Services or supplies that are:

- Provided for the diagnosis, treatment, cure, or relief of a health condition, illness, injury, or disease; and not for experimental, investigational, or cosmetic purposes;
- Necessary for and appropriate to the diagnosis, treatment, cure, or relief of a health condition, illness, injury, disease, or its symptoms;
- Within generally accepted standards of medical care in the community;
- Not solely for the convenience of the insured, the insured's family, or the Practitioner.

1.12. "Member" as used in this Master Agreement means any individual indicated as a Member by an Addendum attached to this Agreement.

1.13. "NCQA" means the National Committee for Quality Assurance.

1.14. "Practitioner" means any practitioner of health care services who is duly licensed to administer such services by the state in which Covered Services are performed, subject to any licensure or regulatory limitation as to location, manner, or scope of practice.

1.15. Additional Definitions. Additional terms may be defined in the Addenda attached hereto.

2. YOUR SERVICES AND OBLIGATIONS

2.1. Member Services.

2.1.1. Services to be Provided. You agree to render Medically Necessary Covered Services to Members as indicated in the attached Addenda, and all obligations and other terms of the Addenda are incorporated by reference into this Master Agreement. The fact that a Practitioner may prescribe, order, or approve a service or supply does not, of itself, make it a Covered Service or Medically Necessary. We expressly reserve the right to require referral of the Member to a more cost effective treatment setting in order for the services to constitute Medically Necessary Covered Services.

2.1.2. Professional Responsibility.

2.1.2.1. Member Relationship. You and we acknowledge and agree that this Agreement is not intended nor is construed to interfere with the relationship between you and a Member. You and we acknowledge and agree that you will have sole professional responsibility for services provided by you to Members under this Agreement. No provision contained in this Agreement nor any of our policies, procedures, programs, or benefit determinations will override your professional or ethical responsibility or interfere with your ability to provide information or assistance to your patients.

2.1.2.2. Open Communication Regarding Treatment. We acknowledge your right to openly communicate with Members regarding treatment options available to them, including alternative medications, regardless of Benefit Plan limitations or exclusions.

2.1.2.3. Non-Discrimination. You agree not to discriminate against Members on the basis of race, color, national origin, gender, age, religion, marital status, health status, or health insurance coverage. You further agree that a Member's Benefit Plan will not affect treatment decisions, and agree to provide Covered Services to

BCBS-PROF-0399 (Revised 05/21/99)                Page 2                                    PROF3

Members so as to provide health or medical care in conformity with accepted and prevailing medical practices.

        2.1.2.4.    Grievance and Appeals Process. You agree to submit in writing to us any case that would result in medical care being provided or denied to a Member that you believe to be inappropriate and contrary to accepted professional or ethical standards of medical practice as a result of our administrative, utilization management process, availability of provider network, or benefit determinations. You agree to cooperate with and assist Members, and other Practitioners if applicable, in our Grievance and Appeals Process.

    2.1.3.    Equipment, Goods and Supplies. You agree that all equipment, goods and supplies used in carrying out your duties under this Agreement is and will remain properly serviced and maintained, in all respects for satisfying your duties and obligations under this Agreement.

    2.1.4.    Accessibility Standards. You agree to comply with our standards for provider accessibility including, if applicable, call coverage or other back-up.

2.2.    Licensure, Accreditation and Insurance.

    2.2.1.    Licensure and Certification.

        2.2.1.1.    Application. You represent and warrant that you have completed our Application and that all of the information in it is true and correct to the best of your knowledge. Your completed Application is incorporated herein by reference as if fully set forth.

        2.2.1.2.    State License. You hereby represent and warrant that your Practitioners presently have valid licenses to practice medicine, or engage in the delivery of certain health care services, in the State of North Carolina.

        2.2.1.3.    DEA Number. You hereby represent and warrant that your Practitioners presently have valid Drug Enforcement Administration Numbers as appropriate for your scope of practice.

        2.2.1.4.    Admitting Privileges. If your Practitioners perform inpatient services, you hereby represent and warrant that such Practitioners presently are members in good standing of the medical staff of a hospital with admitting privileges. In addition, you and the Practitioners performing services under this Agreement agree to comply with the hospital admitting privilege requirements as may be specified in the Addenda.

        2.2.1.5.    Qualified Workers. You hereby represent and warrant that any employees, agents, and independent contractors engaged in or hired by your practice are qualified and duly licensed if applicable.

    2.2.2.    Credential Verification Program.

        2.2.2.1.    Maintenance of License. You agree to maintain, and submit to us upon request, evidence of licensure, accreditation, registration, certification, and all other credentials sufficient to meet all applicable federal and state laws and regulations and our credential verification program requirements.

        2.2.2.2.    Compliance With Program. You agree to comply with our credential verification program and to assist in the credentialing and recredentialing process. You further agree that we may review any and all records and documents which bear upon the credentials of individual Practitioners covered by this Agreement, whether in your possession or in the possession of other individuals or organizations.

    2.2.3.    Insurance. You, at your sole cost and expense, agree to procure and maintain such policies of general liability, professional liability and other insurance as is necessary to insure you and any of your employees or agents against any claim or claims for damages arising by reason of personal injuries or death in connection with the performance of services provided by you, the use of your property and facilities, and the activities performed by you in connection with this Agreement. Each of such policies will have limits of at least one million dollars ($1,000,000) per occurrence and one million dollars ($1,000,000) aggregate. Copies of such policies will be available to us upon request.

2.2.4. <u>Notice of Changes</u>. You agree to notify us in writing of subsequent changes in status of any information relating to professional credentials, licenses, privileges, and certifications of the Practitioners performing services hereunder, as well as changes in professional liability or other insurance as soon as possible but no later than ten (10) business days of your notice or discovery of any such changes.

2.2.5. <u>Other Required Notices.</u> You agree to notify us promptly, but in no event later than thirty (30) business days following the occurrence of any of the following:

2.2.5.1. changes in your ownership or business address;

2.2.5.2. legal or governmental action initiated against you or your Practitioners, including, but not limited to, an action for professional negligence or one involving a violation of law or against any license or certificate required pursuant to Section 2.2.1 above, which, if successful, would materially impair your ability to carry out the duties and obligations assumed under this Agreement;

2.2.5.3. your insolvency or the pendency of bankruptcy by your practice;

2.2.5.4. dissolution or other cessation of your business/professional functions;

2.2.5.5. any other problem or situation that may materially impair your ability to carry out the duties and obligations assumed under this Agreement.

2.2.6. <u>Practitioner Roster</u>. All individual Practitioners subject to the terms of this Agreement are listed on the Practitioner Roster Exhibit, approved by us and incorporated herein. You agree to notify us of proposed additions and deletions to the Practitioner Roster Exhibit. Proposed additions will not be effective until we notify you of our approval, such approval not to be unreasonably withheld following satisfaction of all credentialing requirements. If such new Practitioners have an existing separate agreement with us, then we may, at our sole discretion, reimburse you for the services of such new Practitioners pursuant to the terms of such existing separate agreement, or of this Agreement. We reserve the right to remove individual Practitioners from the Practitioner Roster Exhibit in the event of exclusion pursuant to Sections 2.3.2 or 5.2.

2.3. <u>Your Compliance with Our Programs, Policies and Procedures.</u>

2.3.1. <u>Your Compliance</u>. You agree to participate in and comply with all our rules, regulations, programs, policies and procedures, applicable to Benefit Plans covered by the Addenda attached hereto, as may be enacted and revised from time to time with not less than sixty (60) days' prior notice, including, but not limited to, utilization review and management programs, credential verification programs, provider accessibility standards or policies, quality improvement and management programs, prescription drug programs, provider sanction programs, the Grievance and Appeals Process, referral policies, billing and claims submission policies, and cost containment programs, including but not limited to pre-admission certification, admission certification, length of stay assignment, concurrent review, prior approval, and procedure code auditing.

2.3.2. <u>Non-Compliance</u>. If you fail to comply with our programs, policies and procedures as required by this Section 2.3 and as amended by the Addenda attached hereto, we may impose sanctions in accordance with our provider sanction policy. Such sanctions may include, but are not limited to, implementation of a corrective action plan, or exclusion of individual Practitioners from the terms of this Master Agreement or any of the Addenda attached hereto.

2.4. <u>Your Additional Obligations.</u>

2.4.1. <u>Directory and Marketing Materials</u>. You hereby authorize us to include your name, address, and other biographical information submitted to us by you in our provider directories made available to Members, and our other marketing and information materials. You agree that we may acknowledge you with positive attributes in materials made available to Members and others, including but not limited to provider directories, Member newsletters, and provider newsletters. You further agree that any materials of any nature whatsoever developed by you or on your behalf which make reference to us will be first submitted in writing by notice to us for our prior written approval, not to be unreasonably withheld, except, however, you may list your participation under this Agreement by strictly following the brand regulation guidelines described in the physician manual.

BCBS-PROF-0399 (Revised 05/21/99)    Page 4    PROF3