2.4.2. **No Use of Blue Cross or Blue Shield Symbols.** You agree not to use the Blue Cross or Blue Shield symbols for any purpose or in any manner whatsoever.

2.4.3. **Vendor Relations.** You agree to cooperate with our third-party service vendors in the same manner as you cooperate with us. We agree to provide not less than thirty (30) days' prior written notice before initiating use of a relevant third party service vendor.

3. **OUR SERVICES AND OBLIGATIONS.**

3.1. **Certificate of Authority.** We agree to maintain a certificate of authority and all licenses necessary to operate a hospital, medical and dental service corporation and a health maintenance organization under the statutes of the State of North Carolina. We agree to be responsible for filing reports, obtaining approvals from, and complying with applicable laws and regulations of state, federal and other agencies having jurisdiction over us.

3.2. **Administrative Services.**

3.2.1. **Marketing and Administration.** We agree to perform or to have performed on our behalf, certain marketing, enrollment, administrative, accounting and other functions we may deem necessary to the administration of our Benefit Plans and the performance of this Agreement. We agree to make best efforts to furnish identification cards to Members prior to the Member's effective date and to educate Members in our policies and procedures through Member handbooks and toll-free telephone access to a Member services department.

3.2.2. **Provider Directories.** We agree to list you in the provider directory made available to Members of the Benefit Plans covered by the attached Addenda. However, should either party issue notice of termination pursuant to Section 5.2 hereof, our obligation to list you in the provider directory will not extend to such termination notice period.

3.2.3. **Member Eligibility Verification.** We agree to provide a mechanism that allows you to verify Member eligibility, based on current information held by us, before rendering services. Such verification may be subject to retroactive adjustments pursuant to Section 4.8.

3.2.4. **Program Information.** We agree to provide a physician manual, incorporated herein by reference, containing current information concerning benefit exclusions, administrative and utilization management requirements, credential verification programs, quality assessment programs, and provider sanction policies, when applicable, and to update such information as changes in requirements are made, with sixty (60) days' prior notice. To the extent your compensation is related to efficiency criteria, we agree to provide performance feedback reports or information to you.

3.2.5. **Credentialing and Recredentialing.** We agree to make best efforts to process all credentialing Applications and recredentialing information within one hundred twenty (120) days of receipt of all required information.

3.3. **Benefits Administration.**

3.3.1. **Grievance and Appeals Process.** We agree to establish and maintain a Grievance and Appeals Process as required by current or subsequent North Carolina law and regulations or NCQA or other accrediting organization.

3.3.2. **Quality Improvement/Management and Utilization Review/Management.** We agree to establish and maintain our quality improvement/management and utilization review/management programs, to consult with and obtain the advice of certain Practitioner(s) concerning such programs, and receive input from any Practitioner via written documentation to our Medical Director or the appropriate designee.

3.3.3. **Prior Approval of Services.** We agree to use reasonable efforts to notify you within three (3) business days of our receipt of all necessary information of our decisions regarding prior approval of services as set forth in our utilization review/management programs.

3.4. **Additional Obligations.**

BCBS-PROF-0399 (Revised 05/21/99)     Page 5     PROF3

3.4.1. _Insurance_. We, at our sole cost and expense, agree to procure and maintain such policies of general liability and other insurance as are necessary to insure us and our employees against any claim or claims for damages arising by reason of personal injuries or death occasioned directly or indirectly in connection with the use of any property and facilities provided by us and the activities performed by us in connection with the Agreement. Such policies will be made available to you for your examination at our corporate office during normal business hours.

3.4.2. _Reserves_. We agree to establish and maintain the appropriate level of reserves required by the North Carolina Department of Insurance and the regulations and laws governing us.

4.   PAYMENT TO YOU.

4.1. _Payment_. We agree to pay you for Covered Services provided to Members in accordance with the payment provisions set forth in the attached Addenda, and as otherwise set forth in this Agreement.

4.2. _Billing_.

4.2.1. _Billing Policies_. You agree to comply with our applicable billing and claims submission policies as may be enacted and revised from time to time. Such policies will be included in the physician manual given to you, and will be updated as appropriate.

4.2.2. _Time for Claims Submission_. You agree to use your best efforts to submit claims within ninety (90) days of the date of service; however, unless otherwise agreed to by us, claims must be received by us within one hundred and eighty (180) days of the date of service.

4.2.3 _Electronic Submission_. If you are not already doing so, you agree to use reasonable efforts to begin submitting claims to us electronically within twelve (12) months of the Effective Date of this Agreement.

4.3. _Processing of Claims_. We agree to make a reasonable effort to process all claims for benefits for services and/or supplies provided to Members submitted by you within thirty (30) days of our receipt of all necessary information. We agree that we will not retroactively deny payment of properly submitted claims which have been pre-authorized through our utilization management processes, so long as no false or misleading information was provided by you in the utilization management process, and except for retroactive adjustments to eligibility records pursuant to Section 4.8.

4.4. _Deductibles, Coinsurance and Copayments_. You agree to collect from Members applicable Deductibles, Coinsurance, Copayments, and penalty amounts. The maximum amount of a Member's Copayment will be the lesser of the amount specified in the Member's Benefit Plan or the amount to which you are otherwise entitled pursuant to this Agreement and the Addenda. You agree not to waive any portion of a Member's applicable Deductible, Coinsurance, Copayment or penalty amount that may be required pursuant to the Member's Benefit Plan, unless (a) you have undertaken reasonable collection efforts and been unable to collect the Deductible, Coinsurance, or Copayment; or (b) you have determined that the particular Member is indigent. Any such amounts waived by you contrary to this Section 4.4 will be deducted from the amount you are otherwise entitled to pursuant to this Agreement and the Addenda.

4.5. _Coordination of Benefits and Third Party Liability_. Notwithstanding any provision of this Agreement to the contrary, payment to you for Covered Services: (a) for which we determine that we have other than primary liability based upon the coordination of benefits provisions of the applicable Member's Benefit Plan; or (b) for which we have partial liability; will not be made by us of any amount which, when added to all third party benefit payments or benefit payments paid by us pursuant to other benefit plans, would exceed the amount which you are otherwise entitled to receive as payment under this Agreement.

4.6. _Excess Payments_. You agree that in the event of any overpayment, duplicate payment, or other payment of an amount in excess of any benefits payable according to the Member's Benefit Plan, you will promptly remit such amounts to us, or in addition to our other remedies, we may recover such amounts by offset against current or future amounts payable to you.

BCBS-PROF-0399 (Revised 05/21/99)            Page 6                                    PROF3

4.7. Hold Harmless.

4.7.1. Payment in Full. You agree to accept the amounts due under this Agreement, including applicable Deductibles, Coinsurance and Copayments, as payment in full for Medically Necessary Covered Services provided to Members. In no event, including but not limited to our non-payment or insolvency or breach of this Agreement, will you seek payment from a Member or third party for Medically Necessary Covered Services provided to Members, including but not limited to subrogation and workers' compensation, except as otherwise provided in this Section 4.7.

4.7.2. Timeliness of Claim Submission. You agree not to bill, charge, seek compensation or remuneration or reimbursement, or collect from the Member or us any amount for services or supplies provided to a Member for which a claim was not submitted to us within one hundred eighty (180) days of the date rendered.

4.7.3. Notification of Payment and Refunds. Except as otherwise specified in the Addenda, you agree not to bill Members for services and/or supplies provided until receipt of our notification of payment, except for Deductibles, Copayments, or Coinsurance, and to only bill Members for amounts owed by the Member as reflected on our notification of payment. Any amounts collected erroneously by you from a Member for any reason will be refunded to the Member within forty-five (45) days of your receipt of notification or your discovery of such error.

4.7.4. Member Contributions and Third Party Liability. This Section 4.7 will not prohibit the collection of any Deductible, Copayment, or Coinsurance in accordance with Section 4.4 hereof. In addition, this Section 4.7 will not prohibit the billing and collection of amounts payable by third parties when such parties are primarily responsible for paying for Covered Services in accordance with Section 4.5 hereof.

4.7.5. Survival. You further agree that the provisions of this Section 4.7 will survive termination of this Agreement regardless of the causes giving rise to such termination, will be construed to be for the Members' benefit, and will supersede any oral or written contrary agreement now existing or hereafter entered into between you and a Member or persons acting on behalf of a Member.

4.8. Retroactive Adjustments. You agree to accept and abide by retroactive adjustments made by us to our Member eligibility records and associated adjustments to your reimbursement. You agree that if Medically Necessary Covered Services were provided to a Member during any retroactive adjustment period, you will reimburse the Member for any payments made by the Member for such services and/or supplies within forty-five (45) days of receiving the retroactive adjustment, except for any applicable Deductibles, Coinsurance and/or Copayments.

5. TERM AND TERMINATION.

5.1. Effective Date and Term. This Agreement will be effective as of the date indicated below. The initial term of this Agreement will continue in force and effect for twelve (12) consecutive months from the effective date of this Agreement. Thereafter, this Agreement will automatically renew for additional one-year terms, unless terminated sooner as hereinafter provided.

5.2. Termination. This Agreement may be terminated by either party, without cause, upon not less than ninety (90) days' prior written notice to the other. You agree that any material misstatements or omissions, as determined by us, in the credentialing or recredentialing process will constitute grounds for immediate termination of this Agreement or exclusion of individual Practitioners by us in our sole discretion, notwithstanding any provision to the contrary. In addition, this Agreement may be terminated immediately by us at our sole option and discretion if you fail to comply with our credential-verification program, including timely submission of recredentialing information, or upon any of the occurrences listed in Sections 2.2.4 or 2.2.5.

5.3. Your Obligations After Termination or Our Insolvency.

5.3.1. Continuing Care. You agree that upon termination of this Agreement or our insolvency, you will remain obligated to continue to provide medical care to Members that are receiving ongoing care until we can arrange for the Member to select another provider or ninety (90) days from the date of termination, whichever occurs first. You agree to continue to be obligated to the terms of this Agreement and the Addenda attached hereto, including acceptance of the fees payable hereunder as payment in full for Covered Services, for any such continuing care required by this Section 5.3.

5.3.2.  **Transfer of Duties and Records.** You agree that upon termination of this Agreement or our insolvency, you will cooperate in the orderly transfer of administrative duties and medical records to the Member's new provider after obtaining the Member's authorization, and will be responsible for the cost of transferring medical records or copies thereof.

## 6.  GENERAL PROVISIONS

6.1.  **Records.**

6.1.1.  **Maintenance and Audit.** You agree to maintain adequate and appropriate medical and other health records relating to services and/or supplies provided to Members in accordance with our standards and accepted industry standards and as may be required by law. You agree that we have the right upon request to inspect and audit at reasonable times your medical and administrative records relating to services and/or supplies provided to Members and the administration of this Agreement, and you agree to duplicate and submit to us at no charge copies of such records as might be reasonably requested by us. Such right of audit may be for the purpose of complying with requests of the North Carolina Department of Insurance, verifying services provided, determining benefits, verifying contract compliance, or such other lawful purposes as we may require.

6.1.2.  **Access to Records.** You agree to obtain the Member's authorization to release medical records to us, and you agree to release upon request such records to us or to the North Carolina Department of Insurance in conjunction with its regulation of us. We warrant that we have the contractual right with Members to obtain any and all patient information from you for the purpose of making benefit determinations.

6.1.3.  **Patient Confidentiality.** The parties agree that all Member medical records and other applicable health records will be treated as confidential as required by state and federal law, including but not limited to Article 39 of Chapter 58 of the North Carolina General Statutes, or successor thereto. You agree to maintain written policies and procedures which address protection of patient confidentiality.

6.1.4.  **Survival.** The provisions of this Section 6.1 will survive termination of this Agreement.

6.2.  **Notices.** Any notice to be given under this Agreement will be in writing, addressed to the other party at the address listed below, or such other address as the party may designate by notice to the other party, and will be given by (a) depositing such notice for delivery with the United States Postal Service, postage prepaid, first class, or certified or registered mail with return receipt requested; (b) depositing such notice for delivery with a commercial courier service; or (c) hand delivery.

| Notices to us will be addressed as follows: | Notices to you will be addressed as follows: |
|---|---|
| Blue Cross and Blue Shield of North Carolina<br>P.O. Box 2291<br>Durham, NC 27702<br>Attn: Vice President, Network Management | The Jemsek Clinic<br>16630 Northcross Drive<br>Huntersville, NC 28078<br><br>or, *if different*, your corporate office or physical location as listed in our provider database, will constitute an equally valid alternative address for the purpose of all notices under the Agreement. |

6.3.  **Independent Relationship.**

6.3.1.  **Member Relationship.** We agree to be responsible for making judgments and decisions concerning whether certain services or supplies are Covered Services under the Benefit Plan and the extent to which payment may or may not be made thereunder. You agree to be responsible for making clinical judgments and medical treatment decisions for your patients.

6.3.2.  **Association Relationship.** You hereby expressly acknowledge your understanding that this Agreement constitutes a contract between the parties, that we are an independent corporation operating under a license from

the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield plans, (the "Association") permitting us to use the Blue Cross and/or Blue Shield service marks in the State of North Carolina, and that we are not contracting as the agent of the Association. You further acknowledge and agree that you have not entered into this Agreement based upon representations by any person other than us and that no person, entity, or organization other than us will be held accountable or liable to you for any of our obligations to you created under this Agreement. This paragraph will not create any additional obligations whatsoever on our part other than those obligations created under other provisions of this Agreement.

6.3.3. Rights of Third Parties. This Agreement is a contract between the parties and will not be construed, interpreted, or deemed to confer any rights whatsoever to any third party or parties.

6.3.4. Independent Contractors. The parties agree that both are independent legal entities engaged in the operation of their own respective businesses. In the performance of the obligations of this Agreement, each party will be at all times acting and performing as an independent contractor with respect to the other party, and no party will have or exercise any control or direction over the method by which the other party will perform such work or render or perform such services and functions. Neither party is nor is to be considered the agent or employee of the other party for any purposes whatsoever.

6.4. Separate Contract. The parties agree that this Agreement is separate and distinct from any other contracts between the parties. Any other agreements between the parties for the provision of services to persons who are not Members will remain otherwise unaffected by this Agreement and will remain in full force and effect. Any such other agreements will not apply to services rendered by you to Members covered by this Agreement or any attached Addendum.

6.5. Assignment.

6.5.1. Assignment By You. No assignment, delegation or transfer of the rights, duties, or obligations of this Agreement, or any part of it, will be made by you without our prior written consent. You will give us not less than ninety (90) days' prior written notification as to the identity of each such assignor, and agree to indemnify us from any and all liability to any such assignor.

6.5.2. Assignment By Us. Except as specifically provided elsewhere in this Agreement, no assignment of the rights, duties, or obligations of this Agreement, or any part of it, may be made by us without your prior written consent; provided, however, that we may assign this Agreement, in whole or in part, to any of our corporate parents, subsidiaries, affiliates, or joint venturers; another Blue Cross and/or Blue Shield Plan or corporate parent, subsidiary, or affiliate thereof; or other successor in interest in connection with a merger, sale or transfer of substantially all of our assets or in connection with a reorganization. We will give you not less than ninety (90) days' prior written notice of the delegation or transfer of any of our duties or obligations under this Agreement.

6.6. Resolution Of Contractual Differences.

6.6.1. Informal Resolution. The parties agree to meet and confer in good faith to resolve any problems or disputes that may arise under this Agreement.

6.6.2. Contacting Us. In the event that a dispute under this Agreement cannot be addressed to your satisfaction by our customer services department, you should contact our network management department.

6.7. Entire Agreement and Amendments.

6.7.1. Entire Agreement. This Agreement, together with the attached Addenda, Exhibits, and documents incorporated by reference, constitute the entire agreement between the parties. Any prior agreements, promises, negotiations, or representations, either oral or written, relating to the subject matter of this Agreement are of no force and effect, other than separate agreements as provided in Section 6.4.

6.7.2. Amendments. This Agreement may be amended by written mutual agreement of the parties, or as follows:

6.7.2.1. Changes in Law. In the event that we determine that federal and/or state law or

BCBS-PROF-0399 (Revised 05/21/99)　　　　Page 9　　　　PROF3

regulation or NCQA or other applicable accrediting organization requires amendments to this Agreement, we agree to provide you not less than sixty (60) days' prior written notice, and upon expiration of such sixty (60) day period, this Agreement will be automatically amended to include the amendments set forth in our notice.

6.7.2.2. Changes in Reimbursement. We may amend our fee schedules or other reimbursement rates or mechanisms upon not less than ninety (90) days' prior written notice to you. However, such amendments will not take effect if you send us ninety (90) days' notice of termination within thirty (30) days of receiving the notice of amendment.

6.7.2.3. Incorporation or Exclusion of Addenda. We may incorporate new Addenda to this Agreement or exclude existing Addenda upon not less than ninety (90) days' prior written notice to you. You may reject incorporation of new Addenda to this Agreement by sending us notice of such rejection within sixty (60) days of our notice.

6.7.2.4. All Other Terms. We may amend any other terms of this Agreement by providing not less than sixty (60) days' prior written notice to you. Notwithstanding any other provisions of this Section 6.7.2, we will not add Medicare risk, Medicaid risk, or Workers' Compensation Benefit Plans to this Agreement without your prior written consent.

6.8. Governing Law. This Agreement will be governed and construed in accordance with the laws of the State of North Carolina, excluding its choice of law and/or conflicts of law provisions. The parties hereby consent and agree that the venue for any legal action under or relating to this Agreement will be either Durham or Orange County, North Carolina.

6.9. Waiver and Severability.

6.9.1. Waiver. The waiver of either party of a breach or violation of any provision of this Agreement will not be construed to be a waiver of any subsequent breach thereof.

6.9.2. Severability. In the event any provision of this Agreement conflicts with or is rendered invalid or unenforceable by the laws under which this Agreement is to be construed, or if any other provision is held invalid by a court with jurisdiction over the parties to this Agreement, such provision will be deleted from the Agreement and the Agreement will be construed to give effect to the remaining provisions of it.

6.10. Confidentiality. You agree that this Agreement, including but not limited to Member lists, reimbursements rates and mechanisms, are competitively sensitive and will not be disclosed to any third party, in part or in whole, without our prior written authorization, except as required by law. Both parties agree that the relationship between them is confidential and that this Agreement, or copies thereof, unless required by us or you to comply with any legal, regulatory, licensure, ERISA group, or accreditation requirements, will not be released to any person or entity without both parties' express written prior approval.

6.11. Headings. The headings of sections contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement.

6.12. Exclusive Contract. Except as may be provided for in the Addenda attached hereto, this Agreement is not exclusive and either party may freely contract and enter into other similar arrangements with other persons, firms, or entities. Unless otherwise provided in the Addenda, nothing contained herein will be interpreted to restrict either party from participating in any health care delivery system or program or from enrolling or providing health care to persons not enrolled in a Benefit Plan.



IN WITNESS WHEREOF, each party to this Agreement has caused its duly authorized representative to sign this Agreement on its behalf below, effective as of the Effective Date set forth below.

Blue Cross and Blue Shield of North Carolina

By: *(Signature)*
Print Name: __Milo M. Brunick__
Title: __Vice President__
Date: __JUN 2 6 2000__

The Jemsek Clinic

By: *(Signature)*
Print Name: __Joseph Gregory Jemsek, MD__
Title: __Medical Director__
Date: __5·10·00__

(For BCBSNC Use Only)

Effective Date

Provider Num: _____

List of Addenda

Preferred Provider Network / Indemnity Insurance Addendum

HMO/Point of Service Network
Medical Specialist Addendum

## PREFERRED PROVIDER NETWORK / INDEMNITY INSURANCE ADDENDUM

The terms of the Master Agreement are hereby incorporated by reference into this Addendum as if fully set forth. The terms and conditions of this Addendum supplement and modify the terms of the Master Agreement only with respect to services provided to Members, as defined herein.

1. DEFINITIONS.

   1.15. <u>Additional Definitions</u>. In addition to the definitions set forth in Section 1 of the Master Agreement, the following additional terms are defined for the purposes of this Addendum.

   1.15.1. "Member" as used in this Addendum means an individual designated by us who is eligible for coverage and/or benefits and is properly enrolled in any of the following Benefit Plans: Blue Options and Classic Blue.

   1.15.2. "Participating Hospital" means a licensed general acute care hospital with whom we have an agreement to provide Covered Services to Members.

   1.15.3. "Provider Network" as used in this Addendum consists of those Practitioners and institutional health care providers that have entered into agreements with us to provide health care services to Members.

2. YOUR SERVICES AND OBLIGATIONS

   2.1. <u>Member Services</u>.

   2.1.1. <u>Services to be Provided</u>. In addition to the obligations set forth in Section 2.1.1 of the Master Agreement:

   2.1.1.1. <u>Covered Services</u>. You agree to deliver to Members Medically Necessary Covered Services according to our policies and procedures that are within the scope of your license.

   2.1.1.2. <u>Services Rendered by Other Providers</u>. You agree that when the need arises for a Member to receive other professional services, hospital, or other institutional services, or supplies, outside of the scope of your license, you will refer the Member locally within the Provider Network, when reasonably possible and consistent with good medical care. Nothing contained herein will be construed to require or permit coverage of the use of a Participating Hospital when a lower level of care is deemed appropriate by us.

   2.2. <u>Licensure, Accreditation and Insurance</u>.

   2.2.1. <u>Licensure and Certification</u>.

   2.2.1.4. <u>Admitting Privileges</u>. If your Practitioners perform inpatient services, then in addition to the obligations set forth in 2.2.1.4 of the Master Agreement, you hereby represent and warrant that your Practitioners performing services under this Agreement presently are members in good standing of the medical staff of a Participating Hospital with admitting privileges, or, if one is not designated in the county of the Practitioner's practice, the local hospital as approved by us.

3. OUR SERVICES AND OBLIGATIONS.

   3.2. <u>Administrative Services</u>.

   3.2.2. <u>Provider Directories</u>. We agree to list you in the provider directory made available to Members in Benefit Plans covered by this Addendum, unless you have given us notice of termination pursuant to Section 5.2 of the Master Agreement.

4. PAYMENT TO YOU

   4.1. <u>Payment</u>. In addition to the obligations set forth in Section 4.1 of the Master Agreement:

4.1.1. <u>Fee Schedule</u>. We agree to pay and you agree to accept as payment in full for Covered Services delivered to Members during the term of the Master Agreement and this Addendum or as otherwise required herein, the lesser of your usual charge or the amount specified in our fee schedule, in effect on the date the service or supply is rendered and incorporated herein by reference as follows: (i) for Members enrolled in preferred provider Benefit Plans covered by this Addendum, our preferred provider fee schedule; and (ii) for Members enrolled in indemnity Benefit Plans covered by this Addendum, our indemnity fee schedule.

4.7. <u>Hold Harmless</u>. In addition to your obligations under Section 4.7 of the Master Agreement, you agree to hold harmless, and not to attempt to collect from us, or the Member, any amounts in excess of those set forth in Section 4.1 of this Addendum.

6. **GENERAL PROVISIONS**

6.4. <u>Separate Contract</u>. In addition to the terms of Section 6.4 of the Master Agreement, the parties agree that the terms of this Addendum are separate and distinct from the Master Agreement and any other Addendum to the Master Agreement. Except as specifically provided in this Addendum, the Master Agreement will remain otherwise unaffected by this Addendum and will remain in full force and effect. With respect to services provided to Members, if any terms of this Addendum conflict with the terms of the Master Agreement, this Addendum will control.



### HMO/POINT OF SERVICE NETWORK

### MEDICAL SPECIALIST ADDENDUM

The terms of the Master Agreement are incorporated by reference into this Addendum as if fully set forth. The terms and conditions of the Addendum supplement and modify the terms of the Master Agreement only with respect to services provided to Members, as defined herein.

1. **DEFINITIONS.**

   1.15. **Additional Definitions.** In addition to the definitions set forth in Section 1 of the Master Agreement, the following additional terms are defined for the purposes of this Addendum.

   1.15.1. "HMO" means a health maintenance organization Benefit Plan offered by us pursuant to Article 67 of Chapter 58 of the North Carolina General Statutes, or successor thereof, that provides benefits only for Covered Services rendered by HMO network providers.

   1.15.2. "In-Network Benefits" means the benefits payable under a POS Benefit Plan when the Member sees a POS provider and uses any applicable referral and authorization procedures. Referrals and authorizations are never required for Emergency Services.

   1.15.3. "Medical Specialist" means a Practitioner with whom we have an agreement to provide specialty health care services to Members.

   1.15.4. "Member" as used in this Addendum means an individual designated by us who is eligible for coverage and/or benefits and is properly enrolled in any of the following Benefit Plans: Blue Care, Blue Choice, and any point of service Benefit Plan with another Blue Cross and/or Blue Shield plan, corporate parent, subsidiary, or affiliate thereof or with the Blue Cross and Blue Shield Association.

   1.15.5. "Out-of-Network Benefits" means the limited benefits payable under a POS Benefit Plan when the Member sees a non-POS provider or does not use the applicable referral and authorization procedure.

   1.15.6. "POS" means a point-of-service Benefit Plan offered by us pursuant to Article 67 of Chapter 58 of the North Carolina General Statutes, or successor thereof, that provides benefits for Covered Services rendered by POS network providers, as well as limited benefits for Covered Services rendered by non-POS providers.

   1.15.7. "Participating Hospital" means a licensed general acute care hospital with whom we have an agreement to provide Covered Services to Members.

   1.15.8. "Primary Care Provider" means a Practitioner who has been designated as the Primary Care Provider for a particular Member according to our records.

   1.15.9. "Primary Care Services" mean Covered Services provided by the Primary Care Provider.

   1.15.10. "Provider Network" consists of those Practitioners and institutional health care providers that have entered into agreements with us to provide health care services to Members.

   1.15.11. "Specialty Services" mean Covered Services provided by the Medical Specialist.

2. **YOUR SERVICES AND OBLIGATIONS**

   2.1. **Member Services.**

   2.1.1. **Services to be Provided.** In addition to the obligations set forth in Section 2.1.1 of the Master Agreement:

        2.1.1.1.    <u>Covered Services</u>. You agree to deliver to Members Medically Necessary Specialty Services according to our policies and procedures that are within the scope of your license.

        2.1.1.2.    <u>Services Rendered by Other Providers</u>. You agree that when the need arises for a Member to receive other professional services, hospital or other institutional services, or supplies, outside of the scope of your license, you will refer the Member locally within the Provider Network, when reasonably possible and consistent with good medical care. You agree to comply with all referral and authorization policies and procedures applicable to the Member's Benefit Plan, as well as utilization management, or other applicable policies. Nothing contained herein will be construed to require or permit coverage of the use of a local Participating Hospital when a lower level of care is deemed appropriate by us.

        2.1.1.3.    <u>Out-of-Network Emergency Care</u>. You agree that Members who require and seek Emergency care from non-Provider Network providers will be transferred to your care and/or a Participating Hospital, when reasonably possible and consistent with good medical care.

        2.1.1.4.    <u>Excluded Services</u>. You acknowledge that we may have exclusive agreements in place with certain providers for specific types of Covered Services, including but not limited to, chiropractic care, mental health and substance abuse, and vision care. Any such exclusive arrangements will be indicated in the physician manual given by us to you pursuant to Section 3.2.4 of the Master Agreement. You agree to refer Members to such exclusive providers when medically appropriate, and your obligation to provide Covered Services to Members under this Addendum will not extend to such services.

    2.1.4.    <u>Accessibility Standards</u>. In addition to the obligations set forth in Section 2.1.4 of the Master Agreement, you agree to provide call coverage or other back-up by other Provider Network providers, or with other providers subject to our prior written approval.

  2.2.    <u>Licensure, Accreditation and Insurance</u>.

    2.2.1.    <u>Licensure and Certification</u>.

        2.2.1.4.    <u>Admitting Privileges</u>. If your Practitioners perform inpatient services, then in addition to the obligations set forth in 2.2.1.4 of the Master Agreement, you hereby represent and warrant that your Practitioners performing services under this Agreement presently are members in good standing of the medical staff of a Participating Hospital with admitting privileges, or, if one is not designated in the county of the Practitioner's practice, the local hospital as approved by us.

  2.4    <u>Your Additional Obligations</u>.

    2.4.1    <u>Directory and Marketing Materials</u>. In addition to the obligations set forth in Section 2.4.1 of the Master Agreement, you agree that we may disclose to other Provider Network providers, Members, employer groups, and legal, regulatory, or accrediting bodies, summary performance information that may identify your practice(s) or individual Practitioners. However, we will provide you a copy of such information and receive your input prior to disclosure to any third party.

3.    **OUR SERVICES AND OBLIGATIONS.**

  3.2.    <u>Administrative Services</u>.

    3.2.2.    <u>Provider Directories</u>. We agree to list you in the provider directory made available to Members in Benefit Plans covered by this Addendum, unless you have given us notice of termination pursuant to Section 5.2 of the Master Agreement.

4.    **PAYMENT TO YOU**

  4.1    <u>Payment</u>. In addition to the obligations set forth in Section 4.1 of the Master Agreement:

4.1.1 **Fee Schedule.** We agree to pay and you agree to accept as payment in full for Covered Services delivered to Members during the term of the Master Agreement and this Addendum or as otherwise required herein, the lesser of your usual charge or the amount specified in our fee schedule, in effect on the date the service or supply is rendered and incorporated herein by reference as follows: (i) for Members enrolled in HMO Benefit Plans covered by this Addendum, our HMO fee schedule; and (ii) for Members enrolled in POS Benefit Plans covered by this Addendum, our POS fee schedule.

4.7. **Hold Harmless.** In addition to your obligations under Section 4.7 of the Master Agreement, you agree to hold harmless, and not to attempt to collect from us, or the Member, any amounts in excess of those set forth in Section 4.1 of this Addendum.

4.7.6. **Non-Covered Services.** You agree not to bill, charge, seek compensation, remuneration or reimbursement from any Member, us, or any third party for health care services and/or supplies provided to Members which are determined by us not to be Medically Necessary, or otherwise determined by us to be non-Covered Services, or are not payable due to your failure to follow our applicable policies and procedures, except as provided in Section 4.7.7 below.

4.7.7. **Member's Written Authorization Required.** Notwithstanding the provisions of Section 4.7.6, you may seek compensation from the Member for non-Medically Necessary Services or other non-Covered Services only if you obtain the written authorization of the Member prior to rendering the services. Such authorization must reference the specific services and/or supplies to be provided, contain the Member's acknowledgment that such services and/or supplies may not be covered by his or her Benefit Plan, and indicate the Member's agreement to pay for such services and/or supplies apart from his or her Benefit Plan. You further agree to provide us with a copy of any and all such written authorizations upon request.

5. **TERM AND TERMINATION**

5.3. **Your Obligations After Termination or Our Insolvency.** In addition to your obligations under Section 5.3 of the Master Agreement, upon termination of the Master Agreement or this Addendum or our insolvency, you will be obligated to continue inpatient care until the Member is ready for discharge. In the event of our insolvency, you will be obligated to continue to provide Covered Services for the period for which the Member's premium has been paid.

6. **GENERAL PROVISIONS**

6.1. **Records.** In addition to the obligations under Section 6.1 of the Master Agreement:

6.1.1. **Maintenance and Audit.** Both parties agree to maintain such statistical records with respect to the utilization of Covered Services rendered by you to Members as are necessary, appropriate, or convenient for the proper administration of the Master Agreement and this Addendum.

6.1.2. **Access to Records.** You agree to maintain medical records on the same basis as for all other patients, and to make such information available to us and other Provider Network providers when necessary for the treatment and evaluation of Members, as permitted by law or the terms and conditions governing the Member's Benefit Plan.

6.4. **Separate Contract.** In addition to the terms of Section 6.4 of the Master Agreement, the parties agree that the terms of this Addendum are separate and distinct from the Master Agreement and any other Addendum to the Master Agreement. Except as specifically provided in this Addendum, the Master Agreement will remain otherwise unaffected by this Addendum and will remain in full force and effect. With respect to services provided to Members, if any terms of this Addendum conflict with the terms of the Master Agreement, this Addendum will control.

Practitioner Roster Exhibit

Joseph Gregory Jemsek, MD