UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division

| In re:<br><br>JOSEPH GREGORY JEMSEK,<br><br>Debtor. | Case No. 06-31986<br><br>Chapter 11 |
|---|---|

**MEMORANDUM OF LAW IN SUPPORT OF OBJECTION TO
MOTION BY THE SCOTTISH BANK TO ALLOW FEES AND EXPENSES AND
APPLICATION FOR REIMBURSEMENT OF ATTORNEYS' FEES AND
EXPENSES OF KELLAM & PETTIT, P.A.**

Joseph Gregory Jemsek, the debtor herein (the "Debtor"), through counsel, respectfully presents this *Memorandum of Law in Support of Objection to Motion by The Scottish Bank to Allow Fees and Expenses and Application for Reimbursement of Attorneys' Fees and Expenses of Kellam & Pettit, P.A.* in connection with the Debtor's objection ("Objection") to the *Motion by The Scottish Bank to Allow Fees and Expenses* ("Motion") and the *Application for Reimbursement of Attorneys' Fees and Expenses of Kellam & Pettit, P.A.* ("Application") filed on behalf of the Scottish Bank.

**FACTUAL BACKGROUND**

1.    The Debtor filed his voluntary petition for relief pursuant to chapter 11 of the United States Bankruptcy Code on November 20, 2006 (the "Petition Date").

2.    The Debtor continues to manage his assets and affairs as debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. No trustee has been appointed in this case.

3.    Pre- and postpetition, the Debtor maintained a stock account at Morgan Stanley (the "Stock Account"), comprised of interests in certain blue chip stocks, mutual funds, and municipal bonds.

4.    Prior to the Petition Date, the Debtor signed a commercial guaranty as guarantor

of a promissory note to The Scottish Bank (the "Bank") executed by The Jemsek Charm Project as borrower on December 30, 2004 (the "Charm Note"). The Jemsek Charm Project is a charitable entity founded by the Debtor to provide assistance to HIV and AIDS patients. The principal sum of the Charm Note was $200,000.00. Copies of the Charm Note, a change in terms agreement, and the commercial guaranty appear as Exhibits 4, 5, and 6 to the Motion.

5. Also prior to the Petition Date, on March 29, 2006, the Jemsek Clinic, P.A., executed a promissory note as the borrower in favor of the Bank in the amount of $1,300,000.00 (the "Clinic Note"). In connection with the Clinic Note, the Debtor executed a commercial guaranty and a commercial pledge and security agreement as guarantor of the Clinic Note. As a result, the Stock Account is subject to a first lien (the "First Lien") held by the Bank. The Clinic Note, commercial guaranty, and commercial pledge and security agreement appear as Exhibits 1, 2, and 3 to the Motion.

6. On the Petition Date, the Bank implemented a freeze on the $171,243.36 that the Debtor had on deposit in his checking account on that date (the "Frozen Funds").

7. On November 27, 2007, the Bank filed its *Motion to Allow Set-Off, for Relief from Stay and for Other Relief* (the "November Motion") requesting that it be permitted to set-off against the Frozen Funds amounts due pursuant to the Debtor's guaranty of the Charm Note, the balance of which was $200,000.00 as of the Petition Date.

8. Following a hearing on December 5, 2006, the November Motion was settled by entry of an *Agreed Order Settling Motion of the Scottish Bank to Allow Set-off, for Relief from Stay* (the "Charm Note Order"). The Charm Note Order states that the Bank holds a second lien against the Stock Account in the amount of $171,243.36 as partial security for the Charm Note ("Second Lien").

9. The Bank filed a proof of claim relative to the Charm Note on December 13, 2006 indicating that the claim was secured by "other" and that it amounted to $202,200.00 on the Petition Date. The proof of claim does not include the value of the collateral and does not specifically reference the Charm Note Order. This proof of claim appears as claim number 8 on the claims register in this case.

10. Also on December 13, 2006, the Bank filed a proof of claim relative to the Clinic Note, which appears as claim number 9 on the claims register in this case ("Claim No. 9"). Claim No. 9 includes $1,092.60 for late charges from July, 2006 to the Petition Date. The Motion, however, indicates that the "Debtor was in default for September 29, 2006 and subsequent payments," conflicting with the default date as represented in Claim No 9. *(Motion at ¶ 9.)* Claim No. 9 also states that interest of $51,491.19 was due as of the Petition Date, but provides no explanation of this figure, including the interest rate the Bank applied.[1] The total amount claimed on Claim No. 9 is $1,272,868.80.

11. On February 16, 2007, the Bank filed a *Motion for Adequate Protection and to Modify Stay* regarding the Clinic Note and the Charm Note, which motion was subsequently amended on March 6, 2007 (the "March Motion"). The March Motion represented that the balance on the Clinic Note was $1,220,012.00 and that interest continued to accrue at the contract rate of $220.28 per day. *(March Motion, ¶ 8, pg. 2.)* With regard to the Second Lien securing the Charm Note, the March Motion represented that the balance due on that obligation was $194,457.17, and that interest continued to accrue at the contract rate of $45.83 per day. *(Id., ¶ 20, pg. 3.)* The March Motion stated that the Charm Note was secured "to the extent of $171,243.36" reflecting the amount of the Second Lien. *(Id., ¶ 22, pg. 3.)* The March Motion

---

[1] Assuming Claim No. 9 was calculated on a default date of July, it significantly overstates interest figured at the contract rate of interest but understates interest figured at the default rate.

3

requested adequate protection or relief from stay as to the Stock Account in order to "utilize the proceeds therefrom to pay the obligation of [the Bank] in full, including all principal, interest, etc." relative to the Clinic Note and the Charm Note. *(Id. at pg. 4.)*

12. The March Motion made no specific reference to default interest, late charges, or attorneys' fees relative to the First Lien securing the Clinic Note. In addition, the March Motion did not indicate that the Bank considered itself oversecured as to the Charm Note.

13. The March Motion was heard on March 6, 2007 (the "March Hearing") and subsequently continued to April 24, 2007 (the "April Hearing").

14. After the March Hearing, negotiations ensued between the undersigned and counsel for the Bank relative to settling the March Motion. On March 19, 2007, counsel for the Bank conveyed an offer to settle the March Motion as to the Clinic Note for payment of principal, interest, and court-approved attorneys' fees (estimated at $7,000.00), and the Bank's waiver of any late fees. As for the Charm Note, the Bank's offer was to settle the March Motion with payment of principal and interest up to the secured amount and retention of an unsecured claim in the Debtor's case for any additional amounts due, estimated at $23,000.00, and waiver of any late fees.

15. The Debtor did not formally accept or reject the Bank's settlement offer. However, in reliance on this offer, the Debtor directed Morgan Stanley to liquidate the Stock Account. On April 2, 2007, counsel for the Bank informed the undersigned that the Bank was aware the Stock Account was being liquidated.

16. On or about April 18, 2007, liquidation of the Stock Account was completed resulting in a total of $1,544,442.00.

17. After the Stock Account had been liquidated, on April 23, 2007, counsel for the

Bank asserted that it was due late fees alleging that the Debtor had rejected its settlement offer. The Debtor did not reject that offer. Later, the undersigned was informed that the Bank had withdrawn its settlement offer; however, no such withdrawal was conveyed to the Debtor. In addition, counsel for the Bank estimated that the Bank's attorneys' fees were $7,500.00.

18. At the April Hearing, counsel for the Debtor announced that the Stock Account had been liquidated. The Court allowed the March Motion so as to permit payment of principal and interest on the Clinic Note and the secured portion of the Charm Note. A continued hearing on issues as to fees was set for May 22, 2007.

19. After the April Hearing, in a letter dated April 25, 2007 (the "April Letter," attached hereto as Exhibit A), counsel for the Bank asserted that, with regard to the Clinic Note, the Bank was due a total of $1,326,895.22 as of April 24, 2007. This sum included $102,328.51 in interest calculated on a default rate of $542.23 per day beginning on the Petition Date. *(April Letter, pg. 1.)* The April Letter also states that the Bank's attorneys' fees totaled approximately $10,000.00. *(Id.)* As for the Charm Note, the April Letter asserted that the Bank was due the secured amount of that claim, $171,243.36 plus interest at the contract rate of 8.25%, less a payment made on February 20, 2007, for a total of $171,707.49. *(Id., pg. 2.)*

20. On Friday, May 4, 2007, the Court entered the *Consent Order on Motion for Adequate Protection and to Modify Stay* (the "Consent Order"). The Consent Order provided authority for Morgan Stanley to remit $1,273,980.58 in principal and interest on the Clinic Note, figured at the contract rate through May 1, 2007; $171,243.36 in payment of the Second Lien relative to the Charm Note; and an additional $220.28 per day in interest on the Clinic Note through the date of payment. *(Consent Order at pg. 2.)*

21. The following Monday, May 7, 2007, in compliance with the Consent Order,

5

Morgan Stanley issued three checks on the Debtor's account, number xxx-xxx52-0-21, to the Bank as follows:

- Check number 76710723 in the amount of $1,273,980.58 for the Clinic Note;
- Check number [illegible] in the amount of $171,243.36 for the Charm Note; and
- Check number 76710725 in the amount of $1,541.96 for interest on the Clinic Note for seven days.

These checks were delivered to the Bank on May 8, 2007 at 9:51 a.m. Exhibit B includes copies of the checks payable to the Bank and delivery information relative to the checks.

22. On May 11, 2007, the Motion was filed. The Motion does not acknowledge the payments that the Bank received on May 7, 2007. The Motion requests that the Bank be granted default interest at the rate of 16% on the Clinic Note, $4,554.71 in late charges on the Clinic Note, and interest on the secured portion of the Charm Note from December 5, 2006 until paid. *(Motion at pgs. 4-5.)*

23. Also on May 11, 2007, counsel for the Bank filed a *Brief in Support of Motion to Allow Fees and Expenses* (the "Brief"). In addition to the relief requested in the Motion, the Brief references a request for attorneys' fees relative to the Clinic Note based on an application for fees. *(Brief, pg. 7.)* The Application was filed by counsel for the Bank on May 15, 2007.

## DISCUSSION

24. The Debtor objects to the Motion and requests that it be denied as to the request for payment of interest on the Charm Note based on the provisions of § 506(b) and related case law regarding undersecured claims. As for the Clinic Note, the request for default rate interest should be denied on the grounds that it is not supported by the case law relative to the provisions of 11 U.S.C. § 506(b) and equitable considerations. In addition, the doctrine of equitable estoppel serves as a bar to the Bank's request for default rate interest and late fees. Finally, the Debtor objects to the allowance of attorneys' fees and expenses incurred for work that was not

6

related to the Bank's secured claim on the Clinic Note as the same are not permissible under § 506(b).

### A.     The Bank is Not Entitled to Interest on the Charm Note.

25.     With respect to the Charm Note, the Motion asserts that the Bank is "an oversecured creditor entitled to interest charges in accordance with 11 U.S.C. § 506(b)." *(Motion at ¶ 18.)* Section 506(b) of the Bankruptcy Code states that a holder of a secured claim shall be allowed interest on such claim "[t]o the extent that" such allowed secured claim "is secured by property the value of which . . . is greater than the amount of such claim . . . ." 11 U.S.C. § 506(b). The value of a creditor's secured claim is the value of the collateral. *United Sav. Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 372 (1988).

26.     The substantive effect of § 506's wording is that undersecured creditors are denied postpetition interest on their claims. *Id.* Because § 506(b) allows postpetition interest to be paid only out of a "security cushion," and because undersecured creditors have no such cushion, creditors holding undersecured claims are not entitled to postpetition interest. *Id.* at 372-73. Indeed, to allow undersecured creditors to receive interest on their claims would be inequitable to unsecured creditors. *Id.* at 373 (citing *Vanston Bondhlders Protective Committee v. Green*, 329 U.S. 156, 164 (1946)).

27.     In this case, the Charm Note was an unsecured obligation, the principal balance of which was $200,000 at the Petition Date.[2] By virtue of the Charm Note Order, the Bank obtained a Second Lien against the Stock Account partially securing the Charm Note in the amount of $171,243.36. Accordingly, the Bank is undersecured as to the Charm Note.

28.     The Second Lien has been paid; therefore, the Bank has received the secured

---

[2]     A review of the Charm Note documents and Clinic Note documents attached as exhibits to the Motion indicates that these obligations were not cross-collateralized.

7

amount of the Charm Note. Based on the plain language of § 506(b) and the Supreme Court's interpretation of this statute in the *Timbers* case, the Bank is not entitled to more in the form of postpetition interest on the Charm Note. Moreover, to allow the Bank to collect interest on the Charm Note ahead of any distribution to unsecured creditors would be inequitable.

**B.     The Bank is Not Entitled to Interest at the Default Rate on the Clinic Note**.

29.    The Bank is not entitled to default rate interest on the Clinic Note because the equities involved weigh against the Bank on this issue. Further, the Bank having asserted in the March Motion that "interest continues to accrue on [the Clinic Note] at $220.28 per day" is estopped from now claiming that it is entitled to recover default interest at the rate of $542.23 per day.

30.    The Supreme Court has interpreted § 506(b) as mandating postpetition interest for oversecured creditors. *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989). However, recovery of fees and costs is limited to what is provided for in the agreement under which the claim arose and what is reasonable. *Id.* While providing for postpetition interest, *Ron Pair* does not address the interest rate that should apply. *Florida Asset Financing Corp. v. Dixon (In re Dixon)*, 228 B.R. 166, 171 (W.D. Va. 1998). The majority of federal courts that have considered this issue have presumed that oversecured creditors may recover default rate interest subject to rebuttal of that presumption based on equitable considerations. *In re Terry Ltd. P'ship*, 27 F.3d 241, 243 (7th Cir. 1994); *Bradford v. Crozier (in re Laymon)*, 958 F.2d 72, 74-75 (5th Cir. 1992); *Equitable Life Assurance Soc'y v. Sublett (In re Sublett)*, 895 F.2d 1381, 1385-86 (11th Cir. 1990).

31.    Therefore, the facts and equities of each case determine whether an oversecured creditor is entitled to default interest. *Dixon*, 228 B.R. at 173. In cases "where the circumstances

necessitating an equitable deviation are plainly absent and the contract interest rate does not violate state usury laws, function as a penalty, or exceed the value of the collateral," the presumption favoring the default rate in the contract is not rebutted. *Id.* at 174. However, evaluation of certain factors may result in an equitable deviation, including, for example: (1) whether or not the creditor ambushed the debtor with a claim for default interest; (2) whether the spread between the contract rate and the default rate is small or large; (3) whether the creditor obstructed the reorganization process; and (4) whether creditors junior to the secured creditor will be harmed if the court applies the default rate of interest. *Southland Corp. v. Toronto-Dominion (In re Southland Corp.)*, 160 F.3d 1054, 1059-60 (5th Cir. 1998)).

32.    The Brief cites to a decision from the Middle District of North Carolina, *In re Deep River Warehouse, Inc.*, 2005 WL 1513123 (Bankr. M.D.N.C. 2005), for support in asserting that it is entitled to collect interest at the default rate on the Clinic Note. *(Brief, pgs. 3-6.)* The primary issue regarding default interest in that case was whether the terms of the loan documents at issue required the creditor to provide notice to the debtor of its intent to charge default interest. 2005 WL 1513123 at *4. The loan documents at issue stated that "default interest shall become due immediately" upon default. *Id.* at *5. Based on this mandatory language, the *Deep River Warehouse* court concluded that notice was not required. *Id.* at *5. The court also determined that the 3% default rate or interest in that case was reasonable. *Id.*

33.    In evaluating the equities at play in another case, a bankruptcy court took note that the creditor did not charge default interest on a pre-petition default but rather waited until the bankruptcy case was filed and then sought a "bonus" in the form of default rate interest. *In re Cummins Utility, L.P.*, 279 B.R. 195, 202 (Bankr. N.D. Tex. 2002); *see also, Southland*, 160 F.3d at 1060 (allowing default interest in case where creditor notified debtor of the same pre-

9

petition and thus did not "ambush" debtor with its claim). In addition, the creditor in *Cummins Utility* passed up opportunities to put other creditors on notice that it intended to seek default interest. *Id.* at 202-03 & n.20. Further, the *Cummins Utility* court determined that a 2% spread between the contract rate and the default rate of interest was not too small to be considered inequitable. *Id.* at 203. Finally, an anticipated "miniscule" return to unsecured creditors weighed against allowing default interest in the *Cummins Utility* case. *Id.*

34. In this case, the Clinic Note does not mandate default interest but rather provides that "[u]pon default, Lender, *at Lender's option, may*, if permitted by applicable law, increase the interest rate on this Note to 16.00% per annum." *(Motion, Exhibit 1 (emphasis added).)* When a loan agreement includes an optional rather than a mandatory provision, the holder must affirmatively exercise its option under the agreement. *See Shoenterprise Corp. v. Willingham*, 258 N.C. 36, 39, 127 S.E.2d 767, 770 (N.C. 1962) (discussing an optional acceleration clause). As the *Shoenterprise* court states, "a mere mental intention" is not sufficient to exercise such an option. *See id.* at 39-40; 127 S.E.2d at 770 (citing 5 A.L.R.2d 968, 970). While the Clinic Note allows the Bank the option of charging a higher interest rate upon default, use of the word "may" indicates that this option must be affirmatively exercised. This permissive language stands in sharp contrast to the terminology in the contract at issue in the *Deep River Warehouse* case. In short, under the terms of the Clinic Note, drafted by the Bank, the Bank was required to notify the Debtor before it began accruing default interest.

35. The Motion contends that the Debtor defaulted on the Clinic Note on September 29, 2006. However, the Bank did not notify the Debtor at that time that it intended to exercise its option relative to default interest. Nor did the Bank indicate in the March Motion that it was asserting any entitlement to default interest. Instead, the Bank remained silent as to its intent to

exercise this option until the April Letter, after the Stock Account had been liquidated.[3]

36. The Debtor had no forewarning that the Bank would assert a claim for interest at the default rate after the Stock Account was liquidated. Thus, the Debtor was ambushed by the Bank's request for default interest in the April Letter and the Motion. Because the Bank omitted a request for default interest in the March Motion, not only was the Debtor surprised by the Bank's claim for default interest, but his other creditors were as well.

37. Other equitable considerations weigh against allowing default rate interest in this case. The Bank had already received full payment of principal and contract rate interest before the Motion was filed. The spread between the contract rate of 6.5% and the default of 16% on the Clinic Note is significant, and allowing additional recovery to the Bank would be inequitable as to the Debtor's unsecured creditors. For all these reasons, the equities of this case militate against the Bank and in favor of the Debtor on the issue of default rate interest.

38. Equitable estoppel also applies to bar the Bank's belated request for default rate interest. The doctrine of equitable estoppel as explained in *Whiteacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 591 S.E.2d 870 (N.C. 2004) and *In re Covington*, 252 N.C. 546, 114 S.E.2d 257 (N.C. 1960) holds that a party who induces another to rely on representations to the relying party's detriment may be estopped from taking a position contrary to the position first asserted. *Whiteacre*, 358 N.C. at 17-21, 591 S.E.2d at 881-83; *Covington*, 252 N.C. at 549, 114 S.E.2d at 260.

39. Pre-petition, the Bank did not exercise its option as to default interest. Postpetition, the March Motion represented to the Debtor, the Court, and other creditors that the

---

[3] The April Letter indicates that the Bank began accruing interest at the default rate on the Petition Date. However, the Motion alleges that the Bank is entitled to default interest starting on September 29, 2006, which the Bank contends was the date of the Debtor's default. As indicated herein, Claim No. 9 relative to the Clinic Note does not state what interest rate the Bank applied in calculating the amount allegedly due, and it appears to assert that default occurred in July.

11

Bank was due interest at the contract rate, not the default rate. (*March Motion at ¶ 8.*) The Debtor was entitled to rely on these representations, and in fact did so rely in directing liquidation of his Stock Account. Accordingly, the doctrine of equitable estoppel applies to prevent the Bank's recovery of default rate interest on the Clinic Note.

### C.    The Bank is Not Entitled to Late Fees on the Clinic Note.

40.    Equitable estoppel also works to bar the Bank from claiming late fees at this juncture. Equitable estoppel is designed to promote fairness between the parties. *Whiteacre P'ship*, 358 N.C. at 17, 591 S.E.2d at 881. It is based on the application of the golden rule to everyday affairs. *Covington*, 252 N.C. at 549, 114 S.E.2d at 259. Equitable estoppel applies "when any one, by his acts, representations or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts exist, and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts." *Whitacre*, 358 N.C. at 16, 591 S.E.2d at 881 (quoting *State Highway Comm'n v. Thornton*, 271 N.C. 227, 240, 156 S.E.2d 248, 258 (N.C. 1967).

41.    Here, there is no dispute that the Bank offered to settle the March Motion by, among other things, waiving any late fees. It also is not disputed that the Debtor, while not formally conveying acceptance to the Bank, did request that Morgan Stanley liquidate the Stock Account after receiving that offer. Unquestionably, the Debtor changed his position on the Bank's representation that it would waive late fees. The Bank now seeks to change its position and collect late fees of $4,554.71.[4] The doctrine of equitable estoppel is implicated here and serves as a bar to the Bank's request for late fees.

---

[4]    Neither the Motion nor the Brief provides a calculation of this amount.

12

### D.     The Bank is Only Entitled to Attorneys' Fees Associated with the Clinic Note.

42.    In the Application, the Bank asserts that it is due to be reimbursed for a total of $13,818.00 in attorneys' fees and $223.26 in expenses for a total of $14,341.26. The Debtor objects to the Application on the ground that it includes substantial charges for attorney time spent on matters unrelated to the Bank's secured claim relative to the Clinic Note as will be explained herein and as illustrated on the attached Exhibits C and D.

43.    Section 506(b) gives bankruptcy courts the authority to award attorney's fees to a creditor in instances where three conditions are met: (1) the creditor is oversecured; (2) the underlying agreement between the debtor and creditor provides for the award of fees and costs; and (3) the fees and costs sought are reasonable. *In re Tate*, 253 B.R. 653, 664 (Bankr. W.D.N.C. 2000). The question of reasonableness is determined by the court based on application of federal law. *Id.* at 665. An oversecured creditor is only entitled to fees for services reasonably required to protect its interests. *In re Jemps*, 330 B.R. 258, 262 (D. Wyo. 2005) (citing *In re Villa Capri of Ga. Assoc. Ltd.*, 141 B.R. 257, 263 (Bankr. N.D. Ga. 1992)). While a creditor is not entitled to a secured claim for attorneys' fees incurred in the course of overzealous representation undertaken at the creditor's direction, nothing prevents the creditor-client from compensating its attorney for any attorneys' fees that are not allowed as part of the creditor's secured claim. *Jemps*, 330 B.R. at 262.

44.    Fed. R. Bankr. P. 2016 ("Rule 2016") provides the procedure for court's to follow in determining the reasonableness of attorneys' fees. *Tate*, 253 B.R. at 665. This process allows the court, the debtor, and other parties in interest to carefully review each fee application. *Id.*

45.    In this case, the Bank is only oversecured as to the Clinic Note. Only time and expenses for activities related to the Clinic Note can be allowed as part of that secured claim.

13

The undersigned has reviewed the billing records attached to the Application and coded those records by activity to create Exhibit C. Time and expenses incurred relative to the Clinic Note are coded as "CL."[5] Exhibit D, is a summary of the time and expense for each activity code on Exhibit C. Thus, a review of the billing records included with the Application indicates that fees and expenses associated with the Clinic Note total $8,212.70. The Debtor maintains that this is the maximum amount the Bank can recover for attorneys' fees in this case. The remaining time entries were incurred on matters unrelated to the Clinic Note and fail to meet the first of the three conditions outlined in § 506(b) as explained in *Tate*.

46.     The billing records included as Exhibit A to the Application list numerous entries associated with the undersecured Charm Note, coded on Exhibit C and D as "CH." Examples of the Charm Note related entries include a review of right to setoff on November 21, 2006; revising a motion to allow setoff and to modify stay on the same date; and preparing for and attending a hearing on this motion on December 5, 2006. As shown on Exhibit D, the Charm Note entries total $2,570.56. These fees should be disallowed as the Bank is not entitled to attorneys' fees in connection with the undersecured Charm Note based on the language of § 506(b).

47.     The Application includes time entries for miscellaneous matters associated with monitoring the Debtor's case and the case of the Jemsek Clinic but wholly unrelated to the Clinic Note. Entries for miscellaneous matters are coded on Exhibit C as "M" and total $2,578.00 as indicated on Exhibit D. For example, the billing records include a review of applications to employ an appraiser and attorney on December 1, 2006; appearance at a hearing on a motion to appoint an ombudsman on November 20, 2007; and a review of a notice of removal of a matter

---

[5] In instances where the time entry related to multiple activities, the total time is equally divided on the Exhibit D summary.

14

unrelated to the Bank on February 16, 2007. None of these time entries were for activities associated with the Clinic Note; therefore, they are not allowable pursuant to § 506(b).

48. The Application also includes numerous entries that are non-specific as to whether they relate to the Clinic Note or not. For example, the billing records include phone calls to and from and meetings with Bank personnel, but there is no information regarding the topic of these calls and meetings. These entries are coded on Exhibit C as "U" and total $980 as indicated on Exhibit D. Because the Court does not have all the information necessary for a determination as to whether these attorneys' fees were incurred in connection with the Clinic Note or not, they should be disallowed.

49. In sum, the Bank is only entitled to its fees as they relate to the Clinic Note, and to the extent that the Application reflects a request for fees and expenses not associated with representation as to that secured claim, the Application must be denied. Accordingly, the Debtor believes the maximum allowable amount of fees and expenses in this case is $8,212.70, not the $14,341.26 requested in the Application.

## CONCLUSION

For the reasons set forth herein, the Motion should be denied in all respects, and the Application should be disallowed for any and all attorneys' fees and expenses not associated with the Clinic Note.

This is the 17th day of May, 2007.

/s/ A. Cotten Wright
A. Cotten Wright (State Bar No. 28162)
Grier Furr & Crisp, PA
101 North Tryon Street, Suite 1240
Charlotte, NC 28246
Telephone: (704) 375-3720
Facsimile (704) 332-0215
cwright@grierlaw.com

15