FILED & JUDGMENT ENTERED
David E. Weich

May 31 2007

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_____
J. Craig Whitley
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**Charlotte Division**

In re:

JOSEPH GREGORY JEMSEK,

Debtor.

Case No. 06-31986

Chapter 11

**ORDER ON MOTION TO ALLOW FEES AND EXPENSES BY THE SCOTTISH BANK
AND APPLICATION FOR REIMBURSEMENT OF
ATTORNEYS' FEES AND EXPENSES OF KELLAM & PETTIT, P.A.**

This matter came before the Court on the *Motion to Allow Fees and Expenses* (the "Motion") filed on behalf of The Scottish Bank ("TSB"); the *Application for Reimbursement of Attorneys' Fees and Expenses of Kellam & Pettit, P.A.* (the "Application") filed on behalf of TSB; the *Objection to Motion by The Scottish Bank to Allow Fees and Expenses and Application for Reimbursement of Attorneys' Fees and Expenses of Kellam & Pettit, P.A.* (the "Debtor's Objection") filed on behalf of the debtor ("Debtor"); and the *Objection to Motion to Allow Fees and Expenses and Application for Reimbursement of Attorneys' Fees and Expenses* (the "First-Citizens Objection") filed on behalf of First-Citizens Bank and Trust Company ("First-Citizens").  The Court conducted a hearing on May 22, 2007, and the Application was heard on shortened notice with the consent of the Debtor and First-Citizens.  The Court has considered the

pleadings, arguments of counsel, and the record in this case, and for the reasons stated below, has determined that the Motion and Application should be allowed in part and denied in part.

## PARTIES AND JURISDICTION

1. The Debtor filed his voluntary petition for relief pursuant to chapter 11 of the United States Bankruptcy Code on November 20, 2006 (the "Petition Date"). The Debtor continues to manage his assets and affairs as debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. No trustee has been appointed in this case.

2. TSB is a state banking association duly organized and operating under the laws of the State of North Carolina with its principal place of business being located in Charlotte, North Carolina.

3. First-Citizens is a significant unsecured creditor in the Debtor's bankruptcy case as is evidenced by claims number 11, 12, and 26 in the claims register in this case.

4. The Court has jurisdiction over the Motion and Application pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K).

## FACTUAL BACKGROUND

5. On December 30, 2004, the Debtor signed a commercial guaranty as guarantor of a promissory note to TSB executed by The Jemsek Charm Project as borrower (the "Charm Note"). The Jemsek Charm Project is a charitable entity founded by the Debtor to provide assistance to HIV and AIDS patients. The principal sum of the Charm Note was $200,000.00. On the Petition Date, TSB implemented a freeze on the $171,243.36 that the Debtor had on deposit in his checking account on that date (the "Frozen Funds"). As a result of TSB's *Motion to Allow Set-Off, for Relief from Stay and for Other Relief* requesting that it be permitted to set-off against the Frozen Funds amounts due pursuant to the Debtor's guaranty of the Charm Note,

the Court entered an *Agreed Order Settling Motion of the Scottish Bank to Allow Set-off, for Relief from Stay* (the "Charm Note Order") granting TSB a second lien against the Stock Account in the amount of $171,243.36 as partial security for the Charm Note ("Second Lien").

6.      On March 29, 2006, the Jemsek Clinic, P.A., executed a promissory note as the borrower in favor of TSB in the amount of $1,300,000.00 (the "Clinic Note"). The Clinic Note provided for a contract rate of interest of 6.5% ($220.28 per day) and allowed TSB, at its option, to charge interest at a default rate of 16 % ($542.23 per day) upon default. In addition, the Clinic Note provided for a late charge of 4% of the amount of any delinquent payment made more than 15 days after the due date.

7.      Pre- and postpetition, the Debtor maintained a stock account at Morgan Stanley (the "Stock Account"), comprised of interests in certain blue chip stocks, mutual funds, and municipal bonds. In connection with the Clinic Note, the Debtor executed a commercial guaranty and a commercial pledge and security agreement as guarantor of the Clinic Note. As a result, the Stock Account became subject to a first lien (the "First Lien") held by TSB.

8.      The Debtor defaulted under the payment provisions of the Clinic Note as of September 29, 2006.

9.      On February 16, 2007, TSB filed a *Motion for Adequate Protection and to Modify Stay* regarding the Clinic Note and the Charm Note, which motion was subsequently amended on March 6, 2007 (the "March Motion"). The March Motion represented that the balance on the Clinic Note was $1,220,012.00, and that interest continued to accrue at the contract rate of $220.28 per day. *(March Motion, ¶ 8, pg. 2.)* With regard to the Second Lien securing the Charm Note, the March Motion represented that the balance due on that obligation was $194,457.17, and that interest continued to accrue at the contract rate of $45.83 per day. *(Id., ¶*

3

*20, pg. 3.)* The March Motion stated that the Charm Note was secured "to the extent of $171,243.36" reflecting the amount of the Second Lien. *(Id., ¶ 22, pg. 3.)* The March Motion requested adequate protection or relief from stay as to the Stock Account in order to "utilize the proceeds therefrom to pay the obligation of [TSB] in full, including all principal, interest, etc." relative to the Clinic Note and the Charm Note. *(Id. at pg. 4.)*

10. The March Motion made no specific reference to default interest, late charges, or attorneys' fees relative to the First Lien securing the Clinic Note. In addition, the March Motion did not indicate that TSB considered itself oversecured as to the Charm Note.

11. The March Motion was heard on March 6, 2007 (the "March Hearing") and subsequently continued to April 24, 2007 (the "April Hearing"). After the March Hearing, negotiations ensued between the counsel for the Debtor and counsel for TSB relative to settling the March Motion. Consequently, the Debtor directed Morgan Stanley to liquidate the Stock Account, and on or about April 18, 2007, that liquidation was completed resulting in a total of $1,544,442.00.

12. At the April Hearing, counsel for the Debtor announced that the Stock Account had been liquidated. The Court determined that the March Motion should be allowed so as to permit payment of principal and interest on the Clinic Note and the secured portion of the Charm Note. A continued hearing on the issue of allowable fees was set for May 22, 2007.

13. After the April Hearing, in a letter dated April 25, 2007, counsel for TSB asserted that, with regard to the Clinic Note, TSB was due a total of $1,326,895.22 as of April 24, 2007. This sum included $102,328.51 in interest calculated on a default rate of $542.23 per day beginning on the Petition Date. *(Mem of Law in Supp. of Objection to Mot. ("Debtor's Brief"), Ex. A at pg. 1.)* The April Letter also states that TSB's attorneys' fees totaled approximately

4

$10,000.00.  *(Id.)*  As for the Charm Note, the April Letter asserted that TSB was due the secured amount of that claim, $171,243.36, plus interest at the contract rate of 8.25%, less a payment made on February 20, 2007, for a total of $171,707.49.  *(Id., pg. 2.)*

14. On Friday, May 4, 2007, the Court entered the *Consent Order on Motion for Adequate Protection and to Modify Stay* (the "Consent Order").  The Consent Order provided authority for Morgan Stanley to remit $1,273,980.58 in principal and interest on the Clinic Note, figured at the contract rate through May 1, 2007; $171,243.36 in payment of the Second Lien relative to the Charm Note; and an additional $220.28 per day in interest on the Clinic Note through the date of payment.  *(Consent Order at pg. 2.)*

15. In compliance with the Consent Order, Morgan Stanley issued three checks on the Debtor's account, number xxx-xxx52-0-21, which were delivered to TSB on May 8, 2007. These checks were as follows:

- Check number 76710723 in the amount of $1,273,980.58 for the Clinic Note principal and interest at the contract rate through May 1, 2007;
- Check number [illegible] in the amount of $171,243.36 for the Second Lien relative to the Charm Note; and
- Check number 76710725 in the amount of $1,541.96 for seven days' additional interest at the contract rate on the Clinic Note.

16. On May 11, 2007, the Motion was filed.  The Motion requests that TSB be granted the default rate of interest of 16% on the Clinic Note, $4,554.71 in late charges on the Clinic Note (calculated based on the inclusion of interest at the default rate), and interest on the secured portion of the Charm Note from December 5, 2006 until paid.  *(Motion at pgs. 4-5.)*

17. The Application was filed by counsel for TSB on May 15, 2007.  The Application requests reimbursement for $13,818.00 in attorneys' fees and $523.26 in expenses for the period of November 1, 2006 through May 22, 2007.

18. On May 17, 2007, the Debtor's Objection was filed, and on May 18, 2007, the

5

First-Citizens Objection was filed.

19.     The Court conducted a hearing on the Motion and Application and the objections thereto on May 22, 2007.   On May 23, 2007, the Court announced its ruling as detailed herein.

## DISCUSSION

### A.     Issues Related to the Charm Note

20.     The Court has determined that TSB is not entitled to additional interest, late fees or attorneys' fees relative to the Charm Note.

21.     Section 506(b) of the Bankruptcy Code states that a holder of a secured claim shall be allowed interest on such claim "[t]o the extent that" such allowed secured claim "is secured by property the value of which . . . is greater than the amount of such claim . . . ." 11 U.S.C. § 506(b).  The value of a creditor's secured claim is the value of the collateral.  *United Sav. Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd*., 484 U.S. 365, 372 (1988).

22.     The substantive effect of § 506's wording is that undersecured creditors are denied postpetition interest on their claims.  *Id*.  Because § 506(b) allows postpetition interest to be paid only out of a "security cushion," and because undersecured creditors have no such cushion, creditors holding undersecured claims are not entitled to postpetition interest.  *Id*. at 372-73.  Indeed, to allow undersecured creditors to receive interest on their claims would be inequitable to unsecured creditors.  *Id*. at 373 (citing *Vanston Bondhlders Protective Committee v. Green*, 329 U.S. 156, 164 (1946)).

23.     In this case, the Charm Note was an unsecured obligation, the principal balance of which was $200,000 on the Petition Date.  By virtue of the Charm Note Order, TSB obtained a Second Lien against the Stock Account partially securing the Charm Note in the amount of $171,243.36.  Accordingly, TSB is undersecured as to the Charm Note.

24. Because the Second Lien has been paid, TSB has received the secured amount of the Charm Note. Based on the plain language of § 506(b) and the Supreme Court's interpretation of this statute in the *Timbers* case, TSB is not entitled to more in the form of postpetition interest, late fees, or attorneys' fees on the Charm Note. Moreover, to allow TSB to collect such additional amounts on the Charm Note ahead of any distribution to unsecured creditors would be inequitable.

### B.  Issues Related to the Clinic Note

#### 1.  *Default Rate Interest*

25. Analysis of TSB's request for default rate interest begins with the provisions of § 506(b) granting secured creditors interest on their claims to the extent that the value of the collateral is greater than the amount of the claim. § 506(b).

26. The Supreme Court has interpreted § 506(b) as mandating postpetition interest for oversecured creditors. *United States v. Ron Pair Enterprises, Inc*., 489 U.S. 235, 241 (1989). However, recovery of fees and costs is limited to what is provided for in the agreement under which the claim arose and to what is reasonable. *Id*. While providing for postpetition interest, *Ron Pair* does not address the interest rate that should apply. *Florida Asset Financing Corp. v. Dixon (In re Dixon)*, 228 B.R. 166, 171 (W.D. Va. 1998). The majority of federal courts that have considered this issue have presumed that oversecured creditors may recover default rate interest subject to the rebuttal of that presumption based on equitable considerations. *In re Terry Ltd. P'ship*, 27 F.3d 241, 243 (7th Cir. 1994); *Bradford v. Crozier (in re Laymon)*, 958 F.2d 72, 74-75 (5th Cir. 1992); *Equitable Life Assurance Soc'y v. Sublett (In re Sublett)*, 895 F.2d 1381, 1385-86 (11th Cir. 1990).

27. Therefore, the facts and equities of each case determine whether an oversecured

creditor is entitled to default interest. *Dixon*, 228 B.R. at 173. In cases "where the circumstances necessitating an equitable deviation are plainly absent and the contract interest rate does not violate state usury laws, function as a penalty, or exceed the value of the collateral," the presumption favoring the default rate in the contract is not rebutted. *Id*. at 174. However, evaluation of certain factors may result in an equitable deviation, including, for example: (1) whether or not the creditor ambushed the debtor with a claim for default interest; (2) whether the spread between the contract rate and the default rate is small or large; and (3) whether creditors junior to the secured creditor will be harmed if the court applies the default rate of interest. *Southland Corp. v. Toronto-Dominion (In re Southland Corp.)*, 160 F.3d 1054, 1059-60 (5th Cir. 1998)); *see also*, *Cummins Utility*, L.P., 279 B.R. 195, 202-03 & n.20 (Bankr. N.D. Tex. 2002). Most courts that have allowed default rate interest have dealt with a default rate that was two to three percent above the applicable contract rate. *See, e.g., In re Deep River Warehouse, Inc.*, 2005 WL 1513123 (Bankr. M.D.N.C. 2005).

28. In the *Deep River Warehouse* case, the creditor's entitlement to default rate interest was self-executing, and no notice to the debtor was required. *Id*. at *5. However, when a loan agreement includes an optional rather than a mandatory provision, the holder must affirmatively exercise its option under the agreement. *See Shoenterprise Corp. v. Willingham*, 258 N.C. 36, 39, 127 S.E.2d 767, 770 (N.C. 1962) (discussing an optional acceleration clause). As the *Shoenterprise* court states, "a mere mental intention" is not sufficient to exercise such an option. *See id.* at 39-40; 127 S.E.2d at 770 (citing 5 A.L.R.2d 968, 970).

29. Considering the equities at play in this case, the Court has determined that TSB has not carried its burden of showing that it is entitled to interest at the default rate as compensation for additional costs and risks assumed pursuant to a default on the Clinic Note.

8

Case law cited by TSB in support of its request for default rate illustrates situations involving a debtor and a secured creditor in which unsecured creditors were not affected. Here, however, the Court has the benefit of hindsight in that it knows that TSB has been paid on its primary claim. Other creditors in this case have not been so fortunate. Because unsecured creditors may be affected, the burden is on TSB to show that it is entitled to more than it has received already.

30.     The Clinic Note's 16% default rate of interest is 9.5% higher than the contract rate of 6.5%. This is a substantial gap. The Court believes that the 16% default rate is too high to be compensatory. It appears instead to be punitive. Nevertheless, some additional amount of default interest should be allowed as an incentive to pay this debt. Given these considerations, the Court concludes, that, to the extent that default rate interest is allowed, it will be limited to 3% more than the contract rate, for a total of 9.5%.

31.     The Court's review of the Clinic Note indicates that it gives TSB the option of charging a higher interest rate upon default. The Clinic Note's use of the discretionary term "may" with regard to default rate interest indicates that this provision is not self-executing. Instead, some notice to the Debtor is required under the terms of the Clinic Note.

32.     TSB did not attempt to impose the default rate until after the Debtor's case was filed and after it filed the March Motion. The Court concludes that the Debtor did not receive notice of TSB's intention to charge default rate interest until the date of the April Letter. Accordingly, TSB is entitled to interest totaling 9.5% from that date, April 25, 2007, to the date of payment of the Clinic Note, May 8, 2007, for a total of 14 days.

   2.     *Late Fees*

33.     Applying the provisions of § 506(b) cited above, the Court has determined that late fees should be allowed in this case. However, such late fees are to be calculated on the

9

amounts due based on application of the contract rate of interest up to April 25, 2007, and a 9.5% default rate of interest thereafter to the date of payment.

### *3. Attorneys' Fees*

34.     Pursuant to state law, the Clinic Note, and § 506(b), TSB is entitled to attorneys' fees and expenses to the extent that the Clinic Note is oversecured. In the Application, the Bank asserts that it is due to be reimbursed for a total of $13,818.00 in attorneys' fees and $523.26 in expenses for a total of $14,341.26.

35.     Section 506(b) gives bankruptcy courts the authority to award attorney's fees to a creditor in instances where three conditions are met: (1) the creditor is oversecured; (2) the underlying agreement between the debtor and creditor provides for the award of fees and costs; and (3) the fees and costs sought are reasonable. *In re Tate*, 253 B.R. 653, 664 (Bankr. W.D.N.C. 2000). The question of reasonableness is determined by the court based on application of federal law. *Id*. at 665. An oversecured creditor is only entitled to fees for services reasonably required to protect its interests. *In re Jemps*, 330 B.R. 258, 262 (D. Wyo. 2005) (citing *In re Villa Capri of Ga. Assoc. Ltd*., 141 B.R. 257, 263 (Bankr. N.D. Ga. 1992)). Fed. R. Bankr. P. 2016 ("Rule 2016") provides the procedure for court's to follow in determining the reasonableness of attorneys' fees. *Tate*, 253 B.R. at 665. This process allows the court, the debtor, and other parties in interest to carefully review each fee application. *Id*.

36.     In the instant case, the Debtor's Brief breaks out TSB's attorneys' fees and costs detailed in Exhibit A of the Application by activity. *(Debtor's Br., Ex. D.)* The Court adopts the Debtor's proposed classification and holds that the following fees and expenses should be allowed:

    a.     A total of $8,212.70 ($7,940.00 in fees and $272.70 in expenses) related to the Clinic Note;

    b.    A total of $2,578.00 for fees incurred with miscellaneous matters associated with monitoring the Debtor's case and the case of the Jemsek Clinic; and

    c.    A total of $980 for fees related to billing entries that are non-specific.

As stated above, TSB is not entitled to attorneys' fees and expenses associated with the Charm Note, which total $2,570.56 ($2,500.00 in fees and $250.56 in expenses).

37.    In sum, TSB is entitled to $11,770.70 in attorneys' fees and costs.

### C.    Remaining Proceeds of Stock Account

38.    The Second Lien was paid in full on May 8, 2007. Upon satisfaction of the default rate interest, late fees, and attorneys' fees allowed herein, the First Lien also will have been paid in full. Accordingly, Morgan Stanley will be directed to disburse any remaining amounts to the Debtor.

IT IS, THEREFORE, ORDERED that:

1)    The Motion is ALLOWED in part and DENIED in part;

2)    Morgan Stanley is directed to disburse to TSB additional interest at a default rate of 3% above the contract rate, for a total of 9.5%, for the period of April 25, 2007 through May 8, 2007, which shall result in an additional payment to TSB of $1,423.38;

3)    Morgan Stanley is directed to disburse to TSB late charges totaling $2,277.37;

4)    Morgan Stanley is directed to disburse to TSB attorneys' fees and expenses totaling $11,770.70; and

5)    Morgan Stanley is authorized to disburse the remaining proceeds of the Stock Account to the Debtor.

This Order has been signed                       United States Bankruptcy Court
electronically. The judge's
signature and court's seal
appear at the top of the Order.

11