**EXHIBIT A**

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
|     JOSEPH GREGORY JEMSEK | ) | Bankruptcy Case No. 06-31986 (JCW) |
| | ) | |
|     JEMSEK CLINIC, P. A. | ) | Bankruptcy Case No. 06-31766 |
| | ) | |
|     Debtors. | ) | (Jointly Administered) |

## FIRST AMENDED JOINT PLAN OF REORGANIZATION

Joseph Gregory Jemsek ("Jemsek") and the Jemsek Clinic, P.A. ("Jemsek Clinic"), debtors and debtors-in-possession in the above captioned cases (also called the "Debtors"), submit this Joint Plan of Reorganization pursuant to section 1121(a) under Title 11 of the United States Code, 11 U.S.C. § 101 et seq.

## ARTICLE I
## DEFINITIONS

As used in this chapter 11 plan, the following terms shall have the respective meanings specified below:

**Administrative Claim**. Any cost or expense of administration of the Chapter 11 Case (a) required to be asserted by filing an application with the Bankruptcy Court on or before the Administrative Bar Date, or (b) Allowed under section 503(b) of the Bankruptcy Code, except to the extent the holder of such Claim agrees to be treated differently. Administrative Claims include, but are not limited to, (i) any actual and necessary expenses of preserving either Estate incurred during the Chapter 11 Case, (ii) any actual and necessary expenses of operating the Debtor's business incurred during the Chapter 11 Case, (iii) any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their business as debtors in possession, or for the acquisition or lease of property by, or for the rendition of services to, the Debtors as debtors in possession, (iv) obligations pursuant to executory contracts assumed by the Debtors pursuant to an order of the Bankruptcy Court, (v) all Claims as provided by § 507(b) of the Bankruptcy Code, (vi) all allowances of compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court, (vii) any Allowed Contingent Claims which are granted administrative priority status by Final Order of the Bankruptcy Court, (viii) all fees payable and unpaid under section 1930 of Title 28, United States Code, and (ix) any fees or charges assessed against the Estate under chapter 123 of Title 28, United States Code.

**Administrative Claims Bar Date**. The date thirty (30) days after the Effective Date or such other date(s), if any, as determined by order of the Bankruptcy Court, by which all requests for allowance of Administrative Claims must be filed with the Bankruptcy Court. The Administrative Claims Bar Date shall not apply to fees and expenses of Professionals incurred after the Confirmation Date.

**Allowed Administrative Claim**. All or that portion of any Administrative Claim that is or has become an Allowed Claim.

**Allowed Claim**. Any Claim against the Debtors (i) proof of which was filed on or before the date designated by the Bankruptcy Court as the last date for filing proofs of claims against the Debtors or, if no proof of claim is filed, which has been or hereafter is listed by the Debtors in their Schedules, as liquidated in amount and not disputed or contingent and, in either case, a Claim as to which no objection to the allowance thereof has been interposed within the applicable period of limitation fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or (ii) in favor of any Person arising from a judgment against such Person in any Avoidance Action (if the effect of such judgment gives such Person an Allowed General Unsecured Claim). A Disputed Claim shall be an Allowed Claim if, and only to the extent that, a Final Order has been entered allowing such Disputed Claim. The term "Allowed," when used to modify a reference in this Plan to any Claim or class of Claims, shall mean a Claim (or any Claim in any such class) that is allowed (e.g., an Allowed Secured Claim is a Claim that has been Allowed to the extent of the value of any interest in property of the Estate securing such Claim), as determined by the Bankruptcy Court pursuant to § 506(a) of the Bankruptcy Code. Unless otherwise specified in this Plan or in the Final Order of the Bankruptcy Court allowing such Claim, "Allowed Claim" shall not include interest on the amount of such Claim from and after the Petition Date.

**Assumed Agreement**. Unexpired leases and other executory contracts of the Debtors that are being assumed pursuant to the Plan, if any.

**Avoidance Action**. Any and all actions which a trustee, debtor in possession, or other appropriate party in interest may assert on behalf of the Estate under the Bankruptcy Code, including actions pursuant to sections 542, 543, 544, 545, 546, 547, 548, 549, 550, and/or 551 of the Bankruptcy Code.

**Avoidance Action Claims**. Claims asserted by parties pursuant to sections 502(d) and/or 502(h) of the Bankruptcy Code in connection with any Avoidance Action(s) brought by the Debtors against such parties.

**Ballot**. The document used in voting on the Plan that must be executed and delivered by holders of Claims entitled to vote on the Plan.

**Bankruptcy Administrator**. The United States Bankruptcy Administrator for the Western District of North Carolina.

**Bankruptcy Code**. The United States Bankruptcy Code, 11 U.S.C. § 101 et seq. 1.11 Bankruptcy Court. The United States Bankruptcy Court for the Western District of North Carolina, having jurisdiction over the Chapter 11 Case.

**Bankruptcy Rules**. The Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as applicable to the Chapter 11 Case.

**CNB**.  City National Bank of West Virginia.

**Business Day**.  Any day other than a Saturday, Sunday, or other day on which commercial banks in the State of North Carolina are authorized or required by law to close.

**Cash**. Cash and readily marketable securities or instruments including, without limitation, readily marketable direct obligations of the United States of America or agencies or instrumentalities thereof, time certificates of deposit issued by any bank, and commercial paper.

**Chapter 11 Case**. The Debtors' bankruptcy cases under Chapter 11 of the Bankruptcy Code, which is pending before the Bankruptcy Court.

**Claim**.  Any right to payment from the Estate, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, and arising at any time before the Effective Date or relating to any event that occurred before the Effective Date; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Estate, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and arising at any time before the Effective Date or relating to any event that occurred before the Effective Date.

**Class**. Means a classification of Allowed Claims for the purposes of treatment and distributions under this Plan.

**Confirmation Date**. The date upon which the Bankruptcy Court enters the Confirmation Order confirming this Plan.

**Confirmation Hearing**. The hearing before the Bankruptcy Court to consider confirmation of this Plan.

**Confirmation Order**.  An order of the Bankruptcy Court, in form and substance satisfactory to the Debtor, confirming this Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

**Contingent Claim**.  A Claim that is either contingent or unliquidated on or immediately before the Confirmation Date.

**Creditor**.  Any Person that holds a Claim against the Estates.

**Debtors**.   Joseph Gregory Jemsek and Jemsek Clinic, P. A.

**Disclosure Statement**. The disclosure statement filed with the Bankruptcy Court with respect to this Plan, pursuant to section 1125 of the Bankruptcy Code, either in its present form or as it may be altered, amended, or modified from time to time.

**Disputed Claim**.  A Claim which is the subject of a timely objection interposed by the Debtors,

if at that time such objection remains unresolved; provided, however, that the Bankruptcy Court may determine the amount of a Disputed Claim for purposes of allowance pursuant to section 502(c) of the Bankruptcy Code; provided, further, that the Debtors, in their sole discretion, may elect to treat the portion of a Disputed Claim, if any, that is not in dispute as an Allowed Claim, with the disputed portion remaining a Disputed Claim.

**Disputed Claims Reserve**. The reserve account established by the Reorganized Debtors pursuant to Article 8 of this Plan from which all cash distributions under the Plan shall be made with respect to all Disputed Claims.

**Distribution Reserve**. The reserve accounts established by the Reorganized Debtors pursuant to Article 6 of this Plan from which all cash distribution under the Plan shall be made with respect to all Allowed Claims.

**Effective Date**. The Business Day on which all of the conditions set forth in Article 10 of this Plan shall have been satisfied or waived.

**Estate**. The bankruptcy estate of the Debtors. All property of the Estate shall be vested in the Reorganized Debtors upon the occurrence of the Effective Date of the Plan.

**Final Order**. An order that is no longer subject to appeal, certiorari proceeding or other proceeding for review or rehearing, and as to which no appeal, certiorari proceeding, or other proceeding for review or rehearing shall then be pending.

**General Unsecured Claim**. Any Unsecured Claim, other than an Administrative Claim, an Other Priority Claim, or a Priority Tax Claim. Allowed General Unsecured Claims include, without limitation, Allowed Unsecured Deficiency Claims, and any Claim in favor of any Person arising from a judgment against such Person in any Avoidance Action (if the effect of such judgment gives such Person an Allowed General Unsecured Claim).

**JSC Cash Reserve.** Equal to a maximum of 90 days average expenses of JSC.

**Living Expenses**. $32,951.00 per month from January, 2018 through May, 2019, and $26,951.00 from June, 2019 to January, 2021, less the payment of estimated tax obligations.

**Net After Tax Cash Flow**. The taxable income from the Reorganized Debtors' federal income tax return, less: estimated federal and state income taxes, Living Expenses, secured debt service, JSC Cash Reserve and Allowed Administrative and Priority Claims.

**Non-Exempt Assets** means those assets designated as not exempt on the liquidation analysis, attached to the Disclosure Statement as Exhibit L, together with any other or further assets of the Debtor that are determined to be property of the Debtor's estate prior to the Effective Date.

**Non-Exempt Asset Contribution Deadline** means 180 days after the Effective Date.

**Other Priority Claims**. Any Claim to the extent entitled to priority in payment under sections 507(a)(2) through 507(a)(7) of the Bankruptcy Code.

**Person**. An individual, a corporation, a company, a partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, or a government, governmental unit or any subdivision thereof or any other entity.

**Petition Date**. October 25, 2006 and November 20, 2006 for the Jemsek Clinic and Jemsek, respectively .

**Plan**. This Chapter 11 Plan or, as it may be from time to time modified, amended or supplemented, together with any exhibits thereto.

**Priority Non-Tax Claim**. Any Claim arising prior to the Petition Date entitled to priority in payment under Sections 507(a)(1)-(a)(7) of the Bankruptcy Code.

**Priority Tax Claim**. Any Claim arising prior to the Petition Date entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

**Pro Rata Share**. As of any certain date, with respect to any Allowed Claim in any Class, the proportionate share that such Allowed Claim bears to the aggregate amount of all Claims, including Disputed Claims, in such Class.

**Professional**. Any attorney, accountant, appraiser, auctioneer, or other professional person retained and employed by the Estate in the Chapter 11 Case in accordance with sections 327 and/or 328 of the Bankruptcy Code.

**Rejected Agreement**. Each unexpired lease or other executory contract of the Debtors, which (i) is not an Assumed Agreement, (ii) has not been expressly assumed or rejected by order of the Bankruptcy Court prior to the Confirmation Date, or (iii) is not the subject of a pending motion to assume on the Effective Date.

**Reorganized Debtors**. The Debtors, as reorganized and re-vested with all of the assets of the Estate pursuant to this Plan.

**Schedules**. The Schedules of Assets and Liabilities, and any amendments thereto, filed by the Debtors with the Bankruptcy Court in accordance with section 521(l) of the Bankruptcy Code.

**Secured Claim**. A Claim to the extent of the value, of any interest in property of the Estate securing such Claim, as determined pursuant to section 506(a) or 1111(b) of the Bankruptcy Code. To the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, such Claim is an Unsecured Deficiency Claim unless, in any such case, the class of which such Claim is a part makes a valid and timely election under section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

**Taxes**. All income, franchise, excise, sales, use, employment, withholding, property, payroll,

and other taxes, assessments, and governmental charges, together with any interest, penalties, additions to tax, fines, and similar amounts relating thereto, imposed or collected by any federal, state, local, or foreign governmental authority.

**Unsecured Claim**.  A Claim not secured by a charge against or interest in property in which the Estate has an interest, including any Unsecured Deficiency Claim, and any Claim arising at any time under Bankruptcy Rule 3002(c)(3).

**Unsecured Deficiency Claim**.  A Claim by a Creditor arising out of the same transaction as a Secured Claim to the extent that the value, as determined by the Bankruptcy Court pursuant to section 506(a) of the Bankruptcy Code or by stipulation, of such Creditor's interest in property of the Estate securing such Claim is less than the amount of the Claim which has the benefit of such security as provided by section 506(a) of the Bankruptcy Code.

**Voting Deadline**.  The date set in an order of the Bankruptcy Court as the deadline for the return of Ballots accepting or rejecting the Plan.

**Other Definitions**.  Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in this Plan but that is defined in the Bankruptcy Code or Bankruptcy Rules shall have the meaning set forth therein. Wherever from the context it appears appropriate, each term stated in either of the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter. The words "herein," "hereof," "hereto," "hereunder," and others of similar inference refer to this Plan as a whole and not to any particular article, section, subsection, or clause contained in this Plan. The word "including" shall mean "including without limitation."

## ARTICLE 2

### PROVISIONS FOR PAYMENT OF ALLOWED ADMINISTRATIVE CLAIMS; ADMINISTRATIVE CLAIMS BAR DATE; PROVISIONS FOR PAYMENT OF ALLOWED PRIORITY TAX CLAIMS

**2.1 Super-Priority Administrative Claims, Administrative Claims and Priority Tax Claims are Not Classified in this Plan**.  Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote to accept or reject the Plan. The treatment of and consideration to be received by holders of Allowed Super-Priority Administrative and Administrative Claims and Allowed Priority Tax Claims pursuant to this Article 2 of the Plan shall be in full and complete satisfaction, settlement, release, and discharge of such Claims. The Debtors' obligations in respect of such Allowed Administrative and Priority Tax Claims shall be satisfied in accordance with the terms of this Plan.

**2.2 Administrative Claims Bar Date**.  Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims, including applications for final allowance of compensation and reimbursement of expenses of Professionals incurred before the Confirmation Date, must be filed and served on the Debtors and the Bankruptcy Administrator no later than 30 days after the Effective Date. Any Person required to file and serve a request for payment of an Administrative Claim and who fails to timely file and serve such request, shall be forever barred, estopped, and enjoined

from asserting such Claim or participating in distributions under the Plan on account thereof. However, the Administrative Claims Bar Date shall not apply to fees and expenses of Professionals incurred after the Effective Date.

**2.3 Treatment of Administrative Claims**.  Except to the extent the holder of an Allowed Administrative Claim agrees otherwise, each holder of an Allowed Administrative Claim shall be paid, in respect of such Allowed Claim, the full amount thereof in Cash (or such other form as is agreed upon by any holder of an Allowed Administrative Claim) as soon as practicable after the later of (a) the Effective Date and (b) the date on which such Claim becomes an Allowed Claim, except that Allowed Administrative Claims arising in the ordinary course of business shall, if due at a later date pursuant to its terms, be paid when otherwise due. Furthermore, all fees payable pursuant to Section 1930 of title 28 of the United States Code shall be paid pursuant to § 11.1 of this Plan.

**2.4 Treatment of Priority Tax Claims**.  Each holder of an Allowed Priority Tax Claim shall be paid the Allowed Amount of its Allowed Priority Tax Claim, at the option of the Reorganized Debtors: (a) in full, in Cash, on the Effective Date or as soon as practicable thereafter; (b) upon such other terms as may be mutually agreed upon between such holder of an Allowed Priority Tax Claim and the Reorganized Debtors; or (c) in four Cash payments commencing on or before June 30, 2018 and continuing in three additional, annual installments thereafter on or before June 30th of years 2019-2021, respectively, in an aggregate amount equal to such Allowed Priority Tax Claim (less any payments made by the Debtors with respect thereto during the Chapter 11 Case) together with interest at such rate as required by Section 511 of the Bankruptcy Code or otherwise as required by Section l129(a)(9)(C) or (D) of the Bankruptcy Code.

## ARTICLE 3

## CLASSIFICATION AND TREATMENT
## OF CLAIMS AND INTERESTS

### 3.1 Class 1:    Secured Administrative Expense Claim of Ruggio and Polsinelli

3.1.1    Classification

Class 1 consists of the Secured Administrative Expense Claim of Ruggio and Polsinelli.

3.1.2 Treatment

The Debtors estimate that the unpaid balance of the $750,000.00 to have been paid under the contingency agreement is approximately $150,000.00. Neither Polsinelli nor Ruggio shall be entitled to an Allowed Administrative Expense claim. The holders of claims shall be paid the Allowed Amount of their Allowed Secured Claims, at the option of the Reorganized Debtors: (a) in full, in Cash, on the Effective Date or as soon as practicable thereafter; (b) upon such other terms as may be mutually agreed upon between such holder of an Allowed Secured Claim and the Reorganized Debtors; (c) upon sale of the Greenbrier real property; or (d) at the conclusion of the BCBS litigation (less any payments specifically designated by the Bankruptcy Court to be made to the holders in connection with the BCBS litigation). Each holder shall retain its existing liens, which shall retain the same validity, priority and

extent that existed on the date approved by the Bankruptcy Court. The holders shall release their liens on the Greenbrier property upon payment. If Polsinelli is allowed to withdraw from the BCBS litigation, neither Polsinelli nor Ruggio shall have an Allowed Claim of any kind.

3.1.3 Impairment and Voting

Class 1 is impaired by the Plan. The holders of Class 1 Claims are entitled to vote to accept or reject the Plan. For purposes of voting, each holder of an Allowed Secured Administrative Expense Claim shall be considered to be the sole member of a separate Class.

**3.2 Class 1A:   Ruggio and Polsinelli Settlement Class**

3.2.1   Classification

Class 1A consists of the claims of Ruggio and Polsinelli, which such holders may elect by indicating on a timely filed ballot that the holders elect treatment under Class 1A.

3.2.2   Treatment

To the extent the holders of Class 1A claims enter into and the Court approves a Settlement Agreement prior to the Confirmation Hearing, the holders accept treatment under Class 1A by filing a ballot accepting the Plan as a Class 1A member by the deadline therefore, and by filing a Notice of Plan Support no later than 14 days prior to the Confirmation Hearing, and to the extent BCBS accepts the Optional Treatment under Class 7, such holders shall have an Allowed Administrative Expense Claim in the amount of $925,000.00 solely for voting on, confirmation of and distributions under the Plan (and for no other purposes). $575,000.00 of the Allowed Administrative claim shall be paid from the Distribution Fund, and $350,000.00 will be paid by BCBS. The holders will consent to and support the dismissal of the Clinic Chapter 11. The holders shall also retain their deed of trust on Jemsek's interest in the Greenbrier, West Virginia real property, and shall be paid the net share of the sales proceeds of that property up to $75,000.00. To the extent the net sales proceeds exceeds $75,000.00, the proceeds shall be deposited into the Distribution Fund for distribution in accordance with the Plan. Jemsek may have two years from the Effective Date to market and sell the Greenbrier property.  If the property has not sold within two years, it will be offered for auction with a reserve mutually acceptable to the interested parties.

3.2.3   Impairment and Voting

Class 1A is impaired by the Plan. The holders of Class 1A Claims are entitled to vote to accept or reject the Plan.

**3.3 Class 2:     Secured Claim of  City National Bank of West Virginia**

3.2.1 Classification

Class 2 consists of the Allowed Secured Claim of CNB.

3.2.2 Treatment

This Claim shall be treated as a secured obligation of the Reorganized Debtors upon the terms and conditions as set forth in a Consent Order to Resolve Motion for Relief from Stay Filed by City National Bank of West Virginia (the "Consent Order") to be filed with the Bankruptcy Court. CNB shall retain its lien with the priority thereof, as it existed on the Petition Date pursuant to §1129(b)(2)(A)(i)(I) of the Bankruptcy Code until its Allowed Class 2 Claim is satisfied as set forth in the Consent Order, the terms of which will be incorporated into the Plan by reference.

3.2.3  Impairment and Voting

Class 2 is impaired by the Plan. The holder of Class 2 Claim is entitled to vote to accept or reject the Plan.

### 3.3 Class 2A:   Secured Claim of Greenbrier County, West Virginia Tax Collector

3.3.1 Classification

Class 2A consists of the Allowed Secured Claim of the Greenbrier County, West Virginia Tax Collector

3.3.2 Treatment

This claim shall be treated as a secured obligation. The claim will be paid in full directly by Jemsek on or before January 1, 2018

3.3.3  Impairment and Voting

Class 2A is impaired by the Plan. The holder of the Class 2A Claim is entitled to vote to accept or reject the Plan.

### 3.4 Class 3:    Claims of Kay Jemsek

3.4.1 Classification

Class 3 consists of the claims of Kay Jemsek

3.4.2 Treatment

The Claims shall be treated in accordance with the February 7, 2017 Separation, Property Settlement, Alimony and Child Custody & Support Agreement, attached hereto as Exhibit A and incorporated herein by reference.

3.4.3 Impairment and Voting
Class 3 is impaired by the Plan. The holder of the Class 3 Claim is entitled to vote to accept or

reject the Plan.

### 3.5 Class 4:    Priority Non-Tax Claims

3.5.1 Classification

Class 4 consists of Priority Non-Tax Claims.

3.5.2 Treatment

Each holder of an Allowed Priority Non-Tax Claim shall be paid the Allowed Amount of its Allowed Priority Non-Tax Claim, at the option of the Reorganized Debtors: (a) in full, in Cash, on the Effective Date or as soon as practicable thereafter; (b) upon such other terms as may be mutually agreed upon between the holder of an Allowed Priority Claim and the Reorganized Debtors; or (c) in four Cash payments commencing on or before June 30, 2018 and continuing in three additional, annual installments thereafter on or before June 30th of years 2019-2021, respectively, with interest at the rate of 3.25% per annum and any fees due thereon.

3.5.3 Impairment and Voting

Class 4 is impaired by the Plan. The holders of the Class 4 Claim is entitled to vote to accept or reject the Plan.

### 3.6 Class 5:    Convenience Claims, General Unsecured Claims of $5,000.00 or less

3.6.1 Classification

Class 5 consists of the General Unsecured Claims of $5,000.00 or less.

3.6.2 Treatment

Each holder of an Allowed General Unsecured Claim of $5,000.00 shall be paid 50% of its Allowed Claim, at the option of the Reorganized Debtors: (a) in full, in Cash, on the Effective Date or as soon as practicable thereafter; or (b) within 15 days after then entry of a Final Order allowing such claim.

3.6.3 Impairment and Voting

Class 5 is impaired by the Plan. The holders of the Class 5 Claim are entitled to vote to accept or reject the Plan.

### 3.7 Class 6:    General Unsecured Claims exceeding $5,000 (including BCBS to the extent it accepts treatment under this class)

3.7.1 Classification

Class 6 consists of all General Unsecured Claims exceeding $5,000 (including BCBS to the extent

it accepts treatment under this class)

### 3.7.2 Treatment

These Claims shall be treated as an unsecured obligation of the Reorganized Debtors. In full satisfaction of their claims, the holders of Allowed Class 6 Claims will receive pro-rata distributions from the Distribution Account after the payment to the holders of administrative, priority, Class 1 through 5 claims.  Holders of Allowed Class 6 Claims will receive pro-rata distributions of Jemsek's Net After Tax Cash Flow for the three year period from January, 2018 to January, 2021. Said distributions will be paid in three annual installments, on or before January 30th of years 2019-2021, respectively.

### 3.7.3 Impairment and Voting

Class 6 is impaired by the Plan. The holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

### 3.8 Class 7:   Claims of BCBS.

#### 3.8.1 Classification

Class 7 consists of the Claims of BCBS.

#### 3.8.2 Treatment

The amount of these claims shall be determined in connection with the pending adversary proceedings between the Debtors and BCBS. The Debtors will seek equitable subordination pursuant to 11 U.S.C. Section § 510(c) in either the pending adversary proceeding with BCBS, or in a new adversary proceeding to be filed prior to confirmation. There shall be no distribution to this claim under the Plan. In the event that the Bankruptcy Court determines that the claim, or any portion thereof, is non-dischargeable, BCBS will be prohibited from attempting to collect the claim from the Debtors until the completion of the Debtors' obligations to other creditors under this Plan.

#### 3.8.3 Optional Treatment

To the extent BCBS and the Debtors enter into and the Court approves a Settlement Agreement prior to the Confirmation hearing, and BCBS elects to accept this optional treatment of its claims under Class 6, by filing a ballot making such election and accepting the Class 6 optional treatment, by the deadline therefore and by filing a Notice of Plan Support no later than 14 days prior to the Confirmation Hearing, and to the extent that Ruggio and Polsinelli also accept treatment under Class 1A, BCBS shall have an Allowed Class 6 Claim in the amount of $8,000,000.00 solely for voting on, confirmation of and distributions under the Plan (and for no other purposes). The pending adversary proceedings will be dismissed with prejudice and the BCBS claims shall be deemed to be dischargeable. BCBS will contribute $350,000.00 towards the payment any Class 1A claim held by Ruggio and Polsinelli. BCBS will consent to and support the dismissal of the Clinic Chapter 11.

#### 3.8.4 Impairment and Voting

Class 7 is impaired by the Plan. The holder of Class 7 Claims is entitled to vote to accept or reject the Plan.

## ARTICLE 4
## ACCEPTANCE OR REJECTION OF THE PLAN

**4.1 Impaired Classes Vote**. Each holder of a Claim or Interest in an impaired Class receiving or retaining anything under this Plan is entitled to vote to accept or reject this Plan to the extent and in the manner provided in the Plan, the Bankruptcy Code and the Bankruptcy Rules, or in any voting procedures order.

**4.2 Acceptance by Impaired Classes of Claims**. Acceptance of this Plan by any Impaired Class entitled to vote shall be determined in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any voting procedures order entered by the Bankruptcy Court.

**4.3 Designation of Classes Entitled to Vote**. All Classes are impaired, and the holders of Claims and Interests in all Classes are entitled to vote on the Plan.

**4.4 Nonconsensual Confirmation**. With respect to any Impaired Class, including any Class of Claims or Interests created pursuant to amendments or modifications to this Plan, that does not accept the Plan, the Debtor will request that the Bankruptcy Court confirm this Plan by "cramdown" under Section 1129(b) of the Bankruptcy Code with respect to any such nonaccepting Class or Classes at the Confirmation Hearing, and the filing of this Plan shall constitute a motion for such relief.

## ARTICLE 5
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**5.1 Assumption and Rejection; Exceptions Thereto**. Jemsek shall assume the leases of his apartments in Washington, D.C. and Charlotte, N.C. Any executory contract or unexpired lease assumed pursuant to the Plan shall be and hereby is assumed by the Reorganized Debtors as of the Effective Date and shall be fully enforceable by the Reorganized Debtors in accordance with its terms, and shall include all written modifications, amendments, supplements of said executory contract or unexpired lease and, as with respect to executory contracts or unexpired leases that relate to real property, shall include all written agreements and leases appurtenant to the premises, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easements, and any other interests in real property or rights in rem related to such premises.

The Debtors reserve the right at any time before the Effective Date to amend the "Schedule of Executory Contracts and Unexpired Leases to be Rejected" to: (a) delete any executory contract or unexpired lease listed on the "Schedule of Executory Contracts and Unexpired Leases to be Rejected," thus providing for its assumption under the Plan, or (b) add any executory contract or unexpired lease to the "Schedule of Executory Contracts and Unexpired Leases to be Rejected," thus providing for its rejection under the Plan. The Debtors shall provide notice of any such amendment of the "Schedule of Executory Contracts and Unexpired Leases to be Rejected" to the other party or parties to the affected executory contract and/or unexpired lease, and to the Office of the Bankruptcy Administrator.

**5.2 Cure Payments, Compensation for Pecuniary Loss, and Adequate Assurance**. All payments, including any and all cure payments, adequate assurance or compensation for actual pecuniary loss, required to be paid or provided for by §§ 365(b)(1)(A)- (C) of the Bankruptcy Code (the "Cure Payments") for any executory contract or unexpired lease that is being assumed under the Plan, unless disputed by the Debtors, shall be made by the Reorganized Debtors on the Effective Date. The Debtors hereby give notice that there are no Cure Payments due with respect to any executory contracts and unexpired leases to be assumed under the Plan. Any non-debtor party to any executory contract or unexpired lease to be assumed under the Plan that objects to assumption of the executory contract or unexpired lease or believes that a Cure Payment is due in connection with such assumption must file a written objection to the assumption of such executory contract or unexpired lease with no Cure Payment and state in the written objection the grounds for such objection and specifically set forth the amount of any request for a Cure Payment by the deadline established by the Bankruptcy Court for filing objections to confirmation of the Plan. Unless the non-debtor party to any executory contract or unexpired lease to be assumed files and serves on the Debtors and their counsel an objection to assumption of such executory contract or unexpired lease for any reason, or asserting that a Cure Payment is required or owed in connection with such assumption, by the deadline established by the Bankruptcy Court for filing objections to confirmation of the Plan, then the executory contracts and unexpired leases shall be assumed, and any default then existing in the executory contract and/or unexpired lease shall be deemed cured as of the Effective Date, and there shall be no other cure obligation or Cure Payment due or owed by anyone, including the Debtors and the Reorganized Debtors, in connection with such assumption. Any Claims for Cure Payments not Filed as part of a written objection to the proposed assumption within such time period will be forever barred from assertion against the Debtors, their Estate, the Reorganized Debtors, and their assets, and the holders of any such Claims are barred from recovering any distributions under the Plan on account thereof. In the event of an objection to the assumption of executory contracts or unexpired leases regarding the amount of any Cure Payment, or the ability of the Reorganized Debtors to provide adequate assurance of future performance or any other matter pertaining to assumption, (a) the Bankruptcy Court will hear and determine such dispute at the Confirmation Hearing, and (b) in the discretion of the Debtors, the Debtors (i) may assume such disputed executory contract or unexpired lease by curing any default or providing adequate assurance in the manner determined by the Bankruptcy Court, or (ii) the Debtors may reject such executory contract or unexpired lease as of the Effective Date. The Reorganized Debtors shall make any Cure Payment on the later of the Effective Date or the date such Cure Payment is due pursuant to a Final Order, provided, however, that the Reorganized Debtors shall have ten (10) Business

Days after any order determining the amount of a disputed Cure Payment becomes a Final Order in which to amend the "Schedule of Executory Contracts and Unexpired Leases to be Rejected" to provide for the rejection of such executory contract or unexpired lease and, in such an event, such executory contract or unexpired lease shall be deemed rejected as of the Effective Date.

**5.3 Effect of Confirmation Order on Executory Contracts and Unexpired Leases**. Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of any such assumptions pursuant to Section 365(a) and 1123(b)(2) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such assumption is in the best interest of the Debtors, their estate, and all parties in interest. In addition, the Confirmation Order shall constitute a finding of fact and conclusion of law that (i) there are no defaults of the Debtors, no Cure Payments owing (including that there is no compensation due for any actual pecuniary loss), (ii) there is adequate assurance of future performance

with respect to each such assumed executory contract or unexpired lease, (iii) such assumption is in the best interest of the Debtors and the Estate, (iv) upon the Effective Date, the assumed executory contracts or unexpired leases constitute legal, valid, binding and enforceable contracts in accordance with the terms thereof, and (v) the non-debtor counter party to each assumed executory contract or unexpired lease is required to and ordered to perform under and honor the terms of the assumed executory contract or unexpired lease. All executory contracts and unexpired leases assumed under the Plan or during the Chapter 11 Case constitute valid contracts and leases, as applicable, enforceable by the Debtors or Reorganized Debtors against the non-debtor counterparties regardless of any cross-default or change of control provisions in any contracts or leases assumed or rejected under the Plan or during the Chapter 11 Case.

Likewise, subject to the occurrence of the Effective Date, the Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejection as of the Effective Date of all executory contracts and unexpired leases which are not assumed under this Plan, with the rejection effective as of the day before the Petition Date, as being burdensome and not in the best interest of the Estate.

**5.4 Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan**. Any Claims for damages arising from the rejection of an executory contract or unexpired lease under this Plan must be Filed within thirty (30) days after the Confirmation Date or, with respect to any executory contracts or unexpired leases which are rejected after the Confirmation Date, by amendment to the "Schedule of Executory Contracts and Unexpired Leases to be Rejected," no later than thirty (30) days after the date of such amendment to the "Schedule of Executory Contracts and Unexpired Leases to be Rejected," or such Claims will be forever barred and unenforceable against the Debtors, the Reorganized Debtors, and the Estate, and the holders of any such Claims are barred from receiving any distributions under the Plan.

## ARTICLE 6

## DISTRIBUTIONS

**6.1 Establishment of Distribution Reserve**. Upon confirmation of the Plan, The Henderson Law firm on behalf of the Reorganized Debtors shall establish a segregated trust account which will be the Distribution Reserve. Thereafter, the Reorganized Debtors shall fund the Distribution Reserve with their Net After Tax Income. The Reorganized Debtors shall have discretion to retain a reasonable portion of the funds deposited into the Distribution Reserve to fund the Disputed Claim Reserve described in section 8.3 of this Plan. When all Disputed Claims have been resolved by Final Order, all remaining funds in the Disputed Claims Reserve shall be transferred to the Distribution Reserve.

**6.2 Distributions Under the Plan**. The Reorganized Debtors or, at the option of the Reorganized Debtors, any distribution agent the Reorganized Debtors may retain, shall make all distributions to the holders of Allowed Claims and Allowed Interests that are required under this Plan. Whenever any distribution to be made under this Plan shall be due on a day other than a Business Day, such distribution shall instead be made, without the accrual of any interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due.

**6.3 Delivery of Distributions, Instruments, or Property**. Distributions or delivery of

instruments required under this Plan shall be made at the addresses indicated in the Debtors' records. In the event that any distribution or instrument is returned as undeliverable, the Reorganized Debtors shall use reasonable efforts to determine the current address of the applicable claimant, and no distribution or delivery to such claimant shall be made unless and until the Reorganized Debtors have determined such then current address; provided, however, that if any distribution or instrument remains unclaimed after the first anniversary after distribution or delivery, such distribution or instrument shall be deemed unclaimed property pursuant to section 347(b) of the Bankruptcy Code and shall be vested in the Reorganized Debtors. In such event, the Claim of the holder for such distribution or instrument shall no longer be deemed to be Allowed, and such holder shall be deemed to have waived its rights to such distribution or delivery under this Plan pursuant to section 1143 of the Bankruptcy Code, shall have no further claim or right thereto, and shall not participate in any further distributions under this Plan with respect to such Claim. Checks issued by the Reorganized Debtors in respect of Allowed Claims shall be null and void if not negotiated within 120 days after the date of issuance thereof. Surrender of any property under this Plan to a holder of an Allowed Claim shall be made by mailing written notice of such surrender to the holder of the applicable Allowed Claim at its address as shown in a filed Proof of Claim or in the Schedules. In the event that the recipient of such notice does not contact the Reorganized Debtors or their counsel to arrange for retrieval or storage of the surrendered property at such recipient's expense within thirty (30) days' of the date thereof, such property shall be deemed unclaimed pursuant to § 347(b) and shall become vested in the Reorganized Debtors. The Claim of the holder otherwise entitled to such surrender shall no longer be deemed to be Allowed, and such holder shall be deemed to have waived its rights to any distribution or surrender under this Plan pursuant to § 1143 of the Bankruptcy Code, shall have no further claim or right thereto, and shall not participate in any further distributions under this Plan with respect to such Claim. In such event, the Reorganized Debtors may seek entry of an order by the Bankruptcy Court cancelling any lien, encumbrance, or interest on or in the affected property.

**6.4 Third-Party Agreements**. Distributions to the Classes of Claims or Interests hereunder will not affect the right of any entity to levy, garnish, attach, or employ any other legal process with respect to such distributions by reason of any claimed subordination of lien priority rights or otherwise. All subordination agreements entered into by any parties in interest shall be enforceable to the extent permitted by applicable law, and all distributions and payments made pursuant to the Plan shall be subject to applicable law.

**6.5 Manner of Payment Under the Plan**. At the option of the Reorganized Debtors, any payment in Cash to be made under the Plan may be made by check or wire transfer from a domestic bank or as otherwise required by applicable agreement.

**6.6 No Fractional Distributions**. No fractional dollars shall be distributed under the Plan. For purposes of distributions, Cash distributions shall be rounded up or down, as applicable, to the nearest whole dollar.

**6.7 Withholding and Reporting**. The Reorganized Debtors shall comply with all applicable withholding and reporting requirements imposed by federal, state, and local taxing authorities, and all distributions shall be subject to such withholding and reporting requirements.

## ARTICLE 7

## MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

**7.1 Sources of Funding**. The Plan contemplates that distributions will be funded by the Debtors' Net After Tax Cash Flow, including, but not necessarily limited to, their projected disposable income, and any sanctions awarded in connection with the BCBS litigation.

**7.2 New Value Contribution**. Jemsek will contribute a lump sum of $10,000 to the Distribution Reserve on the Effective Date. Said funds will be from an exempt IRA and will be used to pay distributions to the holders of Allowed Claims

**7.3 Authority to Act Following Confirmation Date**. Upon confirmation of this Plan, the Debtors shall be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of this Plan including, without limitation, the execution and filing of all documents required or contemplated by this Plan. In connection with the occurrence of the Effective Date, the Reorganized Debtors are authorized to execute, deliver, or record such contracts, instruments, releases, indentures, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

**7.4 Authority to Act Following Effective Date**. The Reorganized Debtors shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan and any notes or securities issued pursuant to this Plan.

**7.5 Status of Existing Liens**. Unless otherwise provided in this Plan or by Order of the Bankruptcy Court, on the Effective Date, all existing liens established by properly perfected security agreements and held by any Class or Classes on the Debtors' assets as described in this Plan shall retain the same priority that existed on the Petition Date, provided that such liens and any related rights shall not extend to property acquired by the Debtor after commencement of the Chapter 11 Case as set forth in section 552 of the Bankruptcy Code.

Section 552 of the Bankruptcy Code shall continue to apply to all such liens following confirmation of the Plan. All other liens, encumbrances, and related rights (including, but not limited to, rights of setoff) not specifically provided for in the Plan shall be deemed automatically canceled, terminated and of no further force or effect without further act or action under any applicable agreement, order, law, regulation, order, or rule.

**7.6 Effectuating Documents and Further Transactions**. The Debtors and the Reorganized Debtors shall be authorized, but not required, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan and any notes or securities issued pursuant to this Plan.

**7.7 Liquidation of Non-Exempt Assets.** On or before the Non-Exempt Asset Contribution Deadline, Debtor shall deposit the proceeds from the sale of all Non-Exempt Assets (that are not already reduced to cash as of the Effective Date) to the Distribution Reserve using any or all of the following mechanisms in Debtor's sole and absolute discretion:

(a) liquidate and reduce to cash proceeds Non-Exempt Assets that are not already cash proceeds as of the Effective Date and contribute the net proceeds of such Non-Exempt Assets to the Distribution Reserve; or

(b) contribute to the Distribution Reserve Exempt Assets consisting of cash or cash equivalents in lieu of liquidating a particular Non-Exempt Asset; provided, however, that the amount of such contribution shall be not be less than the net value ascribed to each Non-Exempt Asset as shown on the Liquidation Analysis (**Exhibit L** to the Disclosure Statement).

## ARTICLE 8
## RESOLUTION OF DISPUTED CLAIMS AND INTERESTS

**8.1 Objections to Claims and Interests**. The Debtors, and after the Effective Date, the Reorganized Debtors, shall have the exclusive right to object to the allowance, amount or classification of Claims and Interests asserted in the Chapter 11 Case, and such objections may be litigated to Final Order by the Debtors or Reorganized Debtors, or compromised and settled in accordance with the business judgment of the Debtors or Reorganized Debtors, as applicable, without further order of the Bankruptcy Court. Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections to Claims and Interests shall be Filed no later than one hundred and twenty (120) days after the Effective Date, subject to any extensions granted pursuant to a further order of the Bankruptcy Court, which extensions may be obtained by the Reorganized Debtors without notice upon ex parte motion.

**8.2 Estimation of Disputed Claims and Interests**. The Debtors and, after the Effective Date, the Reorganized Debtors, may at any time request that the Bankruptcy Court estimate for all purposes, including distributions under this Plan, any Disputed, contingent or unliquidated Claim or Interest pursuant to Section 502(c) of the Bankruptcy Code whether or not the Debtors or the Reorganized Debtors have previously objected to such Claim or Interest. The Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest at any time, including, without limitation, during the pendency of an appeal relating to such objection.

**8.3 Establishment of Disputed Claims Reserve**. Within one hundred and twenty (120) days after the Effective Date, the Reorganized Debtors shall establish a Disputed Claims Reserve if any Claims are objected to pursuant to Paragraph 8.1 of this Plan.

**8.4 No Distribution on Account of Disputed Claims and Interests.** Notwithstanding anything else contained in this Plan, except with respect to any undisputed, non-contingent and liquidated portion of General Unsecured Claims, no distribution shall be due or made with respect to all or any portion of any disputed, contingent, or unliquidated Claim until the Claim becomes an Allowed Claim by Final Order. The Reorganized Debtors shall set aside or reserve a portion of the consideration payable to the holders of Allowed Claims and Allowed Interests in a particular Class to be held in the applicable Disputed Claims Reserve for such Class, in an amount sufficient to pay to the holders of all Disputed Claims in such Class the full distributions they would be entitled to if their respective Claims and Interests were ultimately allowed in full by Final Order.

## ARTICLE 9
## EFFECT OF CONFIRMATION OF PLAN

**9.1 Vesting of Assets and Retained Causes of Action**. On the Effective Date, pursuant to Section 1141(b) of the Bankruptcy Code, all assets and property of the Debtors shall vest in the Reorganized Debtors free and clear of any and all Claims, Liens, Interests, and other interests, charges and encumbrances, except as otherwise expressly provided in this Plan or in the Confirmation Order. Consistent with the terms of this Plan, from and after the Effective Date the Reorganized Debtors may operate their businesses, and may own, use, acquire and dispose of their respective property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if the Chapter 11 Case had never been filed. Except as otherwise provided in this Plan, the Reorganized Debtors shall retain all rights and are authorized to commence and pursue, as the Reorganized Debtors deem appropriate, any and all claims and causes of action, including, but not limited to Avoidance Actions, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed in the Chapter 11 Case, and including but not limited to, the claims and causes of action specified in the Plan, any Plan exhibit, the Disclosure Statement, or any exhibit to the Disclosure Statement.

**9.2 Binding Effect**. Subject to the occurrence of the Effective Date on or before the deadline set forth in Article 10 of the Plan, on and after the occurrence of the Confirmation Date, the provisions of this Plan shall bind any holder of a Claim against, or an Interest in, the Debtors and/or their Estate and such holder's successors and assigns, whether or not such holder's Claim or Interest is impaired under the Plan, whether or not such holder has accepted the Plan, and whether or not such holder is entitled to a distribution under the Plan.

**9.3 Discharge of the Debtors**. The consideration distributed under this Plan shall be in exchange for, and in complete satisfaction, discharge, release, and termination of all Claims of any nature whatsoever against the Debtors and their Estate. The Debtors shall be entitled to move for entry of a discharge pursuant to section 1141 of the Bankruptcy Code. If such discharge is approved by Order of the Bankruptcy Court (the "Discharge Order"), the Debtors shall be deemed discharged and released pursuant to section 1141 of the Bankruptcy Code from any and all Claims, including but not limited to demands and liabilities that arose before the date of the Discharge Order, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code; or (c) the holder of a Claim based upon such debt has accepted this Plan.

**9.4 Effect of Discharge**. The Discharge Order shall be a judicial determination of discharge and termination of all liabilities of and all Claims against the Debtors and the Estate, except as otherwise specifically provided in this Plan. Upon the entry of the Discharge Order, as to every discharged Claim and other debt of the Debtors, the holder of such Claim or other debt of the Debtors shall be permanently enjoined and precluded from asserting against the Reorganized Debtors, or against their assets or properties or any transferee thereof, any other or further Claim or other debt of the Debtors based upon any document, instrument, or act, omission, transaction, or other activity of any kind or nature that occurred prior to the entry of the Discharge Order except as expressly set forth in this Plan. In the event that, after entry of the Discharge Order, any Person asserts, against the Reorganized Debtors or any of their subsidiaries or affiliates, any right to payment or equitable remedy for breach of performance which gives rise to a right of payment, which right was not asserted prior to the entry of the Discharge Order but is based on any act, fact, event, occurrence, or omission, by or relating to the

Debtors as they existed before the entry of the Discharge Order, and in the further event that such right is determined by the Bankruptcy Court (a) not to have been discharged pursuant to the provisions of section 1141 of the Bankruptcy Code and this Plan, and (b) that such right may be asserted against the Reorganized Debtors, then, in such circumstances the holder of such right shall be entitled to receive from the Reorganized Debtors value equivalent to that such holder would have received if such right had been asserted against the Debtors before the Confirmation Date and only to the extent such right would have been an Allowed Claim. Nothing in this section 9.4 shall have the effect of excepting from discharge any Claim that is or would be discharged pursuant to section 1141 of the Bankruptcy Code or this Plan.

**9.5 Terms of Certain Injunctions**. As of and on the Confirmation Date, all Persons who have held, hold, or may hold Claims against the Debtors and/or the Estate shall be deemed to have waived, released, and discharged all rights or claims, whether based upon tort, contract or otherwise, which they possessed or may possess prior to the Confirmation Date against the Debtors and/or the Estate, except as otherwise provided for in this Plan (including the documents filed as Schedules or Exhibits to the Plan) or the Confirmation Order; provided, however, that the foregoing release shall not apply to nonperformance under the Plan. The Confirmation Order shall constitute a permanent injunction effectuating these releases, such that all Persons who have held, hold, or may hold Claims against the Debtors and/or the Estate shall be expressly prohibited from taking any action to enforce such Claims against the Reorganized Debtors or their property, or any transferee of such property. Further, any holder of an Allowed Secured Claim whose collateral is surrendered to it pursuant to the terms of this Plan shall be enjoined from exercising its in rem rights as to such collateral unless and until it provides written notice to the Debtors of its intent to do so at least thirty (30) days prior to initiating any action, proceeding, notice, or sale otherwise authorized under applicable law in connection with such in rem rights.

Unless otherwise provided herein or in the Confirmation Order, all injunctions and/or stays provided for in, or in connection with, this Chapter 11 Case shall remain in full force and effect through the Effective Date and thereafter. In addition, the Debtors or the Reorganized Debtors may seek such further orders as they deem necessary or appropriate to preserve the status quo following occurrence of the Confirmation Date.

**9.6 No Successor Liability**. Except as otherwise specifically provided in the Plan or the Confirmation Order, neither the Debtors nor the Reorganized Debtors will have any responsibilities, pursuant to the Plan or otherwise, for any liabilities or obligations of the Debtors or any of the Debtors' past or present companies, affiliates, subsidiaries or predecessors-in interest relating to or arising out of the operations of or assets of the Debtors or any of the Debtors' past or present companies, affiliates, subsidiaries, or predecessors-in-interest whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Effective Date. The Reorganized Debtors shall have no successor or transferee liability of any kind for any Claims; provided, however, that the Reorganized Debtors shall have the obligations specifically and expressly provided, and solely in the manner stated, in the Plan.

**9.7 Preservation of All Causes of Action Not Expressly Settled or Released**. Without limiting or restricting any other provisions of this Plan, including but not limited to Section 9.1, unless a Claim, cause of action, or objection against a Creditor or other entity is expressly and specifically waived, relinquished, released, compromised or settled in this Plan or any Final Order, the Reorganized

Debtors expressly reserve such claim, cause of action, or objection for adjudication or pursuit by the Reorganized Debtors after the Effective Date.

Therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims, causes of action, or objections by the Reorganized Debtors upon or after the Confirmation Date or Effective Date of the Plan based on the Disclosure Statement, the Plan, the Confirmation Order or otherwise. The Reorganized Debtors expressly reserve the right to pursue or adopt any claims (and any defenses), causes of action, or objections of the Debtors or the Debtors in Possession, as trustees for or on behalf of the Creditors, not specifically and expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order against any entity, including, without limitation, the plaintiffs or codefendants in any lawsuits. The Reorganized Debtors shall be the representatives of the Estate appointed for the purposes of pursuing any and all such claims, causes of action, and objections under section 1123(b)(3)(B) of the Bankruptcy Code.

Any Person to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods, tort, breach of contract or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors, should assume that such obligation, transfer, or transaction may be reviewed by the Reorganized Debtors subsequent to the Effective Date and may, to the extent not theretofore specifically waived, relinquished, released, compromised or settled in this Plan or any Final Order, be the subject of an action, claim, demand, or objection after the Confirmation Date or the Effective Date, whether or not (a) such Person has filed a proof of claim in the Chapter 11 Case, (b) such Person's proof of claim has been objected to, (c) such Person's Claim was included in the Debtors' Schedules, or (d) such Person's scheduled Claim has been objected to or has been identified by the Debtors as disputed, contingent, or unliquidated.

## ARTICLE 10
## THE EFFECTIVE DATE OF THE PLAN

**10.1 Conditions to Occurrence of Effective Date of Plan**. The "effective date of the plan," as used in Section 1129 of the Bankruptcy Code, shall not occur until the Effective Date as defined herein. The Effective Date shall occur upon the earlier of: (a) the Business Day that is thirty (30) days after entry of the Confirmation Order; or (b) upon satisfaction of the following conditions precedent (or conditions subsequent with respect to actions that are to be taken contemporaneously with, or immediately upon, the occurrence of the Effective Date), any of which may be waived in writing by the Debtors.

10.1.1 The Confirmation Order shall have been entered by the Bankruptcy Court.

10.1.2 The Confirmation Order shall have become a Final Order.

10.1.3 All actions, agreements and instruments, or other documents necessary to implement the terms and provisions of the Plan, if any, shall have been executed and delivered by any applicable non-debtor parties in form and substance satisfactory to the Debtors.

10.1.4 All actions, agreements and instruments, or other documents necessary to implement the terms and provisions of the Plan, shall have been executed by the Debtors.

10.1.5 The new value contribution contemplated in section 7.2 of the Plan shall have been received by the Reorganized Debtors.

10.1.6 Any federal, state, local and foreign governmental authorizations, consents and regulatory approvals required for the consummation of each of the transactions contemplated in the Plan shall have been obtained and shall have become final and non-appealable and, with respect to any court proceeding relating thereto, been approved by Final Order.

10.1.7 All fees and expenses due to or incurred by Professionals for the Debtors through the Effective Date not previously paid pursuant to interim or Final Orders shall have been paid into and shall be held in trust, free and clear of Liens, Claims and encumbrances (other than the rights of such Professionals) until due and payable in accordance with applicable court order.

10.1.8 All payments required to be made on the Effective Date shall have been made.

10.2 Filing of Notice of Effective Date. Within fourteen (14) Business Days of the occurrence of the Effective Date, the Reorganized Debtors shall file a notice of occurrence of the Effective Date signed by their counsel in the record of the Bankruptcy Court reflecting (a) that the foregoing conditions to the occurrence of the Effective Date have been satisfied or waived by the Debtors and any other person whose consent or waiver is required, (b) the date of the Effective Date, and (c) acknowledging that the Effective Date has occurred on and as of such date.

10.3 Revocation of Confirmation Order or Withdrawal of Plan. The Debtors may revoke or withdraw the Plan prior to the Confirmation Date by filing a Notice of Withdrawal of Plan in the record of the Chapter 11 Case. If the Plan is withdrawn prior to the Confirmation Date or if the Effective Date does not occur prior to the date set forth in Article 10, then the Plan shall be deemed withdrawn and the Confirmation Order (if any has been entered) shall be automatically revoked without the need for any action by any party in interest or the Bankruptcy Court. In such event, the Plan and the Confirmation Order shall be of no further force or effect and, the Debtors and all holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the filing of the Plan, and (ii) all the Debtors' respective obligations with respect to Claims and Interests shall remain unchanged, all of the Debtors' rights and claims against all Entities shall be fully preserved and nothing contained herein or in the Disclosure Statement shall be deemed to constitute an admission or statement against interest or to constitute a waiver or release of any claims by or against the Debtors or any other Persons or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors or any other Persons.

## ARTICLE 11
## MISCELLANEOUS PROVISIONS

11.1 Payment of Statutory Fees. All fees payable pursuant to Section 1930 of title 28 of the United States Code shall be paid by the Reorganized Debtors, as, when and in the amount as required by applicable law, without the filing of any motion or request therefor.

11.2 Notice. Any notice required or permitted to be provided to the Debtors or Reorganized Debtors under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) reputable overnight courier service, freight prepaid, to be addressed as follows: The Henderson Law Firm, 1201 Harding Place, Charlotte, NC 28204.

11.3 Headings. The headings used in this Plan are inserted for convenience only and do not in any manner affect the construction of the provisions of this Plan.

11.4 Governing Law. Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of North Carolina, without giving effect to any conflicts of law principles thereof that would result in the application of the laws of any other jurisdiction, shall govern the construction of this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise expressly provided in such instruments, agreements, or documents.

11.5 Additional Documents. The Debtors and Reorganized Debtors have the authority to take any and all actions and execute (and perform) any agreements and documents as the Debtors and/or Reorganized Debtors deem necessary or appropriate in their reasonable discretion to effectuate and further evidence the terms and conditions of this Plan.

11.6 Compliance with Tax Requirements. In connection with this Plan, the Debtors and the Reorganized Debtors will comply with all applicable withholding and reporting requirements imposed by federal, state, and local taxing authorities, and all distributions hereunder shall be subject to such withholding and reporting requirements.

11.7 Exemption from Transfer Taxes. To the extent applicable, the issuance, transfer, or exchange of any securities under this Plan, the making or delivery of any mortgage, deed of trust, other security interest, or other instrument of transfer under, in furtherance of, or in connection with this Plan, shall be exempt from all taxes as provided in Section 1146(a) of the Bankruptcy Code.

11.8 Further Authorizations. The Debtors, and after the Effective Date, the Reorganized Debtors, may seek such orders, judgments, injunctions, and rulings they deem necessary or useful to carry out the intention and purpose of, and to give full effect to, the provisions of this Plan.

11.9 Successors and Assigns. The rights, benefits and obligations of any Person named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor or assign of such Person.

11.10 Modification and Amendment of the Plan. Subject to section 1127 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3019, this Plan may be amended or modified by the Debtor, and, after the Effective Date, by the Reorganized Debtors.

## ARTICLE 12
## RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain

jurisdiction over any matter arising under the Bankruptcy Code or arising in or related to the Chapter 11 Case or this Plan, including, without limitation, the following:

12.1 Executory Contracts and Unexpired Leases. To hear and determine any and all motions or applications (i) for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases to which the Debtors are a party or with respect to which the Debtors may be liable, (ii) to review and determine all Cure Payments under any such assumed executory contract or unexpired lease, and (iii) to review and determine any Claims resulting from the rejection of any executory contract or unexpired lease.

12.2 Causes of Action. To determine any and all causes of action, including all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to this Plan, may be instituted by the Reorganized Debtors after the Effective Date.

12.3 Disputed Claims, Contingent Claims and Unliquidated Claims Allowance/Disallowance. To hear and determine any objections to the allowance of Claims or Interests (other than Claims that are Allowed pursuant to the Plan), including but not limited to any objections to the classification of any Claim, and to allow or disallow any contingent Claim, Disputed Claim, unliquidated Claim, contingent Interest, disputed Interest in whole or in part, and to determine any and all disputes among Creditors and holders of Interests with respect to their Claims and Interests.

12.4 Enforcement/Modification of Plan.

12.4.1 To hear and determine any requests to modify this Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order.

12.4.2 To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with this Plan or any other Plan documents or their interpretation, implementation, enforcement, or consummation.

12.4.3 To hear and determine such other matters that may be set forth in the Plan and the Confirmation Order or that relate to any transaction required or contemplated by the Plan.

12.4.4 To hear and determine any other matters related hereto, including matters related to the implementation and enforcement of the Plan, the Confirmation Order, and all orders entered by the Bankruptcy Court in this Chapter 11 Case.

12.4.5 To hear and determine any issue relating to distributions under the Plan.

12.4.6 To enter such orders as are necessary to implement and enforce the injunctions described herein, including orders extending the protections afforded under section 105 of the Bankruptcy Code. 12.4.7 To issue such orders in aid of execution of this Plan to the fullest extent authorized or contemplated by section 1142 of the Bankruptcy Code.

12.5 Compensation of Professionals. To hear and determine all applications for allowance of

compensation and reimbursement of expenses of Professionals, any other fees and expenses authorized to be paid or reimbursed under this Plan, and to approve the reasonableness of any payments made or to be made as provided in section 1129(a)(4) of the Bankruptcy Code.

12.6 Settlements. To the extent that Bankruptcy Court approval is required, to consider and act on any compromise and settlement of any Claim against or cause of action by the Debtors or the Reorganized Debtors.

12.7 Taxes. To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the Debtors or Debtors in Possession may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

12.8 506(b), (c) Claims. To determine the amounts, if any, of the reasonable fees, costs and other charges payable under sections 506(b) and/or (c) of the Bankruptcy Code.

12.9 Specific Purposes. To hear and determine such other matters as may be provided for in the Confirmation Order or may be appropriate under applicable law.

12.10 Final Decrees. To enter an order or final decree closing the Chapter 11 Case.

<h3 style="text-align:center">ARTICLE 13</h3>

<h3 style="text-align:center">SUBSTANTIVE CONSOLIDATION</h3>

Upon entry of the Confirmation Order, the Debtors cases will be substantively consolidated unless the Debtors, BCBS and Polsinelli have entered into settlement agreements providing for the dismissal of the Clinic case, the Court has approved such agreements, and the Court determines that the dismissal of the Clinic case is in the best interests of creditors.

This 3rd$^{st}$ day of October, 2017.

/s/Joseph Gregory Jemsek
Joseph Greogry Jemsek

**JEMSEK CLINIC, P. A.**

By:  /s/ Joseph Gregory Jemsek
       Joseph Gregory Jemsek

**THE HENDERSON LAW FIRM, PLLC**

/s/ James H. Henderson

James H. Henderson
NC State Bar No. 13536
1201 Harding Place
Charlotte, North Carolina 28204
Telephone: (704) 333.3444
Counsel for the Debtors

## EXHIBIT L

### Joseph G. Jemsek,  Hypothetical Liquidation Analysis of Assets

**A.      Introduction**

Under the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court may not confirm a plan of reorganization unless the plan provides each holder of a claim or interest who does not otherwise vote in favor of the plan with property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. To demonstrate that the Plan satisfies the "best interests" of creditors test, the Debtor has prepared the following hypothetical Liquidation Analysis, which is based upon certain assumptions discussed in the Disclosure Statement and in the notes accompanying the Liquidation Analysis (the "Notes"). The Liquidation Analysis estimates potential Cash distributions to Holders of Allowed Claim and Interests in a hypothetical chapter 7 liquidation of the Debtor's assets. Asset values discussed in the Liquidation Analysis may differ materially from values referred to in the Plan and Disclosure Statement. The Debtor prepared the Liquidation Analysis with the assistance of their advisors.

**B.      Scope, Intent, and Purpose of the Liquidation Analysis**

The determination of the costs of, and hypothetical proceeds from, the liquidation of the Debtor's assets is an uncertain process involving the extensive use of estimates and assumptions that, although considered reasonable by the Debtor, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtor and his advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could affect the ultimate results in an actual chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good-faith estimate of the proceeds that would be generated if the Debtor were liquidated in accordance with chapter 7 of  the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants. No independent appraisals were conducted (other than for the real property in West Virginia) in preparing the Liquidation Analysis. NEITHER THE DEBTOR  NOR HIS ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY. In preparing the Liquidation Analysis, the Debtor estimated Allowed Claims based upon a review of Claims listed on the Debtors' Schedules and Proofs of Claim filed to date. In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the Chapter 11 Cases, but which could be asserted and Allowed in a chapter 7 liquidation, including Administrative Claims, wind down costs, trustee fees, tax liabilities, and certain lease and contract rejection damages Claims. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. For purposes of the Liquidation Analysis, the Debtor's estimates of Allowed Claims contained in the Liquidation Analysis references specific Claims estimates, even though the Debtor's estimates of ranges of projected recoveries

under the Plan to Holders of Allowed Claims and Interests are based on ranges of Allowed Claims and Interests. Therefore, the Debtor's estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

### Notes to the Liquidation Analysis

**1.      Conversion Date and Appointment of a Chapter 7 Trustee**

The Liquidation Analysis assumes conversion of the Debtors' Chapter 11 Cases to chapter 7 liquidation cases on December 31, 2017 (the "Conversion Date"). On the Conversion Date, it is assumed that the Bankruptcy Court would appoint one chapter 7 trustee (the "Trustee") to oversee the liquidation of the Estate. Should the Trustee in the Jemsek individual proceeding determine that a Chapter 7 should be filed for the Jemsek Specialty Clinic, multiple Trustees would be appointed to administer the Estates, lower recoveries and higher administrative costs could result and distributions to Creditors could be delayed.

**2.      Primary Assets of the Debtor**

The Liquidation Analysis assumes a liquidation of all of the Debtor's assets. The Debtor's primary assets are the balances in various non-exempt cash accounts. The Debtor's other major asset is his interest in the Jemsek Specialty Clinic, PLLC ("JSC"). This is a unique, key-man practice, specializing in the treatment of Lyme Disease. Counsel for the Debtor has spoken with several Chapter 7 trustees in the Charlotte Division concerning this case. Counsel is advised that upon the conversion of the individual Chapter 11 case to Chapter 7, if the Trustees he has spoken to were assigned the case,  they would immediately take steps to discontinue the operations of JSC. Upon information and belief, the possibility and risk of medical malpractice claims against the Chapter 7 estate would preclude the continued operations of JSC.

The Chapter 7 liquidation value of the Debtor's interest in JSC therefore assumes that the Debtor would cease working at this clinic and there would be no longer be any significant good will associated with the clinic. The Debtor cannot be forced to work. Testimony has been presented to Bankruptcy Court that, as of May, 2017, clinic had cash reserve accounts which would only pay operating expenses for a month or two. The current lease for the Washington, D.C. office expires November, 2019. Lease expenses paid by JSC from June, 2016 to June, 2017 were $436,924.90, or approximately $36,500.00 per month. Any breach of lease claim against JSC would be significant.

Additional claims and repercussions which could result from the closure of JSC include employee wages and benefits, the unilateral abandonment of patients without reasonable notice, the loss of accounts receivable, claims for insurance tail coverage, claims based on HIPAA violations and/or failing to make proper arrangements for the disposition and/or retrieval of medical records,

patient privacy issues, costs of noticing patients (many of whom reside out of the United States), the costs to retain medical records of thousands of patients, medical board complaints, the non-payment of accounts payable, and the like. All claims against JSC would have to be paid in full before any funds would be available to a Chapter 7 trustee as the owner of equity.

**3.        Factors Considered in Valuing Hypothetical Liquidation Proceeds**

Certain factors may limit the amount of the Liquidation Proceeds available to the Trustee. It is probable that distribution of the Liquidation Proceeds in a Chapter 7 would be delayed while the Trustee and his or her professionals become knowledgeable about the Chapter 11 Cases and the Debtors' business and operations. This delay would materially reduce the value, on a "present value" basis, of the Liquidation Proceeds.

**The Chart below reflects estimated values as of October 3, 2017 or as otherwise shown. This analysis does not include assets which have been sold, foreclosed on, repossessed, cancelled (i.e. insurance policies), ceased to exist (former clinics), set off or otherwise transferred subsequent to the November 20, 2006 bankruptcy filing date). The "scheduled values" are from schedules filed in 2006 or amendments filed thereafter, unless otherwise indicated.**

| Asset | Non-exempt/Exempt Status | Scheduled value | Estimated current value | % Realizable | Amount Realizable |
|---|---|---|---|---|---|
| NON-LIQUID ASSETS | | | | | |
| Lot 25, 3.12 acres The Ridge of Greenbriar Mountain Phase One Greenbriar, White Sulfur Springs WV (value from November, 2016 appraisal) | exempt as tenants by entirety, Debtor share subject to subject to bankruptcy court approved deed of trust securing contingency fee agreement with Polsinelli | $375,000.00 | $129,500 | 0 | 0.00 |
| Lot 6 Walkingstick Falls Road, Highland NC, no debt | $80,000.00 tax value, will be liquidated under Chapter 11 plan for fair market value and net proceeds to be distributed pursuant to Plan | 149,570.00 | 80,000.00 | 70% | 56,000.00 |

Page 3 of  6

| Asset | Non-exempt/Exempt Status | Scheduled value | Estimated current value | % Realizable | Amount Realizable |
|---|---|---|---|---|---|
| Lot 7 Walkingstick Falls Rd, Highlands NC; $150,000 recent tax valuation, no debt | exempt as tenants by the entirety | 603,530.00 | 150,000.00 | 0 | 0.00 |
| Cash on hand | exempt, NCGS 1-362 | 500.00 | 500.00 | 0 | 0.00 |
| Household goods (½ interest) | divided outside of agreement; value reflects $5,000 exemption and Debtor's ½ share | 6,250.00 | 2,500.00 | 20% | 500.00 |
| crystal, collections, art, etc. | divided outside of agreement; scheduled joint value $25,000.00 | 12,500.00 | 5,000.00 | 20% | 1,000.00 |
| cameras | divided outside of agreement | 3,000.00 | 500.00 | 20% | 100.00 |
| Cadillac, 2011 DTS sedan | $3,500.00 of value is exempt, not included in amount realizable | 8,000.00 | 3,500.00 | 0 | 0.00 |
| Claims against Blue Cross Blue Shield of N.C. | Not exempt | unknown | unknown | unknown | unknown |
| Panthers PSLs and tickets, 2 tickets, Sec 131, Row 4 (prices vary, value is based on similar asking prices at http://www.pslsource.com | Not exempt | n/a | 25,000.00 | 80 | 20,000.00 |
| Jemsek Specialty Clinic, PLLC - Washington DC, 100% interest | Not exempt | n/a | 623,700.00 | 0.00 | 0.00 |
| **SUBTOTAL NON-LIQUID NON-EXEMPT ASSETS $77,600.00** | | | | | |
| **LIQUID ASSETS** | | | | | |
| Wells Fargo acct. no. xxx0794 | not exempt | n/a | 480,728.80 | 100 | 480,728.80 |
| Wells Fargo Command Cash and Sweep no. xxx3534 | not exempt | n/a | 10,000.00 | 100 | 10,000.00 |
| Wells Fargo Checking acct. no. xxx7301 | not exempt | n/a | 83,368.07 | 100 | 83,368.07 |

| Asset | Non-exempt/Exempt Status | Scheduled value | Estimated current value | % Realizable | Amount Realizable |
|---|---|---|---|---|---|
| Wells Fargo Beneficial IRA xxx0469 | IRA inherited from mother post petition; exempt per NCGS 1C-1601(a)(9); 6.30.17 balance $81,617.31 | 0.00 | $81,617.31 | 0 | 0.00 |
| UTMA account college fund for  Jordan E. Jemsek, daughter;Wells Fargo no. xxx4762 | not exempt, proposed settlement agreement with Kay Jemsek provides that these funds are to be held by Debtor and used for post high school education of Jordan, Debtor's plan proposes to pay college expenses from post-confirmation income, as allowed by *In re Bumgardner*, 26 Bankr. LEXIS 747 (E.D.N.C. 2013) | n/a | 39,558.93 | 100 | 39,558.93 |
| Wells Fargo Brokerage Cash account,Wells Fargo no. xxx3468 | not exempt | n/a | 32,000.00 | 100 | 32,000.00 |
| UTMA account college fund for James Gregory Jemsek, son; Wells Fargo acct. no. xxx0498 | not exempt, proposed settlement agreement with Kay Jemsek provides that these funds are to be held by Debtor and used for post high school education of James, Debtor's plan proposes to pay college expenses from post-confirmation income, as allowed by *In re Bumgardner*, 26 Bankr. LEXIS 747 (E.D.N.C. 2013) | n/a | 124,053.95 | 100 | 124,053.95 |
| Wells Fargo Brokerage Cash account,Wells Fargo no. xxx2731 | not exempt | n/a | 55,000.00 | 100 | $55,000.00 |

| Asset | Non-exempt/Exempt Status | Scheduled value | Estimated current value | % Realizable | Amount Realizable |
|---|---|---|---|---|---|
| Morgan Stanley Rollover IRA, acct. no. xxx1422 (retirement funded pre-petition, Nalle Clinic) | exempt, balance shown in separation agreement, $251,246.57, exempt per NCGS 1C-1601(a)(9), to be distributed to Kay Jemsek | 0.00 | $251,246.57, | 0 | 0.00 |
| Morgan Stanley SAR-SEP IRA, acct. no. xxx1221 | balance shown in separation agreement, $98,363.43, exempt per NCGS 1C-1601(a)(9), to be equally divided with Kay Jemsek based on 1.5.16 balance | n/a | 98,363.43 | 0 | 0.00 |
| Personal post-petition loan to fund operating expenses of Jemsek Specialty Clinic | Not exempt | n/a | 20,000.00 | 100 | 20,000.00 |
| **SUBTOTAL LIQUID NON-EXEMPT ASSETS $844,709.75** | | | | | |
| | | | | | |

| | | |
|---|---|---|
| **TOTAL REALIZABLE ASSETS** | | **$922,309.75** |
| Less: | Liquidation costs (statutory trustee commission, 11 USC Section 326) | 49,365.00 |
| Less: | Chapter 7 administrative fees (11 USC Section 327 and 330) | 200,000.00 |
| Less: | Chapter 11 administrative expenses | 6,350,000.00 |
| | Net available for distribution to priority and general unsecured creditors | -5,677,055.25 |

EXHIBIT K

# Jemsek Specialty Clinic PLLC

## PROFIT AND LOSS

July 2016 - June 2017

|  | TOTAL |
|---|---:|
| **INCOME** | |
| Income | |
| Miscellaneous Income | 5,600.00 |
| Patient Payments | 5,196,190.22 |
| Patient Refunds | -73,898.04 |
| **Total Income** | **5,127,892.18** |
| **Total Income** | **$5,127,892.18** |
| **GROSS PROFIT** | **$5,127,892.18** |
| **EXPENSES** | |
| 6105 - Rent | |
| Charlotte Rent | 15,145.88 |
| DC Condo Rent | 32,795.83 |
| Medical Office Rent | 436,924.90 |
| Parking Space | 1,811.16 |
| Storage Unit Rent | 7,319.40 |
| **Total 6105 - Rent** | **493,997.17** |
| 6115 - Utilities | 11,271.72 |
| 6120 - General Office | 28,673.16 |
| 6125 - Medical Office | 7,266.08 |
| 6140 - Travel | |
| Air/Parking/Taxi | 58,963.64 |
| Hotel | 14,325.57 |
| Meals and Entertainment | 16,595.11 |
| Travel Meals | 5,541.40 |
| **Total 6140 - Travel** | **95,425.72** |
| 6500 - Insurance | 1,167.76 |
| Business Owners Insurance | 118.00 |
| Dental Insurance | 9,648.12 |
| Health Insurance - DC | 258,693.31 |
| Insurance - Liability | 39,081.44 |
| Workers Comp Insurance | 10,513.81 |
| **Total 6500 - Insurance** | **319,222.44** |
| 6800 - Legal & Professional Fees | 900.00 |
| Consulting Fees | 80,487.71 |
| Court Fees | 14,500.00 |
| Filing Fees | 905.00 |
| Legal Fees | 388,973.00 |
| **Total 6800 - Legal & Professional Fees** | **485,765.71** |
| 8000 - Payroll Expense | |
| Contract Labor and Temporary Help | 15,985.67 |
| do not use | -17,880.63 |
| Employer Payroll Taxes - DC | 195,834.81 |
| Hiring Expenses | 995.00 |

| | TOTAL |
|---|---:|
| Payroll Processing Fee - DC | 37,004.12 |
| Salaries | |
|    Owners Salary - DC | 408,898.08 |
|    Provider Salaries | 630,575.70 |
|    Staff Salaries - DC | 1,292,738.69 |
|    **Total Salaries** | **2,332,212.47** |
| **Total 8000 - Payroll Expense** | **2,564,151.44** |
| Advertising | 16,878.52 |
| Answering Service | 3,172.00 |
| Bank Charges/Credit Card Fees | 117,446.19 |
| Computer/Software Maintenance | 70,211.96 |
| Copier/Fax Maintenance | 4,128.38 |
| Depreciation Expense | 7,293.76 |
| Disposal Fees | 5,797.43 |
| Do Not Use-Office Supplies | 18,952.36 |
| Document Storage | 3,716.60 |
| Dues & Subscriptions | 6,557.03 |
| Equipment Lease | 3,650.90 |
| Fax | 8,110.48 |
| Franchise Tax Expense | 496.00 |
| Franchise Tax Expense - DC | 68,000.00 |
| Investment Advisory Fees | 11,218.33 |
| License Expense | 815.00 |
| Linen Services | 2,644.51 |
| Medical Supplies | 110,737.59 |
| Medication Supplies | 573,605.50 |
| Moving Expense | 800.00 |
| Office Furniture/Equipment | 29,847.91 |
| Other Miscellaneous Service Cost (deleted) | 2,115.00 |
| Postage & Couriers | 11,285.45 |
| Printing and Copying | 525.00 |
| Stationery & Printing | 618.66 |
| Telephone | 27,123.48 |
| Telephone Maintenance | 43.54 |
| Transcription | 66,458.34 |
| Uniform/Medical Wardrobe | 3,207.10 |
| **Total Expenses** | **$5,181,230.46** |
| **NET OPERATING INCOME** | **$ -53,338.28** |
| OTHER INCOME | |
|    Capital Gains Distributions | 3,460.50 |
|    Dividend Income | 20,241.97 |
|    Interest Earned | 10.85 |
|    Long Term Gain | -7,689.81 |
|    Miscellaneous Income | 14,050.00 |
|    Short Term Capital Gain | -897.14 |
| **Total Other Income** | **$29,176.37** |
| OTHER EXPENSES | |
|    Foreign Tax Paid | 295.34 |
|    Miscellaneous | 2,853.33 |

|  | TOTAL |
|---|---|
| **Total Other Expenses** | **$3,148.67** |
| NET OTHER INCOME | **$26,027.70** |
| NET INCOME | **$ -27,310.58** |

## EXHIBIT J

## JOSEPH GREGORY JEMSEK

### Projected disposable income

Note: In determining the Debtor's "projected disposable income"pursuant to 11 U.S.C. Section 1129(a)(15), the Court is to use the formula set forth in 11 U.S.C. Section 1325(b)(2) (which, in turn, references the Debtor's "current monthly income" as defined in 11 U.S.C. Section 101(10A). The Debtor's "current monthly income" is $8,114.53, as shown on the Statement of Current Monthly Income, filed with the Court on December 19, 2001 [Doc. 23, pages 42-43]. These projections nor the Debtor's historic level of income is a guarantee of future disposable income.

| Monthly projected income | | | |
|---|---|---|---|
| Source | Income based on May, 2017 budget Jemsek Specialty Clinic historic income | Income based on Jemsek Specialty Clinic P&L 6/16 to 6/17 | Currently monthly income as defined 11 USC 1325(b)(2) and 101(10A) |
| Salary, net of withholding | $20,700.00 | 16,498.00 | 7,000.00 |
| Dividend and interest income | 900.00 | 100.00 | 1,114.53 |
| Jemsek Clinic profits | 23,812.00 | 8,201.00 | n/a |
| Total monthly income | 44,782.00 | 24,799.00 | 8,114.53 |
| Monthly living expenses[2] | | | |

---

[1]Pursuant to the proposed plan, Jemsek will be liquidating his investment/securities accounts and distributing proceeds to creditors, and he will no longer own the source of the historic dividends and interest.

[2]It should be noted that the expenses to not include ongoing legal, accounting and other professional fees, and as such the expenses are underestimated. These expenses would include fees related to actions seeking to preserve Jemsek's medical license, which have historically be substantial. Fees have historically been paid by the medical practice. Professional fees are an allowable expense pursuant to 11 U.S.C. 1325(b)(2)(B) as "expenditures necessary for the continuation, preservation, and operation of [the debtor's] business."

| | | | |
|---|---|---|---|
| Alimony[3] | 10,500.00 | 10,500.00 | 10,500.00 |
| Child support | 2,000.00 | 2,000.00 | 2,000.00 |
| Washington, DC rent | 4,475.00 | 4,475.00 | 4,475.00 |
| Charlotte, NC rent[4] | 3,872.00 | 3,872.00 | 3,872.00 |
| Food and entertainment | 913.00 | 855.00 | 855.00 |
| Utilities/home expenses | 553.00 | 579.00 | 579.00 |
| Medical products | 337.00 | 861.00 | 861.00 |
| School tuition and expenses[6] | 3,917.00 | 3,917.00 | 3,917.00 |
| Phone | 85.00 | 80.00 | 80.00 |
| Clothing | 97.00 | 114.00 | 114.00 |
| City National Bank (Greenbrier property)[7] | 1,500.00 | 1,500.00 | 1,500.00 |
| Other personal | 2,500.00 | 3,062.00 | 3,062.00 |
| Estimated tax on S corporation profits | 9,525.00 | 3,280.00 | 3,280.00 |
| **TOTAL EXPENSES** | 40,273.00 | 32,951.00 | 32,951.00 |
| **NET MONTHLY** | 4,509.00 | -8,152.00 | -24,836.47 |

[3]Pursuant to proposed agreement with Kay Jemsek, monthly alimony will terminate on certain conditions, and will be reduced to $4,000.00 per month on Jemsek attaining the age of 70 on April 16, 2019 for an additional two years (until April 16, 2012).

[4]Budget assumes that Kay Jemsek and minor children will continue to reside in Charlotte, N.C. and that Jemsek will continue to maintain a second residence in Charlotte. Jemsek is not able to practice medicine in North Carolina. The Charlotte rent did not appear on the budget presented to the Court in May, 2017. It has historically been paid by the Clinic and treated as a taxable distribution to the Debtor. It appears on this budget for clarity. The tax ramifications are the same whether paid by the Clinic or by the Debtor.

[5]This expense was inadvertently not included in budget submitted to court in May, 2017.

[6]Daughter, born July 20, 2004 (age 12), and son, born September 2, 1999 (age 17).

[7]The real property is for sale, and this payment will not be made after any sale.

Page 2 of  3

| | | | |
|---|---|---|---|
| **NET MONTHLY AFTER ALIMONY REDUCTION** | 10,509.00 | -2,152.00 | -18,836.47 |
| **CALCULATION OF RANGE OF THREE YEAR DISPOSABLE INCOME** | | | |
| January, 2018 through May, 2019 (when alimony decreases to $4,000.00 per month (16 months)) | 72,144.00 | -203,520.00 | -397,383.52 |
| June, 2019 through January, 2021 (19 months)(adding $6,000.00 alimony reduction to disposable income) [8] | 199,671.00 | -40,888.00 | -357,892.93 |
| **TOTAL ESTIMATED DISPOSABLE INCOME** | 271,815.00 | -244,408.00 | -755,276.45 |

---

[8]Jemsek has not determined his retirement date. Studies suggest that the average age for actual and expected retirement of a physician in the United States was commonly between 60 and 69 years, respectively. See  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5109800/. Jemsek's retirement date will have a significant impact on his disposable income.

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| JOSEPH GREGORY JEMSEK | ) | Bankruptcy Case No. 06-31986 (JCW) |
| | ) | |
| JEMSEK CLINIC, P. A. | ) | Bankruptcy Case No. 06-31766 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## SUMMARY OF MONTHLY REPORTS, JOSEPH G. JEMSEK, 2012 TO PRESENT

| Date | Cash Receipts | Disbursements | End Cash Position |
|---|---|---|---|
| January, 2012 | $ 75,000.31 | $ 57,897.65 | $ 51,904.32 |
| February, 2012 | 30,000.29 | 53,938.78 | 27,965.83 |
| March, 2012 | 81,035.24 | 37,124.82 | 71,876.25 |
| April, 2012 | 12,170.28 | 53,791.48 | 30,255.05 |
| May, 2012 | 37,070.35 | 47,727.75 | 19,597.65 |
| June, 2012 | 27,070.11 | 30,150.65 | 16,517.11 |
| July, 2012 | 34,070.21 | 34,444.14 | 16,143.18 |
| August, 2012 | 53,521.36 | 46,532.41 | 23,132.13 |
| September, 2012 | 24,910.20 | 21,829.85 | 26,212.48 |
| October, 2012 | 67,910.12 | 37,764.59 | 56,358.01 |
| November, 2012 | 42,910.09 | 74,388.58 | 24,879.52 |
| December, 2012 | 32,802.62 | 26,762.20 | 30,919.94 |
| January, 2013 | 25,505.09 | 42,638.25 | 13,786.78 |
| February, 2013 | 22,505.12 | 32,114.84 | 4,177.06 |
| March, 2013 | 53,257.60 | 32,304.18 | 25,130.48 |
| April, 2013 | 38,825.71 | 30,521.30 | 33,434.89 |
| May, 2013 | 19,365.08 | 30,711.22 | 22,088.75 |
| June, 2013 | 73,277.93 | 52,005.88 | 43,360.80 |

| | | | |
|---|---|---|---|
| July, 2013 | 159,698.60 | 168,979.37 | 34,080.03 |
| August, 2013 | 39,848.83 | 32,626.06 | 41,302.80 |
| September, 2013 | 30,364.18 | 30,605.66 | 41,061.32 |
| October, 2013 | 41,357.90 | 32,021.61 | 50,397.61 |
| November, 2013 | 20,434.38 | 43,978.02 | 26,853.97 |
| December, 2013 | 158,134.00 | 163,230.64 | 21,757.33 |
| January, 2014 | 29,883.14 | 27,760.40 | 23,880.07 |
| February, 2014 | 33,612.06 | 29,488.99 | 28,003.14 |
| March, 2014 | 38,834.01 | 36,448.72 | 30,388.43 |
| April, 2014 | 18,624.75 | 31,993.33 | 17,019.85 |
| May, 2014 | 76,443.80 | 70,064.16 | 23,299.49 |
| June, 2014 | 46,171.87 | 30,394.87 | 39,176.49 |
| July, 2014 | 34,529.45 | 36,758.29 | 34,065.29 |
| August, 2014 | 24,998.10 | 31,222.04 | 27,841.45 |
| September, 2014 | 350,780.31 | 177,719.69 | 200,902.07 |
| October, 2014 | 19,801.06 | 24,811.04 | 195,892.09 |
| November, 2014 | 28,409.11 | 20,650.71 | 203,650.49 |
| December, 2014 | 56,409.76 | 82,128.67 | 177,931.58 |
| January, 2015 | 38,520.91 | 21,641.69 | 194,810.80 |
| February, 2015 | 23,229.56 | 27,691.33 | 190,349.03 |
| March, 2015 | 47,184.20 | 49,924.16 | 187,609.07 |
| April, 2015 | 117,730.15 | 135,525.94 | 171,803.28 |
| May, 2015 | 26,127.48 | 39,801.88 | 158,128.88 |
| June, 2015 | 109,317.12 | 115,811.82 | 151,634.18 |
| July, 2015 | 31,791.11 | 34,525.98 | 148,899.31 |
| August, 2015 | 23,630.65 | 19,560.95 | 152,969.01 |
| September, 2015 | 44,446.97 | 45,908.46 | 151,507.52 |
| October, 2015 | 21,584.25 | 25,141.02 | 147,950.75 |

| | | | |
|---|---|---|---|
| November, 2015 | 34,426.25 | 54,824.28 | 127,552.72 |
| December, 2015 | 44,978.71 | 39,575.93 | 132,955.50 |
| January, 2016 | 20,317.28 | 11,882.27 | 141,390.51 |
| February, 2016 | 105,479.88 | 76,630.11 | 170,240.28 |
| March, 2016 | 84,345.19 | 88,939.66 | 165,645.81 |
| April, 2016 | 218,592.26 | 326,903.07 | 57,335.00 |
| May, 2016 | 25,382.52 | 50,488.50 | 32,229.02 |
| June, 2016 | 133,155.81 | 132,899.89 | 32,484.94 |
| July, 2016 | 33,049.04 | 24,950.48 | 40,583.50 |
| August, 2016 | 21,637.20 | 22,457.44 | 39,763.26 |
| September, 2016 | 161,188.77 | 151,984.68 | 48,967.35 |
| October, 2016 | 30,706.85 | 19,849.15 | 59,825.05 |
| November, 2016 | 223,821.14 | 199,422.01 | 84,224.18 |
| December, 2016 | 52,848.78 | 50,216.03 | 86,856.93 |
| January, 2017 | 3,093.71 | 49,823.27 | 40,127.37 |
| February, 2017 | 60,281.36 | 22,066.61 | 78,342.12 |
| March, 2017 | 56,037.82 | 63,615.05 | 70,764.89 |
| April, 2017 | 37,218.03 | 28,108.74 | 79,874.18 |
| May 2017 | 153,007.95 | 110,244.14 | 122,637.99 |
| June, 2017 | 23,171.49 | 48,266.54 | 97,542.94 |
| **TOTAL** | **$ 3,965,845.46** | **$ 3,902,211.92** | **$ 5,120,249.10** |
| **AVERAGE** | **$60,088.57** | **$ 59124.42** | **$77,579.53** |

# EXHIBIT H

**JOSEPH G. JEMSEK, CHAPTER 11 CASE NO. 06-31986**
**PRE-PETITION CLAIM STATUS AS OF MAY 22, 2017**

| Claimant | Scheduled Amount | Sec'd/Priority | Claim Number(s) | Amount of Claim | Current Status |
|---|---|---|---|---|---|
| Bank of America MBNA (credit card) | $ 45,270.00 | Unsecured | 7 | $     44,840.83 | Presumed valid, subject to objection |
| Blue Cross Blue Shield | 0.00 | Unsecured | 19 | 16,325,974.78 | Pending AP |
| Citimortgage | 997,481.00 | Sec'd, residence | 26 | 997,481.15 | Paid, collateral sold, Court order [Doc. 877] |
| City National Bank | 133,000.00 | Sec'd, Greenbrier property | | | Balance est. $19K, not including legal fees, Consent Order circulating |
| First-Citizens Bank | 279,988.00 | Unsecured, personal guarantee, Jemsek Clinic note | 11 | 285,840.51 | Presumed valid, subject to objection |
| First-Citizens Bank | 435,758.00 | Unsecured, personal guarantee, Jemsek Clinic note | 12 | 446,173.32 | Presumed valid, subject to objection |

| Claimant | Scheduled Amount | Sec'd/Priority | Claim Number(s) | Amount of Claim | Current Status |
|---|---|---|---|---|---|
| First-Citizens Bank | 1,633,546.66 | Unsecured (breach of lease) | 13 27 - Amended | 1,251,372.30 1,745,003.46 | Presumed valid, subject to objection |
| Florida Infusion Services | 0.00 | Unsecured | 28 29 - Amended 30 | 74,460.15 | Presumed valid, subject to objection |
| Gaither, Deborah D. | 0.00 | Unsecured | 20 21 | 0.00 | AP 07-03075, Order Approving Settlement, 2.21.08 |
| Ingram, Patty Looper | 0.00 | Unsecured | 22 23 - Amended 24 - Amended | 0.00 6,000,000.00 6,000,000.00 | AP 07-03069, settlement approved 1.25.08 |
| Jabkiewicz, Joseph Estate of Kathleen | 0.00 | Unsecured | 16 17 | 0.00 1,500,000.00 600,000.00 900,000.00 | AP 07-03035, Dismissed after settlement, 9.20.07 |
| Jenkins, Heather | 0.00 | | | | AP 07-3018, Order Remanding to State Court for Approval of Settlement, 2.13.08 |
| Moore, Phillip and Nikki | 0.00 | Unsecured | 25 | 600,000.00 | Settled, notice of disinterest filed by attorney Gary Jackson 11.4.09 |
| Morgan Stanley Credit Corporation | 577,571.00 | Sec'd, Sharon Ln. residence | 4 | 580,018.38 | No claim, collateral sold, Court order [Doc. 877] |

| Claimant | Scheduled Amount | Sec'd/Priority | Claim Number(s) | Amount of Claim | Current Status |
|---|---|---|---|---|---|
| NC Dept of Revenue | 0.00 | Priority | 10 | 43,577.59 | Undetermined |
| Scottish Bank | 1,220,012.00 | Sec'd, Morgan Stanley stock portfolio, $1.5M balance | 8<br>9 | 202,200.00<br>1,272.86<br>8.80 | Consent Order Granting Set off and relief from stay 12.5.06 |
| SunTrust Bank | 200,000.00 | Unsecured | 1<br>2 | 0.00<br>0.00 | Undetermined |
| SunTrust Bank | 6,087,291.15 | Unsecured | 5 | 6,127,985.99 | First mortgage, Huntersville office, paid in foreclosure |
| SunTrust Bank | 77,735.00 | Secured, 2004 BMW | 6<br>6 - Amended | 75,915.77<br>56,228.56 | Order for Relief entered 7.11.07 |
| VT Inc as Trustee for World Omni | 0.00 | Unsecured | 31<br>31 - Amended | 171,180.85<br>4,829.12 | Consent order Granting Relief in PA case, 9.14.07 |
| Wilson, James A. | 18,119.87 | Unsecured (legal fees) | 3 | 18,119.87 | |

**EXHIBIT G**

**JEMSEK CLINIC, P. A. CHAPTER 11 CASE NO. 06-31766**
**PRE-PETITION CLAIM STATUS AS OF July 19, 2017**

| Claimant | Scheduled Amount | Sec'd/Priority | Claim Number(s) | Amount of Claim | Current Status |
|---|---|---|---|---|---|
| Bank of America | 39,430.00 | Secured; auto | 13 | 34,131.63 | believed to have been paid post–petition |
| Blue Cross and Blue Shield of North Carolina | 0.00 | Secured | 30 | 16,325,974.78 | subject to litigation |
| De Lage Landen Financial Services, Inc. | 0.00 | Unsecured | 18 | 94,601.21 | |
| Deborah Gaither | 0.00 | Unsecured | 31 | 0.00 | |
| Etactics | 427.31 | Unsecured | 2 | 171.27 | |
| First-Citizens Bank & Trust Company | 279,988.00 | Secured | 7 | 284,499.24 | Unsecured |
| First-Citizens Bank & Trust Company | 435,758.18 | Secured | 8 | 444,066.14 | Unsecured |
| First-Citizens Bank & Trust Company | 1,633,546.66 | Secured | 9 | 1,733,576.92 | Unsecured |
| Florida Infusion Services, Inc. | 0.00 | Unsecured | 5 | 66,439.25 | |
| General Electric Healthcare Diagnostic Imaging | 468.75 | Unsecured | 10 | 468.75 | |

| Claimant | Scheduled Amount | Sec'd/Priority | Claim Number(s) | Amount of Claim | Current Status |
|---|---|---|---|---|---|
| Hartford Fire Insurance Co. | 1,045.50 | Unsecured | 34 | 0.00 | |
| Jemsek Clinic PA | 0.00 | Unsecured | 27 | 0.00 | |
| John C. Robinson | 0.00 | Unsecured | 37 | 75.00 | |
| Joseph Jabkiewicz | 0.00 | Unsecured | 19<br>21 | 0.00<br>0.00 | Withdrawal of Claims filed by Stacy C. Cordes |
| Kim M. Dorney | 0.00 | Unsecured | 25 | 7,219.35 | |
| Lauri O. Byerley | 1,734.00 | Unsecured | 14 | 2,006.00 | |
| Linda Strand | 1,526.69 | Unsecured | 29 | 1,526.69 | |
| Linde Gas, LLC | 256.29 | Unsecured | 16 | 340.26 | |
| LVNV Funding, LLC | | Unsecured | 20 | 7,604.89 | |
| Mary J. Porter | 328.41 | | 3 | 0.00 | |
| McGuireWoods LLP | 2,643.00 | Unsecured | 28 | 2,643.00 | |
| Mecklenburg County Tax Collector | 21,570.45 | Priority | 40 | 29,162.54 | Related to real property foreclosed in 2008; believe to have been paid post-petition by third party |

| Claimant | Scheduled Amount | Sec'd/Priority | Claim Number(s) | Amount of Claim | Current Status |
|---|---|---|---|---|---|
| Mecklenburg County Tax Collector | 0.00 | Priority | 26 | 22,001.86 | Related to real property foreclosed in 2008; believe to have been paid post-petition by third party |
| Mecklenburg County Tax Collector | 0.00 | Priority | 41 | 32,818.27 | Related to real property foreclosed in 2008; believe to have been paid post-petition by third party |
| Medicare | 0.00 | Unsecured | 22 | 1,018.61 | |
| Mitchell and Randy Omstein | 0.00 | Unsecured | 35 | 1,105.44 | |
| Mitchell and Randy Omstein | 0.00 | Unsecured | 33 | 1,105.44 | |
| Patti Looper Ingram | 0.00 | Unsecured | 36 | 0.00 | |
| Paula Hutcherson | 1,938.46 | Unsecured | 12 | 1,755.77 | |
| Pitney Bowes Credit Corporation | 1,446.96 | Unsecured | 15 | 2,439.09 | |
| Quest Diagnostics Incorporated | 55,446.96 | Unsecured | 38 | 6,653.39 | |
| Stephanie L. Burns | 236.50 | Unsecured | 23 | 237.00 | |
| TechStructures, LLC | 671.70 | Unsecured | 1 | $    7,547.43 | |
| The Scottish Bank | 1,220,012.00 | Secured | 4 | 1,233,244.10 | |
| The Bankers Bank | 0.00 | Unsecured | 11 | 4,674.67 | |

| Claimant | Scheduled Amount | Sec'd/Priority | Claim Number(s) | Amount of Claim | Current Status |
|---|---|---|---|---|---|
| The Charlotte Observer | 2,988.65 | Unsecured | 6 | 4,203.40 | |
| Time Warner Telecom Inc | 3,828.80 | Unsecured | 17 | 5,160.94 | |
| Verizon Wireless South | 497.34 | Unsecured | 24 | 210.57 | |
| VT Inc. As Trustee of World Omni LT | 0.00 | Unsecured | 39 | 5,277.23 | |
| William J. Gaither | 0.00 | Unsecured | 32 | 0.00 | |

## Valuation Services

# Jemsek Specialty Clinic, PLLC

### May 17, 2017

## *Your guide forward*

### Valuation Date:
### November 30, 2016

**Cherry Bekaert LLP**

**1075 Peachtree Street Suite 2200**
**Atlanta, Georgia 30309**
**Telephone: (404) 209 - 0954**
**cbh.com**





# TRANSMITTAL LETTER

May 17, 2017

Mr. James H. Henderson
The Henderson Law Firm
1201 Harding Place
Charlotte, North Carolina 28204

**Re: Valuation Services**

Dear Mr. Henderson:

At your request, Cherry Bekaert LLP has been engaged to determine the fair market value of 100.0% of the equity in Jemsek Specialty Clinic, PLLC ("Jemsek" or the "Practice") on a controlling, non-marketable basis as of November 30, 2016 (the "Valuation Date") for management planning purposes related to providing legal advice to Dr. Jemsek.

This valuation was performed solely to assist you with providing legal advice to Dr. Jemsek; the resulting estimate of value should not be used for any other purpose or by any other party for any purpose. A valuation for a different purpose, under a different standard or basis of value, and/or for a different date of value could result in a materially different opinion of value.

Based on our analysis, as described in this valuation report, our conclusion of the fair market value of 100.0% of the equity in Jemsek Specialty Clinic, PLLC on a controlling, non-marketable basis as of the Valuation Date is:

**$623,700**

This conclusion of value is subject to the Statement of Assumptions and Limiting Conditions found in this report. We have no obligation to update this report or our conclusion of value for information that comes to our attention after the date of this report.

Very truly yours,

Cherry Bekaert LLP


**Thomas T. Brooks CPA/ABV, ASA**
Senior Manager, Valuation Services

**Zain U. Ahmed ASA**
Principal, Valuation Services





# CERTIFICATION BY APPRAISERS

We certify that, to the best of our knowledge and belief:

-- The statements of fact contained in this report are true and correct.

-- The reported analyses, opinions and conclusions are limited only by any reported assumptions and limiting conditions, and are the appraisers' personal, impartial, and unbiased professional analyses, opinions and conclusions.

-- Our analyses, opinions, and conclusions are subject to the requirements of the Uniform Standards of Professional Appraisal Practice ("USPAP") as promulgated by the Appraisal Foundation, Principles of Appraisal Practice and Code of Ethics promulgated by the American Society of Appraisers, the American Institute of Certified Public Accountants Statement on Standards for Valuation Services ("SSVS") and the Code of Ethics and Standards of Professional Conduct of the CFA Institute.

-- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the Practice, the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this valuation report.

-- We have no responsibility to update this report for events and circumstances subsequent to the date of this report. The opinions expressed in this valuation are contingent upon the conditions set forth in the Statement of Assumptions and Limiting Conditions contained in **Appendix A** of this report.

-- We express no opinion and accept no responsibility for the accuracy and completeness of the financial information and other data provided to us by others. We assume that the financial and other information provided to us is accurate and complete, and we have relied upon this information in performing this valuation.

-- The economic and industry data included in the valuation report have been obtained from various printed or electronic reference sources that we believe to be reliable. We have not performed any corroborating procedures to substantiate that data.

-- We have performed no services, as an appraiser, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

-- We have no present or prospective interest in the Practice and any of its subsidiaries and have no personal interest or bias with respect to the parties involved.

-- Rodrigo Visbal provided significant valuation assistance to the persons signing this certification.

**Thomas T. Brooks CPA/ABV, ASA**
Senior Manager, Valuation Services

**Zain U. Ahmed, ASA**
Principal, Valuation Services

ii



# Table of Contents

TRANSMITTAL LETTER................................................................................................I

CERTIFICATION BY APPRAISERS ....................................................................... II

VALUATION SUMMARY ............................................................................................2

SOURCES OF INFORMATION ..................................................................................3

INTRODUCTION............................................................................................................4

    Description of the Assignment and Scope of the Work ...................................... 4

    Standard and Definition of Value ........................................................................ 4

    Factors Relevant to Fair Market Value .............................................................. 4

    Valuation Premises and Approaches .................................................................. 5

    Summary of Valuation Conclusions ................................................................... 6

ECONOMIC OUTLOOK ..............................................................................................7

    Economy of the United States ............................................................................. 7

INDUSTRY OVERVIEW ...........................................................................................15

    Specialist Doctors in the U.S. ........................................................................... 15

FUNDAMENTAL POSITION OF THE COMPANY ...........................................21

    Summary .............................................................................................................. 20

    History ................................................................................................................. 20

    Products ............................................................................................................... 23

    Location ............................................................................................................... 23

    Team Overview.................................................................................................... 23

    Distribution Policy ............................................................................................. 25

    Litigation ............................................................................................................. 25

    Summary of Positive and Negative Factors Affecting the Practice.............. 25

FINANCIAL STATEMENT ANALYSIS ...............................................................26

    Overview .............................................................................................................. 26

    Balance Sheet Analysis...................................................................................... 26

    Income Statement Analysis ............................................................................... 26

VALUATION ANALYSIS...........................................................................................28

    The Asset-Based Approach ............................................................................... 28

    The Market Approach ........................................................................................ 29

    The Income Approach ........................................................................................ 29

    Discount Rate ...................................................................................................... 32

    Premiums and Discounts ................................................................................... 34

RECONCILIATION OF VALUES.............................................................................37

APPENDICES ................................................................................................................38

    Statement of Assumptions and Limiting Conditions ...................................... A

    Schedules .............................................................................................................. B

    Premiums and Discounts ....................................................................................C

    Curriculum Vitae ................................................................................................ D

**Cherry Bekaert** LLP
CPAs & Advisors

# VALUATION SUMMARY

| | |
|---|---|
| **Report Summarized:** | The valuation report presented herein contains 38 pages plus 4 appendices (A-D) and was issued May 17, 2017 by Cherry Bekaert LLP. This valuation report is subject to the Statement of Assumptions and Limiting Conditions presented in **Appendix A**. |
| **Subject of Appraisal:** | The fair market value of 100.0% of the equity in Jemsek Specialty Clinic, PLLC |
| **Business Activities:** | Lyme disease specialty medical practice |
| **Purpose of Appraisal:** | Management planning purposes |
| **Standard of Value:** | Fair market value |
| **Ownership Characteristic:** | 100.0% of the equity<br>Controlling, non-marketable basis |
| **Premise of Value:** | As a going concern |
| **Date of Value:** | November 30, 2016 |
| **Discount for Lack of Control:** | n/a |
| **Discount for Lack of Marketability:** | 10% |
| **Conclusion of Value:** | **$623,700** |

© Cherry Bekaert LLP
All Rights Reserved

# SOURCES OF INFORMATION

In arriving at our value conclusion, we have considered and relied upon all pertinent information available to us at the Valuation Date, including, but not limited to:

1. Jemsek's unaudited internal financial statements as of and for the years ended December 31, 2011 through 2015, and the latest twelve months ended November 30, 2016;

2. Financial projections ending December 31, 2016 through 2020;

3. S&P Capital IQ database (www.capitaliq.com);

4. Duff & Phelps 2016 Valuation Handbook – Guide to Cost of Capital, Duff & Phelps, Chicago;

5. Duff & Phelps Risk Premium Report 2016, Duff & Phelps, LLC, Chicago;

6. Guideline mergers and acquisitions transactions data from Pratt's Stats, S&P Capital IQ, BizComps, and IBA;

7. Federal Reserve Statistical Release for selected rates as of November 30, 2016;

8. National Economic Review 3Q 2016 published by Mercer Capital;

9. IBISWorld Industry Report Specialist Doctors in the US;

10. Interviews with Practice management; and

11. Other sources cited throughout this report.



# INTRODUCTION

**Description of the Assignment and Scope of the Work**

Cherry Bekaert LLP has been engaged to determine the fair market value of 100.0% of the equity in Jemsek Specialty Clinic, PLLC as of November 30, 2016 for management planning purposes related to providing legal advice to Dr. Jemsek; the resulting estimate of value should not be used for any other purpose or by any other party for any purpose.

We used appropriate valuation methods, including consideration of discounts for lack of control and for lack of marketability associated with the subject interest. The standard of value is "fair market value" as defined in Section 25.2512-1 of the U.S. Treasury regulations. We assume that the Practice will continue as a going concern and that the character of its present business will remain intact.

The engagement was performed as a valuation engagement, as that term is defined in the Statement of Standards for Valuation Services ("SSVS") of the American Institute of Certified Public Accountants. The result of a valuation engagement is expressed as a conclusion of value. The opinions expressed in this valuation are contingent upon the conditions set forth in the Statement of Assumptions and Limiting Conditions contained in **Appendix A** of this Report.

**Standard and Definition of Value**

We have used "fair market value" as the standard of value for this engagement. Fair market value is defined in Section 25.2512-1 of the U.S. Treasury regulations as

> *"the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."*

IRS Revenue Ruling 59-60, 1959-1, C.B. 237 also states that "the hypothetical buyer and seller are assumed to be able, as well as willing, to trade and to be well informed about the property and the market for such property."

**Factors Relevant to Fair Market Value**

The factors considered in the valuation process include the eight factors enumerated in Revenue Ruling 59-60, Section 4.01 for consideration in a fair market value determination:

1. The nature of the business and the history of the enterprise from its inception.
2. The economic outlook in general and the condition and outlook of the specific industry in particular.
3. The book value of the stock and the financial condition of the business.
4. The earning capacity of the company.
5. The dividend-paying capacity of the company.
6. Whether or not the enterprise has goodwill or other intangible value.
7. Sales of the stock and the size of the block of stock to be valued.
8. The market prices of stock of corporations engaged in the same or similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the counter.



**Valuation Premises and Approaches**

There are two essential premises on which a company may be valued:

    1.      As if in liquidation, and

    2.      As a going concern

The value of the company is deemed to be the higher of the two values determined under either a liquidation or going-concern premise. This approach is consistent with the valuation concept of highest and best use, which requires an appraiser to consider the optimal use of the assets being appraised under current market conditions.

<u>Liquidation Premise of Value</u>
The liquidation premise of value assumes that a company has greater value if it ceases operations and sells its assets to the highest bidders.

<u>Going-Concern Premise of Value</u>
The going-concern premise of value assumes that a company has the ability to generate earnings from tangible and intangible assets and will continue to operate as an income-producing entity. We have appraised the subject company's stock under the premise of value in continued use, as a going-concern business entity.

There are many acceptable methods used in business valuation. The three fundamental approaches that must be considered by the appraiser are:

    1.      The Asset-Based Approach;

    2.      The Market Approach; and

    3.      The Income Approach.

<u>The Asset-Based (Cost) Approach</u>
The asset-based, or cost, approach assumes that the value of an entity is closely related to the value of the entity's underlying assets and liabilities. The asset approach is generally used when the subject entity holds significant tangible assets, if the entity is not labor intensive, or if it has a weak earnings history. Under the net asset value method in the asset-based approach, values of assets and liabilities are adjusted to market value. The difference between the fair market value of the assets and liabilities is an indication of the value of the entity as a whole.

<u>The Market Approach</u>
In determining the value of a business, a consideration of share prices of comparable companies traded in public markets should be undertaken, to the extent that public companies that are reasonably comparable can be identified. As a generalization, the prices of stocks traded in volume in a free and active market by informed persons best reflect the consensus of the investing public as to what the future holds for the corporations whose stocks are publicly traded and the industries in which they operate.

Another conventional alternative of this approach is to locate entire companies, either publicly traded or closely-held, that have been bought and sold in the market place that provides the appraiser with the ability to determine the multiples that resulted from the transaction. These multiples can then be applied to the subject entity, with or without adjustment, depending on the circumstances.



<u>The Income Approach</u>

The income approach is a valuation process in which the income expected to be generated by an asset or business is converted into a value estimate. The income approach is applied in valuing operating businesses and income-producing businesses. An income approach applies a basic valuation principle that the value of an ownership interest in a company is equal to the present worth of the future benefits of ownership. It reflects the price an investor is willing to pay now for future earnings and earnings-growth opportunities. Two common methodologies applied in business valuation under the income approach are the capitalization of earnings method and the discounted cash flow method.

**Summary of Valuation Conclusions**

All three of the fundamental valuation approaches, in conjunction with other relevant factors, were considered in arriving at an estimate of the total value of equity in Jemsek. We used the discounted cash flow method under the income approach and the net asset value method under the cost approach to calculate the fair market value of 100.0% of the equity in Jemsek.

Based on our analysis, which considered the relevant factors affecting the valuation, the fair market value of 100.0% of the equity in Jemsek as of November 30, 2016 is **$623,700** on a controlling, non-marketable basis.

| Valuation Approach | | Indicated Equity | DLOM | | Indicated Equity Value after Discounts | Weight | | Weighted Equity Value |
|---|---|---|---|---|---|---|---|---|
| Cost Approach: Net Asset Value Method | $ | 640,000 | 10% | $ | 576,000 | 75% | $ | 432,000 |
| Income Approach: Discounted Cash Flow Method | | 852,000 | 10% | | 766,800 | 25% | | 191,700 |
| **Fair Market Value of 100.0% of the Equity - Controlling, Non-marketable Basis** | | | | | | | $ | **623,700** |



# ECONOMIC OUTLOOK[1]

Generally, business performance varies in relation to the economy. Just as a strong economy can improve overall business performance and value, a declining economy can have the opposite effect. Businesses can be affected by global, national and local events. Changes in regulatory environments, political climate, and market and competitive forces can also have a significant impact on businesses. Since the valuation process is an assessment of expected future conditions, it is important to analyze the economic outlook for potential influences on the operations of the subject entity.

## Economy of the United States

Gross Domestic Product
According to advance estimates released by the Department of Commerce's Bureau of Economic Analysis (the "BEA"), Real Gross Domestic Product ("GDP"), the output of goods and services produced by labor and property located in the United States, increased at an annualized rate of 2.9% during the third quarter of 2016. The increase was attributable to gains in personal consumption expenditures, exports, private inventory investment, federal government spending, and nonresidential fixed investment. These gains were offset by declines in residential fixed investment and state and local government spending. Imports (which are subtracted from the national income and product accounts used in the calculation of GDP) increased. GDP grew 2.6% for all of 2015, compared to growth of 1.7% in 2013 and 2.4% in 2014.

| Real Gross Domestic Product | | |
|---|---|---|
| Monthly Change - September 2016 | | |
| Increase Attributable to Gains in: | Unchanged | Increase Offset by Decreases in: |
| Personal consumption expenditures | | Residential Fixed Investment |
| Exports | | State and Local Government Spending |
| Private Inventory Investment | | |
| Federal Government Spending | | Imports (Increased, subtracted from the national income and product accounts) |
| Nonresidential Fixed Investment | | |

Annualized GDP performance during the third quarter of 2016 was above economists' expectations of 2.6% and follows increases of 0.8% and 1.4% in the first and second quarters of 2016, respectively. The third quarter GDP performance represents the largest GDP growth since the third quarter of 2014. GDP growth was driven in part by exports, which grew 10.0% in the third quarter, compared to a decline of 0.7% in the first quarter and an increase of 1.8% in the second quarter. Durable goods growth increased at an annualized rate of 9.5%, following a decrease of 0.6% in the first quarter of 2016 and an increase of 9.8% in the second quarter of 2016. Economists do not anticipate the export growth to be permanent and expect GDP growth to moderate in coming quarters. A survey of economists conducted by *The Wall Street Journal* reflects an average GDP forecast of 2.3% annualized growth in the fourth quarter of 2016.

---

[1] Unless otherwise noted, this section has been adapted from the *National Economic Review- Third Quarter of 2016* published by Mercer Capital.

The BEA released updated estimates of national income and product accounts. The updated estimates account for new information, more comprehensive data, and improved estimation models. The update impacts estimates of GDP from the first quarter of 2013 through the first quarter of 2016. The reference year remains the same (2009).



Gross Domestic Product

Source: Bureau of Economic Analysis

## Economic Indicators

The Conference Board ("TCB") reported that the Leading Economic Index ("LEI"), the government's primary forecasting gauge, increased 0.2% in September 2016 to 124.4, after an increase of 0.5% in July and a decline of 0.2% in August. Traditionally, the index is thought to gauge economic activity six to nine months in advance. Multiple consecutive moves in the same direction are thought to be indicative of the general direction of the economy.



Trends in Leading, Coincident, and Lagging Economic Indicators

Source: The Conference Board
Note: Indices @ 2010 = 100

Conference Board economists view the LEI's recent movements as a sign of potential growth. According to the Director of Business Cycles and Growth Research at TCB, Ataman Ozyildirim, "The U.S. LEI increased in September, reversing its August decline, which together with the pickup in the six-month growth rate, suggests that the economy should continue expanding at a moderate pace through early 2017." He added, "Housing permits, unemployment insurance claims, and the interest rate spread were the main components lifting the index in



September. Overall, the strengths among the leading indicators are outweighing modest weaknesses in stock prices and the average workweek." Five of the LEI's ten leading economic indicators increased during September 2016, and five decreased. The following table shows the breakdown of changes among the indicators. The rolling six-month percentage change in LEI increased 0.3% in September 2016.

**Leading Economic Indicators**

**Monthly Change - September 2016**

| Increased | Unchanged | Decreased |
|---|---|---|
| Building Permits | | Average Weekly Manufacturing Hours |
| Interest Rate Spread | | Stock Prices |
| Average Weekly Initial Claims for Unemployment Insurance (Inverted) | | Manufacturers' New Orders for Nondefense Capital Goods Excluding Aircraft |
| Manufacturers' New Orders for Consumer Goods and Materials | | Leading Credit Index™ (Inverted) |
| Average Consumer Expectations for Business Conditions | | ISM® New Orders Index |

In September 2016, the Coincident Economic Index increased 0.2% and the Lagging Economic Index increased 0.2%.

<u>Historical Business Cycle and Fiscal Situation</u>

In September 2010, the Business Cycle Dating Committee of the National Bureau of Economic Research ("NBER") determined that the contraction that began in December 2007 had ended in June 2009. The following table provides perspective concerning NBER business cycles dating from the Great Depression to the present. (The contraction period measures from the peak to the trough. The expansion period measures from the previous trough to the peak.) The 2008/2009 contraction represented the longest of 13 contractions subsequent to the Great Depression. September 2016 marks 87 months of expansion following June 2009.

**NBER Business Cycle Reference Dates (1929 - Present)**

| Month & Year of Economic | | Duration in Months of | |
|---|---|---|---|
| Peak | Trough | Contraction | Prior Expansion |
| August 1929 | March 1933 | 43 | 21 |
| May 1937 | June 1938 | 13 | 50 |
| February 1945 | October 1945 | 8 | 80 |
| November 1948 | October 1949 | 11 | 37 |
| July 1953 | May 1954 | 10 | 45 |
| August 1957 | April 1958 | 8 | 39 |
| April 1960 | February 1961 | 10 | 24 |
| December 1969 | November 1970 | 11 | 106 |
| November 1973 | March 1975 | 16 | 36 |
| January 1980 | July 1980 | 6 | 58 |
| July 1981 | November 1982 | 16 | 12 |
| July 1990 | March 1991 | 8 | 92 |
| March 2001 | November 2001 | 8 | 120 |
| December 2007 | June 2009 | 18 | 73 |



In August 2011 (the date the Treasury Department expected the U.S. to reach its congressionally mandated debt ceiling), President Obama signed the Budget Control Act of 2011 (the "BCA"), ending the debt ceiling crisis in the near term.  The BCA immediately increased the debt ceiling and created the Joint Select Committee on Deficit Reduction (commonly referred to as the "Supercommittee") tasked with recommending policies to reduce the budget deficit by at least $1.5 trillion over the next ten years. In the event that a consensus could not be reached by the Supercommittee, the BCA called for automatic spending cuts starting in 2013.  Failure to pass a budget led to a 16-day government shutdown beginning on October 1, 2013.  According to a report released by the White House in November 2013, the shutdown resulted in an estimated $2 billion to $6 billion in lost economic output.  Another potential shutdown in December 2014 was avoided when Congress passed a budget.

Budget battles were at a minimum through the first half of the Presidential election year, but the threat of another shutdown was raised at the end of the third quarter.  On September 28, 2016, Congress passed a stopgap spending bill that would fund the government through December 9, after the Presidential election.

The Congressional Budget Office announced that the U.S. posted a $588 billion budget deficit in September 2016, compared to the deficit of $439 billion in September 2015.  The 2016 deficit was estimated to be 3.2% of GDP, up from 2.5% of GDP in 2015.  The CBO estimated that outlays were 5.0% higher in fiscal 2016 than the year before, while revenue increased less than 1.0% over the same period.  Congress ended the quarter without passing a budget for the entire fiscal year that begins in October 2016.

On June 23, 2016, British citizens voted to leave the European Union in a move that became known as the "Brexit."  The Brexit vote was a surprise to many, resulting in turmoil in stock and currency markets.  Within a day, the pound had fallen to its lowest point since 1985, resulting in a relatively strong dollar.  At the end of the third quarter, Britain was still trying to determine the path it would take to exit the European Union, leaving uncertainty about the move's future impact.  This uncertainty has led many companies to continue operations as normal until trade and employment treaties are drafted.  Analysts expect the Brexit to impact international trade.

<u>Inflation</u>
According to the Bureau of Labor Statistics ("BLS"), the Consumer Price Index ("CPI") increased 0.3% in September 2016 (on a seasonally adjusted basis), following no change in July and an increase of 0.2% in August.  The unadjusted CPI stood at 241.428 (CPI-U all urban consumers, 1982-1984 = 100).  The seasonally adjusted annual rate ("SAAR") of inflation for the third quarter of 2016 increased 1.8%, compared with a decrease of 0.2% in the first quarter of 2016 and an increase of 3.4% in the second quarter.  The CPI increased 1.5% over the previous twelve months.

The Core CPI, which excludes food and energy prices, increased 0.1% in September, following increases of 0.1% in July and 0.3% in August.  Core inflation was 1.9% (SAAR) in the third quarter of 2016, following increases of 2.6% and 2.3% in the first and second quarters of 2016, respectively.  The Core CPI increased 2.2% on an unadjusted basis over the previous twelve months.

The Producer Price Index ("PPI"), which is generally recognized as predictive of near-term consumer inflation, increased 0.3% in September 2016 (PPI for total final demand, seasonally adjusted), after a decrease of 0.4% in July and no change in August.  The PPI for final demand goods, excluding foods and energy, increased 0.3% in September seasonally adjusted basis, and was unchanged in July and increased 0.1% in August.  The final demand services PPI increased 0.1% in September, following a decrease of 0.3% in July and an increase of 0.1% in August.  On an unadjusted basis, the twelve-month change in the final demand PPI was an increase of 0.7%.

<u>Oil and Gasoline</u>
Gasoline prices were relatively flat during September 2016 and ended the quarter lower than 2015 prices.  Regional pricing was more volatile due to pipeline spills and refinery maintenance. On September 28, 2016, OPEC



agreed to limit oil output for the first time since 2008 in an attempt to prevent further oil price decreases.  OPEC anticipates reducing oil production from 33.2 million barrels per day to a range of 32.5 to 33.0 million barrels per day.  The allocation of oil production and the exact level of the ceiling were to be determined in a November 2016 meeting.

Retail Sales and Personal Consumption
According to the Census Bureau of the U.S. Department of Commerce, the advance estimates of U.S. retail and food service sales (adjusted for seasonal, holiday, and trading-day differences) for September 2016 increased 0.6% from the previous month, and increased 2.7% relative to September 2015.  Core retail and food service sales (which exclude motor vehicles & parts) increased 0.5% relative to the previous month and increased 2.7% relative to September 2015.  In the third quarter of 2016, retail and food service sales increased 0.3% relative to the second quarter of 2016 and were 2.3% above the level observed in the third quarter of 2015.

Personal consumption spending represents approximately two-thirds of total economic activity and is a primary component of overall economic growth. Real personal consumption spending increased 2.1% in the third quarter of 2016, following increases of 1.6% and 4.3% in the first and second quarters of 2016, respectively.  According to the Bureau of Economic Analysis, durable goods purchases increased 9.5% in the third quarter of 2016, following a decrease of 0.6% in the first quarter of 2016 and an increase of 9.8% in the second quarter of 2016.

Business and Manufacturing Productivity
According to the BLS, seasonally adjusted nonfarm business productivity (as measured by the hourly output of all persons) increased at an annual rate of 3.1% in the third quarter of 2016, the largest increase in productivity since the third quarter of 2014.  The productivity increase was a function of output (an increase in productivity) growth of 3.4% combined with an increase of 0.3% in hours worked (a negative contribution to productivity). Hourly compensation, unit labor costs, and real hourly compensation also increased. The productivity increase in the third quarter follows decreases of 0.6% and 0.2% in the first and second quarters of 2016, respectively.  Productivity was unchanged in the third quarter of 2016 relative to the third quarter of 2015.





Productivity increased 3.4% for the business sector (inclusive of farming activity) in the third quarter of 2016. This was the result of a 3.5% increase in output and a 0.1% increase in hours worked, which is a negative contributor to productivity. Manufacturing productivity increased 1.0% during the quarter.

Industrial Production and Capacity Utilization
According to the Federal Reserve, seasonally adjusted industrial production increased 0.1% in September 2016, following an increase of 0.5% in July and a decrease of 0.5% in August. Overall industrial production during the third quarter increased at an annualized rate of 1.8%. This increase followed decreases of 1.7% and 0.8% in the first and second quarters of 2016, respectively. During the third quarter of 2016, manufacturing output increased at an annualized rate of 1.1%, following an increase of 0.6% in the first quarter of 2016 and a decrease of 1.1% in the second quarter of 2016. Mining output increased at an annualized rate of 3.7% during the third quarter of 2016.

Seasonally adjusted capacity utilization was 75.4% in September 2016, after measures of 75.8% and 75.3% in July and August, respectively. Capacity utilization in September 2015 was 76.4%; however, September 2016's overall capacity increased 0.4% relative to September 2015. Capacity utilization for the third quarter measured 75.5%. Capacity utilization measured 75.4% and 75.2% during the first and second quarters of 2016, respectively. During the period from 1972 through 2015, the average capacity utilization was 80.0%, and capacity utilization has only exceeded 90% during wartime situations.

The Financial Markets
The first three quarters of 2016 have been marked by volatility in the stock markets. Despite ongoing volatility, financial markets generally exhibited growth during the third quarter. The Brexit caused a sharp decline in prices that largely recovered by the end of the quarter.

- The Dow Jones Industrial Average ended the third quarter of 2016 at 18,308.15, up 2.1% for the quarter, following gains of 1.5% and 1.4% in the first and second quarters of 2016, respectively. The Dow was down 2.2% during 2015.

- The S&P 500 Index increased 3.3% during the third quarter to close at 2,168.27, following gains of 0.8% and 1.9% in the first and second quarters of 2016, respectively. The S&P 500 was down 0.7% in 2015.

- The NASDAQ Composite Index increased 9.7% during the third quarter to close at 5,312.00, following losses of 2.7% and 0.6% during the first and second quarters of 2016, respectively. During 2015, the NASDAQ rose 5.7%.

- The broad market Wilshire 5000 Index closed at 22,576.67, a gain of 4.0% over the quarter, following gains of 0.3% and 2.3% in the first and second quarters of 2016, respectively. The Wilshire 5000 index was down 2.3% during 2015.

Housing Market
Home building activity has traditionally been a primary driver of overall economic activity because new home construction stimulates a broad range of industrial, commercial, and consumer spending and investment. According to the U.S. Census Bureau, new privately owned housing starts were at a seasonally adjusted annualized rate of 1,047,000 units in September 2016, 9.0% below the revised August rate of 1,150,000 units and 11.9% below the September 2015 level. The seasonally adjusted annual rate of private housing units authorized by building permits (considered the best indicator of future housing starts) was 1,225,000 units in September 2016, 6.3% above the revised August estimate of 1,152,000 and 8.5% above the September 2015 level.



Source: U.S. Census Bureau
Note: Permits at a given date are generally a leading indicator of future starts. Beginning with January 2004, buik'ing permit data reflects the change to the 20,000 place series.

According to the National Association of Realtors ("NAR"), existing-home sales (at a seasonally adjusted annual rate) totaled 5.5 million in September 2016, 3.2% above the August level, and 0.6% above the September 2015 level. First-time home buyers purchased 34% of existing homes, a high not seen by the NAR in over four years. Housing inventory stood at 2.04 million existing-homes, representing approximately four and a half months of supply at the current sales pace and down 6.8% since September 2015. The national median existing-home price increased 5.6% relative to September 2015. Distressed sales, which include foreclosures and short sales, accounted for approximately 4% of sales in September 2016, down 7.0% from the prior year and reaching a new low since tracking began in October 2008.

Unemployment and Payroll Jobs
According to the BLS, the unemployment rate was 5.0% in September 2016, compared to 4.9% in both July and August. Unemployment rates increased steadily throughout 2008 and into 2009, peaking at 10% in October 2009. While unemployment has consistently fallen throughout the past several years, the labor force participation rate is also lower relative to pre-recession levels. In September 2016, the labor force participation rate stood at 62.9% (relative to mid- to high- 60s prior to the recession). Excluding the recent trend, the last time the labor force participation rate was lower than its current level was 1978. As job availability increases, the labor force participation may improve as individuals re-enter the workforce. This, in turn, could lead to periodic increases in the unemployment rate even as the labor market improves. Economists surveyed by *The Wall Street Journal* anticipate an unemployment rate of 4.8% and 4.7% in December 2016 and June 2017, respectively.

The number of nonfarm payroll jobs increased by 156,000 in September 2016. September's gain follows increases of 252,000 and 167,000 jobs in July and August, respectively. During 2008 and 2009, the economy lost nearly 8.7 million nonfarm payroll jobs. Economists surveyed by *The Wall Street Journal* anticipate payroll gains of approximately 165,000 jobs per month over the next year. Population growth adds approximately 107,000 individuals to the workforce per month.





*Source: Bureau of Labor Statistics*

Monetary Policy and Interest rates

The Federal Reserve's Open Market Committee ("FOMC") lowered its target for the federal funds rate to a range of 0% to 0.25% during the fourth quarter of 2008. Target rates were held steady during 2009 and remained unchanged for several years. The accommodative monetary policy actions used to keep interest rates low included the purchase of agency mortgage-backed securities and long-term Treasury securities. These asset purchases were reduced by $10 billion (in aggregate) per month beginning in January 2014, and the program was officially terminated in October 2014. In December 2015, the FOMC increased the target range for the federal funds rate to a range of 0.25% to 0.50% and affirmed its objective of 2.0% inflation. During its September 2016 meeting, the FOMC noted that unemployment has remained stable despite "solid" job gains, but inflation remains below the FOMC's target rate of 2.0%. As a result, the FOMC did not increase the target federal funds range.

Summary and Outlook

While the Great Recession reached its official end in mid-2009, economic growth remains slow in some sectors. Although the housing market has strengthened, growth in the economy remains modest and equity markets have been volatile. The unemployment rate has recovered to pre-recession levels and has remained stable for several months, but labor force participation remains low. Economic growth is expected to remain positive, though a lack of sustainable productivity growth and rising interest rates may dampen future growth. GDP growth expectations from private economists surveyed by *The Wall Street Journal* are on the order of 2.3% for the fourth quarter of 2016 and 2.2% for the first quarter of 2017. This compares to annual GDP growth of 1.7%, 2.4%, and 2.6% in 2013, 2014, and 2015, respectively. The Federal Reserve declined to increase interest rates based on mixed economic signals. Rate increases are expected in the fourth quarter of 2016 or in early 2017.



# INDUSTRY OVERVIEW[2]

It is important to examine Jemsek in the context of the industries in which it operates and any industries whose dynamics may affect its economic performance. The Practice falls under the specialist doctors in the U.S. industry.

## Specialist Doctors in the U.S.

**Key Statistics Snapshot**

| | | |
|---|---|---|
| Revenue **$251.6bn** | Annual Growth 11-16 **1.5%** | Annual Growth 16-21 **5.6%** |
| Profit **$28.2bn** | Wages **$129.4bn** | Businesses **246,528** |

In recent years, the specialist doctors industry benefited from a rise in demand for its services, due to an aging population and the growing prevalence of chronic diseases. Moreover, industry growth was aided by improving access to healthcare insurance as a result of the Patient Protection and Affordable Care Act ("PPACA"). Under the landmark healthcare reform law, subsidized state and federal healthcare exchanges have enabled more consumers to purchase private health insurance, in accordance with the laws, mandate that all individuals obtain some form of health insurance coverage. Government health insurance enrollment has also swelled under the PPACA, as 30 states have accepted the federal government's Medicaid expansion as of November 2015. As a result, industry revenue is projected to grow an annualized 1.5% to $251.6 billion over the five years to 2016, including growth of 4.1% during the current year, as healthcare reform enters its third year of full implementation.

However, the effects of healthcare reform have ultimately proven to be mixed for the industry. With its emphasis on primary care, the PPACA has begun to move reimbursement under Medicare and Medicaid away from the traditional fee-for-service model. Some specialists have already seen declining reimbursement rates negatively impact revenue growth, and industry revenue fell 2.6% in 2013. In response to changing conditions, specialists are increasingly working in group practices. As a result, enterprise growth in the industry will slow over the next five years, as profit pressures under the PPACA encourage more doctors to join multispecialty practices.

While key growth drivers, including income levels and private health insurance rates, are forecast to improve over the next five years, profit growth is expected to be stagnant over the next five years as specialist doctors bear the brunt of the PPACA's cost-cutting reforms. Nonetheless, demand for industry services will remain strong as a result of positive demographic changes and rising access to healthcare coverage, both private and public. Consequently, IBISWorld expects industry revenue to rise at an annualized rate of 5.6% to $329.8 billion over the five years to 2021.

<u>Industry Performance</u>
The specialist doctors industry has been resilient recently, expanding throughout the past five years despite broad challenges across the economy early in the period. In 2016, industry revenue is expected to continue on this upward trajectory with a 4.1% increase to total $251.6 billion, representing annualized growth of 1.5% since 2011. Health insurance coverage is expected to continue rising as the state and federal exchanges established by the PPACA enter a third year, generating greater demand for industry services.

---

[2] The content of the "Specialist Doctors in the US" section of this valuation report is based on information from the May 2016 IBIS World 62111b Industry Report - "Specialist Doctors in the US."



However, the industry was not been completely immune to challenges. The economic downturn caused widespread unemployment, which led to decreases in disposable income and health insurance coverage early in the current five-year period, causing patient volume to fall. According to an IMS Institute for Healthcare Informatics survey, the number of physician visits declined in 2010 and continued into the current five-year period. In addition, the industry has been tested by the PPACA's attempt to reorient healthcare toward primary care, adversely affecting specialty care receipts by moving away from the fee-for-service model and reducing reimbursement rates for services under Medicare and Medicaid.

The growth of the US population, accompanied by the rising number of older Americans have generated demand for industry services over the past five years. Historically, older patients have had more complicated conditions, comorbidities (coexisting medical conditions), chronic conditions and treatments involving multiple medications. An increase in the average age of the population and, in some cases, the availability of new medical technologies, has bolstered demand for specialties that address changing demographics, such as cardiology, ophthalmology, orthopedic surgery and urology. Over the five years to 2016, the number of adults aged 65 and older is expected to increase at an annualized rate of 3.6%, making the US population older today than at any previous point in its history.

Similarly, rising obesity levels and the early onset of chronic health conditions, such as heart disease and diabetes, have boosted demand for endocrinologists (medical specialists dealing with disorders of the endocrine system and its specific hormones); cardiologists and cardiac surgeons; neurologists (medical specialists working with stroke patients or patients with diabetic neuropathy); and orthopedic surgeons. Consequently, IBISWorld estimates the number of physician visits will rise over the five years to 2016.

Although primary care is regarded as a cost-effective way to promote good health, the number of specialists has risen more quickly than the number of primary care doctors over the past five years. On average, there are now two specialists for every primary care physician. Specialists earn substantially higher wages than primary care doctors, partly contributing to concerns of a primary care shortage in the United States. While primary care income is high relative to the US average, it remains less than half that of many procedure-oriented specialties, and wage disparities are widening. Furthermore, medical students are often swayed toward specialization because they perceive that generalists have less leisure time. The considerable educational debt that primary care physicians incur also diverts many graduates from primary care. Currently, only about 20.0% of medical students opt to enter primary care. A 2012 study conducted by the University of California, Davis, found that over a lifetime, a primary care doctor is likely to make $1.5 million less than a classmate entering specialty care.

As a result, the number of specialist physicians has continued to rise. Over the five-year period to 2016, industry employment is expected to rise at an annualized rate of 0.2% to nearly 1.5 million people. The average industry wage, which includes that of all industry employees, is expected to stand at $88,238 in 2016, compared with $76,241 in the primary care doctors industry. However, wage growth in the specialist doctors industry (1.6% per year on average from 2011 to 2016) has been slower than in the Primary Care Doctors industry (2.6% per year on average from 2011 to 2016) over the past five years, bucking historical trends. According to a physician compensation and productivity survey from Sullivan, Cotter and Associates, for example, median total cash compensation for primary care physicians rose 5.7% between 2012 and 2013, compared with 3.2% and 2.3% for medical and surgical specialists, respectively. This trend is indicative of the current movement to shift the healthcare industry toward a focus on primary care, emphasized by the PPACA.

The effects of the landmark PPACA on the industry are many and varied. Immediately, the industry has benefited from substantial growth in the number of insured Americans. Under the PPACA, subsidized state and federal healthcare exchanges were rolled out in 2014, and all individuals are now required by law to obtain some form of health insurance coverage. As a result, the number of people with private health insurance is expected to increase at annualized rate of 2.2% over the five years to 2016.



Healthcare reform has also increased the number of Americans who rely on government insurance. For example, the law expanded Medicaid eligibility to people earning up to 133.0% of the federal poverty level. The federal government will cover 100.0% of the cost of this expansion through 2016, 95.0% in 2017, 94.0% in 2018, 93.0% in 2019 and 90.0% in 2020 and all subsequent years. Consequently, in states that decided to participate in the expanded Medicaid program (30 states as of November 2015), the number of people covered by government health insurance rose substantially. The growing number of insured, both by private and government programs, has been a boon to the industry by enabling more people to access industry services.

Not all of the changes implemented under the PPACA have advanced the interests of the industry, however. In making primary care a lynchpin in its efforts to overhaul the healthcare system, the PPACA has attempted to reform the payment schedule for physicians, benefiting primary care doctors. Perhaps most importantly, the healthcare reform law aims to extinguish the fee-for-service ("FFS") payment model used by Medicare and Medicaid to reimburse doctors. Under the FFS system, services are unbundled and paid for separately, basing pay largely on the quantity of services performed. Under the PPACA, a myriad of initiatives such as the creation of innovative payment and delivery models and value-based purchasing programs are expected to drive payment away from the FFS model. While these reforms are aimed at driving quality improvements in healthcare and realizing cost savings, they will likely negatively impact specialist doctors because they are largely paid based on how many services they perform.

Already, some specialist doctors have seen declining reimbursement rates negatively impact revenue. According to a 2013 survey by Merritt Hawkins, specialists in noninvasive cardiology, invasive cardiology, gastroenterology, general surgery, neurology, neurosurgery, ophthalmology and pulmonology showed revenue decreases from 2011 levels. Moreover, the survey noted that for the first time, the revenue generated by primary care physicians eclipsed that of specialist physicians, underscoring the effect of changing reimbursement rates. On aggregate, industry revenue growth was nonexistent during this period, stagnating in 2011 and declining 0.1% and 2.6% in 2012 and 2013, respectively.

During the recession, increased financial hardship caused many patients to miss payments, driving industry profit margins down. Costs were pressured by a variety of factors, including increases in drug supply costs and professional liability fees. In addition, federal budget shortfalls over the past five years have pressured Medicare reimbursement for most specialty procedures, while the implementation of the PPACA has cut the reimbursement rate of numerous specialist services in an attempt to alter the healthcare payment model. In 2016, industry profit margins are expected to stand at 11.2%, up only slightly from 10.9% in 2011.

<u>Industry Outlook</u>
The specialist doctors industry is expected to experience positive results over the next five years, with revenue growth forecast to accelerate an annualized 5.6%, reaching $329.8 billion by 2021. The industry is expected to see growth because of numerous factors, including an improving economy and demographic changes, as the aging population necessitates more healthcare services. Most important to the industry, however, will be the continuation of changes brought about by the healthcare reform law. Under the Patient Protection and Affordable Care Act, an increasing number of individuals with healthcare insurance coverage will boost demand for industry services throughout the next five years. In 2017, the cumulative effect of these trends is expected to push industry revenue upward 4.7%.

Despite mounting demand for industry services, some factors will temper growth. Specifically, the rising cost of healthcare has the potential to considerably check demand for industry services, which is sensitive to changes in healthcare reimbursement policies. If changes to health coverage result in higher out-of-pocket costs for consumers, demand for specialist physician services may fall. Meanwhile, the continuation of healthcare reform under the PPACA is also expected to usher in adverse changes for the industry. While the reform law is expected to increase the percentage of the population covered by government insurance during the next five years, it will

significantly alter the current fee-for service payment model. With reimbursement rates for specialist services expected to decline relative to current rates, industry revenue growth and profitability are expected to experience substantial downward pressure.



## Industry Lifecycle

The specialist doctors industry is in the growth stage of its life cycle. During the 10 years to 2021, industry value added, a measure of the industry's contribution to the overall economy, is forecast to increase 3.6% per year on average. In comparison, IBISWorld projects that US GDP will grow at an average annual rate of 2.2%. While this indicates that the industry will grow at a faster rate than the overall economy, it is weighed down by poor revenue growth from 2011 to 2013, when difficult economic conditions limited access to healthcare and the implementation of reimbursement rate changes negatively impacted the industry.

Specialist doctors enjoy strong and growing demand for their services, due to demographic trends in the United States. An aging population leads to a greater number of people requiring geriatric services and more healthcare overall. Chronic conditions are also on the rise in the United States, which increases demand for cardiovascular surgeons and endocrinologists, among other specialists. Innovations in technologies are allowing specialist doctors to treat more illnesses that were previously untreatable. These developments include computerized systems for electronic medical records and financial and administrative information, and an extensive range of medical equipment and drugs that enable tests to be performed quickly and treatment to be delivered more effectively and accurately. Specialized surgical equipment and devices increase the speed and success of surgical procedures. Improved technology also increases the share of the population that the industry can serve, contributing to revenue growth.

Despite rising revenue, increasing costs have encouraged many specialist doctors to join group practices. Consolidation in other industries usually indicates maturity or decline; however, for specialist doctors, consolidation indicates a changing business model rather than a dying one. Doctors who join group practices are better able to spread overhead costs among other physicians and worry less about administrative duties that usually fall on doctors who own their own practices. Over this period, consolidation has caused the number of operators to remain relatively stagnant; however, it has actually helped the industry grow because doctors have become more efficient and able to serve more patients. The number of industry enterprises is estimated to decrease at an annualized rate of 0.7% in the 10 years to 2021, reaching 241,373 businesses.

## Competitive Landscape

The specialist doctors industry is highly fragmented and has a low level of concentration. The largest four industry players are estimated to account for less than 5.0% of industry revenue and only three providers are expected to



generate more than 1.0% of total industry revenue. About 46.4% of industry establishments are solo practices and nonemployers (i.e. companies with no employees) account for less than 4.0% of revenue. This share indicates that larger practices generate more revenue.

Over the past five years, consolidation has been increasing, albeit at a slow pace. Surveys conducted by the Center for Studying Health System Change ("HSC") indicate that there was a decrease in the prevalence of small practices among medical and surgical specialists, reflecting consolidation and a decline in ownership among specialists. According to HSC, increased financial pressures provide incentives for physicians to aggregate into midsize practices to spread fixed costs over a larger number of physicians. In addition, physicians benefit from aggregating into larger single-specialty practices with greater economies of scale, which can invest in equipment and facilities to provide profitable procedures, such as high-end imaging and diagnostic testing.

Profit, measured as earnings before interest and taxes, is expected to stand at 11.2% of industry revenue, up only slightly from 10.9% in 2011. The growing economy has increased levels of disposable income, leaving Americans with funds for doctor visits. However, declining reimbursement from Medicare and Medicaid and costly administrative burdens have placed pressure on margins. Medicare and Medicaid reimbursement schedules have been hard to anticipate, making it difficult for operators to adjust their practices. Costs have been rising for drug supplies, support staff and professional liability coverage for most types of practices; yet, certain specialists have experienced higher increases than others for particular costs. For instance, drug supply costs have increased dramatically for pediatric practices, based on data from the Medical Group Management Association ("MGMA"). Obstetrics and gynecology specialists and pediatrics groups have experienced notable hikes in support staff costs, while cardiology groups have experienced the highest increase in malpractice insurance premiums.

By contrast, electronic health records ("EHRs") have helped specialty doctors increase savings. The use of EHRs leads to more efficiency in care, which is more cost-effective, creating wider profit margins. The data in EHRs has to be active, rather than static, like paper records. There are also alerts to prompt doctors of patients missing follow-up tests or preventive measures, which encourage patients to maintain regular visits, thereby increasing revenue. Higher profitability as a result of EHR use is significant because beginning in 2015, Medicare began withholding reimbursement increases for physicians who do not demonstrate "meaningful use" of electronic health records. Current evidence of profit gains could provide additional incentives for physicians without electronic records to begin the process to purchase and install them.

Wages are the largest industry expense, due to the high level of skill required of its employees, accounting for an estimated 51.4% of revenue. These costs have increased slightly over the past five years, rising from 51.0% of industry revenue in 2011. Costs for support staff, which include general administrative, accounting, information technology and maintenance employees, make up a significant percentage of this industry expense and have been on the rise over the past five years. The wages of specialist doctors have undergone scrutiny because of the pending primary physician shortage reported by various media outlets. According to the MGMA, median wages for specialists are almost twice those of primary-care physicians. This contrast has been associated with a comparatively low number of doctors who are motivated to enter primary care because they are lured by the higher wages of specialty practices. A 2012 study conducted by the University of California in Davis found that over a lifetime, a specialist doctor is likely to make about $1.5 million more than a classmate who enters into primary care.

Purchases are estimated to account for 14.3% of revenue in 2016, the second largest portion of industry revenue. Industry purchases generally include medical supplies (mainly pharmaceuticals) and anything else necessary to run and operate medical establishments. Spending on medical supplies accounts for nearly 85.0% of all industry purchases. Over the past five years these costs have declined slightly, dropping from an estimated 15.2% of industry revenue in 2011.



## Internal competition
Competition in this industry is principally based on reputation, price, accessibility and quality. Reputation is derived from doctor-patient relationships, which, if positive, can improve a community's impression of a doctor. The prices that specialists charge can attract patients; although healthcare is a necessary service, a person's ability to pay for it can affect where and when they receive services. Accessibility refers to a doctor's location; specialists tend to locate in areas with large populations and in proximity to referring physicians and other healthcare providers. Differentiation of doctor services can also be on the basis of training and training experience, the quality of accommodation and staff competence and friendliness.

## External competition
Specialist services compete with those services provided by other doctors in hospitals, home health organizations, community health centers and in other ambulatory centers. Some hospitals provide services to doctors (e.g. back-office systems, operating theaters and other equipment) and doctors compete for access to these services. Large practices may also be in a better position to negotiate with HMOs, hospitals, medical equipment suppliers and drug companies. According to the American Medical Association, more than 90.0% of doctors in a practice have at least one managed-care contract, with managed-care contracts accounting for nearly half of practice revenue.

Patients in the United States are progressively visiting specialist doctors for purposes that primary care physicians are able to address. This trend indicates that specialists are competing as well, which is somewhat attributable to rising accessibility to specialists and the cultural sentiment that specialist doctors are better equipped to handle most healthcare issues.

## Barriers to Entry
Barriers to entry in the Specialist Doctors industry are moderate. The most notable entry barriers exist in the industry due to educational requirements, residency review committees and regulation. In addition, operators must develop a critical mass of patients to be viable. Depending on the specialty and location, it can be difficult or take considerable time for new entrants to establish a referral base and relationships with other physicians, hospitals and the local community.

Although several barriers exist to new entrants, the large number of small establishments indicates that barriers are not extreme. This may be due to low levels of fixed capital costs in the industry and the high demand for specialist doctors. The strong demand results in high levels of compensation, which can help new entrants make a return on upfront investments in a reasonable time frame.

**Barriers to Entry checklist**

| | |
|---|---|
| Competition | Medium |
| Concentration | Low |
| Life Cycle Stage | Growth |
| Capital Intensity | Low |
| Technology Change | High |
| Regulation & Policy | Heavy |
| Industry Assistance | High |

SOURCE: WWW.IBISWORLD.COM



# FUNDAMENTAL POSITION OF THE COMPANY

**Summary**

Joseph Jemsek, MD is the namesake and founder of the Practice. After practicing medicine in Charlotte, North Carolina, for more than 20 years with the Nalle Clinic, Dr. Jemsek created a specialty infectious disease practice in 2000 with the goal of serving individuals with HIV/AIDS as he had done since 1983, in addition to pursuing the practice of general infectious disease.

The Practice's web site is http://jemsekspecialty.com.

**History**

In the fall of 1979, Dr. Jemsek joined the now defunct Nalle Clinic in Charlotte, working as an infectious disease specialist and general internist.  In the spring of 2000, the 75-year old multispecialty Nalle Clinic was forced to close its doors due to financial hardship, thereby displacing over 120 physicians. Dr. Jemsek elected to relocate to the Lake Norman, NC area where he originated the Jemsek Clinic, PA ("Jemsek Clinic") as a solo practitioner. A physician's assistant was hired to assist with the care of the 250 patient HIV/AIDS caseload, which followed Dr. Jemsek from the Nalle Clinic. The new Jemsek Clinic, opened with eight employees in June 2000.

The Clinic grew rapidly in its core specialty, HIV/AIDS, but within the first few months of operation, Dr. Jemsek began to notice a curious migration of patients to the Jemsek Clinic, arriving from outside the Charlotte area, who were seeking help with Lyme disease. Dr. Jemsek believed he was well aware of Lyme disease at that time in 2000-2001, since he had treated approximately 30 patients while at the Nalle Clinic, beginning in 1986. Dr. Jemsek had always simply assumed that chronic illness with Lyme disease was widely recognized by his peers. He had little reason to believe otherwise, as his view of the existence of a chronic form of the illness had been constantly reinforced by patient interviews and by his increasing understanding of the complex biology of the spirochetal bacterium causing Lyme disease, Borrelia burgdorferi. Intuitively, he drew correlations in treatment of chronic illness from other infectious disease treatment paradigms universally accepted by his infectious disease physician colleagues, such as those illustrated in the treatment of chronic infections due to Hepatitis C, Tuberculosis, and HIV/AIDS. Because of increasing patient awareness attained primarily through internet communication, more patients learned that Dr. Jemsek was willing to spend the necessary time to fashion customized treatment plans for patients with Lyme Borreliosis Complex ("LBC"). The Jemsek Clinic's pattern as a destination practice began to emerge as an ever-increasing number of new patients with LBC were arriving from outside the Metrolina region. After many years at the forefront of the HIV/AIDS epidemic, Dr. Jemsek had gained a great deal of experience in the increasingly sophisticated medical research associated with the study of the HIV/AIDS pandemic. Dr. Jemsek constantly sought to share his experience and treatment successes in LBC, and so presented a number of lectures on this subject, which often occurred simply because he solicited opportunities to share information by lecturing in different venues. He also wrote an extensive website on this subject, which attracted considerable attention and interest.

Over the next three years, the twin epidemics of HIV/AIDS and LBC, fueled Jemsek Clinic growth such that by late 2005 and into early 2006, Dr. Jemsek employed two infectious disease physicians proficient in HIV/AIDS care, two physician assistants, and five family nurse practitioners. There were by then a total of 65 fulltime employees and several part-time consultants at Jemsek Clinic. By 2005, new patient demographics showed that patients who had attended the Jemsek Clinic since 2001 had traveled from a total of 45 states, as well as from several foreign countries. The clinic was at this time treating an average of 80 new patients per month for possible tick-borne illnesses ("TBIs") and the HIV growth was burgeoning. In the fall of 2005, the Clinic had a waiting list of 150 patients scheduled for new patient appointments for evaluation of possible TBIs. The HIV/AIDS practice



had expanded to more than 1,000 individuals and was adding an average of 20 patients monthly to what was already by far the largest private clinic for HIV/AIDS in the Carolinas, and one of the largest private clinics in the country. Projections for growth of the HIV/AIDS practice were for 2,000 patients by the year 2011, which would easily qualify the Clinic as one of the world's largest private facilities for HIV/AIDS care.

In 2004, Dr. Jemsek committed to a vision for a world-class practice for emerging illnesses and began preparations to create an appropriate facility to accommodate this growth. The clinic was to be called Rosedale Medical Center. In the fall of 2005, bids from financial institutions were well underway for the financing of the new medical facility. This project attracted the eager interest of several prominent lending institutions, including SunTrust, Wachovia, and First Citizens Bank, all of which were avidly competing and promoting 100% funding packages in the $9 to 10 million range. In February 2006, after 24 months of intensive planning and preparation, Dr. Jemsek and his staff opened an $11 million state-of-the-art clinic at Rosedale Medical Center in Huntersville, NC.

Just a few weeks prior to moving the Jemsek Clinic into the new Rosedale Medical Center facility, a series of adverse actions occurred. Since Jemsek's LBC treatment differed from the Infectious Disease Society of America's guidelines (which was not the standard of care), the North Carolina Medical Board filed actions against Dr. Jemsek, which resulted in the suspension of his license with immediate stay. After the North Carolina Medical Board actions became public, Dr. Jemsek proceeded to witness the rapid disintegration of his practice. Most dramatically, this disintegration was ushered in by the unexpected withdrawal of insurance reimbursement by Blue Cross Blue Shield of North Carolina ("BCBSNC") had on his patient volume and on the income stream required for clinic operations. Given this devastating shortfall in reimbursement, the next several months brought severe clinic contraction, including the involuntary attrition and release/loss of almost 80% of Dr. Jemsek's 65 to 70 employee base staff. Without warning or communication with the Jemsek Clinic, BCBSNC refused to pay for the vast majority of clinical services that Jemsek Clinic rendered from the period late 2005 forward, including services for HIV/AIDS care. While BCBSNC had never previously held a formal written policy for therapy for Lyme disease, suddenly, in a January 2006 bulletin, BCBSNC stated that by the first of February 2006, the insurer would announce its first policy on Lyme disease. Out of respect for the patient dilemma brought on by these circumstances, the Jemsek Clinic never demanded payment or otherwise pressured patients to pay their medical bills.

In March 2006, as the Jemsek Clinic moved into its new facility at Rosedale Medical Center, only four months later one of their lending institutions, which subsequently had been awarded a minority fraction of the developmental loan costs, but which controlled the Clinic's line of credit, proceeded to place the Jemsek Clinic into the special assets category. The Clinic had remained current on all interest and principal payments to the lending institution in question. The line of credit agreed upon by this bank, which at the time was several hundreds of thousands below their limit, was immediately frozen.

After painstaking review of the situation in the fall of 2006 Dr. Jemsek complied with the advice of a group of attorneys and consultants by entering into both professional and personal bankruptcy. By then (September 2006), a lawsuit filed by BCBSNC against Dr. Jemsek had arrived. By August 2007, Dr. Jemsek witnessed the foreclosure of his Rosedale Medical Center.

The actions taken by the North Carolina medical board and BCBSNC forced him to completely reevaluate his interests in practicing medicine in North Carolina. In the summer of 2007, Dr. Jemsek incorporated a new clinic, Jemsek Specialty Clinic of South Carolina, LLC, in anticipation of moving his infectious disease practice to nearby South Carolina. In September 2007, after foreclosure of the Rosedale Medical Center, the Clinic moved from the location in Huntersville, North Carolina and set up a temporary business office in Charlotte, NC (a few weeks prior to Jemsek's request for inactive status of his North Carolina license). One of the clinic's patients, James Finkel, DDS in Blythewood, SC (just north of Columbia), offered to lease temporary space at his private dental clinic in order to facilitate Dr. Jemsek's transition to a SC location. On October 11, 2007, Dr. Jemsek began to work

extended weekends in Dr. James Finkel's office in Blythewood, SC. This required a daily 150-mile commute for a total of three months. The success of this transition in Blythewood, SC led to the establishment of JC of SC in Baxter Village in Fort Mill, SC, where rebirth and growth continued.

Dr. Jemsek successfully moved his operations one last time and in January 2010 Jemsek Specialty Clinic in Washington, D.C. officially opened as a private pay practice. In spite of the political barriers that currently exist, he continues to create and evolve innovative approaches in the treatment of LBC and is in the process of collaborating with other researchers in the development of credentialed treatment protocols; future goals include, with the benefit of collaboration with like-minded physicians, additional clinic locations in the Mid-Atlantic and Northeastern U.S. regions.

**Products**

The Practice focuses in treating LBC, commonly referred as Lyme Disease.

**Location**

The Practice leases space located at 2440 M Street N.W., Washington, DC 20037



**Team Overview**

JOSEPH G. JEMSEK, MD, FACP, AAHIVS
*Board Certified Internal Medicine and Infectious Disease*
Dr. Jemsek is a board-certified physician in infectious disease and internal medicine. He received his medical degree from the University of Illinois, Medical Center of Chicago, and completed his internship and residency at the Medical University of South Carolina in Charleston, SC. He then went on to complete a postgraduate fellowship at Baylor College of Medicine at the Texas Medical Center in Houston, TX. Dr. Jemsek practiced medicine for more than two decades at the Nalle Clinic in Charlotte, NC, and diagnosed one of the first patients with AIDS in North Carolina in 1983.

MARJAN AMERI, MSPA, PA-C
*Certified Physician Assistant*
Marjan Ameri has been with JSC since January 2012. She obtained her bachelor of science in Biology from George Mason University in Virginia, and went on in 2011 to obtain a master's degree in Physician Assistant



Studies from the Jefferson College of Health Sciences in Roanoke, VA. Prior to working at JSC, Marjan volunteered at several hospitals, in addition to working as a research assistant at the National Opinion Research Center in Bethesda, MD.

KIM FOGARTY, PA-C
*Certified Physician Assistant*
Kim Fogarty joined JSC in March 2010, shortly after the clinic opened in DC. She received her master's in Physician Assistant Studies from DeSales University in Center Valley, PA, and her undergraduate bachelor of science in Health Sciences, with a minor in Biology, from James Madison University in Harrisonburg, VA. Kim began her physician assistant career in the hospital emergency department; after three years of working in the ER, she moved into family practice/urgent care, where she remained for five years before coming to JSC. She has practiced in the Tidewater area in Virginia as well as Fredericksburg, VA. Prior to becoming a physician assistant, Kim worked as a student athletic trainer and as an EMT. For recreation,

TARA FOX, CPNP
*Certified Pediatric Nurse Practitioner*
Tara Fox serves as JSC's pediatric nurse practitioner and treats patients from infancy through their young adult years. Tara completed her undergraduate studies at Virginia Polytechnic Institute and State University (Virginia Tech) in Blacksburg, VA, receiving her bachelor of science in Biological Sciences. She then continued her education at Vanderbilt University in Nashville, TN, where she received a bachelor of science degree in Nursing, and went on to complete her master of science in Nursing. Tara joined JSC in early 2011 and received training not only from Dr. Jemsek but also from Dr. Charles Jones, a Lyme-literate pediatrician in Connecticut.

RACHEL MARKEY, PA-C
*Certified Physician Assistant*
Rachel Markey, PA-C, joined JSC in the fall of 2013. She received her master of science in physician assistant studies from Western University of Health Sciences in California. She also attended St. Mary's College of Maryland for undergraduate studies, where she received her bachelor's degrees in biology and anthropology with a minor in environmental science. Prior to joining JSC, Rachel practiced for several years in internal medicine in Alexandria, VA.

KELLY LENNON, MSN, AGPCNP-BC
*Nurse Practitioner*
Kelly Lennon joined the medical staff as a nurse practitioner in September of 2015. Kelly did her undergraduate work at Tulane University in New Orleans, studying management consulting but with a heavy load of science classes because she always knew she wanted to be in the medical field. After earning a Bachelors of Science in Management degree in 2012, she returned to her hometown of Boca Raton, Florida, where she got licensed as an emergency medical technician and phlebotomist. Kelly worked as a phlebotomist in Florida until starting nursing school at Vanderbilt University in Nashville, Tennessee, earning a Masters of Science in Nursing degree. With her masters degree in hand, she joined her sister in Washington, D.C., where she had internships at two primary care practices, one working with geriatric medicine and the other treating a younger population.

ANNE WALCH, MHS, PA-C
*Certified Physician Assistant*
Anne Walch has been working with Dr. Jemsek since 2009, beginning at his Fort Mill, SC practice location. She is based in Asheville, NC, but travels to DC to see patients at JSC one to two weeks out of each month. Anne received both her master of health science and her undergraduate bachelor of science in Psychology from Duke University in Durham, NC. She worked in Duke's Family Medicine Department for 7 years; Nepal for 3 years; then in an integrative medicine practice for 13 years.



## Distribution Policy

Jemsek does not have an established distribution policy. As illustrated in the table below, the Practice has made distributions for the past five years:

| | For the Years Ended December 31, | | | | TTM |
| --- | --- | --- | --- | --- | --- |
| | 2012 | 2013 | 2014 | 2015 | 11/30/2016 |
| Distributions | 841,271 | 221,841 | 209,298 | 347,515 | 179,273 |
| Distributions as % of Net Income | 88.07% | 41.79% | 80.85% | 47.02% | 66.17% |

## Litigation

As of the Valuation Date, it is our understanding the Practice is involved in the BCBSNC law suit. For further information, see the "History" section previously discussed.

### Summary of Positive and Negative Factors Affecting the Practice

Valuation methodology encompasses the analysis of quantitative fundamental data and empirical capital market evidence and also the qualitative factors relevant to the subject industry and company. The quantitative fundamental data and empirical capital market evidence will be discussed in later sections of this report. Qualitative factors generally refer to certain aspects specific to an industry or business that are necessary in assessing the risk and expected return on an investment. Perceptions of differences between the Practice and comparative alternative companies provide a basis for identifying risk, as well as return potential.

The following is a summary of strengths and weaknesses pertaining to Jemsek:

Positive Factors

1.   The Practice has a very experienced medical team;

2.   Dr. Jemsek has been practicing medicine for more than 35 years;

3.   The Practice is tied to the community;

4.   Their tradename is well recognized nationally;

5.   It is the only practice specializing in Lyme Disease in the United States; and

6.   The Practice saves lives.

Negative Factors

1.   The medical community believes his methods of Lyme Disease treatment are nontraditional;

2.   Insurance companies do not cover the treatment that Jemsek offers;

3.   The Practice has a low number of potential customers per location;

4.   The Practice is currently involved in litigation pays a substantial amount of its expenses in legal and consulting fees; and

5.   There is a possibility that Dr. Jemsek will retire in the next five years.



# FINANCIAL STATEMENT ANALYSIS

**Overview**

An essential step in the valuation of any company is an analysis of its financial performance over time. Analyzing a company's financial statements provides an indication of historic growth, liquidity, leverage, and profitability, all of which influence the value of the company's equity. The following sections of this report examine the trends in the Practice's balance sheets, income statements, and financial ratios.

We conducted an analysis of the Practice's historical unaudited internal financial statements for the years ended December 31, 2012 through December 31, 2015, and through the last twelve months ended November 30, 2016. The Practice's historical balance sheets and income statements and their respective common size analysis are presented in **Appendix B — Schedules 2 through 3.2.**

**Balance Sheet Analysis**

<u>Assets</u>

The Practice's total assets as of November 30, 2016 were $1,017,936, an increase from $611,407 in total assets as of December 31, 2012. The change in asset allocation between 2012 and 2016 is shown in the graphs below.




As of November 30, 2016, current assets comprised 98.2% of total assets, or $999,169. Investments and cash equivalents is the largest component of current assets. The Practice essentially has no liabilities since they only booked $-3,065 for payroll garnishments.

**Income Statement Analysis**

We also analyzed the Practice's historical income statements. This analysis of the Practice's earnings capacity is based on its historic results as well as expectations for the future. Future earnings capacity is critical, as it is an important component of the valuation. For this reason, the historical financial statements are analyzed with an eye toward probable future earnings that can be generated by the subject company. In order to further analyze the Practice's operating performance, historical common-size income statements are presented in **Appendix B — Schedule 2**. The common-size figures allow the appraiser to analyze trends in the Practice's expenses in relation to

revenues and also permit us to compare the expenses and income of the subject company to the selected guideline companies.



As shown in the chart above, the Practice's net revenue increased from approximately $4.52 million in 2012 to approximately $5.59 million for the LTM ended November 30, 2016 at a compound annual growth rate of 7.58%. The Practice did not have cost of goods sold during this period. For the most part, from 2012 through 2016, operating expenses were particularly volatile, mainly driven by payroll expenses and legal and professional fees.



# VALUATION ANALYSIS

As indicated previously in this Report, the three approaches to be considered in a valuation are:

1. The Asset-Based Approach
2. The Market Approach
3. The Income Approach

The narrative that follows discusses the valuation methods considered and employed within each approach.

## The Asset-Based or Cost Approach

The net asset value method is an underlying asset method that presumes the value of a company will be realized upon the sale of its assets instead of focusing on its earnings potential. When applying the net asset value method, the company's assets and liabilities are adjusted to their market values, and the net result is an indication of the value of the company's equity as a going concern. This is a minimum value estimate because as a going concern there is an intangible value that is not captured by the utilization of this approach. This method is typically used when the company's value depends heavily on the value of its tangible assets, and there is little or no value added to its products or services from labor or intangible assets. In the case of Jemsek, the Practice has significant intangible assets values such as customer relationships, trade name and trademark, and goodwill, but the Practice's business model relies on Dr. Jemsek's intellectual property and a hypothetical buyer would not have access to Dr. Jemsek's personal goodwill and the patents would likely follow him if he left the Practice.

The first step in utilizing the above-described cost approach is to state the Practice's assets and liabilities at their market values. The market value of the Practice's net assets amounted to $640,251 based on marking-to-market all of the Company's assets and liabilities. This value represents 100% of the ownership interests in the Practice, on a controlling, marketable basis.

| | As of November 30, 2016 | | |
|---|---|---|---|
| | Reported | Adjustments | Market Value |
| **ASSETS** | | | |
| Current Assets | | | |
| Cash | $           203,004 | - | $           203,004 |
| Investments and Cash Equivalents | 685,913 | (2,936) | 682,977 |
| Accounts Receivable | 99,000 | (99,000) | - |
| Employee Loan | 500 | - | 500 |
| Prepaid Expenses | 10,751 | - | 10,751 |
| Total Current Assets | 999,169 | (101,936) | 897,233 |
| Property & Equipment, Net | 18,767 | - | 18,767 |
| **TOTAL ASSETS** | **$        1,017,936** | **$      (101,936)** | **$           916,000** |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | |
| Current Liabilities | | | |
| Payroll Garnishment | $             (3,065) | - | $             (3,065) |
| Payroll Accrual | - | 179,720 | 179,720 |
| Accounts Payable | - | 99,094 | 99,094 |
| Total Current Liabilities | (3,065) | 278,814 | 275,749 |
| Total Long Term Liabilities | - | - | - |
| Total Liabilities | (3,065) | 278,814 | 275,749 |
| Total Shareholders' Equity | 1,021,001 | (380,750) | 640,251 |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | **$        1,017,936** | **$      (101,936)** | **$           916,000** |
| **Net Asset Value - Controlling, Marketable Basis (Rounded)** | | | **$           640,000** |



The financial information presented in the previous page is included solely to assist in the development of the conclusion of value presented in this report.  It should not be used to obtain credit or for any other purpose. Because of the limited purpose of this presentation, it may contain departures from generally accepted accounting principles. We have not audited, reviewed, or compiled this presentation and express no assurance on it.

**The Market Approach**

The market approach is arguably the most direct approach for establishing the market value of a business.  Under the market approach, we considered the following three methodologies in our analysis: (A) the guideline public company method; (B) guideline transaction method; and (C) prior transactions in the Practice's stock.

(A) The Guideline Public Company Method
The guideline public company method estimates the subject company's value based on the application of capitalization factors (i.e., pricing multiples) extracted from stock prices and earnings fundamentals of comparative publicly traded corporations.  Because the guideline public company method relies on an examination of minority share prices traded on public exchanges, indications of value are arrived at on a minority, marketable basis.  The first step in the guideline public company method requires identifying and selecting publicly traded companies that would be deemed comparable to the subject company through an examination of information available within the public domain.  We relied on the Capital IQ database in order to locate potential guideline companies but concluded that public companies in the healthcare industry were too diverse to be compared with a small specialty medical practice.

(B) Merger and Acquisition Transaction Method
In addition to searching for the publicly traded companies, we conducted an analysis of merger and acquisition activity that took place in the market.  In doing so, we used two databases to obtain information about mergers and acquisitions.  The databases utilized were as follows:

1. Pratt's Stats (www.bvresources.com); and
2. Capital IQ (www.capitaliq.com).

We were unable to locate any comparable publicly-traded companies or companies that been acquired in recent transactions.

(C) Prior Transactions in the Practice's Stock
It is our understanding the Practice has not had any transactions in the stock in the last five years.

**The Income Approach**

The discounted cash flow ("DCF") method involves estimating the Practice's future annual net cash flows and then discounting those cash flows back to the present value as of the Valuation Date using an appropriate discount rate.

Discounted Cash Flow Method

The DCF method under the income approach is based on the premise that the investment in a business is worth the present value of all the future benefits it will produce for its owner(s). This method entails four basic steps, as follows:

1. The determination of the appropriate cash flows, based upon projected income statements;

2.  The selection of an appropriate discount rate for the subject company projections, based upon an analysis of alternative investments, including public company discount rates;

3.  The determination of a terminal value for the subject company, as of the end of the last period for which projections are available. In the case of Jemsek, we did not determine a terminal value since Management is expecting Dr. Jemsek to retire in four years; and

4.  The determination of value for the subject company.

The formula for the DCF method can be generalized as follows:

$$\underline{\text{The Discounted Cash Flow Formula}}$$

PV of NCFs during Explicit Period

$$\frac{NCF_1}{(1+k)^1} + \frac{NCF_2}{(1+k)^2} + \frac{NCF_n}{(1+k)^n}$$

NCF =  Expected future economic benefit, or more specifically, net cash flow
N =  the last period for which economic income is expected
K =  Discount rate (the cost of capital, e.g., the expected rate of return available in the market for other investments of comparable risk and other investment characteristics)
g =  Expected long-term growth rate

Derivation of Cash Flows

When employing the DCF method, the expected or projected future net cash flows and the discount rate must be quantified.

In order to calculate net cash flows, we made additional adjustments to debt-free net income for capital expenditures, depreciation, and working capital needs going forward according to the formula below:

|   | Debt-free net income |
|---|---|
| + | Depreciation and amortization |
| - | Capital expenditures |
| - | Increases (or + decreases) in working capital requirements |
| = | Net cash flow to invested capital |

Mid-Year Discounting Convention

In the previously presented discounted cash flow formula, it was implied that by using whole integer exponents in deriving the present value factor, that cash flows are expected to be received at the end of each period. However, we considered it to be more appropriate to assume that cash flows are received, or at least available, more or less evenly throughout the year. This assumption can be reflected in the discounted cash flow model by using the mid-year discounting convention as follows:



---

**The Discounted Cash Flow Formula -**

PV of NCFs during Explicit Period

$$\frac{NCF_1}{(1+k)^{0.5}} + \frac{NCF_2}{(1+k)^{1.5}} + \frac{NCF_n}{(1+k)^{n.5}}$$

---

We relied on management's projections for the period December 31, 2016 through December 31, 2020 as a starting point in developing our DCF model. Management's projections are summarized in the following table.

| | Projected Years Ending December 31, | | | | |
|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 |
| Revenue | $ 5,599,253 | $ 5,767,231 | $ 5,940,247 | $ 6,118,455 | $ 6,302,009 |
| *Growth Rate* | *-2.2%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* |
| Cost of Sales | - | - | - | - | - |
| **Gross Profit** | **5,599,253** | **5,767,231** | **5,940,247** | **6,118,455** | **6,302,009** |
| *Gross Profit Margin* | *100.0%* | *100.0%* | *100.0%* | *100.0%* | *100.0%* |
| Operating Expenses | 5,321,360 | 5,481,000 | 5,645,430 | 5,814,793 | 5,989,237 |
| **EBITDA** | **277,893** | **286,230** | **294,817** | **303,662** | **312,771** |
| *EBITDA Margin* | *5.0%* | *5.0%* | *5.0%* | *5.0%* | *5.0%* |
| Depreciation | 5,082 | 11,182 | 13,004 | 14,455 | 15,651 |
| **Operating Income (EBIT)** | **272,811** | **275,048** | **281,813** | **289,206** | **297,121** |
| *EBIT Margin* | *4.9%* | *4.8%* | *4.7%* | *4.7%* | *4.7%* |

Key assumptions driving Management's projections are summarized below:

Based on information provided by Management, we understand Dr. Jemsek is contemplating retirement in the future. Therefore, the Practice's projection runs for a five-year period and assumes the Practice will cease operations at that time due to Dr. Jemsek's personal goodwill and likelihood that a physician could not simply purchase his Practice due to his unique treatment procedures.

<u>Revenues</u>
Based on management's projections, revenues are expected to grow from approximately $5.59 million for the twelve months ended November 30, 2016 to approximately $6.30 million for the twelve months ending December 31, 2020 reflecting a CAGR of 3.04%.

<u>Cost of Sales and Operating Expenses</u>
The cost of sales as a percentage of revenues is projected to 0.0% for the years ending December 31, 2016 through 2020. EBITDA is expected to be approximately 5.0% of revenues during the projected period.

<u>EBIT Margin</u>
The earnings before interest and taxes ("EBIT") margin is projected to range from approximately 4.7% to 4.8% for the year ending December 31, 2016 through 2020.

<u>Cash Flow Adjustments</u>
In order to utilize Management's projections for the purpose of this valuation, we had to make cash flow adjustments. We added back depreciation and subtracted capital expenditure as well as the change in working capital requirements. Because we are valuing a controlling interest, debt free working capital and capital expenditure requirements were based on a review of the latest Integra "Office of Physicians Industry" report as of



the valuation date and estimated as a percentage of revenue. Projected depreciation expense was estimated by using a depreciation waterfall.

<u>Corporate Tax Rate</u>
We assumed an effective corporate tax rate of **41%** based on a blending of federal and Washington DC corporate tax rate.

## Discount Rate

In a rational investment environment, an investor has alternative investment opportunities.  The investor will require a rate of return on these investments that is a function of: (1) the expected rate of inflation, (2) the rate of return currently offered above inflation on a risk-less investment, and (3) a return to compensate for the relative uncertainty (additional risk) of the projected future cash flows.  The required return on an investment is therefore a function of the investment risk inherent in the return cash flows. When utilizing dividends or distributions, the most appropriate discount rate is the required yield on the Practice's equity.

The required rate of return for the Practice's equity must incorporate the perceived risks, as they were known on the valuation date, relative to the empirical evidence of alternative investments with comparable risk.   In developing this rate of return, the Build-Up Method was utilized and it is defined as follows:

> Required rate of return on equity =
> + Risk-free rate
> + Equity risk premium ("ERP")
> + Size premium
> + Practice-specific risk premium

The process of estimating the required rate of return on the Practice's equity interest begins with the appropriate risk-free rate of return, which incorporates investors' expectations for the real rate of return on a risk-less investment and the impact of expected inflation on the investors' purchasing power.  The risk-free rate proxy we selected is based on long-term U.S. Treasury securities.   The market yield on the U.S. Treasury security at 20-year constant maturity as of November 30, 2016 was **1.83%**.

Historic equity returns net of the risk-free rate over a long-term investment horizon were used to estimate the premium for the required rate of return for equity investments in relation to the risk-free rate of return.  According to the Duff & Phelps 2016 Valuation Handbook[3] ("D&P Handbook"), the equity risk premium on the Standard & Poor's 500 Composite Common Stock Index above the risk-free rate was **6.03%** over the period 1926-2015 included in the study.

Another component of a discount rate is the "size premium."   Published research indicates that the size of a company is important since stocks of smaller companies are riskier than larger ones and small-company stocks command a higher expected rate of return in the market.  Some of the most common sources of size premium data in the United States include the D&P Handbook and the D&P study.  While the D&P Handbook only provides one measurement of size (market value of equity) for a company, the data is broken down into various levels (deciles) that intend to be applicable to each company's size. The D&P study on the other hand, provides eight different size measurements, including: revenues, net income, operating income (EBITDA), assets, book value, equity, market value of invested capital (equity plus debt), and number of employees.

---

[3] Duff and Phelps 2016 Valuation Handbook.



According to the data from the D&P Handbook, the size premium for the smallest stocks on the NYSE, AMEX, and NASDAQ, referred to as the 10th decile equity size premium is **5.78%**.

Adding the risk-free rate to the beta-adjusted equity premium and the size premium gives us the required equity rate of return before taking any other risks of the Practice into consideration. However, there are inherent risks related to the subject company that are not considered solely by those factors. The factors cited in the Summary of Positive and Negative Factors Affecting the Practice section of this report combined with the quantitative risk factors discussed in the Financial Statement Analysis section of this report led to adding a company specific risk premium of **10.0%** to the required rate of return on equity.

For purposes of this analysis, we have relied on both sources of data cited above and after adding the risk-free rate, the equity risk premium, and the benchmark premium for size, and taking an average of the two results, we estimated the appropriate cost of equity to be **23.6%**.

After deriving the rate that would be demanded by an equity holder, the next step is to estimate the Practice's cost of debt. We estimated the borrowing rate based on Moody's Baa rate which was **4.8%** as of the Valuation Date. The pre-tax cost of debt was then multiplied by 1 minus the projected tax rate of **41.0%** as interest expense is tax deductible at the corporate level. This resulted in an after-tax cost of debt of **2.8%**.

A capital structure comprised of **100.0%** equity and **0.0%** debt was used to reflect the Practice's actual capital since the Practice does not have collateral against any future debt. The calculation of the weighted average cost of capital is summarized in the following table:

| Cost of Equity - Build-Up Method:  Ke = Rf + ERP + RPs + RPcs | Build - Up |
|---|---|
| Risk-Free Rate (Treasury Securities with 20 years to maturity) (Rf) | 1.83% |
| Equity Risk Premium (ERP) | 6.03% |
| Plus: Benchmark Premium for Size  (RPs) | 5.78% |
| Plus: Company-Specific Risk (RPcs) | 10.00% |
| **After Tax Cost of Equity (Ke) =** | **23.6%** |

| After Tax Cost of Debt: Borrowing Rate × (1-T) | |
|---|---|
| Borrowing Rate | 4.8% |
| Times: 1 - Tax Rate (T) | 41.0% |
| **After Tax Cost of Debt (Kd) =** | **2.8%** |

**Weighted Average Cost of Capital (WACC)**

| | Capital Structure | | Cost | | Weighted Cost |
|---|---|---|---|---|---|
| Equity | 100% | x | 23.64% | = | 23.64% |
| Debt | 0% | x | 2.84% | = | 0.00% |
| | | | WACC = | | 23.64% |
| | | | **WACC (rounded) =** | | **24.0%** |

After adding the present value of the projected years' net cash flow, we added the excess debt-free working capital to arrive at the value of invested capital of Jemsek. Since there was no interest bearing debt to subtract, we arrived at the fair market value of equity derived under the discounted cash flow method of approximately **$852,000** on a controlling, marketable basis as presented in **Appendix B – Schedule 5.**



**Premiums and Discounts**

The final value reached in the valuation of a closely held business may be more or less than the value that was calculated using the various methods of valuation that are available. The type and size of the discount(s) or premium(s) will vary depending on the starting point. The starting point will depend on which methods of calculation were used during the valuation as well as other factors, such as the sources of the information used to derive multiples or discount rates and normalization adjustments.

The discounts typically considered when valuing an interest in a closely-held business are discounts for lack of control (or conversely a premium for control) and lack of marketability. In this case, the net asset value method resulted in a controlling, marketable basis. In addition, the income approach (DCF Method) also resulted in a controlling, marketable interest basis of value, as there were controlling adjustments made to the cash flows. Therefore, a control premium was not appropriate. However, it is appropriate to apply a discount for lack of marketability to the indicated value.

Discounts for lack of marketability should be considered in this case given that the subject privately-held interest is not marketable. The following section addresses the characteristics and circumstances involving the applicability of marketability discounts.

<u>Discount for Lack of Marketability</u>
All other things being equal, an investor prefers investments that can be easily liquidated. Empirical studies demonstrate that investors will pay a higher price for investments that are more marketable. A controlling investment in Jemsek is not liquid and will be less desirable than a marketable investment with similar attributes.

When referencing publicly-traded securities in valuing a minority position in a closely-held company, it should be noted that a discount for lack of marketability of the privately-held interest is required, as the shareholders have no access to an active public market for their investments and cannot force registration to create marketability. Without market access, an investor's ability to control the timing of potential gains, to avoid losses and to minimize the opportunity cost associated with alternative investments is severely impaired. Given two investment instruments identical in all other respects, the market will accord a considerable premium to one that can be liquidated into cash instantly, especially without risk of loss in value. For this reason, an investment in a privately held company usually is worth less than an otherwise comparable investment in a publicly-traded entity.

The market places a far greater value differential on the liquidity factor alone in its pricing of common stocks than in its pricing of any other class of investment assets, for sound reasons. Numerous studies concerning the existence of marketability discounts and their size have been published. These include the SEC Institutional Investment Study, Gelman Study, Trout Study, Moroney Study, Maher Study, Standard Research Consultants Study, Willamette Management Associates Study, and FMV Opinions, Inc. Study. The preceding studies are based upon analysis of restricted stocks. Initial public offering studies have been performed by Robert W. Baird & Co. and Willamette Management Associates. These studies provide empirical evidence that investors place significance on the liquidity of their investments (See **Appendix C** for a summary of each of the preceding studies).

The restricted stock studies are consistent in indicating an average discount for lack of marketability of at least 35%. In addition, the IPO studies provide support for somewhat higher discounts for lack of marketability of approximately 45%. Such a result is rational, since the restricted securities will have access to an established public market upon the expiration of the restrictions. However, the more recent restricted stock studies (i.e., those studies conducted after 1980) have an average discount for lack of marketability closer to 20%.

Factors affecting the size of the lack of marketability discount for a firm that most likely cannot make a public offering include the following: whether or not there is evidence of a market for the securities; if restrictions on the sale of the interest exist; the amount of control present in the transferred shares; whether there is a history of distributions; the holding period for the shares; and the company's redemption policy.

Interests in closely-held companies of this size can typically take months, if not longer, to sell.  Therefore, we have utilized the 11 different factors mentioned in an article published by Robert E. Moroney titled "Why 25% Discount for Non-marketability in One Valuation, 100% in Another?"[4] These factors are as follow:

1. *High dividend yield:*  Companies that pay dividends tend to be more marketable than companies that do not. In this case, the Practice's historical distribution payout ratio and Management's indicated intent to make distributions going forward has a positive effect on marketability.

2. *Bright growth prospects:*  Companies that have bright growth prospects are easier to sell than companies that do not.  This makes them more marketable.  Based on the analysis performed in this assignment, the Practice's is projected to grow at a slower rate than historical growth. This would have a negative effect on marketability.

3. *Swing values:* If a block of stock has swing value, it may be more marketable than the typical small block of stock.  As we are valuing the fair market value of 100.0% of the equity in the Practice on a control basis, this would have swing value capability and is positive on marketability.

4. *Restrictions on Transfer:* If the company's shareholders' agreement restricts transfers, it would have a negative effect in marketability. In this case, we were not presented with a shareholders' agreement, as such, this would have a neutral effect in marketability.

5. *Buy-sell agreements:* Buy-sell agreements can go either way.  The agreement can create a market for the stock, making it more marketable, or the agreement can restrict the sale, making it less marketable. The Practice does not have a buy-sell agreement and therefore a neutral effect on marketability.

6. *Stock Quality Grade:* The better the quality of the stock, the more marketable it will be.  This has been determined not to be an issue, which increases marketability.

7. *Controlling shareholder's honesty:* The integrity of the controlling shareholder can make a difference regarding the ability to sell a partial interest in a company.  This has been determined not to be an issue and increases marketability.

8. *Controlling shareholder's friendliness:* Similar to the shareholder's honesty, the manner in which he or she deals with others can make the stock more marketable.  This has been determined not to be an issue, which has a positive impact on marketability.

9. *Prospects for the industry*: A company that is in an industry with good prospects will also generally be more marketable.  The industry is forecasted to grow as explained in the industry section of this report. This factor would increase slightly the marketability of the subject interest.

10. *Prospects for the company:* If a company has good prospects for the future, it will generally be more marketable. It is expected that Dr. Jemsek will retire in four years. Therefore, the Practice will lose most of its intangible value resulting on significantly lower operating results and will have a negative effect on marketability.

---

[4] Robert E. Moroney, "Why 25 % Discount for Nonmarketability in One Valuation, 100% in Another?" Taxes, May 1977, p.320.



11.    *Mood of the investing public:* When the investing public is bullish, they are more willing to make an investment. This can increase the marketability. Given the market conditions in 2016, and outlook going forward, this would have a positive effect on marketability.

The conclusions drawn from the various studies mentioned in **Appendix C**, as well as from the analysis performed throughout this report should be adjusted for the fact that the Practice is a closely held business, and in the case of the subject equity interest, we are valuing a controlling interest. All else being equal, a controlling interest in a company is more marketable than a minority interest.

For purposes of this analysis, we calculated the implied discount using the Black-Scholes option pricing model for a range of holding periods and volatilities as summarized in the table below. The range is based on hypothetical annual volatility and holding periods. We calculated the implied DLOM as the price of the protective put option as calculated using the Black-Scholes option divided by the marketable price of the Practice's stock plus the premium required to ensure marketability by purchasing a put option.

In our analysis, we assumed a longer-term holding period of five years and calculated the volatility for the specialty health care providers industry to be approximately 20**%**. Under this approach, the two most important factors in this model are the assumed holding period and the estimated volatility. Given the subjectivity required in choosing these inputs, we performed a sensitivity analysis of the model by manipulating the holding period and volatility. For purposes of this analysis, we calculated the implied lack of marketability discount using the Black-Scholes option pricing model for a range of holding periods and volatilities as summarized in the table below.

| Volatility | *HOLDING PERIOD IN YEARS* | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | 10.00 | 20.00 |
| **5.0%** | 4.7% | 5.1% | 5.2% | 5.1% | 4.9% | 4.6% | 3.9% | 2.0% |
| **10.0%** | 7.1% | 8.0% | 8.5% | 8.6% | 8.6% | 8.5% | 8.1% | 5.8% |
| **15.0%** | 9.5% | 10.7% | 11.5% | 12.0% | 12.2% | 12.2% | 12.1% | 10.1% |
| **20.0%** | 11.7% | 13.3% | 14.4% | 15.0% | 15.4% | 15.6% | 15.9% | 14.2% |
| **25.0%** | 13.8% | 15.7% | 17.0% | 17.9% | 18.4% | 18.7% | 19.2% | 17.8% |
| **30.0%** | 15.8% | 18.0% | 19.5% | 20.5% | 21.2% | 21.5% | 22.3% | 21.0% |
| **35.0%** | 17.6% | 20.1% | 21.8% | 22.9% | 23.7% | 24.1% | 25.0% | 23.8% |

We ran a Black-Scholes put option pricing model, which indicated a 14.4% discount for lack of marketability (based on a 20% volatility and four-year holding period). We believe the volatility for the Practice's privately held stock is likely higher. Based on the put option pricing model, the various studies, and we are valuing a controlling interest, we applied a **10%** discount for lack of marketability to the Net Asset Value Method and the Discounted Cash Flow Method.



# RECONCILIATION OF VALUES

The value derived under the cost and income approaches, as well as the application of the discount for lack of marketability are summarized in the following table:

| Valuation Approach | Indicated Equity | DLOM | Indicated Equity Value after Discounts | Weight | Weighted Equity Value |
|---|---|---|---|---|---|
| Cost Approach: Net Asset Value Method | $ 640,000 | 10% | $ 576,000 | 75% | $ 432,000 |
| Income Approach: Discounted Cash Flow Method | 852,000 | 10% | 766,800 | 25% | 191,700 |
| **Fair Market Value of 100.0% of the Equity - Controlling, Non-marketable Basis** | | | | | **$ 623,700** |

We applied a 75.0 percent weight to the Cost Approach because the Practice's specialty and business model relies on Dr. Jemsek's personal goodwill. Therefore, a hypothetical buyer would not have access to Dr. Jemsek's personal goodwill. After applying the discount for lack of marketability, selecting the appropriate weights and dividing the total by the amount of shares outstanding, the fair market value of 100.0% of the equity in Jemsek Specialty Clinic, PLLC as of November 30, 2016 is **$623,700** on a controlling, non-marketable basis.

# APPENDICES

A.   Statement of Assumptions and Limiting Conditions

B.   Schedules

C.   Premiums and Discounts

D.   Appraiser Qualifications



# APPENDIX A
## Statement of Assumptions and Limiting Conditions

This valuation is subject to the following assumptions and limiting conditions:

1.  This appraisal was made, and this Report has been prepared, for the purpose(s) stated in the introduction section of this Report.  Neither the Report nor the information that it contains should be used for any other purpose, and they are invalid if so used.  This Report is valid only for the effective date specified herein and only for the purposes specified herein.

2.  Our Report is based on prospective financial information provided to us by Management and other third-parties.  This information has not been audited, reviewed, or compiled by us, nor has it been subjected to any type of audit, review, or compilation procedures by us, nor have we audited, reviewed, or compiled the books and records of the subject Practice.  Had we audited, reviewed or compiled the underlying data, matters may have come to our attention which would have resulted in our using amounts which differ from those provided; accordingly, we take no responsibility for the underlying data presented or relied upon in this Report.

3.  This appraisal is based upon information obtained from sources that, with the exceptions and qualifications as noted herein, the appraisers believe to be reliable.  However, the appraisers have not confirmed the validity of all of the information.  We have assumed the accuracy of all data provided to us, and accordingly, no warranty or other form of assurance regarding its fairness, completeness or accuracy is issued.  Responsible ownership and competent management with respect to the subject assets, properties, or business interests is assumed.

4.  The distribution of total value among the various elements of the business applies only for the purposes of this appraisal, and the separate value estimates for individual elements of the property should not be used for any other purpose, and are invalid if so used.

5.  This Report and/or any or all of the information contained in this Report may not be disseminated or disclosed in any manner, either directly or indirectly, to any party whatsoever without the prior written consent of Cherry Bekaert LLP.

6.  The appraisers, by reason of performing this appraisal and preparing this Report, are not required to give testimony, nor to be in attendance in court or at any governmental hearing with reference to matters herein, unless prior arrangements have been made with the appraiser relative to such additional employment.

7.  The primary sources of financial data used in this appraisal are unaudited financial statements for the years 2012 – 2016.

8.  We have used financial forecasts provided by Management. The future may not occur as anticipated, and actual operating results may vary from those described in our report. In the case that the forecast data differ from the actual future events, our recommendations as to the indication of value may be materially affected.

9.  This appraisal is subject to any and all assumptions and limiting conditions which may be mentioned elsewhere within this Appraisal Report and which may not have been specifically stated herein.

10. All files, working papers or documents developed during the course of the assignment shall be the property



of Cherry Bekaert LLP.  We will retain this data for as long as we deem necessary.

11.   This valuation reflects facts and conditions existing at the Valuation Date.  Subsequent events have not been considered, and we have no obligation to update our Report for such events and conditions.  Our estimate of fair market value is based on assumptions about future events.  We do not give assurances that actual events will be as assumed for purposes of this Valuation.  The fair market value of the subject will change over time and under different circumstances.

12.   This Report was prepared under the direction of Thomas T. Brooks, CPA/ABV, ASA.   Neither the professionals who worked on this engagement, nor the partners of Cherry Bekaert LLP have any present or contemplated future interest in the Practice, any personal interest with respect to the parties involved, or any other interest that might prevent us from performing an unbiased valuation.   Our compensation is not contingent on any action or event resulting from the analyses, opinions, or conclusions in, or the use of, this Report.

13.   In the event these documents would have disclosed relevant alternative information, our conclusion of value may be different from the result achieved and the difference may have been significantly different from the result indicated herein.



# APPENDIX B
Schedules

**Jemsek Specialty Clinic, PLLC**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Valuation Summary** | | | | | | **Schedule 1** |
| *As of November 30, 2016* | | | | | | **(USD Actuals)** |

| Valuation Approach | Reference | Indicated Equity | DLOM [1] | Indicated Equity Value after Discounts | Weight [2] | Weighted Equity Value |
|---|---|---|---|---|---|---|
| Cost Approach: Net Asset Value Method | *Schedule 4* | $        640,000 | 10% | $        576,000 | 75% | $        432,000 |
| Income Approach: Discounted Cash Flow Method | *Schedule 5* | 852,000 | 10% | 766,800 | 25% | 191,700 |
| **Fair Market Value of 100.0% of the Equity - Controlling, Non-marketable Basis** | | | | | | $        623,700 |

**Footnotes:**
[1]  DLOM = "Discount for Lack of Marketability". Discount calculations are further discussed in report.
[2]  We applied a 75.0 percent weight to the Cost Approach because the Company's specialty and business model relies on Dr. Jemsek's intellectual property. Therefore, a hypothetical buyer would not have access to Dr. Jemsek's personal goodwill.

CHERRY BEKAERT LLP
Your guide forward

**Jemsek Specialty Clinic, PLLC**
**Historical Income Statements**
*As of November 30, 2016*

Schedule 2
(USD Actuals)

| | For the Years Ended December 31, [1] | | | | TTM [1] | For the Years Ended December 31, | | | | TTM |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 11/30/2016 | 2012 | 2013 | 2014 | 2015 | 11/30/2016 |
| **Net Revenues** | 4,517,028 | 4,602,000 | 4,798,075 | 5,726,661 | 5,590,630 | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of Sales | - | - | - | - | - | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Gross Profit** | 4,517,028 | 4,602,000 | 4,798,075 | 5,726,661 | 5,590,630 | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| **Operating Expenses** | | | | | | | | | | |
| Office Expense | 26,313 | 2,669 | 3,669 | 4,762 | 6,265 | 0.6% | 0.1% | 0.1% | 0.1% | 0.1% |
| Rent | 346,204 | 512,925 | 447,969 | 545,200 | 506,860 | 7.7% | 11.1% | 9.3% | 9.5% | 9.1% |
| Utilities | - | - | 120 | 15,528 | 36,263 | 0.0% | 0.0% | 0.0% | 0.3% | 0.6% |
| General Office | 8,723 | 2,715 | 7,762 | 19,464 | 23,239 | 0.2% | 0.1% | 0.2% | 0.3% | 0.4% |
| Medical Office | 1,548 | 835 | 8,018 | 3,558 | 3,557 | 0.0% | 0.0% | 0.2% | 0.1% | 0.1% |
| Travel | 111,747 | 104,478 | 109,296 | 94,264 | 90,227 | 2.5% | 2.3% | 2.3% | 1.6% | 1.6% |
| Insurance | 164,099 | 231,847 | 240,717 | 289,058 | 364,965 | 3.6% | 5.0% | 5.0% | 5.0% | 6.5% |
| Legal & Professional Fees | 378,711 | 414,278 | 720,692 | 374,610 | 438,820 | 8.4% | 9.0% | 15.0% | 6.5% | 7.8% |
| Payroll Expense | 1,679,905 | 2,067,211 | 2,141,643 | 2,375,280 | 2,552,398 | 37.2% | 44.9% | 44.6% | 41.5% | 45.7% |
| Advertising | 5,951 | 7,968 | 10,471 | 10,835 | 13,728 | 0.1% | 0.2% | 0.2% | 0.2% | 0.2% |
| Answering Service | 6,000 | 7,000 | 6,000 | 6,500 | 4,964 | 0.1% | 0.2% | 0.1% | 0.1% | 0.1% |
| Bank Charges/Credit Card Fees | 77,713 | 88,462 | 100,007 | 126,223 | 120,388 | 1.7% | 1.9% | 2.1% | 2.2% | 2.2% |
| Cable | - | 865 | 2,700 | 983 | - | 0.0% | 0.0% | 0.1% | 0.0% | 0.0% |
| Computer/Software Maintenance | 16,717 | 21,363 | 24,532 | 54,601 | 83,934 | 0.4% | 0.5% | 0.5% | 1.0% | 1.5% |
| Copier/Fax Maintenance | 11,233 | 12,158 | 13,893 | 17,705 | 21,753 | 0.2% | 0.3% | 0.3% | 0.3% | 0.4% |
| Depreciation | 413 | 594 | 594 | 18,816 | 18,816 | 0.0% | 0.0% | 0.0% | 0.3% | 0.3% |
| Disposal Fees | 423 | 3,487 | 8,780 | 9,510 | 8,532 | 0.0% | 0.1% | 0.2% | 0.2% | 0.2% |
| Document Storage | 1,871 | 2,759 | 2,609 | 2,619 | 3,830 | 0.0% | 0.1% | 0.1% | 0.0% | 0.1% |
| Dues & Subscriptions | 8,664 | 7,381 | 13,430 | 8,103 | 7,206 | 0.2% | 0.2% | 0.3% | 0.1% | 0.1% |
| Equipment Lease | 2,456 | 4,491 | 4,534 | 4,680 | 4,340 | 0.1% | 0.1% | 0.1% | 0.1% | 0.1% |
| Equipment Repair & Maintenance | 15,684 | 215 | - | - | - | 0.3% | 0.0% | 0.0% | 0.0% | 0.0% |
| Fax | - | 474 | - | - | - | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| IRA Contribution | 65,711 | 69,195 | - | - | - | 1.5% | 1.5% | 0.0% | 0.0% | 0.0% |
| Franchise Tax Expense | - | - | - | 76,718 | 123,315 | 0.0% | 0.0% | 0.0% | 1.3% | 2.2% |
| Interest Expense | - | - | - | 54 | 54 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Investment Advisory Fees | - | - | - | 4,795 | 4,795 | 0.0% | 0.0% | 0.0% | 0.1% | 0.1% |
| License Expense | 3,034 | 3,527 | 2,389 | 3,394 | 1,343 | 0.1% | 0.1% | 0.0% | 0.1% | 0.0% |
| Linen Services | 3,200 | 3,951 | 4,028 | 2,748 | 2,523 | 0.1% | 0.1% | 0.1% | 0.0% | 0.0% |
| Medical Supplies | 118,160 | 74,097 | 88,102 | 267,200 | 315,766 | 2.6% | 1.6% | 1.8% | 4.7% | 5.6% |
| Medical Waste | 4,202 | 2,512 | - | - | - | 0.1% | 0.1% | 0.0% | 0.0% | 0.0% |
| Medication Supplies | 315,075 | 355,494 | 410,984 | 491,504 | 396,138 | 7.0% | 7.7% | 8.6% | 8.6% | 7.1% |
| Moving Expense | - | - | 2,791 | 556 | - | 0.0% | 0.0% | 0.1% | 0.0% | 0.0% |
| Office Furniture/Equipment | 6,065 | 2,555 | 3,922 | - | 17,896 | 0.1% | 0.1% | 0.1% | 0.0% | 0.3% |
| Office Supplies | 30,999 | 34,557 | 38,334 | 27,912 | 40,348 | 0.7% | 0.8% | 0.8% | 0.5% | 0.7% |
| Other Miscellaneous Service Cost | - | - | - | 1,495 | 2,475 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Postage & Couriers | 32,741 | 31,113 | 29,141 | 24,165 | 15,465 | 0.7% | 0.7% | 0.6% | 0.4% | 0.3% |
| Printing and Copying | 4,005 | 790 | 930 | 455 | 265 | 0.1% | 0.0% | 0.0% | 0.0% | 0.0% |
| Promotional | 1,138 | - | 1,566 | 360 | 233 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Security System | - | - | - | 3,000 | - | 0.0% | 0.0% | 0.0% | 0.1% | 0.0% |
| Stationery & Printing | 1,742 | 2,642 | 1,978 | 5,817 | 12,395 | 0.0% | 0.1% | 0.0% | 0.1% | 0.2% |
| Telephone | 21,837 | 24,236 | 12,228 | 20,609 | 20,855 | 0.5% | 0.5% | 0.3% | 0.4% | 0.4% |
| Telephone Maintenance | 10,912 | 1,464 | - | 479 | 43 | 0.2% | 0.0% | 0.0% | 0.0% | 0.0% |
| Transcription | 77,993 | 71,542 | 69,439 | 79,974 | 66,424 | 1.7% | 1.6% | 1.4% | 1.4% | 1.2% |
| Uniform/Medical Wardrobe | - | - | 3,793 | 5,745 | 1,562 | 0.0% | 0.0% | 0.1% | 0.1% | 0.0% |
| **Total Operating Expenses** | 3,561,191 | 4,171,848 | 4,537,061 | 4,999,279 | 5,331,980 | 78.8% | 90.7% | 94.6% | 87.3% | 95.4% |
| **Operating Income** | 955,837 | 430,153 | 261,014 | 727,382 | 258,649 | 21.2% | 9.3% | 5.4% | 12.7% | 4.6% |
| **Other Income (Expense)** | | | | | | | | | | |
| Other Expenses | (854) | (30,385) | (2,155) | (13,392) | (6,400) | 0.0% | -0.7% | 0.0% | -0.2% | -0.1% |
| Other Income | 228 | 131,024 | 12 | 25,107 | 18,690 | 0.0% | 2.8% | 0.0% | 0.4% | 0.3% |
| **Income Before Taxes** | 955,211 | 530,791 | 258,871 | 739,097 | 270,939 | 21.1% | 11.5% | 5.4% | 12.9% | 4.8% |
| Income Taxes | - | - | - | - | - | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| **Net Income** | $ 955,211 | $ 530,791 | $ 258,871 | $ 739,097 | $ 270,939 | 21.1% | 11.5% | 5.4% | 12.9% | 4.8% |
| **Other Information** | | | | | | | | | | |
| EBIT | $ 955,837 | $ 430,153 | $ 261,014 | $ 727,382 | $ 258,649 | 21.2% | 9.3% | 5.4% | 12.7% | 4.6% |
| Depreciation | 413 | 594 | 594 | 18,816 | 18,816 | 0.0% | 0.0% | 0.0% | 0.3% | 0.3% |
| EBITDA | 956,250 | 430,747 | 261,608 | 746,198 | 277,465 | 21.2% | 9.4% | 5.5% | 13.0% | 5.0% |
| Distributions | 841,271 | 221,841 | 209,298 | 347,515 | 179,273 | 18.6% | 4.8% | 4.4% | 6.1% | 3.2% |
| Distributions as % of Net Income | 88.07% | 41.79% | 80.85% | 47.02% | 66.17% | | | | | |

**Footnotes:**
[1] Based on unaudited, internal financial statements provided by Management.



**Jemsek Specialty Clinic, PLLC**

**Balance Sheets**

*As of November 30, 2016*

Schedule 3.1
(USD Actuals)

| | | As of December 31, [1] | | | As of [1] |
|---|---|---|---|---|---|
| | **2012** | **2013** | **2014** | **2015** | **11/30/2016** |
| **ASSETS** | | | | | |
| Current Assets | | | | | |
| Cash | $ 527,584 | $ 639,459 | $ 658,035 | $ 982,855 | $ 203,004 |
| Investments and Cash Equivalents | - | - | - | - | 685,913 |
| Accounts Receivable | - | - | 27,000 | 93,000 | 99,000 |
| Employee Loan | - | - | - | - | 500 |
| Prepaid Expenses | 10,076 | 10,076 | 10,751 | 10,751 | 10,751 |
| Total Current Assets | 537,660 | 649,535 | 695,786 | 1,086,606 | 999,169 |
| | | | | | |
| Property & Equipment, Net | 73,747 | 74,098 | 12,661 | 12,067 | 18,767 |
| | | | | | |
| **TOTAL ASSETS** | $ 611,407 | $ 723,633 | $ 708,447 | $ 1,098,673 | $ 1,017,936 |
| | | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | |
| | | | | | |
| Current Liabilities | | | | | |
| Payroll Garnishment | - | - | - | - | (3,065) |
| Total Current Liabilities | - | - | - | - | (3,065) |
| | | | | | |
| Total Long Term Liabilities | - | - | - | - | - |
| | | | | | |
| Total Liabilities | - | - | - | - | (3,065) |
| | | | | | |
| Total Shareholders' Equity | 611,407 | 723,633 | 708,447 | 1,098,673 | 1,021,001 |
| | | | | | |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | $ 611,407 | $ 723,633 | $ 708,447 | $ 1,098,673 | $ 1,017,936 |
| | | | | | |
| **Other Information** | | | | | |
| Interest-Bearing Debt | $ - | $ - | $ - | $ - | $ - |
| Working Capital | 537,660 | 649,535 | 695,786 | 1,086,606 | 1,002,234 |
| Debt Free, Working Capital | 537,660 | 649,535 | 695,786 | 1,086,606 | 1,002,234 |
| Cash Free, Debt Free, Working Capital | 10,076 | 10,076 | 37,751 | 103,751 | 113,317 |
| Capital Expenditures | NA | NA | NA | NA | NA |

**Footnotes:**

[1] Based on unaudited, internal financial statements provided by Management.



**Jemsek Specialty Clinic, PLLC**

**Balance Sheets**                                                                                                          Schedule 3.2

*As of November 30, 2016*

| | As of December 31, | | | | As of |
|---|---|---|---|---|---|
| | **2012** | **2013** | **2014** | **2015** | **11/30/2016** |
| **ASSETS** | | | | | |
| Current Assets | | | | | |
| Cash | 86.3% | 88.4% | 92.9% | 89.5% | 19.9% |
| Investments and Cash Equivalents | 0.0% | 0.0% | 0.0% | 0.0% | 67.4% |
| Accounts Receivable | 0.0% | 0.0% | 3.8% | 8.5% | 9.7% |
| Employee Loan | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Prepaid Expenses | 1.6% | 1.4% | 1.5% | 1.0% | 1.1% |
| Total Current Assets | 87.9% | 89.8% | 98.2% | 98.9% | 98.2% |
| | | | | | |
| Property & Equipment, Net | 12.1% | 10.2% | 1.8% | 1.1% | 1.8% |
| | | | | | |
| **TOTAL ASSETS** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |
| | | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | |
| | | | | | |
| Current Liabilities | | | | | |
| Payroll Garnishment | 0.0% | 0.0% | 0.0% | 0.0% | -0.3% |
| Total Current Liabilities | 0.0% | 0.0% | 0.0% | 0.0% | -0.3% |
| | | | | | |
| Total Long Term Liabilities | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| | | | | | |
| Total Liabilities | 0.0% | 0.0% | 0.0% | 0.0% | -0.3% |
| | | | | | |
| Total Shareholders' Equity | 100.0% | 100.0% | 100.0% | 100.0% | 100.3% |
| | | | | | |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | **100.0%** | **100.0%** | **100.0%** | **100.0%** | **100.0%** |
| | | | | | |
| | | | | | |
| Interest-Bearing Debt to Sales | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Working Capital to Sales Ratio | 11.9% | 14.1% | 14.5% | 19.0% | 17.9% |
| DF Working Capital to Sales Ratio | 11.9% | 14.1% | 14.5% | 19.0% | 17.9% |
| CF, DF Working Capital to Sales Ratio | 0.2% | 0.2% | 0.8% | 1.8% | 2.0% |
| Capital Expenditures to Sales Ratio | NA | NA | NA | NA | NA |

Footnotes:
[1]  Based on unaudited, internal financial statements provided by Management.



**Jemsek Specialty Clinic, PLLC**

Cost Approach: Net Asset Value Method

Schedule 4

*As of November 30, 2016*

(USD Actuals)

| | As of November 30, 2016 | | | |
|---|---|---|---|---|
| | Reported [1] | Adjustments | Market Value | |
| **ASSETS** | | | | |
| Current Assets | | | | |
| Cash | $ 203,004 | - $ | 203,004 | |
| Investments and Cash Equivalents | 685,913 | (2,936) | 682,977 | [2] |
| Accounts Receivable | 99,000 | (99,000) | - | [3] |
| Employee Loan | 500 | - | 500 | |
| Prepaid Expenses | 10,751 | - | 10,751 | |
| Total Current Assets | 999,169 | (101,936) | 897,233 | |
| | | | | |
| Property & Equipment, Net | 18,767 | - | 18,767 | [4] |
| **TOTAL ASSETS** | $ 1,017,936 | $ (101,936) $ | 916,000 | |
| | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | |
| | | | | |
| Current Liabilities | | | | |
| Payroll Garnishment | $ (3,065) $ | - $ | (3,065) | |
| Payroll Accrual | - | 179,720 | 179,720 | [5] |
| Accounts Payable | - | 99,094 | 99,094 | [5] |
| Total Current Liabilities | (3,065) | 278,814 | 275,749 | |
| | | | | |
| Total Long Term Liabilities | - | - | - | |
| | | | | |
| Total Liabilities | (3,065) | 278,814 | 275,749 | |
| | | | | |
| Total Shareholders' Equity | 1,021,001 | (380,750) | 640,251 | |
| | | | | |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | $ 1,017,936 | $ (101,936) $ | 916,000 | |

| | | |
|---|---|---|
| Net Asset Value - Controlling, Marketable Basis (Rounded) | $ | 640,000 |

**Adjusted Other Information**

| | | |
|---|---|---|
| Adjusted Working Capital | $ | 621,484 |
| Adjusted Debt Free, Working Capital | | 621,484 |
| Adjusted DF WC to Sales Ratio | | 11.1% |

**Footnotes:**

[1] Based on unaudited, internal financial statements provided by Management.

[2] Adjustment is based on Wells Fargo statement provided by Management. We understand the 11/30/16 balance of the account is $682,977 per the statement, and the book value is $685,913.

[3] It is our understanding the accounts receivable are payments to Dr. Jemsek that have not been run through distributions.

[4] Management indicated the book value of fixed assets approximates market value.

[5] It is our understanding payroll accruals and professional service liabilities were not reflected in the balance sheet.



**Jemsek Specialty Clinic, PLLC**

| | | | | | | |
|---|---|---|---|---|---|---|
| Income Approach - Discounted Cash Flow Method | | | | | | Schedule 5 |
| *As of November 30, 2016* | | | | | | (USD Actuals) |

| | TTM | Projected Years Ending December 31, [1] | | | | |
|---|---|---|---|---|---|---|
| | 11/30/2016 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Revenue | $ 5,590,630 | $ 5,599,253 | $ 5,767,231 | $ 5,940,247 | $ 6,118,455 | $ 6,302,009 |
| *Growth Rate* | *NA* | *-2.2%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* |
| Cost of Sales | - | - | - | - | - | - |
| **Gross Profit** | **5,590,630** | **5,599,253** | **5,767,231** | **5,940,247** | **6,118,455** | **6,302,009** |
| *Gross Profit Margin* | *100.0%* | *100.0%* | *100.0%* | *100.0%* | *100.0%* | *100.0%* |
| Operating Expenses | 5,313,164 | 5,321,360 | 5,481,000 | 5,645,430 | 5,814,793 | 5,989,237 |
| **EBITDA** | **277,465** | **277,893** | **286,230** | **294,817** | **303,662** | **312,771** |
| *EBITDA Margin* | *5.0%* | *5.0%* | *5.0%* | *5.0%* | *5.0%* | *5.0%* |
| Depreciation | 18,816 | 5,082 | 11,182 | 13,004 | 14,455 | 15,651 [2] |
| **Operating Income (EBIT)** | **258,649** | **272,811** | **275,048** | **281,813** | **289,206** | **297,121** |
| *EBIT Margin* | *4.6%* | *4.9%* | *4.8%* | *4.7%* | *4.7%* | *4.7%* |
| Income Tax Expense | | 111,853 | 112,770 | 115,543 | 118,575 | 121,820 [3] |
| **Debt-Free Net Income** | | **160,959** | **162,278** | **166,270** | **170,632** | **175,301** |
| **Cash Flow Adjustments:** | | | | | | |
| Add: Depreciation | | 5,082 | 11,182 | 13,004 | 14,455 | 15,651 [2] |
| Less: Capital Expenditures | | (16,798) | (17,302) | (17,821) | (18,355) | (18,906) [4] |
| Less: Increase in Debt Free, Working Capital | | (302) | (5,879) | (6,056) | (6,237) | (6,424) [4] |
| **Debt-Free Net Cash Flow to Invested Capital** | | **148,941** | **150,280** | **155,397** | **160,494** | **165,622** |
| **Terminal Value** | | | | | | |
| Partial Year Adjustment | | 0.0822 | 1.0000 | 1.0000 | 1.0000 | 0.9178 |
| Discount Period (Half Year Convention) | | 0.0411 | 0.5822 | 1.5822 | 2.5822 | 3.0411 |
| Present Value Income Factor | | 0.9912 | 0.8823 | 0.7115 | 0.5738 | 0.5199 |
| **Present Value of Cash Flows** | | **12,134** | **132,590** | **110,569** | **92,093** | **79,025** |
| **Cumulative Present Value of Future Cash Flows** | | $ 12,134 | $ 144,724 | $ 255,293 | $ 347,386 | $ 426,411 |

| Assumptions | |
|---|---|
| Discount Rate | 24.0% |
| Tax Rate [3] | 41.0% |
| Debt-Free, Working Capital as a % of Revenue [4] | 3.5% |
| Capital Expenditures as a % of Revenue [4] | 0.3% |

| | |
|---|---|
| Sum of Present Value of Future Cash Flows | $ 426,411 |
| Plus: Excess Debt-Free, Working Capital | 425,812 [5] |
| **Estimated Value of Invested Capital - Controlling, Marketable Basis** | 852,223 |
| Less: Interest Bearing Debt | - |
| **Estimated Value of Equity - Controlling, Marketable Basis (Rounded)** | $ 852,000 |

**Footnotes:**

[1] Revenue growth rates, projected margins and expected years until retirement provided by Management.

[2] See Schedule 9. Based on the Practice's low fixed asset balance, the Practice has low capital expenditures. Therefore, we assumed capital expenditures to be 0.3% of revenues.

[3] Based on a blending of federal and Washington DC corporate tax rate.

[4] Estimated based on a review of the latest Integra "Office of Physicians Industry" report as of the valuation date.

[5] Excess debt free working capital calculated by subtracting the adjusted debt free working capital (See Schedule 5) from the normalized debt free working capital at a 3.5% of revenues.



**Jemsek Specialty Clinic, PLLC**

**Weighted Average Cost of Capital Calculation**                                                                                       Schedule 6
*As of November 30, 2016*

**Cost of Equity - Build-Up Method:  Ke = Rf + ERP + RPs + RPcs**                                                    Build - Up

| | |
|---|---|
| Risk-Free Rate (Treasury Securities with 20 years to maturity) (Rf) | 1.83% [1] |
| Equity Risk Premium (ERP) | 6.03% [2] |
| Plus: Benchmark Premium for Size  (RPs) | 5.78% [3] |
| Plus: Company-Specific Risk (RPcs) | 10.00% [4] |
| **After Tax Cost of Equity (Ke) =** | **23.6%** |

**After Tax Cost of Debt: Borrowing Rate × (1-T)**

| | |
|---|---|
| Borrowing Rate | 4.8% [5] |
| Times: 1 - Tax Rate (T) | 41.0% [6] |
| **After Tax Cost of Debt (Kd) =** | **2.8%** |

**Weighted Average Cost of Capital (WACC)**

| | Capital Structure | | Cost | | Weighted Cost | |
|---|---|---|---|---|---|---|
| Equity | 100% | x | 23.64% | = | 23.64% | |
| Debt | 0% | x | 2.84% | = | 0.00% | [7] |
| | | | | WACC = | 23.64% | |
| | | | | **WACC (rounded) =** | **24.0%** | |

**Footnotes:**

**[1]** 20-Year Treasury Constant Maturity Rate as of Nov. 30, 2016; CapitalIQ and Federal Reserve Board Statistical Release H.15.
**[2]** Long-horizon expected equity risk premium (supply side); 2016 Duff & Phelps Valuation Handbook.
**[3]** Size premium for 10th Decile Group - (Duff & Phelps 2016 Valuation Handbook), 1926 to 2015.
**[4]** Analysts' assessment of qualitative and quantitative risk factors, primarily forecast risk related to Dr. Jemsek's nontraditional treatment plans for lyme disease.
**[5]** Based on Moody's Seasoned Baa Corporate Bond Yield as of the Valuation Date.
**[6]** Based on blending federal and state corporate income tax rates.
**[7]** Since the Company does not have collateral against any future debt, the capital weightings for debt and equity were determined using the Company's actual capital structure.



**Jemsek Specialty Clinic, PLLC**

Analysis of Depreciation Expense

*As of November 30, 2016*

Schedule 7

($US Actuals)

| Year | Projections As of December 31, | | | | |
|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** |
| Opening net fixed asset balance **[1]** | 18,767 | 30,482 | 36,602 | 41,419 | 45,319 |
| Capital expenditures **[2]**: | 16,798 | 17,302 | 17,821 | 18,355 | 18,906 |
| Existing fixed assets **[3]** | 14.3% | 24.5% | 17.5% | 12.5% | 8.9% |
| New additions **[3]** | 14.3% | 24.5% | 17.5% | 12.5% | 8.9% |
| **Depreciation Waterfall** | | | | | |
| Existing fixed assets | $2,682 | $4,596 | $3,282 | $2,344 | $1,676 |
| 2016 Capital Expenditure | 2,400 | 4,114 | 2,938 | 2,098 | 1,500 |
| 2017 Capital Expenditure | | 2,472 | 4,237 | 3,026 | 2,161 |
| 2018 Capital Expenditure | | | 2,547 | 4,364 | 3,117 |
| 2019 Capital Expenditure | | | | 2,623 | 4,495 |
| 2020 Capital Expenditure | | | | | 2,702 |
| **Depreciation Expense** | **$5,082** | **$11,182** | **$13,004** | **$14,455** | **$15,651** |

**Footnotes:**

**[1]** See Schedule 3.1

**[2]** See Schedule 4

**[3]** As per Management's representations, most of the existing fixed assets and the capital expenditures are related to office equipment. Therefore, we have decided to use the 7-year Modified Accelerated Cost Recovery System (MACRS) recovery table to estimate the projected depreciation expense. The company's new additions are depreciated based on the 7-year recovery table.





# Appendix C
## Premiums and Discounts

**Discount for Lack of Marketability**

A discount for lack of marketability ("DLOM") is used to compensate for the difficulty of selling shares of stock that are not traded on a stock exchange compared with those that can be traded publicly. The inability to readily sell stock increases a shareholder's exposure to risk. As compensation for additional risk, investors demand a higher return causing shares to trade at a discount. The magnitude of the adjustment in value is dependent on case-specific factors. The DLOM is a recognition and quantification of the effect on value from the inability to convert a privately held interest into liquid funds as quickly as a publicly-traded security. The Internal Revenue Service refers to the concept of marketability in Revenue Ruling 77-287, which is related to restricted stock. Marketability expresses the relative ease and promptness with which a security or commodity may be sold when desired, at a representative current price, without material concession in price merely because of the necessity of the sale.

Other factors being equal, publicly-traded securities are more marketable than the securities for private concerns, and securities with restrictions are generally less marketable than securities without restrictions. A DLOM is appropriate when the shares have either legal or contractual restrictions placed upon them. The restrictions may be in the form of restricted stock, restrictions resulting from buy-sell agreements, partnership agreements, shareholders agreements, Practice loan restrictions, or other types of contracts that restrict the sale of shares.

The most common sources of data for determining an appropriate level of a DLOM are studies involving two types of analyses:

1. Restricted stock studies. These studies measure the difference between the private price of a restricted security and the publicly-traded stock price of the same company.
2. IPO studies. These are studies based on the difference between the initial public offering ("IPO") price of a company and transactions in the same company's stock prior to the IPO.
3. Cost of "flotation" studies.

*Restricted Stock Studies*

Restricted stock studies are comprised of studies that measure the difference between the private price of a restricted security and the publicly-traded stock price of the same company. The more important studies are summarized in the exhibit entitled: "Summary of Restricted Stock Studies" at the end of this section.

Restricted stock is stock that is not registered with the SEC and cannot be readily sold into the public market. Restricted stock is issued when a corporation is first going public, making an acquisition, or raising capital. Investment companies regularly purchase private placements of restricted securities. Corporations issue restricted stock rather than tradable stock mainly to (i) to avoid dilution of their stock price when an excessive number of shares are available for sale at any time, and (ii) to avoid the costs and process of registering the securities with the SEC.

To sell restricted stock on the public market, holders must either register the securities with the SEC or qualify for a Rule 144 exemption. Originally, Rule 144 allowed the limited resale of unregistered securities after a minimum holding period of two years (now six months). Resale is limited to the higher of 1% of outstanding stock or average weekly volume over a four-week preceding the filing of a notice of sale. There is no quantity limitation after a four-year holding period. Because of the restriction on the marketability of the securities, the investment



companies purchase the securities at prices lower than the price of a registered security of the same company.  The difference between the two prices represents the DLOM.

### SEC Institutional Investor Study
The Securities and Exchange Commission reviewed purchases of restricted securities by investment companies for the period January 1, 1966 through June 30, 1969, and published the study in March 1971.  The study included letter stocks traded on the NYSE and AMEX as well as the OTC markets.  The mean DLOM in this study was 25.8%.  The study analyzed discounts both by trading market as well as by sales of the company.  For OTC non-reporting companies, 56% had discounts over 30%; 34% of the companies had discounts over 40%.  For companies with sales between $1 million and $5 million, 54% had discounts over 30 %, 34% had DLOM's over 40%.

### Hall and Polacek Study
The authors discuss relevant factors for determining the taxable value of an estate.  Among these factors are the criteria outlined by relevant IRS Revenue rulings and the court-allowed discounts for minority interest and lack of marketability.  The authors define the purpose for the discounts, evaluate historical trends in court-allowed discounts, and review several methods for determining the appropriate discount for each situation.  The mean discount for lack of marketability in this study was 23%.  The time period for this study was 1979 to 1992.

### Silber Study
Silber developed a model that describes the relationship of the discount to restricted securities and the factors that affect the discount.  Using data provided by the Securities Data Corporation, the author analyzed reported transactions of restricted stock sales from 1981 to 1988.  Of the 310 private placements of common stock of public companies, Silber chose 69 transactions that carried no warrants or special provisions.

Analysis of these transactions showed an average price discount of 33.75%.  Silber found that "firms with higher revenues, earnings, and market capitalizations are associated with lower discounts."  Furthermore, Silber developed a statistical model that described the discount as a function of (i) credit-worthiness of the company, (ii) marketability of the shares, (iii) cash flow, and (iv) special (value-added) concessions to the investor.  Silber found that the size of the block of restricted securities issued affects the size of the discount more than the amount of revenues of the company.

### Stryker and Pittock Study
The authors analyzed 28 restricted stock purchases that occurred from October 1978 through June 1982.  The study was done in the same manner as the earlier SEC study.  The study excluded corporations that were in a state of bankruptcy or financial, insurance, or real estate companies.  The median discount for lack of marketability, as calculated in this study, was 45%.  The authors also studied the effect on the discount caused by four determinants of discounts that were outlined in Revenue Ruling 77-287: (i) earnings, (ii) sales, (iii) trading market, and (iv) resale agreement provisions.  The earnings patterns did have an effect on the discounts.  Companies that were profitable over the five years prior to the placement appeared to sell restricted stock at substantially lower discounts.  Companies with larger revenues, stable markets for unrestricted stock, and sound capitalizations, appeared to sell restricted stock at substantially lower discounts.  Restricted stock of companies, whose stock appears to be overpriced, will sell at higher discounts.

### Maher Study
The author researched the purchase of restricted securities by investment companies from 1969 to 1973.  The costs to the funds were then compared to the market value of unrestricted securities of the same class in the same companies on the acquisition date.  Maher determined that the mean discount on transactions occurring in this time



frame was approximately 35% and the median discount was 33%. 68% of the transactions occurred at discounts of 30% or more, 35% occurred at discounts of 40% or higher, and 21% occurred at discounts of 50% or greater.

### Gelman Study
The author evaluated the purchases of restricted securities by four investment companies from 1968 through 1970. Using publicly available information, Gelman compared the price that the investment companies paid for the restricted securities of a corporation to the market price of publicly-traded securities of the same corporation. Gelman analyzed the transactions and determined that the mean and median discount of all 89 stock purchases was 33%. Upon further analysis, 36% of the stocks exhibited discounts of greater than 40%, 59% of the stocks exhibited discounts of greater than 30%, and 84% of the stocks exhibited discounts of greater than 20%.

### Moroney Study
Moroney studied the prices paid for restricted securities by 10 registered investment companies. The study included 146 purchases of unregistered and restricted stocks from 1969 to 1973. Moroney also investigated the published financial statements of the companies and reviewed the valuations prepared by the boards of directors of the firms that were required by law to make good-faith estimates of value. The mean discount for the 146 transactions based on the original purchase was 35.6% and the median discount was 33%. Of the 146 transactions reviewed, 64% occurred at a discount of greater than 30%, 40% occurred at a discount of greater than 40%, and 23% occurred at a discount of greater than 50%.

### Trout Study
Trout analyzed 60 historical transactions of investment letter stock purchase by mutual funds from 1968 to 1972. Using the data from the 60 transactions he used, Trout found the mean discount to be 33.45%. Using multiple regression analysis, he determined the relationship among the factors that influence the size of the discount. These factors are: exchange listing, number of shares outstanding, percentage of control (which is the number of shares purchased divided by the shares outstanding), size of the purchase, and value of the purchase.

- Exchange listing. Trout's analysis indicated that stocks traded on the New York or American Stock Exchange will have an 8.39% lower discount than securities listed on smaller exchanges.

- Number of shares outstanding. His analysis indicated that for each additional million shares of common stock of the issue, which are outstanding, the discount would be 4% smaller.

- Percentage of control. The percentage of control has a small negative effect on the discount. Trout found that the discount should decline by a little less than 1% for each additional 1% of control involved in the purchase.

- Size of the purchase. Trout's analysis also showed that small purchases of stock should have a 12.11% lower discount than purchases that amount to more than 1% of the outstanding shares.

- Value of the purchase. Finally, he found that the discount will increase by 4.75% for each additional million dollars of stock purchased.

### Arneson Study
Arneson evaluated studies of purchases of letter stock by investment companies. He referred to studies by Maher and Moroney that indicate the appropriate discount for non-marketability of an interest in a closely held company should be around 35%. Arneson agreed with this discount for restricted securities, but pointed out that restricted securities of publicly traded companies are different from interests in closely held businesses. He sees enough dissimilarity between the two securities to argue that the discounts on closely held securities should be above the 35% level.



Arneson's support for higher discounts included such factors as: costs of flotation, lack of a pre-established market, risk, inability to market because of company size and history, non-cash costs of underwriting, and timing and length of time necessary to go public. He concluded that the discount for lack of marketability for a closely-held company should be closer to 50%, or even greater.

### Willamette Management Associates Study

In a study of 33 transactions involving purchases of restricted securities from 1981 to 1984, Willamette Management found that the restricted securities sold at a median discount of 31.2% to comparable publicly traded stocks from the issuing company.

The Willamette study noted that the slightly lower than average discounts during this time may be attributable to the somewhat depressed pricing in the public stock market during the time period viewed.

### Management Planning Restricted Stock Studies

Management Planning, Inc. is an independent business appraisal firm that compiled an analysis of the discounts on restricted stocks as compared to their publicly traded counterparts that includes data for the period 1980 to 1995. After restricting the study based on share price, stage of business, size, profitability in the fiscal year preceding the private transaction, and other restrictions designed to mitigate abnormalities in the discount data, 49 companies met the criteria.

A number of factors were then reviewed to determine whether they affected the restricted stock discount. The following factors showed a "clear correlation" in their effect on the discount: revenues, recent earnings, market price/share, price stability, and earnings stability. Moreover, the factors which also exhibited "some correlation" with the restricted stock discounts were: market capitalization, number of shares in the block, time to sell according to SEC Rule 144 restrictions (dribble out period, the number of three-month periods), number of weeks trading volume to sell, block size/trading volume (%), 10-year revenue, and 10-year earnings growth and revenue stability.

The analysis indicated that these factors generally followed a predictable pattern. Companies with larger market capitalization tended to have lower discounts. Larger blocks of stock tended to have higher discounts. The longer the period required to sell the stock based on the Rule 144 restrictions, the higher the restricted stock discount tended to be. The higher the block size as a percentage of annual trading volume, the higher the discount tended to be. Companies with greater revenue and earnings growth and revenue stability tended to have lower discounts.

The Management Planning study showed a mean discount of 27.7% and a median discount of 28.8% for the 49 transactions in the sample.

### FMV Opinions Study

FMV Opinions, Inc. reviewed 243 restricted stock transactions from 1980 through 1997. The study found that risk had a significant effect on the size of the discounts. All transactions were prior to the Rule 144 amendment in 1997 that reduced the holding period from two years to one year. The mean discount for lack of marketability in the study was 22.1%, with a median discount of 20.1%. The median discount for exchange-traded securities was 15.3%, while the median discount for over-the-counter traded securities was 22.4%.

### Johnson Study

The Johnson study observed 72 transactions during the years 1991 to 1995. The author pointed out that the increased number of investors who entered the market for restricted stocks in this five-year period following the SEC adoption of Rule 144A, which allowed qualified institutional investors to trade unregistered securities without



filing registration statements, could have had a dampening effect on the discounts seen by this study. The mean discount for lack of marketability observed by this study was 20%, which is lower than past studies.

The study also considered the effect of such factors as profitability, size, transaction amount, and the holding period on the amount of the DLOM. The average DLOM was 16% when the company reported positive earnings compared to 23% when the company reported a loss. This spread in the average discount remained constant for each year net income was examined. The relationship between the magnitude of the discount and the size of the company is clearly direct. The average discount was 13% for companies with sales greater than $200 million compared to 23.5% for companies with sales of less than $10 million.

### Columbia Financial Advisors, Inc. Studies

Columbia Financial Advisors, Inc. performed two studies; one examined only private equity placements over the period January 1, 1996 to April 30, 1997, and the other examined only private common equity placements from January 1, 1997 to December 31, 1998. This second study is notable in that it was the first study on discounts for lack of marketability conducted after the 1997 change in Rule 144 which reduced the holding period for restricted stocks from two years to one.

In the first study, Columbia Financial analyzed 23 transactions and found an average discount of 21% with a median discount of 14%. A possible explanation for these low discount figures was the increased activity in privately placed stock. Greater liquidity and more and better information translated into decreased discounts. In addition, in June 1995, the SEC proposed amendment to Rule 144 had been published for public comment. Therefore, knowledgeable private placement and Rule 144A market participants were most likely aware of the proposed changes.

In the second study, Columbia Financial analyzed 15 transactions and found the average discount to be 13%, with a median discount of just 9%. The lower discounts most likely reflect the market's reaction to the SEC's change in the holding period from two years to one year.

The Columbia study concluded that while discounts for restricted stocks have been declining, the studies conducted after 1990 are not relevant for determining the discounts for lack of marketability in privately held stock, because they reflect increased liquidity in the market for restricted securities. Such increased liquidity is not present in privately held securities.

### Initial Public Offering Studies

Initial public offering studies are based on the difference between the IPO price of a company's stock and transactions in the same company's stock before the IPO.

### Emory Studies

John D. Emory has published numerous IPO studies, starting in January 1980 and ending March 2000. In his first eight studies (1980-1997), Emory reviewed over 2,200 prospectuses and analyzed 310 transactions. He eliminated development-stage companies, companies with operating losses, and companies with IPO prices less than $5 per share. All of the transactions he used took place within a five-month period prior to the IPO. The mean and median discounts for lack of marketability for Emory's eight studies were 44% and 43%, respectively.

Emory has also conducted three studies that looked at data from 1997 to 2000. In addition, for the first time in one of these studies, Emory included Dot.Com companies. In an expanded study, he broadened his search and did not eliminate companies based on financial strength. This study yielded 283 transactions and a median discount of 52%.



Over the entire 11 studies from 1980 to 2000, the 593 transactions analyzed by Emory had a mean discount of 47% and a median discount of 48%.

### Willamette Management Associates Studies

Willamette Management Associates, Inc. has conducted a series of 18 studies, ranging from 1975 to 1997, comparing private stock transactions to subsequent initial public offerings of stock in the same companies. The Willamette studies reviewed transactions that took place up to 36 months prior to the IPO, whereas Emory analyzed transactions up to five months prior to IPO. In conducting the studies, Willamette used S-1 and S-18 registration statements, which disclosed more information than the company prospectuses utilized by Emory. Moreover, the Willamette study attempted to adjust for the differences between market conditions between the dates by comparing the Industry P/E ratio at the time of offering to the Industry P/E ratio at the time of the private transaction.

The median discounts of the 18 studies conducted by Willamette ranged from a low of 31.8% (1991) to a high of 73.1% (1984). The total median discount among the 18 studies was 51.0%.

### Key Court Case involving the Discount for Lack of Marketability

In *Mandelbaum v. Commissioner*, Judge Laro compiled a nonexclusive list of fundamental elements of value that are used by an investor in making his or her investment decision. The expert for the taxpayer cited seven restricted stock studies and the John Emory and the Willamette Management pre-IPO studies. The Court used the studies cited as a starting point for the marketability discount and outlined ten factors that might cause the marketability discount for a given instance to be higher or lower than the benchmark averages. The factors cited in the case are as follows:

1.  Private Versus Public Sales of the Stock
2.  Financial Statement Analysis
3.  Practice's Dividend Policy
4.  Nature of the Practice, Its History, Its Position in the Industry, and Its Economic Outlook
5.  Practice's Management
6.  Amount of Control in Transferred Shares
7.  Restrictions on Transferability of Stock
8.  Holding Period for Stock
9.  Practice's Redemption Policy
10. Costs Associated with Making a Public Offering

### Cost of "Flotation" Studies.

"Cost of flotation" (cost of selling stock to the public, called "floating an issue" in securities trade jargon) is sometimes used as a benchmark for quantifying the discount for lack of marketability for controlling interests. These flotation costs usually include underwriting, legal, accounting, and printing expenditures. The most comprehensive and still most often quoted study on the cost of flotation is one published by the SEC in December 1974, which covered 1,599 public offerings. However, costs of public flotation today are considerably greater than those at that time. Because we are valuing a controlling interest in which the buyer would be able to make the Practice go public, these studies were heavily weighted in our consideration of the discount for lack of marketability.



## Option Pricing Models

Option pricing models assume that the cost to purchase a stock option directly relates to the measurement of the discount for lack of marketability. An article written by Travis R. Lance summarizes four published studies that relate to the use of options to estimate the discount for lack of marketability.

**The Chaffee Study.** David B.H. Chaffee, III's 1993 study uses the Black-Scholes option pricing model to calculate the value of a European put option on a company's stock. The cost of the option in effect reflects the cost to attain marketability in an otherwise unmarketable security by purchasing the right to sell the stock at a future date, in this case at the end of the holding period. Chaffee relied on the Black-Scholes option pricing model to estimate the price of the option in his model. The inputs to the Black-Scholes option pricing model are (1) stock price, (2) strike price, (3) time to expiration, (4) interest rate, and (5) volatility.

In the Chaffee model, the stock price and the strike price equal the marketable value of the private company stock as of the Valuation Date; the time to expiration equals the time the securities are expected to remain nonmarketable; the interest rate is the cost of capital; and, volatility is a judgmental factor based on the volatility of guideline publicly traded stocks. According to Chaffee, volatility for small privately owned companies is likely to be 60% or greater. Chaffee reached this conclusion based on an analysis of the volatility for small public companies that are traded in the over-the-counter market. According to the Chaffee study, the appropriate DLOM for a privately held stock with a two-year required holding period and volatility between 60% and 90% is between 28% and 41%.

**The Longstaff Study.** Francis A. Longstaff also authored a study that relies on stock options to estimate the DLOM for the valuation of private company stock. Whereas the Chaffee study is based on avoiding losses, the Longstaff study is based on unrealized gains. Another difference from the Chaffee study is that the Longstaff study (allegedly) provides an estimate for the upper bound on the value for marketability. The Longstaff study is based on the price of a "lookback" option. The Longstaff study assumes an investor has (1) a single-security portfolio, (2) perfect market timing, and (3) trading restrictions that prevent the security from being sold at the optimal time. The value of marketability, based on these assumptions, is the payoff from an option on the maximum value of the security, where the strike price of the option is stochastic. For a five-year holding period and 30% standard deviation, the appropriate DLOM is over 65%. Longstaff analyzed securities with volatility between 10% and 30% because, "This range of volatility is consistent with typical stock return volatilities." However, as noted above, small stocks (such as those traded over-the-counter and analyzed by Chaffee) typically have greater volatility, all else equal.

**The Finnerty Study.** John D. Finnerty conducted an option-pricing study that, "tests the relative importance of transfer restrictions on the one hand and information and equity ownership concentration effects on the other in explaining private placement discounts." The Finnerty option-pricing study is an extension of the Longstaff study. Unlike Longstaff, however, Finnerty did not assume that investors have perfect market timing ability. Instead, Finnerty modeled the DLOM as the value of an Asian, or arithmetic average strike put model. In addition to analyzing stock-options, Finnerty analyzed 101 private placements of restricted stock that occurred between January 1, 1997, and February 3, 1997. The Finnerty private placement study concluded price discounts of 20.13% and 18.41% for the day prior to the private placement and for 10 days prior to the private placement, respectively. With regard to his option-pricing model, Finnerty concluded: the model calculates transferability discounts that are consistent with the range of discounts observed empirically in letter-stock private placements for common stocks with volatilities between 30% and 70% but the implied discounts are greater than (less than) those predicted by the model for lower (higher) volatilities.

In addition, Finnerty made the following observation about the importance of dividends, volatility, and the DLOM:



*My model implies that when the stock price volatility is under 30%, the appropriate discount is smaller than the customary discount range of about 25% to 35%. For example, when volatility is between 20% and 30% and there is a two-year restriction period, the proper discount is in the range from 15.76% to 20.12% for a non-dividend-paying stock and in the range from 11.50% to 15.96% for a stock yielding 3.0%. The halving of the initial restriction period under Rule 144 since February 1997 has roughly halved the transferability discount.*

**Long-Term Equity Anticipation Securities (LEAPS) Studies.** In September 2003, Robert Trout published a LEAPS study. In June 2005, Ronald Seaman updated the Trout LEAPS study. In winter 2005, Seaman expanded his earlier study. Each of these LEAPS studies was conducted with similar research logic and with similar research procedures. This discussion concurrently reviews these three LEAPS studies. LEAPs, generally, are long-term put options. LEAPS offer price protection for up to two years in the future. Therefore, an investor who desires protection against stock price declines can purchase a LEAPS put option. The LEAPS studies examined the cost of buying LEAP puts. The cost of the LEAP put option divided by the stock price serves as the basis for the DLOM. Trout examined nine LEAPS as of March 2003 (with options expiring January 2005). The nine LEAPS examined were for large companies with actively traded securities. According to the Trout study, "The data concerning the relative cost of puts as an insurance premium cost equal to about 24% of price. This finding suggests that the minimum discount that one should assign for the lack of marketability of holding privately held stock is at least 24%." The Seaman study updated and extended the Trout study up through June 2005. The Seaman study determined if holding period and risk affected the LEAPS cost (i.e., the price discount). This first Seaman study considered 100 randomly selected securities where LEAPS options are traded.

*Quantitative Marketability Discount Model*

In 1997, Z. Christopher Mercer published a book entitled Quantifying Marketability Discounts. Mercer's book presents a model for analyzing marketability discounts and includes excellent overviews of restricted stock studies, IPO studies, and Tax Court cases. The quantitative marketability discount model ("QMDM") requires five key inputs:

- Marketable minority value of the stock
- Expected growth rate of a marketable minority shareholder interest
- Expected holding period
- Required rate of return for a non-marketable minority interest
- Expected dividend payments

The QMDM represents continued theoretical development of the concept of the marketability discount. Some analysts have observed that the discount derived under this approach may appear to combine both discounts for lack of control and marketability. Mercer, however, disagrees. Some appraisers have adopted some form of the framework for analyzing discounts that Mercer has presented, but most agree that if used, it should be used in conjunction with the use of traditional discount studies.

**Sources:**

- Trugman, Gary R. Understanding Business Valuation: *A Practical Guide to Valuing Small to Medium-Sized Businesses, Second Edition*. American Institute of Certified Public Accountants, 2002.
- Pratt, Shannon P. *Business Valuation Discounts and Premiums*. John Wiley & Sons, Inc., 2001.
- Hitchner, James R. *Financial Valuation: Applications and Models*. John Wiley & Sons, Inc., 2003.
- Practitioners Publishing Company (PPC): Guide to Business Valuations, Volumes 1-3. Practitioners Publishing Company, 2001.
- *Mandelbaum* v. Commissioner, T.C. Memo 1995-255; 69 T.C.M. (CCH) 2852; (June 12, 1995). Judge Laro



# APPENDIX D
Curriculum Vitae

# THOMAS T. BROOKS, CPA/ABV, ASA

*Senior Manager - Business Valuation Services*

## COMPANY & POSITION

*With over 1000 professionals, Cherry Bekaert ranks among the 2nd largest accounting firms in the Southeast of the United States and 25th largest CPA firm in the nation.  In today's demanding and changing marketplace, we serve as trusted advisors to domestic and international businesses, the legal community and high net worth individuals.*

*The combined depth of experience, market knowledge, technical expertise and business acumen of our professionals allow us to successfully meet the diverse demands of our clients.  We offer a full range of accounting and business solutions including:*

- *Accounting*
- *SEC Audits*
- *Business Advisory*
- *Business Valuation*
- *Business Assurance*
- *Financial Advisory*
- *Forensic Technology*

- *Litigation Support*
- *Tax, Domestic and International*
- *Personal Taxes*
- *Wealth Management*
- *Marital Dissolution*
- *Economic Damages*
- *Bankruptcy*

## SUMMARY OF EXPERIENCE

*With over 20 years of experience handling valuation and litigation support matters, Tom is a Senior Manager with the Valuation Services team. He specializes in guiding clients with the valuation of their businesses; business interests; and intangible assets for mergers and acquisitions; gift and estate planning; financial and tax reporting; charitable giving; strategic planning; shareholder disputes; commercial litigation; marital dissolution; and creditor/collateral analysis.*

*Clients in manufacturing; retail; distribution; technology; food and beverage; agribusiness; property investment/development; healthcare; trucking/transportation; contractors; restaurant; textiles; and home building have sought Tom's expertise. He has handled start-up business matters and larger companies with over $1 billion in revenue, effectively communicating complex valuation issues and collaborating with his clients in building successful relationships.*

*Prior to joining Cherry Bekaert in its Atlanta office, Tom was a director in the Valuation practice of a leading tax and advisory firm. As a licensed CPA in Georgia, Accredited in Business Valuation (ABV) and as an Accredited Senior Appraiser (ASA), Tom often speaks for organizations such as the Atlanta National Association of Certified Valuation Analysts (NACVA) chapter, the Georgia Society of Certified Public Accountants and Atlanta Alumni of*



*Retired Revenue Agents. He has also presented for Georgia Tech and LaGrange College accounting students and at Merrill Lynch seminars.*

**EDUCATION**
*Georgia Institute of Technology*
*Bachelor of Science in Management*

**PROFESSIONAL DESIGNATIONS & MEMBERSHIPS**

*Certified Public Accountant licensed in the State of Georgia*
*Accredited in Business Valuation through the AICPA*
*Accredited Senior Appraiser through the American Society of Appraisers*
*American Institute of Certified Public Accountants*
*Georgia Society of Certified Public Accountants (GSCPA)*
*Atlanta Estate Planning Council*
*Member of the GSCPA's 2004 Leadership Academy*

**CHERRY BEKAERT** LLP
CPAs & Advisors

# ZAIN U. AHMED, ASA
*Principal - Valuation Services*

**SUMMARY OF EXPERIENCE**

*Based in Cherry Bekaert's Charlotte office, Zain serves as a Principal in the Firm's Valuation Services Practice where he leverages his extensive knowledge of financial theory, valuation analysis, financial modeling, and economic and industry research to address clients' valuation needs.*

*With over 17 years of valuation experience, Zain has helped manage and execute over 300 engagements with transactions ranging between $3 million and greater than $40 billion, including cross-border deals in a dozen countries. Such engagements have involved the valuations of business enterprises and shareholders' equity, real estate, inventory, and other assets for transaction pricing, financing, regulatory reporting and tax purposes, including fairness opinions, common stock valuations, purchase price allocations (ASC 805 and IFRS 3R) and goodwill impairment (ASC 350, IAS 36).*

*Zain's background includes working for one of the nation's top financial institutions, two Big Four firms, and three nationally ranked accounting firms based in South Florida. Zain holds the designation of Accredited Senior Appraiser (ASA) from the American Society of Appraisers.*

**EDUCATION**

*University of North Carolina at Chapel Hill,*
*AB in Economics*

*Smeal College of Business Administration*
*Pennsylvania State University*
*Master in Business Administration*

**PROFESSIONAL DESIGNATIONS & MEMBERSHIPS**

*Accredited Senior Appraiser*
*American Society of Appraisers*

**EXHIBIT E**

**JOSEPH G. JEMSEK**
**COMPARISON OF ASSET TREATMENT IN CHAPTER 11 VERSUS CHAPTER 7**[1]
(revised October 2, 2017)

| ASSET | Status/comments | Proposed Separation Agreement treatment | Scheduled value | Chapter 11 /Going Concern Value | Chapter 7/liquidation Value |
|---|---|---|---|---|---|
| **2006 original schedules** | | | | | |
| 2215 Sharon Lane Charlotte NC | sold per bankruptcy court order, no net proceeds to Debtor | n/a | $2,088,000.00 | $0.00 | $0.00 |
| Lot 25, 3.12 acres The Ridge of Greenbriar Mountain Phase One Greenbriar, White Sulfur Springs WV | exempt as tenants by entirety, owns with wife, security for contingency fee agreement with Polsinelli | to be sold, net proceeds equally divided | 375,000.00 | 0.00 | 0.00 |
| Lot 6 Walkingstick Falls Road, Highland NC; $80,000 recent tax valuation, no debt | fee simple | to Debtor | 149,570.00 | 80,000.00 | 56,000.00 |
| Lot 7 Walkingstick Falls Rd, Highlands NC; $150,000 recent tax valuation, no debt | tenants by the entirety (exempt) | to Debtor | 603,530.00 | 0.00 | 0.00 |
| Cash on hand | exempt, NCGS 1-362 | | 0.00 | 0.00 | 0.00 |

---

[1]All values are estimated; assets as of July 31, 2014 subject to equitable distribution claims of Kay Jemsek.

| ASSET | Status/comments | Proposed Separation Agreement treatment | Scheduled value | Chapter 11 /Going Concern Value | Chapter 7/liquidation Value |
|---|---|---|---|---|---|
| Interest in checking account - Scottish Bank | set off per court order | n/a | 67,018.22 | 0.00 | 0.00 |
| Morgan Stanley Brokerage account | Set off by Scottish Bank, per 12.5.06 order | n/a | 1,472,985.00 | 0.00 | 0.00 |
| Household goods(½ interest)[2] | divided outside of agreement | divided outside of agreement; value reflects $5,000 exemption | 6,250.00 | 2,500.00 | 500.00 |
| crystal, collections, art, etc. | jointly owned | divided outside of agreement | 25,000.00 | 5,000.00 | 1,000.00 |
| cameras | | divided outside of agreement | 3,000.00 | 500.00 | 100.00 |
| Jemsek Clinic, P. A. 401(k) Plan | exempt; this was placed in Morgan Stanley IRA rollover account xxxx4-221 (listed below) | | 139,895.75 | 0.00 | 0.00 |
| John Hancock Term insurance policy thru 10/19/2015; face amount $2,000,000 | cancelled | n/a | 0.00 | 0.00 | 0.00 |

---

[2]Most furniture and household goods are in Washington, D.C., and liquidation values reflect that appointed Trustee is unlikely to want to incur the costs inspect, inventory, value, move, store, sell and otherwise administratively deal with such personal property.

| ASSET | Status/comments | Proposed Separation Agreement treatment | Scheduled value | Chapter 11 /Going Concern Value | Chapter 7/liquidation Value |
|---|---|---|---|---|---|
| First Colony term life insurance policy; face value - $2,000,000; owned by 1st Mid-Illinois Bank & Trust, Trustee of the Joseph G. Jemsek 1999 Irrevocable Trust, dated 12/29/99 | cancelled | n/a | 0.00 | 0.00 | 0.00 |
| PhoenixBay, Inc. Preferred Series A Shares (5,000 shares; 5,000 stock warrants) | Debtor believes these shares have no value; value will be investigated if creditors agree | shares to be divided equally | 200,000.00 | 0.00 | 0.00 |
| Interest in Jemsek Clinic, P. A. | All assets liquidated by secured creditor per order 12.03.07, suspended by NC 8.5.08 | n/a | "Indeterminate" | 0.00 | 0.00 |
| Interest in Jemsek Speciality Clinic, Lyme & Related Diseases, P. A. | Suspended by NC Secretary of State 8.13.08 | n/a | "Indeterminate" | 0.00 | 0.00 |
| Rosedale Medical Group, LLC | Admin. Dissolved 8.13.10 | n/a | "Indeterminate" | 0.00 | 0.00 |
| JGJ Enterprises, LLC | Admin. Dissolved 8.13.10 | | "Indeterminate" | 0.00 | 0.00 |
| Interest due from Phoenix Bay, Inc. | company has been dissolved, not believed to be collectible | | 60,000.00 | 0.00 | 0.00 |

| ASSET | Status/comments | Proposed Separation Agreement treatment | Scheduled value | Chapter 11 /Going Concern Value | Chapter 7/liquidation Value |
|---|---|---|---|---|---|
| Tax refund from IRS/NC Department of Revenue (½ interest) | received and used for expenses post-petition | | 130,000.00 | 0.00 | 0.00 |
| 1998 BMW 750IL Sedan 4 door | motion for relief from stay granted | | 9,725.00 | 0.00 | 0.00 |
| **Amendment to Schedules filed 6.11.07** | | | | | |
| 718 shares of Scottish Bank | sold and reported as income on Dec., 2006 monthly report | | 13,462.08 | 0.00 | 0.00 |
| **Supplemental schedules filed 10.10.13** | | | | | |
| inheritance from mother, received 6.13 (1/4 share of two Wells Fargo TOD accounts of Marijane Jemsek) | $258,220.50 in cash and securities, Currently in Wells Fargo account Wells Fargo acct. no. xxx0794 | | 271,289.83 | 0.00 | 0.00 |
| inheritance from mother, IRA (1/4 share of two Wells Fargo IRA accounts of Marijane Jemsek) | These funds were deposited into Wells Fargo Beneficial IRA xxx0469 (see below) | | 138,686.34 | 0.00 | 0.00 |
| inheritance from mother, contingent interest in irrevocable trust, Mid-Illinois Bank (see below, was listed on Supplemental schedule filed  3.3.14) | | | Not valued | 0.00 | 0.00 |
| **Supplemental schedule filed 3.3.14** | | | | | |

| ASSET | Status/comments | Proposed Separation Agreement treatment | Scheduled value | Chapter 11 /Going Concern Value | Chapter 7/liquidation Value |
|---|---|---|---|---|---|
| Inheritance, Jemsek Family Trust 12.17.13 | Deposited in Wells Fargo acct. no. xxx0794, commingled with other funds | | 119,797.52 | 0.00 | 0.00 |
| "possible additional inheritance" | | | not valued | 0.00 | 0.00 |
| **Unscheduled post-petition assets** | | | | | |
| Jemsek Specialty Clinic of SC, LLC, formed 12.12.07 | incorporated 12.12.07, out of business after approximately 21 months | | N/A | 0.00 | 0.00 |
| Cadillac, DTS sedan 2011 | $3,500.00 exemption, KBB value 10/17 approximately $3,500.00 | to Debtor | N/A | 0.00 | 0.00 |
| Wells Fargo acct. no. xxx0794 balance from 6.30.17 monthly report) | not exempt | | N/A | 480,728.80 | 480,728.80 |
| Wells Fargo Command Cash and Sweep no. xxx3534; (associated with Wells Fargo no. xxx0794 above) | not exempt | | N/A | 10,000.00 | 10,000.00 |
| Wells Fargo Checking acct. no. xxx7301 (balance based on 6.30.17 monthly report | not exempt | | N/A | 83,368.07 | 83,368.07 |

| ASSET | Status/comments | Proposed Separation Agreement treatment | Scheduled value | Chapter 11 /Going Concern Value | Chapter 7/liquidation Value |
|---|---|---|---|---|---|
| Wells Fargo Beneficial IRA xxx0469; (balance $81,617.31, 6.30.17 monthly report) | IRA inherited from mother post petition; exempt per NCGS 1C-1601(a)(9) | to be retained by Debtor | N/A | 0.00 | 0.00 |
| Jordan E. Jemsek, daughter, UTMA account college fund; Wells Fargo no. xxx4762 Balance based on 6.30.17 monthly report | not exempt | to be held by Debtor and used for post high school education of Jordan | N/A | 39,558.93 | 39,558.93 |
| Wells Fargo Brokerage Cash account,Wells Fargo no. xxx3468 (associated with Wells Fargo no. xxx4762 above)(reflects 5/17 transfer of $30,000.00 from xxx7301) | not exempt | | N/A | 32,000.00 | 32,000.00 |
| James Gregory Jemsek, son, UTMA account college fund; Wells Fargo acct. no. xxx0498 (based on 6.30.17 monthly report) | not exempt, this account appears to have been misidentified in separation agreement as Wells Fargo Acct. No. xxx2731 | to be held by Debtor and used for post high school education of James | N/A | 124,053.95 | 124,053.95 |
| Wells Fargo Brokerage Cash account,Wells Fargo no. xxx2731 (associated with Wells Fargo no. xxx4762 above)(reflects 5/17 transfer of $50,000.00 from xxx7301) | not exempt | n/a | N/A | 55,000.00 | 55,000.00 |

| ASSET | Status/comments | Proposed Separation Agreement treatment | Scheduled value | Chapter 11 /Going Concern Value | Chapter 7/liquidation Value |
|---|---|---|---|---|---|
| PNC Acct. No. xxx2651 (balance, 6.30.17 monthly report) | | n/a | N/A | 0.00 | 0.00 |
| Enterprise Products Partners, LP | | n/a | N/A | 0.00 | 0.0 0 |
| Jemsek Specialty Clinic, PLLC, 100% interest[3] | | to be retained by Debtor | N/A | 623,700.00 | 0.00 |
| Panthers PSLs and tickets, 2 tickets, Sec 131, Row 4 (prices vary, value is based on similar asking prices at http://www.pslsource.com/) | | To be retained by Debtor | N/A | 25,000.00 | 20,000.00 |
| Morgan Stanley Rollover IRA, acct. no. xxx1422 (retirement funded pre-petition, Nalle Clinic) | balance shown in separation agreement, $251,246.57, exempt per NCGS 1C-1601(a)(9) | To be transferred to Kay Jemsek | N/A | 0.00 | 0.00 |

[3]Counsel for the Debtor has spoken with several Chapter 7 trustees in the Charlotte Division concerning this case. Counsel is advised that upon the conversion of the individual Chapter 11 case to Chapter 7, if the Trustees he has spoken to were assigned the case,  they would immediately take steps to discontinue the operations of the Jemsek Specialty Clinic, PLLC ("JSC"). The Chapter 7 liquidation value of the Debtor's interest in JSC therefore assumes that the Debtor would cease working at this clinic and there would be no longer be any significant good will associated with the clinic. Testimony has been presented to Bankruptcy Court that, as of May, 2017, clinic had cash reserve accounts which would only pay operating expenses for a month or two. Current lease expires November, 2019, annual rent exceeds $220,000.00, breach of lease claim against could be significant. All claims against JSC would have to be paid in full before any funds would be available to Jemsek as the owner of equity.

| ASSET | Status/comments | Proposed Separation Agreement treatment | Scheduled value | Chapter 11 /Going Concern Value | Chapter 7/liquidation Value |
|---|---|---|---|---|---|
| Morgan Stanley SAR-SEP IRA, acct. no. xxx1221 (funded with post-petition earnings) | balance shown in separation agreement, $98,363.43, exempt per NCGS 1C-1601(a)(9) | To be divided equally based on 1.5.16 balance | N/A | 0.00 | 0.00 |
| Personal loans to fund operating expenses of Jemsek Specialty Clinic | Amount varies, may be offset by claim of Jemsek for unpaid wages in 2017 | | | 20,000.00 | 20,000.00 |
| **Other** | | | | | |
| Blue Cross Blue Shield Claims | See disclosure statement for further detail regarding BCBS litigation | | | Unknown | Unknown |
| **TOTAL** | | | | **$1,581,409.75** | **$922,309.75** |

**EXHIBIT D**

**TREATMENT OF KAY JEMSEK CLAIM, PROPOSED SETTLEMENT SEPTEMBER, 2017**

**NOTE: WOULD NEED TO DETERMINE DATE OF SEPARATION VALUES IF ED ISSUES WERE LITIGATED, I.E. KAY JEMSEK'S MARITAL SHARE OF FUNDS BEING HELD ACCOUNTS, INCLUDING COLLEGE ACCOUNTS**

**ALIMONY $10,500 PER MONTH UNTIL TERMINATED, i.e. JEMSEK TURNS 70 4.16.19, REDUCES TO $4,000.00 PER MONTH UNTIL 4.16.21**

**CHILD SUPPORT $2,000.00 PER MONTH; $200k FUNDING FOR EDUCATION TRUST**

| ASSET | Status/exempt or non-exempt | Proposed Separation Agreement treatment | Exempt Value of Proposed Asset Transfer | Non-exempt Value of Proposed Asset Transfer |
|---|---|---|---|---|
| **2006 original schedules** | | | | |
| 2215 Sharon Lane Charlotte NC | sold per bankruptcy court order, no net proceeds to Debtor | n/a | $0.00 | $0.00 |
| Lot 25, 3.12 acres The Ridge of Greenbriar Mountain Phase One Greenbriar, White Sulfur Springs WV | **exempt as tenants by entirety**, owns with wife, security for contingency fee agreement with Polsinelli | to be sold, net proceeds equally divided | 75,000.00 (est. net of her ½ share) | 0.00 |
| Lot 6 Walkingstick Falls Road, Highland NC; $80,000 recent tax valuation, no debt | fee simple, not exempt | to Debtor | 0.00 | 0.00 |

| ASSET | Status/exempt or non-exempt | Proposed Separation Agreement treatment | Exempt Value of Proposed Asset Transfer | Non-exempt Value of Proposed Asset Transfer |
|---|---|---|---|---|
| Lot 7 Walkingstick Falls Rd, Highlands NC; $150,000 recent tax valuation, no debt (new value) | **tenants by the entirety (exempt)** | to Debtor | 0.00 | 0.00 |
| Cash on hand | exempt | | 500.00 | 500.00 |
| Interest in checking account - Scottish Bank | set off per court order | n/a | 0.00 | 0.00 |
| Morgan Stanley Brokerage account | Set off by Scottish Bank, per 12.5.06 order | n/a | 0.00 | 0.00 |
| Household goods        (½ interest) | divided outside of agreement | divided outside of agreement; value reflects $5,000 exemption | 1,250.00 | 0.00 |
| crystal, collections, art, etc. | | divided outside of agreement | | 7,500.00 Marital share ED |
| cameras | | divided outside of agreement | 0.00 | 0.00 |
| Jemsek Clinic, P. A. 401(k) Plan | exempt; this was placed in Morgan Stanley IRA rollover account xxx xxxx4-221 (listed below) | N/a | 0.00 | 0.00 |
| John Hancock Term insurance policy thru 10/19/2015; face amount $2,000,000 | cancelled | n/a | 0.00 | 0.00 |

| ASSET | Status/exempt or non-exempt | Proposed Separation Agreement treatment | Exempt Value of Proposed Asset Transfer | Non-exempt Value of Proposed Asset Transfer |
|---|---|---|---|---|
| First Colony term life insurance policy; face value - $2,000,000; owned by 1st Mid-Illinois Bank & Trust, Trustee of the Joseph G. Jemsek 1999 Irrevocable Trust, dated 12/29/99 | cancelled | n/a | 0.00 | 0.00 |
| PhoenixBay, Inc. Preferred Series A Shares (5,000 shares; 5,000 stock warrants) | Debtor believes these shares have no value | shares to be divided equally | 0.00 | 0.00 |
| Interest in Jemsek Clinic, P. A. | All assets liquidated by secured creditor per order 12.03.07, suspended by NC 8.5.08 | n/a | 0.00 | 0.00 |
| Interest in Jemsek Speciality Clinic, Lyme & Related Diseases, P. A. | Suspended by NC Secretary of State 8.13.08 | n/a | 0.00 | 0.00 |
| Rosedale Medical Group, LLC | Admin. Dissolved 8.13.10 | n/a | 0.00 | 0.00 |
| JGJ Enterprises, LLC | Admin. Dissolved 8.13.10 | n/a | 0.00 | 0.00 |
| Interest due from Phoenix Bay, Inc. | company has been dissolved, not believed to be collectible | n/a | 0.00 | 0.00 |
| Tax refund from IRS/NC Department of Revenue (½ interest) | received and used for expenses post-petition | N/a | 0.00 | 0.00 |

| ASSET | Status/exempt or non-exempt | Proposed Separation Agreement treatment | Exempt Value of Proposed Asset Transfer | Non-exempt Value of Proposed Asset Transfer |
|---|---|---|---|---|
| 1998 BMW 750IL Sedan 4 door | motion for relief from stay granted | n/a | 0.00 | 0.00 |
| **Amendment to Schedules filed 6.11.07** | | | | |
| 718 shares of Scottish Bank | sold and reported as income on Dec., 2006 monthly report | n/a | 0.00 | 0.00 |
| **Supplemental schedules filed 10.10.13** | | | | |
| inheritance from mother, received 6.13 (1/4 share of two Wells Fargo TOD accounts of Marijane Jemsek) | $258,220.50 in cash and securities, Currently in Wells Fargo account Wells Fargo acct. no. xxx0794 | n/a | 0.00 | 0.00 |
| inheritance from mother, IRA (1/4 share of two Wells Fargo IRA accounts of Marijane Jemsek) | ~~Approximately $60K used to satisfy deficiency, sale of Sharon Road residence~~ These funds were deposited into Wells Fargo Beneficial IRA xxx0469 (see below) | N/a | 0.00 | 0.00 |
| inheritance from mother, contingent interest in irrevocable trust, Mid-Illinois Bank (see below, was listed on Supplemental schedule filed ~~scheduled~~ 3.3.14) | ~~counsel for debtors is obtaining documentation to establish nature of inheritance and whether certain components may be exempt (i.e. IRA per NCGS Sec. 1C-1601(a)(9)~~ | n/a | 0.00 | 0.00 |
| **Supplemental schedule filed 3.3.14** | | | | |

| ASSET | Status/exempt or non-exempt | Proposed Separation Agreement treatment | Exempt Value of Proposed Asset Transfer | Non-exempt Value of Proposed Asset Transfer |
|---|---|---|---|---|
| Inheritance, Jemsek Family Trust 12.17.13 | ~~Currently~~ Deposited in Wells Fargo acct. no. xxx0794, commingled with other funds ~~(?);~~ ~~counsel for debtors is obtaining documentation to establish nature of inheritance and whether certain components may be exempt (i.e. IRA per NCGS Sec. 1C-1601(a)(9)~~ | N/a | 0.00 | 0.00 |
| "possible additional inheritance" | ~~See above, Wells Fargo (?); counsel for debtors is obtaining documentation to establish nature of inheritance and whether certain components may be exempt (i.e. IRA per NCGS Sec. 1C-1601(a)(9)~~ Inherited assets are more specifically listed elsewhere in this summary | N/a | 0.00 | 0.00 |
| **Unscheduled post-petition assets** | | | | |
| Jemsek Specialty Clinic of SC, LLC, formed 12.12.07 | incorporated 12.12.07, out of business after approximately 21 months | n/a | 0.00 | 0.00 |
| Cadillac, DTS sedan 2011 | $8,000.00, partially exempt | to Debtor | 0.00 | 0.00 |

| ASSET | Status/exempt or non-exempt | Proposed Separation Agreement treatment | Exempt Value of Proposed Asset Transfer | Non-exempt Value of Proposed Asset Transfer |
|---|---|---|---|---|
| Wells Fargo acct. no. xxx0794 (balance based on 3.31.17 monthly report, will be greater due to receipt of tax refund in May, 2017 ) (balance from 6.30.17 monthly report) | not exempt  480,728.80 | | 0.00 | 0.00 |
| Wells Fargo Command Cash and Sweep no. xxx3534; (associated with Wells Fargo no. xxx0794 above) | not exempt | | 0.00 | 0.00 |
| Wells Fargo Checking acct. no. xxx7301 (balance based on 6.30.17 monthly report 3.31.17 monthly report, will be greater due to receipt of tax refund in May, 2017 ) | not exempt  83,368.07 | | 0.00 | 0.00 |
| Wells Fargo Beneficial IRA xxx0469; (balance $79,416.49 $81,617.31, 3.31.17 6.30.17 monthly report) | IRA inherited from mother post petition; exempt per NCGS 1C-1601(a)(9) | to be retained by Debtor | 0.00 | 0.00 |
| Jordan E. Jemsek, daughter, UTMA account college fund; Wells Fargo no. xxx4762 (Balance shown per 3.31.17 monthly report)  (based on 6.30.17 monthly report) | not exempt  39,558.93 | to be held by Debtor and used for post high school education of Jordan | 0.00 | 0.00 |

| ASSET | Status/exempt or non-exempt | Proposed Separation Agreement treatment | Exempt Value of Proposed Asset Transfer | Non-exempt Value of Proposed Asset Transfer |
|---|---|---|---|---|
| Wells Fargo Brokerage Cash account,Wells Fargo no. xxx3468 (associated with Wells Fargo no. xxx4762 above)(reflects 5/17 transfer of $30,000.00 from xxx7301) | not exempt 32,000.00 | | 0.00 | 0.00 |
| James Gregory Jemsek, son, UTMA account college fund; Wells Fargo acct. no. xxx0498 (based on 6.30.17 monthly report) | not exempt This account appears to have been misidentified in separation agreement as Wells Fargo Acct. No. xxx2731 124,053.95 | to be held by Debtor and used for post high school education of James | 0.00 | 0.00 |
| Wells Fargo Brokerage Cash account,Wells Fargo no. xxx2731 (associated with Wells Fargo no. xxx4762 above)(reflects 5/17 transfer of $50,000.00 from xxx7301) | not exempt $55,000.00 | n/a | 0.00 | 0.00 |
| PNC Acct. No. xxx2651 (balance, 3.31.17 6.30.17 monthly report) | | n/a | 0.00 | 0.00 |
| Enterprise Products Partners, LP | | n/a | 0.00 | 0.00 |
| Jemsek Specialty Clinic, PLLC - Washington DC, 100% interest | | to be retained by Debtor | 0.00 | 0.00[1] |

---

[1]Counsel for the Debtor has spoken with several Chapter 7 trustees in the Charlotte Division concerning this case. Counsel is advised that upon the conversion of the individual Chapter 11 case to Chapter 7, if the Trustees he has spoken to were assigned the

| ASSET | Status/exempt or non-exempt | Proposed Separation Agreement treatment | Exempt Value of Proposed Asset Transfer | Non-exempt Value of Proposed Asset Transfer |
|---|---|---|---|---|
| Panthers PSLs and tickets, 2 tickets, Sec 131, Row 4 (prices vary, value is based on similar asking prices at http://www.pslsource.com/) | Not exempt 25,000.00 | To be retained by Debtor | 0.00 | 0.00 |
| Morgan Stanley Rollover IRA, acct. no. xxx1422 (retirement funded pre-petition, Nalle Clinic) | balance shown in separation agreement, $251,246.57, exempt per NCGS 1C-1601(a)(9) | To be transferred to Kay Jemsek | 251,246.57 | 0.00 |
| Morgan Stanley SAR-SEP IRA, acct. no. xxx1221 (funded with post-petition earnings) | balance shown in separation agreement, $98,363.43, exempt per NCGS 1C-1601(a)(9) | To be divided equally based on 1.5.16 balance | 49,000.00 | 0.00 |

---

case, they would immediately take steps to discontinue the operations of the Jemsek Specialty Clinic, PLLC ("JSC"). The Chapter 7 liquidation value of the Debtor's interest in JSC therefore assumes that the Debtor would cease working at this clinic and there would be no longer be any significant good will associated with the clinic. Testimony has been presented to Bankruptcy Court that, as of May, 2017, clinic had cash reserve accounts which would only pay operating expenses for a month or two. Current lease expires November, 2019, annual rent exceeds $220,000.00, breach of lease claim against could be significant. All claims against the clinic would have to be paid in full before any funds would be available to Jemsek as the owner of equity.

| ASSET | Status/exempt or non-exempt | Proposed Separation Agreement treatment | Exempt Value of Proposed Asset Transfer | Non-exempt Value of Proposed Asset Transfer |
|---|---|---|---|---|
| Personal loans to fund operating expenses of Jemsek Specialty Clinic | Amount varies, not exempt, $20,000.00 ~~counsel is obtaining documents to verify current balance~~, may be offset by claim of Jemsek for unpaid wages in 2017 | | 0.00 | 0.00 |
| **Other** | | | | |
| Blue Cross Blue Shield Claims | See disclosure statement for further detail regarding BCBS litigation | | Unknown | Unknown |
| **TOTAL** | | | **$376,996.57** | **$7,500.00** |

EXHIBIT "C" ALLOWED PROFESSIONAL FEES BY CLAIMANT

| DATE OF ORDER | RECIPIENT | FEE/CLAIM AWARDED |
|---|---|---|
| 1/26/2007 | Grier Furr & Crisp | $  20,257.63 |
| 3/6/2007 | Grier Furr & Crisp | 12,142.87 |
| 4/9/2007 | Grier Furr & Crisp | 18,137.67 |
| 5/7/2007 | Grier Furr & Crisp | 15,436.26 |
| 5/30/2007 | Grier Furr & Crisp | 16,510.36 |
| 7/9/2007 | Grier Furr & Crisp | 24,925.84 |
| 8/7/2007 | Grier Furr & Crisp | 14,894.71 |
| 9/5/2007 | Grier Furr & Crisp | 21,493.19 |
| 10/3/2007 | Grier Furr & Crisp | 8,680.14 |
| 11/5/2007 | Grier Furr & Crisp | 13,568.43 |
| 12/5/2007 | Grier Furr & Crisp | 8,913.49 |
| 1/3/2008 | Grier Furr & Crisp | 5,149.27 |
| 2/5/2008 | Grier Furr & Crisp | 3,508.87 |
| 3/4/2008 | Grier Furr & Crisp | 6,646.70 |
| 4/3/2008 | Grier Furr & Crisp | 7,667.45 |
| 4/29/2008 | Grier Furr & Crisp | 5,434.56 |
| 6/05/2008 | Grier Gurr & Crisp | 15,577.79 |
| 7/9/2008 | Grier Furr & Crisp | 13,666.00 |
| 8/6/2008 | Grier Furr & Crisp | 6,489.01 |
| 9/8/2008 | Grier Furr & Crisp | 12,038.03 |
| 10/8/2008 | Grier Furr & Crisp | 7,268.53 |
| 11/13/2008 | Grier Furr & Crisp | 9,458.26 |
| 12/08/2008 | Grier Furr & Crisp | 17,921.14 |
| 12/29/2008 | Grier Furr & Crisp | 2,132.66 |
| 02/03/2009 | Grier Furr & Crisp | 4,894.84 |
| 03/05/2009 | Grier Furr & Crisp | 2,379.74 |

| | | |
|---|---|---|
| 04/30/2009 | Grier Furr & Crisp | 2,455.82 |
| 06/26/2009 | Grier Furr & Crisp | 3,745.67 |
| 08/06/2009 | Grier Furr & Crisp | 3,518.33 |
| 09/03/2009 | Grier Furr & Crisp | 2,447.57 |
| 10/13/2009 | Grier Furr & Crisp | 1,927.24 |
| 11/16/2009 | Grier Furr & Crisp | 5,791.41 |
| 12/07/2009 | Grier Furr & Crisp | 27,907.25 |
| 01/05/2010 | Grier Furr & Crisp | 4,312.27 |
| 02/08/2010 | Grier Furr & Crisp | 8,735.07 |
| 03/04/2010 | Grier Furr & Crisp | 38,487.62 |
| 04/09/2010 | Grier Furr & Crisp | 3,363.44 |
| 05/31/2010 | Grier Furr & Crisp | 6,925.16 |
| 06/16/2010 | Grier Furr & Crisp | 7,698.63 |
| 08/20/2010 | Grier Furr & Crisp | 1,927.77 |
| 11/08/2010 | Grier Furr & Crisp | 13,102.93 |
| 01/03/2011 | Grier Furr & Crisp | 20,292.22 |
| 02/23/2011 | Grier Furr & Crisp | 15,433.90 |
| 05/09/2011 | Grier Furr & Crisp | 11,852.50 |
| 08/10/2011 | Grier Furr & Crisp | 2,250.67 |
| 02/17/2012 | Grier Furr & Crisp | 16,416.22 |
| 09/11/2012 | Grier Furr & Crisp | 73,170.24 |
| 12/07/2012 | Grier Furr & Crisp | 25,065.84 |
| 07/16/2013 | Joseph W. Grier | 65,558.61 |
| 09/26/2013 | Grier Furr & Crisp | 11,259.30 |
| 11/26/2013 | Grier Furr & Crisp | 24,942.02 |
| 12/23/2013 | Grier Furr & Crisp | 4,009.70 |
| 02/04/2014 | Grier Furr & Crisp | 18,002.55 |
| 02/24/2014 | Grier Furr & Crisp | 14,169.08 |

| 04/08/2014 | Grier Furr & Crisp | 17,872.81 |
|---|---|---|
| 05/08/2014 | Grier Furr & Crisp | 6,723.97 |
| 06/05/2015 | Grier Furr & Crisp | 21,222.15 |
| 07/10/2014 | Joseph W. Grier | 15,638.28 |
| 07/29/2015 | Joseph W. Grier | 1,225.12 |
| 10/17/2014 | Grier Furr & Crisp | 12,399.06 |
| | **TOTAL** | **$   797,231.86** |

| DATE OF ORDER | RECIPIENT | FEE/CLAIM AWARDED |
|---|---|---|
| 2/28/07 | Michael F. Ruggio | $ 31,448.09 |
| 4/9/2007 | Michael F. Ruggio | 49,665.28 |
| 5/30/2007 | Michael F. Ruggio | 89,905.20 |
| 7/9/2007 | Michael F. Ruggio | 38,619.12 |
| 8/7/2007 | Michael F. Ruggio | 32,849.02 |
| 9/5/2007 | Ruggio/Polsinelli | 32,155.49 |
| 10/3/2007 | Ruggio/Polsinelli | 46,131.18 |
| 11/5/2007 | Ruggio/Polsinelli | 54,593.98 |
| 12/5/2007 | Ruggio/Polsinelli | 49,219.53 |
| 1/3/2008 | Ruggio/Polsinelli | 36,282.83 |
| 2/5/2008 | Ruggio/Polsinelli | 26,125.39 |
| 3/4/2008 | Ruggio/Polsinelli | 13,674.52 |
| 4/3/2008 | Ruggio/Polsinelli | 9,748.80 |
| 4/29/2008 | Ruggio/Polsinelli | 22,798.75 |
| 6/4/2008 | Ruggio/Polsinelli | 34,318.13 |
| 7/9/2008 | Ruggio/Polsinelli | 47,608.64 |
| 8/6/2008 | Ruggio/Polsinelli | 41,062.85 |
| 9/8/2008 | Ruggio/Polsinelli | 21,329.73 |
| 10/8/2008 | Ruggio/Polsinelli | 36,995.44 |
| 11/13/2008 | Ruggio/Polsinelli | 40,382.15 |
| 12/09/2008 | Ruggio/Polsinelli | 37,929.61 |
| 12/29/2008 | Ruggio/Polsinelli | 30,083.41 |
| 02/03/2009 | Ruggio/Polsinelli | 19,547.16 |
| 03/5/3009 | Ruggio/Polsinelli | 15,047.80 |
| 04/30/2009 | Ruggio/Polsinelli | 16,812.05 |
| 01/29/2010 | Ruggio/Polsinelli | 19,775.48 |

| 03/04/2010 | Polsinelli Shughart | 228,164.70 |
| 05/19/2010 | Polsinelli Shughart | 18,712.67 |
| 06/18/2010 | The Polsinelli Firm | 17,580.40 |
| 08/20/2010 | Polsinelli/Shughart | 14,969.90 |
| 11/08/2010 | Polsinelli Shughart | 13,358.70 |
| 01/03/2011 | Polsinelli Shughart | 42,748.11 |
| 02/23/2011 | Polsinelli Shughart | 31,833.41 |
| 07/25/2011 | Polsinelli Shughart | 48,851.73 |
| 08/10/2011 | Polsinelli Shughart | 55,450.44 |
| 02/21/2012 | Polsinelli Shughart | 167,585.57 |
| 10/03/2012 | Polsinelli Shughart | 551,944.24 |
| 04/17/2013 | Ruggio/Polsinelli Shughart | 429,736.05 |
| 09/30/2013 | Ruggio/Polsinelli Shughart | 729,371.14 |
| 04/25/2014 | Michael F. Ruggio, Special Counsel | 964,099.00 |
| 09/17/2014 | Polsinelli Shughart | 883,134.18 |
| 02/06/2015 | Polsinelli Shughart | 287,598.13 |
| | **TOTAL** | $5,379,248.00 |

SINCE ?

| DATE OF ORDER | RECIPIENT | FEE/CLAIM AWARDED |
|---|---|---|
| 3/6/2007 | James A. Wilson, Special Counsel | $   4,816.00 |
| 4/9/2007 | James A. Wilson, Special Counsel | 2,240.00 |
| 5/7/2007 | James A. Wilson, Special Counsel | 560.00 |
| 7/9/2007 | James A. Wilson, Special Counsel | 793.67 |
| 8/7/2007 | James A. Wilson, Special Counsel | 224.00 |
| 12/5/2007 | James A. Wilson, Special Counsel | 224.00 |
| | **TOTAL** | **$   8,857.67** |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| DATE OF ORDER | RECIPIENT | FEE/CLAIM AWARDED |
|---|---|---|
| 5/30/2007 | Beck/Beck Lindsey & Dyer | $ 13,465.99 |
| 1/3/2008 | Beck/Beck Lindsey & Frame | 2,982.45 |
| 04/30/2009 | Beck/Beck Lindsey & Dyer | 4,231.04 |
| 01/03/2011 | Beck/Beck Lindsey & Dyer | 1,455.53 |
| | **TOTAL** | $ **22,135.01** |

| DATE OF ORDER | RECIPIENT | FEE/CLAIM AWARDED |
|---|---|---|
| 5/31/2007 | W. Walt Pettit | $ 11,770.70 |
| | **TOTAL** | **$ 11,770.70** |

| DATE OF ORDER | RECIPIENT | FEE/CLAIM AWARDED |
|---|---|---|
| 06/26/2009 | Douglas Jeffrey and The Fullerton Law Group LLP | $ 4,680.00 |
| | **TOTAL** | **$ 4,680.00** |

| DATE OF ORDER | RECIPIENT | FEE/CLAIM AWARDED |
|---|---|---|
| 12/10/2012 | Lamberth/Cherry Bekaert & Holland | $ 1,522.00 |
| 12/23/2013 | Shechter/Cherry Bekaert | 43,921.00 |
| 06/05/2014 | Shechter/Cherry Bekaert | 8,240.75 |
| | **TOTAL** | **$ 53,683.75** |

| DATE OF ORDER | RECIPIENT | FEE/CLAIM AWARDED |
|---|---|---|
| 04/08/2014 | Stuart Sobel/Seigfreid Rivera | $    3,385.20 |
| 05/08/2014 | Stuart Sobel | 7,679.38 |
| 06/05/2015 | Stuart Sobel | 421.05 |
|  | **TOTAL** | **$   11,485.63** |

| DATE OF ORDER | RECIPIENT | FEE/CLAIM AWARDED |
|---|---|---|
| 06/02/2014 | Nexsen Pruet | $    5,000.00 |
| | **TOTAL** | **$    5,000.00** |

| DATE OF ORDER | RECIPIENT | FEE/CLAIM AWARDED |
|---|---|---|
| 12/23/2013 | Berkeley Research Group | 35,090.00 |
| 04/25/2014 | Hurd/Berkeley Research Group | 44,068.57 |
| | **TOTAL** | $    **79,158.57** |

| DATE OF ORDER | RECIPIENT | FEE/CLAIM AWARDED |
|---|---|---|
| 12/23/2013 | Kerry Clark | $ 3,000.00 |
| | **TOTAL** | **$ 3,000.00** |

| DATE OF ORDER | RECIPIENT | FEE/CLAIM AWARDED |
|---|---|---|
| 12/30/2014 | Langdon M. Cooper | $ 63,021.19 |
| 02/06/2015 | Langdon M. Cooper | 12,548.36 |
| 10/09/2015 | Langdon M. Cooper | 36,820.00 |
| | **TOTAL** | **$112,389.55** |

| DATE OF ORDER | RECIPIENT | FEE/CLAIM AWARDED |
|---|---|---|
| 11/13/2013 | Samuel Shor, Expert | $ 5,200.00 |
| | **TOTAL** | **$ 5,200.00** |

| DATE OF ORDER | RECIPIENT | FEE/CLAIM AWARDED |
|---|---|---|
| 10/30/2013 | Higgins & Owens, Mediator | $ 100.00 |
| 12/16/2013 | Higgins & Owens | 100.00 |
| | **TOTAL** | **$ 200.00** |

| DATE OF ORDER | RECIPIENT | FEE/CLAIM AWARDED |
|---|---|---|
| 09/26/2013 | Huron Consulting Services LLC | $ 48,277.64 |
| | **TOTAL** | **$ 48,277.64** |

# EXHIBIT B

## SUMMARY OF ORDERS ALLOWING PROFESSIONAL ADMINISTRATIVE CLAIMS

| DATE OF ORDER | RECIPIENT | FEE/CLAIM AWARDED |
|---|---|---|
| 1/26/2007 | Grier Furr & Crisp | $    20,257.63 |
| 2/28/07 | Michael F. Ruggio | 31,448.09 |
| 3/6/2007 | Grier Furr & Crisp | 12,142.87 |
| 3/6/2007 | James A. Wilson, Special Counsel | 4,816.00 |
| 4/9/2007 | Grier Furr & Crisp | 18,137.67 |
| 4/9/2007 | Michael F. Ruggio | 49,665.28 |
| 4/9/2007 | James A. Wilson, Special Counsel | 2,240.00 |
| 5/7/2007 | James A. Wilson, Special Counsel | 560.00 |
| 5/7/2007 | Grier Furr & Crisp | 15,436.26 |
| 5/30/2007 | Grier Furr & Crisp | 16,510.36 |
| 5/30/2007 | Michael F. Ruggio | 89,905.20 |
| 5/30/2007 | Beck/Beck Lindsey & Dyer | 13,465.99 |
| 5/31/2007 | W. Walt Pettit | 11,770.70 |
| 7/9/2007 | Grier Furr & Crisp | 24,925.84 |
| 7/9/2007 | Michael F. Ruggio | 38,619.12 |
| 7/9/2007 | James A. Wilson, Special Counsel | 793.67 |
| 8/7/2007 | Grier Furr & Crisp | 14,894.71 |
| 8/7/2007 | James A. Wilson, Special Counsel | 224.00 |
| 8/7/2007 | Michael F. Ruggio | 32,849.02 |
| 9/5/2007 | Ruggio/Polsinelli | 32,155.49 |
| 9/5/2007 | Grier Furr & Crisp | 21,493.19 |
| 10/3/2007 | Grier Furr & Crisp | 8,680.14 |
| 10/3/2007 | Ruggio/Polsinelli | 46,131.18 |

| | | |
|---|---|---|
| 11/5/2007 | Ruggio/Polsinelli | 54,593.98 |
| 11/5/2007 | Grier Furr & Crisp | 13,568.43 |
| 12/5/2007 | Grier Furr & Crisp | 8,913.49 |
| 12/5/2007 | James A. Wilson, Special Counsel | 224.00 |
| 12/5/2007 | Ruggio/Polsinelli | 49,219.53 |
| 1/3/2008 | Grier Furr & Crisp | 5,149.27 |
| 1/3/2008 | Ruggio/Polsinelli | 36,282.83 |
| 1/3/2008 | Beck/Beck Lindsey & Frame | 2,982.45 |
| 2/5/2008 | Grier Furr & Crisp | 3,508.87 |
| 2/5/2008 | Ruggio/Polsinelli | 26,125.39 |
| 3/4/2008 | Grier Furr & Crisp | 6,646.70 |
| 3/4/2008 | Ruggio/Polsinelli | 13,674.52 |
| 4/3/2008 | Grier Furr & Crisp | 7,667.45 |
| 4/3/2008 | Ruggio/Polsinelli | 9,748.80 |
| 4/29/2008 | Grier Furr & Crisp | 5,434.56 |
| 4/29/2008 | Ruggio/Polsinelli | 22,798.75 |
| 6/05/2008 | Grier Gurr & Crisp | 15,577.79 |
| 6/4/2008 | Ruggio/Polsinelli | 34,318.13 |
| 7/9/2008 | Grier Furr & Crisp | 13,666.00 |
| 7/9/2008 | Ruggio/Polsinelli | 47,608.64 |
| 8/6/2008 | Ruggio/Polsinelli | 41,062.85 |
| 8/6/2008 | Grier Furr & Crisp | 6,489.01 |
| 9/8/2008 | Ruggio/Polsinelli | 21,329.73 |
| 9/8/2008 | Grier Furr & Crisp | 12,038.03 |
| 10/8/2008 | Grier Furr & Crisp | 7,268.53 |
| 10/8/2008 | Ruggio/Polsinelli | 36,995.44 |
| 11/13/2008 | Grier Furr & Crisp | 9,458.26 |
| 11/13/2008 | Ruggio/Polsinelli | 40,382.15 |

| | | |
|---|---|---|
| 12/08/2008 | Grier Furr & Crisp | 17,921.14 |
| 12/09/2008 | Ruggio/Polsinelli | 37,929.61 |
| 12/29/2008 | Grier Furr & Crisp | 2,132.66 |
| 12/29/2008 | Ruggio/Polsinelli | 30,083.41 |
| 02/03/2009 | Grier Furr & Crisp | 4,894.84 |
| 02/03/2009 | Ruggio/Polsinelli | 19,547.16 |
| 03/05/2009 | Grier Furr & Crisp | 2,379.74 |
| 03/5/3009 | Ruggio/Polsinelli | 15,047.80 |
| 04/30/2009 | Grier Furr & Crisp | 2,455.82 |
| 04/30/2009 | Ruggio/Polsinelli | 16,812.05 |
| 04/30/2009 | Beck/Beck Lindsey & Dyer | 4,231.04 |
| 06/26/2009 | Grier Furr & Crisp | 3,745.67 |
| 06/26/2009 | Douglas Jeffrey and The Fullerton Law Group LLP | 4,680.00 |
| 08/06/2009 | Grier Furr & Crisp | 3,518.33 |
| 09/03/2009 | Grier Furr & Crisp | 2,447.57 |
| 10/13/2009 | Grier Furr & Crisp | 1,927.24 |
| 11/16/2009 | Grier Furr & Crisp | 5,791.41 |
| 12/07/2009 | Grier Furr & Crisp | 27,907.25 |
| 01/05/2010 | Grier Furr & Crisp | 4,312.27 |
| 01/29/2010 | Ruggio/Polsinelli | 19,775.48 |
| 02/08/2010 | Grier Furr & Crisp | 8,735.07 |
| 03/04/2010 | Grier Furr & Crisp | 38,487.62 |
| 03/04/2010 | Polsinelli Shughart | 228,164.70 |
| 04/09/2010 | Grier Furr & Crisp | 3,363.44 |
| 05/19/2010 | Polsinelli Shughart | 18,712.67 |
| 05/31/2010 | Grier Furr & Crisp | 6,925.16 |
| 06/16/2010 | Grier Furr & Crisp | 7,698.63 |

| | | |
|---|---|---|
| 06/18/2010 | The Polsinelli Firm | 17,580.40 |
| 08/20/2010 | Grier Furr & Crisp | 1,927.77 |
| 08/20/2010 | Polsinelli/Shughart | 14,969.90 |
| 11/08/2010 | Grier Furr & Crisp | 13,102.93 |
| 11/08/2010 | Polsinelli Shughart | 13,358.70 |
| 01/03/2011 | Grier Furr & Crisp | 20,292.22 |
| 01/03/2011 | Polsinelli Shughart | 42,748.11 |
| 01/03/2011 | Beck/Beck Lindsey & Dyer | 1,455.53 |
| 02/23/2011 | Grier Furr & Crisp | 15,433.90 |
| 02/23/2011 | Polsinelli Shughart | 31,833.41 |
| 05/09/2011 | Grier Furr & Crisp | 11,852.50 |
| 07/25/2011 | Polsinelli Shughart | 48,851.73 |
| 08/10/2011 | Grier Furr & Crisp | 2,250.67 |
| 08/10/2011 | Polsinelli Shughart | 55,450.44 |
| 02/17/2012 | Grier Furr & Crisp | 16,416.22 |
| 02/21/2012 | Polsinelli Shughart | 167,585.57 |
| 09/11/2012 | Grier Furr & Crisp | 73,170.24 |
| 10/03/2012 | Polsinelli Shughart | 551,944.24 |
| 12/07/2012 | Grier Furr & Crisp | 25,065.84 |
| 12/10/2012 | Lamberth/Cherry Bekaert & Holland | 1,522.00 |
| 04/17/2013 | Ruggio/Polsinelli Shughart | 429,736.05 |
| 07/16/2013 | Joseph W. Grier | 65,558.61 |
| 09/26/2013 | Grier Furr & Crisp | 11,259.30 |
| 09/26/2013 | Huron Consulting Services LLC | 48,277.64 |
| 09/30/2013 | Ruggio/Polsinelli Shughart | 729,371.14 |
| 10/30/2013 | Higgins & Owens, Mediator | 100.00 |
| 11/13/2013 | Samuel Shor, Expert | 5,200.00 |
| 11/26/2013 | Grier Furr & Crisp | 24,942.02 |

| | | |
|---|---|---|
| 12/16/2013 | Higgins & Owens | 100.00 |
| 12/23/2013 | Kerry Clark | 3,000.00 |
| 12/23/2013 | Shechter/Cherry Bekaert | 43,921.00 |
| 12/23/2013 | Grier Furr & Crisp | 4,009.70 |
| 12/23/2013 | Berkeley Research Group | 35,090.00 |
| 02/04/2014 | Grier Furr & Crisp | 18,002.55 |
| 02/24/2014 | Grier Furr & Crisp | 14,169.08 |
| 04/08/2014 | Grier Furr & Crisp | 17,872.81 |
| 04/08/2014 | Stuart Sobel/Seigfreid Rivera | 3,385.20 |
| 04/25/2014 | Michael F. Ruggio, Special Counsel | 964,099.00 |
| 04/25/2014 | Hurd/Berkeley Research Group | 44,068.57 |
| 05/08/2014 | Stuart Sobel | 7,679.38 |
| 05/08/2014 | Grier Furr & Crisp | 6,723.97 |
| 06/02/2014 | Nexsen Pruet | 5,000.00 |
| 06/05/2014 | Shechter/Cherry Bekaert | 8,240.75 |
| 06/05/2015 | Stuart Sobel | 421.05 |
| 06/05/2015 | Grier Furr & Crisp | 21,222.15 |
| 07/10/2014 | Joseph W. Grier | 15,638.28 |
| 07/29/2015 | Joseph W. Grier | 1,225.12 |
| 09/17/2014 | Polsinelli Shughart | 883,134.18 |
| 10/17/2014 | Grier Furr & Crisp | 12,399.06 |
| 12/30/2014 | Langdon M. Cooper | 63,021.19 |
| 02/06/2015 | Polsinelli Shughart | 287,598.13 |
| 02/06/2015 | Langdon M. Cooper | 12,548.36 |
| 10/09/2015 | Langdon M. Cooper | 36,820.00 |
| 12/14/2016 | Langdon M. Cooper | 47,249.17 (Interim basis) |
| | | |

| | TOTAL | $ 6,589,567.55 |
|---|---|---|